# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

**FILED**

DEC - 7 2006

NANCY MAYER WHITTINGTON, CLERK
U.S. DISTRICT COURT

PETER AMAEFULE )
4650 SOUTH CAPITOL ST, SE )
WASHINGTON, DC 20032 )
**Plaintiff,** )

v.

EXXONMOBIL OIL CORPORATION
3225 GALLOWS RD
FAIRFAX, VA 22037 **Defendant.**

CASE NUMBER 1:06CV02087

JUDGE: Richard W. Roberts

DECK TYPE: Contract

DATE STAMP: 12/07/2006

JURY ACTION

---

## VERIFIED COMPLAINT

Plaintiff, Peter Amaefule, through undersigned counsel, Peter C. Ibe, Esquire, and

Victor Mba-Jonas, Esquire, files this Complaint against defendant, Exxon Mobil Oil

Corporation ("Exxon"). In support of this Complaint, Plaintiff states as follows:

### Jurisdiction and Venue

1. This Complaint is brought against defendant for violations of the Petroleum

Marketing Practices Act ("PMPA") (15 U.S.C. §§ 2801 et seq.). This Court has federal

subject matter jurisdiction pursuant to 28 U.S.C. § 1331 and 15 U.S.C. § 2805. Diversity

jurisdiction also exists pursuant to 28 U.S.C. § 1332.

2. Venue is properly situated in this District pursuant to 28 U.S.C. § 1391 and 15 U.S.C.

§ 2805(a).

### Parties

3. Plaintiff, Peter Amaefule, is a Maryland resident, doing business in the District of

Columbia. Peter Amaefule operates a retail motor fuel, convenience store and mechanic

shop at 4650 South Capitol Street, SE, Washington, DC 20032.

4. Defendant Exxon is a New Jersey corporation, with its principal place of business in Fairfax, Virginia. Exxon is, among other things, an international refiner and marketer of petroleum products. In the District of Columbia, Exxon markets its motor fuel pursuant to a franchise distribution system whereby Exxon contracts with purportedly independent franchisees pursuant to three-year franchise agreements. These franchisees lease their retail service station facilities from Exxon and agree to purchase "Exxon" branded motor from Exxon for resale to the motoring public under the "Exxon" trademark. Plaintiff, Peter Amaefule is an Exxon franchisee at 4650 South Capitol Street, SE, Washington, DC 20032.

**Facts**

5. The Plaintiff's association with the Exxon began in 1990 when the Plaintiff entered into a Trial Franchise Agreement with Exxon with respect to the gasoline station located at 4650 South Capitol Street, SE, Washington, DC 20032 (hereinafter the "Marketing Premises") for the purchase and resale of motor fuel under the "Exxon" trademark. After the trial period, in 1991, Plaintiff entered into a full-fledged Franchise Agreement with the Defendant (the 1991 Franchise Agreement). Pursuant to that agreement, Plaintiff, as a franchisee, operated a gasoline station, selling motor fuel and other products supplied the Defendant (franchisor). The Plaintiff and the Defendant have been renewing this franchise agreement periodically until the present time. The Franchise Agreements, created a petroleum marketing franchise and franchise relationship between Peter Amaefule and Exxon, the termination or non-renewal of which was governed by the PMPA.

2

6. Exxon renewed its franchise relationship with Peter Amaefule effective April 1, 2006 to March 31, 2009, pursuant to PMPA Franchise Agreement (the "2006 Franchise Agreement"). The PMPA governs the termination or non-renewal of the 2006 Franchise Agreement. A copy of the 2006 Franchise Agreement is attached and incorporated as Exhibit A.

7. By letter dated November 20, 2006 (the "Termination Notice"), attached and incorporated as Exhibit B, Exxon notified Peter Amaefule that it is terminating the franchise and franchise relationship effective December 8, 2006 "based upon [Peter Amaefule's] failure to operate [his] service station for the sale of motor fuel for at least seven (7) consecutive days, beginning on October 30, 2006 continuing through and possibly beyond November 19, 2006." The Termination Notice also indicates that the termination is based on "[Peter Amaefule's] violation of Articles 2.1 and IX of the Franchise Agreement, which requires [Plaintiff] to use [his] best efforts to maximize the sale of ExxonMobil's motor fuel products at [Plaintiff's] station." The Termination Notice further provides that "[p]ursuant to Article XIV of the Franchise Agreement and Sections 2802(b)(2)(A), 2802(b)(2)(C) of the PMPA, Exxon hereby terminates its Franchise Agreement, franchise, and franchise relationship with you ..." The Termination Notice states that the termination is "final and irrevocable."

## COUNT I (Violation of the PMPA)

8. Paragraphs 1 through 7 are incorporated by reference as though fully set forth herein.

9. The relationship between Plaintiff, Peter Amaefule and Exxon under the 2006 Franchise Agreement is a petroleum marketing franchise relationship, the termination or non-renewal of which is governed by the PMPA.

3

10. Exxon is a "franchisor," and Peter Amaefule is a "franchisee," as defined by the PMPA, 15 U.S.C. § 2801(4).

11. Exxon's termination of the franchise relationship is unlawful, and in willful violation of the 15 U.S.C. § 2802 of the PMPA in that:

a. Exxon cannot show as required by 15 U.S.C. § 2804(a) and (b) that it provided notice of termination 90 days prior to the date on which the termination is to take effect, cannot show that less than 90 days notice of termination is reasonable under the circumstances, and cannot show that notice was given on the earliest date on which furnishing such notification was reasonably practical.

b. Exxon cannot show that Plaintiff's failed to operate the marketing premises for seven consecutive days.

c. Exxon cannot show that Plaintiff's alleged failure to operate the marketing premises for seven consecutive days was not caused directly or indirectly by Exxon.

d. Exxon cannot show that it provided Plaintiff with the required notice and opportunity to remedy or address the alleged lack of good faith efforts to maximize the sale of Exxon's motor fuel products.

e. Exxon cannot show that a permissible ground for termination exists under 15 U.S.C. § 2802 and that the reasons asserted in the Termination Notice are not pretextual.

12. Exxon's unlawful actions as detailed in this Complaint are in willful violation of the PMPA.

4

13. If Exxon terminates the franchise and franchise relationship with Plaintiff, Plaintiff will suffer irreparable harm, including the loss of its franchise and business into which significant financial resources, time and hard work have been invested.

14. As a result of Exxon's conduct, the Plaintiff is entitled to relief under 15 U.S.C. § 2805.

**WHEREFORE**, Plaintiff, Peter Amaefule, respectfully requests this Court to grant him the following relief:

A. Issue a preliminary and final injunctive relief to enjoin the termination of the franchise and franchise relationship;

B. Declare that the termination of the franchise and Franchise Relationship is unlawful and in violation of the PMPA;

C. Issue an injunction barring the Defendant from dispossessing or attempting to dispossess the Plaintiff of the gas station located at 4650 South Capitol Street, SE, Washington, DC 20032;

D. Enjoin Defendant from entering the property (located at 4650 South Capitol Street, SE, Washington, DC 20032) for the purpose of taking possession and control until such time as a judicial determination can be made as to Defendant's right to do so;

E. Award compensatory damages in such amount as may be proved and prejudgment interest;

F. Award exemplary damages in such amount as the Court deems appropriate for Exxon's willful violation of the PMPA;

G. Award reasonable attorneys' fees and expert witness fees and costs; and

H. Grant such other and further legal and equitable relief as this Court deems just and proper.

## JURY DEMAND

Plaintiff demands a trial by jury on all issues that a triable by and to a jury.

## VERIFICATION

The undersigned, Peter Amaefule, hereby deposes and says:

1.  I am over the age of eighteen and believe in the obligation of an oath.

2. I am the named Plaintiff in the present action.

3. I reviewed the Complaint and the attached documents filed on my behalf in the present action.

4. The facts contained in those documents are true and accurate to the best of my knowledge, information and belief. In my opinion, the foregoing facts are sufficient to show that Temporary Injunction should issue. Pursuant to 18 U.S.C. § 1746, I declare under penalty of perjury that the foregoing is true and correct.

_____          12/06/2006
Peter Amaefule                              Date

6

Respectfully submitted,

_____
PETER C. IBE, D.C. BAR # 481265
1717 K Street, NW,
Suite 600
Washington, DC 20036
Phone: (202) 276-7662

_____
Victor Mba-Jonas, Esq., D.C. BAR # 452042
8020 New Hampshire Avenue,
Suite 130, Adelphi, MD 20783
Phone: (301) 431-0333

Counsel for Plaintiff

06-2087
RWR

JS-44
(Rev.1/05 DC)

# CIVIL COVER SHEET

## I (a) PLAINTIFFS

*PETER AMAEFULE*

**(b)** COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF _DC_
(EXCEPT IN U.S. PLAINTIFF CASES)  11001

## DEFENDANTS

*EXXON MOBIL OIL CORPORATION*

COUNTY OF RESIDENCE OF FIRST LISTED DEFENDANT _____
(IN U.S. PLAINTIFF CASES ONLY)
NOTE: IN LAND CONDEMNATION CASES, USE THE LOCATION OF THE TRACT OF LAND INVOLVED

**(c)** ATTORNEYS (FIRM NAME, ADDRESS, AND TELEPHONE NUMBER)

*PETER IBE*
*17'7 K ST, NW, StE 600*      202-2
*WASHINGTON DC 20036*        766-

CASE NUMBER   1:06CV02087

JUDGE:  Richard W. Roberts

DECK TYPE:  Contract

DATE STAMP:  12/07/2006

## II. BASIS OF JURISDICTION
(PLACE AN x IN ONE BOX ONLY)

☐ 1 U.S. Government
Plaintiff

☑ 3 Federal Question
(U.S. Government Not a Party)

☐ 2 U.S. Government
Defendant

☐ 4 Diversity
(Indicate Citizenship of Parties
in item III)

## III CITIZENSHIP OF PRINCIPAL PARTIES
FOR PLAINTIFF

|  | PTF | DFT |  | PTF | DFT |
|---|---|---|---|---|---|
| Citizen of this State | ☐ 1 | ☐ 1 | Incorporated or Principal Place of Business in This State | ☐ 4 | ☐ 4 |
| Citizen of Another State | ☐ 2 | ☐ 2 | Incorporated and Principal Place of Business in Another State | ☐ 5 | ☑ 5 |
| Citizen or Subject of a Foreign Country | ☐ 3 | ☐ 3 | Foreign Nation | ☐ 6 | ☐ 6 |

## IV. CASE ASSIGNMENT AND NATURE OF SUIT
**(Place a X in one category, A-N, that best represents your cause of action and one in a corresponding Nature of Suit)**

☐ **A.** *Antitrust*

☐ 410 Antitrust

☐ **B.** *Personal Injury/ Malpractice*

☐ 310 Airplane
☐ 315 Airplane Product Liability
☐ 320 Assault, Libel & Slander
☐ 330 Federal Employers Liability
☐ 340 Marine
☐ 345 Marine Product Liability
☐ 350 Motor Vehicle
☐ 355 Motor Vehicle Product Liability
☐ 360 Other Personal Injury
☐ 362 Medical Malpractice
☐ 365 Product Liability
☐ 368 Asbestos Product Liability

☐ **C.** *Administrative Agency Review*

☐ 151 Medicare Act

**Social Security:**
☐ 861 HIA ((1395ff)
☐ 862 Black Lung (923)
☐ 863 DIWC/DIWW (405(g)
☐ 864 SSID Title XVI
☐ 865 RSI (405(g)

**Other Statutes**
☐ 891 Agricultural Acts
☐ 892 Economic Stabilization Act
☐ 893 Environmental Matters
☐ 894 Energy Allocation Act
☐ 890 Other Statutory Actions (If Administrative Agency is Involved)

☑ **D.** *Temporary Restraining Order/Preliminary Injunction*

Any nature of suit from any category may be selected for this category of case assignment.

*(If Antitrust, then A governs)*

## ☐ E. General Civil (Other) OR ☐ F. Pro Se General Civil

**Real Property**
☐ 210 Land Condemnation
☐ 220 Foreclosure
☐ 230 Rent, Lease & Ejectment
☐ 240 Torts to Land
☐ 245 Tort Product Liability
☐ 290 All Other Real Property

**Personal Property**
☐ 370 Other Fraud
☐ 371 Truth in Lending
☐ 380 Other Personal Property Damage
☐ 385 Property Damage Product Liability

**Bankruptcy**
☐ 422 Appeal 28 USC 158
☐ 423 Withdrawal 28 USC 157

**Prisoner Petitions**
☐ 535 Death Penalty
☐ 540 Mandamus & Other
☐ 550 Civil Rights
☐ 555 Prison Condition

**Property Rights**
☐ 820 Copyrights
☐ 830 Patent
☐ 840 Trademark

**Federal Tax Suits**
☐ 870 Taxes (US plaintiff or defendant
☐ 871 IRS-Third Party 26 USC 7609

**Forfeiture/Penalty**
☐ 610 Agriculture
☐ 620 Other Food &Drug
☐ 625 Drug Related Seizure of Property 21 USC 881
☐ 630 Liquor Laws
☐ 640 RR & Truck
☐ 650 Airline Regs
☐ 660 Occupational Safety/Health
☐ 690 Other

**Other Statutes**
☐ 400 State Reapportionment
☐ 430 Banks & Banking
☐ 450 Commerce/ICC Rates/etc.
☐ 460 Deportation

☐ 470 Racketeer Influenced & Corrupt Organizations
☐ 480 Consumer Credit
☐ 490 Cable/Satellite TV
☐ 810 Selective Service
☐ 850 Securities/Commodities/ Exchange
☐ 875 Customer Challenge 12 USC 3410
☐ 900 Appeal of fee determination under equal access to Justice
☐ 950 Constitutionality of State Statutes
☑ 890 Other Statutory Actions (if not administrative agency review or Privacy Act

| ☐ **G.  Habeas Corpus/ 2255** | ☐ **H.  Employment Discrimination** | ☐ **I.  FOIA/PRIVACY ACT** | ☐ **J.  Student Loan** |
|---|---|---|---|
| ☐ 530 Habeas Corpus-General ☐ 510 Motion/Vacate Sentence | ☐ 442 Civil Rights-Employment (criteria: race, gender/sex, national origin, discrimination, disability age, religion, retaliation)  *(If pro se, select this deck)* | ☐ 895 Freedom of Information Act ☐ 890 Other Statutory Actions (if Privacy Act)  *(If pro se, select this deck)* | ☐ 152 Recovery of Defaulted Student Loans (excluding veterans) |

| ☐ **K.  Labor/ERISA (non-employment)** | ☐ **L.  Other Civil Rights (non-employment)** | ☒ **M.  Contract** | ☐ **N.  Three-Judge Court** |
|---|---|---|---|
| ☐ 710 Fair Labor Standards Act ☐ 720 Labor/Mgmt. Relations ☐ 730 Labor/Mgmt. Reporting & Disclosure Act ☐ 740 Labor Railway Act ☐ 790 Other Labor Litigation ☐ 791 Empl. Ret. Inc. Security Act | ☐ 441 Voting (if not Voting Rights Act) ☐ 443 Housing/Accommodations ☐ 444 Welfare ☐ 440 Other Civil Rights ☐ 445 American w/Disabilities-Employment ☐ 446 Americans w/Disabilities-Other | ☐ 110 Insurance ☐ 120 Marine ☐ 130 Miller Act ☐ 140 Negotiable Instrument ☐ 150 Recovery of Overpayment & Enforcement of Judgment ☐ 153 Recovery of Overpayment of Veteran's Benefits ☐ 160 Stockholder's Suits ☐ 190 Other Contracts ☐ 195 Contract Product Liability ☐ 196 Franchise | ☐ 441 Civil Rights-Voting (if Voting Rights Act) |

**V. ORIGIN**

☐ 1 Original Proceeding   ☐ 2 Removed from State Court   ☐ 3 Remanded from Appellate Court   ☐ 4 Reinstated or Reopened   ☐ 5 Transferred from another district (specify)   ☐ Multi district Litigation   ☐ 7 Appeal to District Judge from Mag. Judge

**VI. CAUSE OF ACTION** (CITE THE U.S. CIVIL STATUTE UNDER WHICH YOU ARE FILING AND WRITE A BRIEF STATEMENT OF CAUSE.)

IS 15 USC § 2801 et seq

**VII. REQUESTED IN COMPLAINT**   CHECK IF THIS IS A CLASS ☐ ACTION UNDER F.R.C.P. 23   **DEMAND $**   Check YES only if demanded in complaint   **JURY DEMAND:** ☐ YES   ☐ NO

**VIII. RELATED CASE(S) IF ANY**   (See instruction)   ☐ YES   ☐ NO   If yes, please complete related case form.

DATE 12/7/2006   SIGNATURE OF ATTORNEY OF RECORD

**INSTRUCTIONS FOR COMPLETING CIVIL COVER SHEET JS-44**
Authority for Civil Cover Sheet

The JS-44 civil cover sheet and the information contained herein neither replaces nor supplements the filings and service of pleadings or other papers as required by law, except as provided by local rules of court. This form, approved by the Judicial Conference of the United States in September 1974, is required for the use of the Clerk of Court for the purpose of initiating the civil docket sheet. Consequently a civil cover sheet is submitted to the Clerk of Court for each civil complaint filed. Listed below are tips for completing the civil cover sheet. These tips coincide with the Roman Numerals on the Cover Sheet.

I.    COUNTY OF RESIDENCE OF FIRST LISTED PLAINTIFF/DEFENDANT (b) County of residence: Use 11001 to indicate plaintiff is resident of Washington, D.C.; 88888 if plaintiff is resident of the United States but not of Washington, D.C., and 99999 if plaintiff is outside the United States.

III.   CITIZENSHIP OF PRINCIPAL PARTIES: This section is completed only if diversity of citizenship was selected as the Basis of Jurisdiction under Section II.

IV.   CASE ASSIGNMENT AND NATURE OF SUIT: The assignment of a judge to your case will depend on the category you select that best represents the primary cause of action found in your complaint. You may select only one category. You must also select one corresponding nature of suit found under the category of case.

VI.   CAUSE OF ACTION: Cite the US Civil Statute under which you are filing and write a brief statement of the primary cause.

VIII.  RELATED CASES, IF ANY: If you indicated that there is a related case, you must complete a related case form, which may be obtained from the Clerk's Office.

Because of the need for accurate and complete information, you should ensure the accuracy of the information provided prior to signing the form.

N:\forms\js-44.wpd

# EXHIBIT A

# ExxonMobil
## *Fuels Marketing*

95 Foundry Street
Moncton, NB E1C 5H7

October 13, 2005

Peter Amaefule
Exxon Service Center
4650 S Capitol Street SE
Washington, DC 20032

Re: **25050**

Dear Dealer:

We are writing to you on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). Enclosed is one copy of the new PMPA Franchise Agreement covering the premises situated at 4650 S Capitol Street SE, Washington, DC 20032 which the parties intended to take effect on April 1, 2006 through March 31, 2009.

Your Territory Manager will contact you in the next thirty days to set up a date and time to sign two copies of the contract. In preparation for that meeting, please review the contract and take note of the current Real Estate Value, Rent Schedule and Purchase Schedule. Please keep in mind that no changes will be accepted.

If you have any questions, please do not hesitate to call your Territory Manager.

Sincerely,

*Emilie Robichaud*
Emilie Robichaud
Contract Specialist

CC: R. Alexandrowicz
Enclosures

# ExxonMobil
## *Fuels Marketing*

Date 10/13/05

Dear Exxon Dealer:

Attached please find your new PMPA Franchise Agreement and related documents. Your ExxonMobil representative will be working with you to review and familiarize you with this package.

With the execution of your new PMPA Franchise Agreement, and upon its effective date, you will join many other dealers and distributors who are committed to ExxonMobil's Core Values which form the foundation of a new customer-oriented service station franchise offering that will drive and sustain the best buying experience in the petroleum industry.

### Core Values

- To Deliver Quality products our customer trust
- To Employ Friendly, Helpful people
- To Provide Speedy, Reliable Service
- To Provide Clean, Attractive Facilities
- To be an Environmentally Responsible Neighbor

In the attached materials, you will find the ExxonMobil National Standards Handbook which is applicable to your station, including the current Minimum Acceptable Ratings (MARs), that you will need to attain to meet those standards. Your ExxonMobil representative will be working closely with you to ensure that you understand the new standards and support system. If you have not already attained the MARs, your ExxonMobil representative will be assisting you in obtaining help and resources to attain the necessary rating levels. To allow an orderly transition to the new standards, you will have 1 year from the effective date of your new agreement to reach the applicable MARs.

You can count on the support of the entire ExxonMobil team as we launch our new ExxonMobil Fuels Franchise.

Dealer Sales Manager

XOM_Welcome.htm

October 13, 2005

Loc. 25050

Dear PETER AMAEFULE :

You and ExxonMobil Oil Corporation ("ExxonMobil") are currently discussing the possibility of entering into or renewing a PMPA Franchise Agreement (the "Franchise Agreement"). In order for you to fully evaluate whether to enter into the Franchise Agreement, ExxonMobil is willing to disclose to you certain proprietary information, (the "Confidential Information"), subject to the terms set out below.

1. The term "Confidential Information" includes all information disclosed to you by ExxonMobil, including, but not limited to, copies of ExxonMobil's Standards Handbook and copies of the Franchise Agreement, whether that information is in oral form or in written or other visual form, or recorded on tape or other media.

2. You agree to treat the Confidential Information as confidential and you must not disclose it to any third party. You may use the Confidential Information only for the purpose of evaluating whether to enter into the Franchise Agreement with ExxonMobil. The requirements of this paragraph will remain in effect for five (5) years from the date of this letter.

3. ExxonMobil makes no representation or warranty concerning the quality, reliability, or accuracy of the Confidential Information. Any conclusions that you draw from the Confidential Information are at your own risk.

4. The Confidential Information remains the property of ExxonMobil and ExxonMobil may demand its return at any time upon ten (10) days written notice to you. Within five (5) days after receiving such a notice, you shall return all the Confidential Information other than that which is expressly granted by ExxonMobil in this letter.

5. Nothing contained in this letter may be construed as requiring you or ExxonMobil to consummate any transaction, whether related to the Confidential Information or otherwise. Nothing may be construed as granting you any interest in the Confidential Information other than that which is expressly granted by ExxonMobil in this letter.

6. This letter comprises the full agreement between you and ExxonMobil concerning this disclosure of the Confidential Information. This letter supersedes any prior understanding or agreements, regardless of form, between you and ExxonMobil with respect to the Confidential Information. No amendments of the terms of this letter will be valid unless they are made in writing and signed by you and the authorized representatives of ExxonMobil.

If you are in agreement with the above terms, please sign below where indicated and return one copy of this letter to ExxonMobil.

Sincerely,

ExxonMobil Oil Corporation

Agreed and Accepted:

PETER AMAEFULE

## FRANCHISE AGREEMENT PRESENTATION LETTER

To: ExxonMobil Oil Corporation

RE: LOC# 54 - 25050

On _13/14/2005_ the PMPA Franchise Agreement effective APRIL 1, 2006, through MARCH 31, 2009, for the location at, 4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000 was presented to me for my review and signature.

_____
WITNESS

_____
PETER AMAEFULE

XOM_COVLET1.htm

# SUMMARY OF REAL ESTATE VALUE

Service Station #:  25050
Date:    October 13, 2005

Summary:

The Real Estate (land) value used in determining your rent was:  $134,000.

EXPLANATION:

The annual contract rental in the attached rent schedule was calculated using the Real Estate (land) Value of the marketing premises shown above.

If you wish to challenge the Real Estate (land) Value, please notify your TM within 10 days from the receipt of this summary.

_____
TM's Signature

Date Received by Dealer   12/14/05

_____
Dealer's Signature

**RENT SCHEDULE**
**TO**
**THE CODO LEASE PROVISIONS OF THE PMPA FRANCHISE AGREEMENT**

This Rent Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil") and **Peter Amaefule, 4650 S Capitol Street SE, Washington, DC 20032** ("Franchise Dealer") with a Term beginning on **April 1, 2006** (the "Effective Date").

1.   The Rental Period covered by this schedule is for the period from **APRIL 1, 2006 to MARCH 31, 2009**.

2.   Pursuant to Section 2.1 of the CODO Lease Provisions, the Rent is as follows:

| Period | Annual Amount | Monthly Amount |
|---|---|---|
| 04/01/06 to 03/31/07 | $78,000.00 | $6,500.00 |
| 04/01/07 to 03/31/08 | $78,000.00 | $6,500.00 |
| 04/01/08 to 03/31/09 | $78,000.00 | $6,500.00 |

I acknowledge the receipt and applicability of this Rent Schedule:

PETER AMAEFULE                                    DATE

# EXXONMOBIL'S NATIONAL RENT GUIDELINES

## (Attachment I)

### General Provisions

The Guidelines outline ExxonMobil's National Rent Program and set forth the criteria for how rent will be calculated. The Guidelines are effective on March 1, 2003, but will not be applicable for existing dealers until July 1, 2003 given notice requirements and PMPA renewal lead times. They will replace the guidelines that have been in effect since January 1, 2001, and will remain in effect until changed, revoked or suspended by ExxonMobil. For purposes of the Guidelines, references to ExxonMobil may include Exxon Mobil Corporation, Mobil Corporation, Mobil Oil Corporation, Exxon Company U. S. A., ExxonMobil Fuels Marketing Company, ExxonMobil Oil Corporation, and any subsidiary or affiliate of Exxon Mobil Corporation.

Unless otherwise provided in the guidelines, ExxonMobil may change, suspend or revoke the Guidelines, in whole or in part, upon 90 days written notice. However, except as set forth in the "Additional Rent Increases" section, the Guidelines in effect when a lessee dealer signs its franchise agreement will remain in effect throughout the entire term of a 3-year agreement, the first three years of a 5-year agreement, and during the first five years of a 10-year agreement.

### Annual Maximum Rent

Maximum rent is the most ExxonMobil may annually charge a lessee dealer for rent. It is determined by multiplying the total property value by 12% and adding the real property tax. In the case of service station properties with an underlying lease, there will be an exception to the calculation of the Maximum rent such that the Maximum rent will not be less than the annual rent that ExxonMobil pays for any underlying lease and/or annual property tax. The land value is established by an independent third party appraiser selected by ExxonMobil. The value of the land component of the appraisal will be determined using the sales-comparison method and will be based on the highest and best use of the land, regardless of current use or the nature of the underlying estate. The appraiser will also assume that there are no conditions of property, subsoil or structures that are hidden or not apparent that render it more or less valuable. The service station building and improvements will be appraised using the Marshall-Swift evaluation, and values from that evaluation will be added to the appraised value of the land to determine a total property value. A re-appraisal will occur every three years for those dealers on a 3-year agreement and every five years for those dealers on a 5 or 10-year agreement. Real property tax is the annualized tax most recently paid by ExxonMobil for the service station real estate and improvements.

### Minimum Rent

Minimum rent for a lessee dealer operated Exxon or Mobil service station will be established by ExxonMobil from time to time, and in accordance with the Guidelines. In the event the minimum annual rent exceeds the amount of rent otherwise payable pursuant to the Guidelines, the minimum

annual rent shall take precedence. Effective March 1, 2003, minimum annual rent will be $78,000. Thereafter, changes to the minimum annual rent will be made pursuant to the Guidelines.

## *Rent Increase Schedule*

Until the maximum rent is reached, rent increases will occur on the franchise anniversary date and when the franchise is renewed. Those increases are as follows:

### **Three and Five Year Franchise Agreements**

Beginning March 1, 2003, rent increases for all ExxonMobil lessee dealers who sign new three or five-year franchise agreements, or renew three or five-year agreements on or after July 1, 2003, will be as follows:

If the existing contract rent is less than $108,000 per year,
the rent will be increased by 12% per year.

If the existing contract rent is equal to or greater than
$108,000 but less than $132,000 per year, the rent will be
increased by 8% per year.

If the existing contract rent is equal to or greater than
$132,000 per year, the rent will be increased by 3% per year.

At the beginning of year four of a five year agreement a rent
reopener will occur and the existing rent will be adjusted
as necessary, pursuant to the Guidelines and rent schedule then
in effect.

### *Ten Year Franchise Agreements*

Rent increases for all ExxonMobil lessee dealers who reach year six of a 10-year franchise agreement, which commenced on or after January 1, 2001, or who renew or sign a new 10-year franchise agreement, will be as follows:

If the existing contract rent is less than $108,000 per year,
the rent will be increased 12% per year.

If the existing contract rent is equal to or greater than

$108,000 but less than $132,000 per year, the rent
will be
increased by 8% per year.

If the existing contract rent is equal to or greater
than
$132,000 per year, the rent will be increased by 3%
per year.

In year six, a rent re-opener will occur, and the
existing rent
will be adjusted pursuant to the Guidelines and rent
schedule
then in effect.

This rent increase schedule for three, five and ten-year franchise agreements will remain in effect
until changed, amended or revoked pursuant to the Guidelines.

### *Rent Increase Schedule – Underlying Lease Properties*

If the current annual franchise rent is less than the annual rent that ExxonMobil pays for the
underlying lease and/or property tax, the annual rent paid by the franchise dealer will increase by 12%
per year, regardless of the annual contract rent amount, as noted in the aforementioned Rent Increase
Schedule. The 12% annual rent increase will continue until the annual rent paid by the franchise
dealer is equivalent to the annual rent ExxonMobil pays for the underlying lease and/or property tax.

## *Alternate Method of Calculating Real Estate Value*

In some instances, as set out below, the appraised real estate value may not be used as part of the rent
calculation. Instead, ExxonMobil will use an alternate land value calculation, which will be done as
follows. Annually, ExxonMobil will determine, for the preceding three years, the average price it has
paid nationwide for real estate that will be used as a service station. This price will then be divided by
the average projected annual motor gasoline sales for those sites, which will also be determined
annually. This produces the Average Land Acquisition Cost (ALAC) multiplier. For the year 2003,
the average land acquisition cost is $1,049,000 and average volume is 2,760,500 gallons, which
produces an ALAC multiplier of 38 (thirty-eight) cents per gallon.

If the appraised real estate value exceeds 125% the average price ExxonMobil has paid for service
station property for the previous three years, ExxonMobil will use the MPSI projected motor gasoline
volume for that lessee dealer's service station and multiply it by the ALAC multiplier. If there is not
an MPSI projected volume for the lessee dealer's service station that is currently representative of the
station's volume, ExxonMobil will select the four nearest Exxon or Mobil service stations with
similar demographics and physical design. The average motor gasoline volume at these four stations
for the previous three years will be used in place of the MPSI projected volume. The lower of the
appraised real estate value or the number produced by using the ALAC multiplier will be used for the
real estate value component of the lessee dealer's rent calculation. However, in no case will the real
estate value component be less than 125% of ExxonMobil's average land acquisition cost.

As appraisals of buildings, equipment and improvements are made, in no event will the depreciated replacement value of these buildings, equipment and improvements be less than 25% of its actual replacement value.

## *Appraisal Challenge*

When a franchise agreement is entered into or renewed, the lessee dealer will receive a summary of the appraisal done for the service station. If the lessee dealer disputes the real estate value set forth in the summary and wants to challenge it, the lessee dealer must provide written notice to its territory manager within 10 days of receipt of the appraisal summary.

ExxonMobil will then provide the lessee dealer with a list of three certified MAI appraisers, from which the lessee dealer will select one to do an appraisal. The lessee dealer must contact the appraiser and obtain, pay for, and furnish the appraisal to ExxonMobil within 45 days of providing written notice of its intent to challenge the real estate value. The lessee dealer also is required to pay a fee of $750 to ExxonMobil to cover the administrative costs associated with the challenge. The $750 must accompany the lessee dealer's written notice to ExxonMobil and is non-refundable.

To be considered by ExxonMobil, the real estate appraisal must be based on the highest and best use of the land regardless of its current use or the nature of the underlying estate. The appraisal must also assume that there are no hidden or unapparent conditions of property, subsoil or structures that render it more or less valuable. Lessee dealer shall promptly furnish documentation and information requested by ExxonMobil to allow it to understand the basis of the appraisal or to confirm that the appraisal meets the stated requirements.

If the variance between ExxonMobil's appraisal and the lessee dealer's appraisal is 10% or less, no change to the real estate value, originally provided by ExxonMobil to the lessee dealer, will be made. If the variance between the two appraisals is greater than 10% but less than 20%, the two appraisals will be averaged. If the variance is 20% or more, ExxonMobil will request and pay for a third appraisal. The third appraisal will be averaged with the previous two appraisals, and the average of the three will be the real estate value used to calculate the lessee dealer's rent.

## *Additional Rent Increases*

### *Government Action*

If the federal government and/or any state or local government agency enacts legislation, regulations, laws or rules, or takes any other action that alters any of the contractual or legal obligations or expectations of ExxonMobil or the lessee dealer, or if a federal or state court of competent jurisdiction takes any action that alters the contractual or legal obligations or expectations of ExxonMobil or the lessee dealer, ExxonMobil may revoke the Guidelines on a nationwide basis, in the affected state or in the affected local area on 30 days written notice. Thereafter, ExxonMobil may calculate and set rent for the affected lessee dealers in any manner it deems fit and in its sole discretion.

## *General Site Redevelopment and Mart*

## and Snack Shop Upgrade Rent Increases

### General Site Redevelopment Rent

If ExxonMobil redevelops any service station on or after
March 1, 2003, both the annual and maximum
rent for the service station may be increased based on the amount of any
ExxonMobil investment.

Redevelopment includes, but is not limited to, any
demolishing, rebuilding or adding to the service station,
including any of the following:

- Canopies
- Dispensers/CAT's
- Gasoline/Diesel UG Tanks
- Additional Islands
- Additional Lighting
- Additional Service Station Bay Lifts
- Car Washes, Bay Conversions, Mart and Snack Shop Upgrades
- Marketing/Technology Innovations
- On the Run ® Related Improvements
- Equipment and Improvements that increase sales capacity

Rent will not be increased for non-redevelopment projects such as equipment replacement or
improvements associated with routine maintenance and/or upgrades made to existing equipment or
improvements at the site. However, the cost to replace or upgrade the equipment will be used to
determine the maximum rent.

If the cost of the redevelopment is less than $500,000, the current annual rent will be increased by an
amount equal to the cost of the redevelopment multiplied by 12%. This increase will be effective
immediately upon completion of the redevelopment, and will stay in effect for a minimum of 12
months. Thereafter, rent will be adjusted on the next franchise anniversary or renewal date and
pursuant to the Guidelines.

For a redevelopment which exceeds $500,000 or which requires a lessee dealer to sign a new ten-year
franchise agreement, annual rent will be the cost of the redevelopment, the appraised value of all
improvements not affected by the redevelopment, if any, and the real estate value multiplied by 8%.
The monthly rent is determined by dividing the annual rent by 12. The new rent will be phased in as
follows: for the first three months following completion of the redevelopment, no rent will be
charged. For the next three months, the monthly rent will be reduced by 50%. Thereafter, the lessee
dealer will pay the full monthly rent, and future increases will be made pursuant to the Guidelines.

### Mart/Snack Shop Upgrade Rental

Except where self-service is prohibited by law, when an existing Tiger Mart/Market or a
Mobil Mart or Snack Shop is redeveloped or upgraded, rent will be the lower of 1) the
cost of the redevelopment or upgrade multiplied by 8% plus 8% of the existing property
value or 2) the cost of the redevelopment or upgrade multiplied by 8% plus the lessee

dealer's then existing annual rent. In markets where self-serve is prohibited by law, the multiplier shall be 5% rather than 8%.

## Rent for New to Industry Service Stations

When ExxonMobil opens a New to Industry (NTI) service station, the first year rent will be the total cost associated with building the NTI service station, including land value, multiplied by 8%. The ALAC multiplier does not apply to the rental calculation for NTI's. Thereafter, rent increases will occur pursuant to the terms of the Guidelines.

## Rent for Conversions

When ExxonMobil brands a service station that is not currently operated or owned by ExxonMobil, the first year rent will be ExxonMobil's total cost of acquiring and/or upgrading the service station, including land value, multiplied by 8%. The ALAC multiplier does not apply to the rental calculation for these sites. Thereafter, rent increases will occur pursuant to the terms of the Guidelines.

## Rent for Dealer to Dealer Conversions

The first year rent for a dealer who purchases a station from, or receives a station from an existing dealer, and who signs a new ExxonMobil Fuels Franchise Agreement, shall be the greater of the then current minimum rent, the average business unit rent, or the outgoing dealer's rent. Subsequent annual rent increases will be subject to the then current National Rent Guidelines.

## Company Owned Retail Stores (CORS)
## Conversions to a Lessee Dealer Service Station

First year rent for a Company Operated Retail Store (CORS) conversion to a Lessee Dealer Service Station will be the greater of the minimum rent in effect pursuant to the Guidelines or the average service station rent for the respective business unit where the store is located. Thereafter, rent increases will occur pursuant to the terms of the Guidelines.

## Waiver of Rights

Except as otherwise provided herein, the Guidelines do not waive or amend any rights or remedies ExxonMobil or the lessee dealers have under the franchise agreement. Further, nothing in the Guidelines prevents the parties from agreeing to changes in the Guidelines by separate written agreement.

# PMPA FRANCHISE AGREEMENT

## (CODO AND DOSS)

### BETWEEN

### EXXONMOBIL OIL CORPORATION

### AND

### PETER AMAEFULE

### DATED

12/14/2K5

# TABLE OF CONTENTS

| | | |
|---|---|---:|
| RECITALS | | 5 |
| AGREEMENT | | 5 |
| ARTICLE I | | |
| GRANT | | 6 |
| 1.1 | PMPA Franchise Relationship | 6 |
| 1.2 | Related Businesses | 6 |
| 1.3 | Related Business Attachments | 7 |
| 1.4 | No Exclusive Marketing Rights | 8 |
| 1.5 | Term | 8 |
| ARTICLE II | | |
| PURCHASE AND DELIVERY OF PRODUCTS | | 8 |
| 2.1 | Purchase Obligation | 8 |
| 2.2 | Prices | 8 |
| 2.3 | Terms of Payment | 9 |
| 2.4 | Credit; Security | 9 |
| 2.5 | Deliveries | 10 |
| 2.6 | Other Terms and Conditions of Sale | 10 |
| 2.7 | ExxonMobil Product Certification | 10 |
| 2.8 | Franchise Dealer Product Control; Safeguards | 10 |
| 2.9 | Effect of Quality Violations; Samples | 11 |
| 2.10 | Product Quality or Quantity Claims | 11 |
| ARTICLE III | | |
| SERVICES BY EXXONMOBIL | | 11 |
| 3.1 | ExxonMobil Services | 11 |
| ARTICLE IV | | |
| PARTICIPATION/ORGANIZATIONAL FORM | | 12 |
| 4.1 | Organizational Form; Key Individual | 12 |
| 4.2 | Participation in Business; Multi-Unit Operators | 12 |
| 4.3 | Corporation | 12 |
| 4.4 | Other Business Forms | 13 |
| 4.5 | Disclosure of Ownership Interests | 15 |
| 4.6 | Waiver | 15 |
| ARTICLE V | | |
| CONFIDENTIALITY | | 15 |
| 5.1 | Confidential Information | 15 |
| 5.2 | Examples of Confidential Information; Compelled Disclosures | 16 |
| 5.3 | Use of Confidential Information | 16 |
| 5.4 | Remedy; Survival | 17 |
| ARTICLE VI | | |
| STANDARDS HANDBOOK | | 17 |
| 6.1 | Standards Handbook | 17 |
| 6.2 | Revisions | 17 |
| 6.3 | Minimum Acceptable Ratings | 17 |
| ARTICLE VII | | |
| PROPRIETARY MARKS | | 18 |

| | | |
|---|---|---|
| 7.1 | Use of Proprietary Marks | 18 |
| 7.2 | Non-Exclusive Use | 18 |
| 7.3 | Ownership of Proprietary Rights | 19 |

ARTICLE VIII
MANAGEMENT AND TRAINING ......................................................... 19

| | | |
|---|---|---|
| 8.1 | Franchisee Dealer Management | 19 |
| 8.2 | Franchise Management Training | 19 |
| 8.3 | Employee Training | 19 |
| 8.4 | Educational Meetings and Seminars | 20 |
| 8.5 | Training Expenses | 20 |

ARTICLE IX
OPERATIONS ........................................................................................... 20

| | | |
|---|---|---|
| 9.1 | Importance of Operational Requirements | 20 |
| 9.2 | Operation of Businesses | 20 |
| 9.3 | Operating Hours | 20 |
| 9.4 | Use of Marketing Premises | 21 |
| 9.5 | Installation of Additional Tanks | 21 |
| 9.6 | Equipment, Fixtures, Signs | 21 |
| 9.7 | Customer Service | 22 |
| 9.8 | Clean, Attractive and Functional Operations | 22 |
| 9.9 | Maintenance Obligations | 22 |
| 9.10 | Compliance with Laws, Covenants and Restrictions | 22 |
| 9.11 | Safety Procedures | 22 |
| 9.12 | Image and Trademark Standards; Promotion Programs | 22 |
| 9.13 | Staffing | 22 |
| 9.14 | Conduct | 22 |
| 9.15 | System Modifications | 23 |
| 9.16 | Retail Credit and Debit Program | 23 |
| 9.17 | Improvements and Investments in Marketing Premises | 24 |
| 9.18 | Technological and Communication Updates | 24 |
| 9.19 | Inspection | 24 |
| 9.20 | Pricing | 24 |
| 9.21 | Environmental Standards | 24 |
| 9.22 | Maintain Inventory | 24 |

ARTICLE X
ADVERTISING, PROMOTION; AND MARKETING ................................ 24

| | | |
|---|---|---|
| 10.1 | General Advertising | 25 |
| 10.2 | Local Advertising Approval | 25 |
| 10.3 | Advertising Contributions | 25 |

ARTICLE XI
INSURANCE ............................................................................................. 25

| | | |
|---|---|---|
| 11.1 | Types of Insurance Required | 25 |
| 11.2 | CODO Additional Insurance Clause | 26 |
| 11.3 | DOSS Additional Insurance Clause | 26 |
| 11.4 | Evidence of Insurance | 26 |
| 11.5 | Other Provisions | 26 |

ARTICLE XII
TRANSFER OF INTEREST; SURVIVORSHIP ..................................... 27

| 12.1 | Consent Requirements | 27 |
| 12.2 | Consent to Transfer | 27 |
| 12.3 | Conditions to Transfer | 28 |
| 12.4 | Administrative Fees | 29 |
| 12.5 | Survivorship | 29 |
| 12.6 | Waivers | 30 |
| 12.7 | Assignment by ExxonMobil | 30 |
| 12.8 | Communications with Transferees | 30 |

ARTICLE XIII
RIGHT OF FIRST REFUSAL — 31

| 13.1 | Right of First Refusal | 31 |
| 13.2 | Transfers to Immediate Family | 32 |

ARTICLE XIV
DEFAULT AND TERMINATION — 32

| 14.1 | Termination or Non-renewal of Agreement and Franchise Relationship | 33 |
| 14.2 | Right of Termination Due to Governmental Action | 33 |
| 14.3 | Accrued Rights | 33 |
| 14.4 | Remedies of ExxonMobil | 34 |

ARTICLE XV
OBLIGATIONS UPON TERMINATION OR EXPIRATION — 34

| 15.1 | Termination of Business Operation | 34 |

ARTICLE XVI
TAXES, PERMITS, INDEBTEDNESS — 35

| 16.1 | Tax, Duty, Fee Due ExxonMobil | 35 |
| 16.2 | Local, State, Federal Taxes and General Indebtedness | 35 |
| 16.3 | Indebtedness Dispute | 35 |
| 16.4 | Permits and Licenses | 35 |
| 16.5 | Notices | 35 |

ARTICLE XVII
INDEPENDENT CONTRACTOR — 35

| 17.1 | Relationship of the Parties | 35 |
| 17.2 | Public Notification | 36 |
| 17.3 | Other Franchise Dealer Obligations | 36 |

ARTICLE XVIII
INDEMNIFICATION — 36

| 18.1 | Definition of Losses | 36 |
| 18.2 | Indemnity | 36 |
| 18.3 | Notices; Choice of Counsel | 37 |
| 18.4 | Remedies | 37 |
| 18.5 | Defenses | 37 |
| 18.6 | Recovery Obligations | 38 |
| 18.7 | Claims against ExxonMobil | 38 |
| 18.8 | Criminal Act | 38 |
| 18.9 | Negligence: Willful Misconduct | 38 |

ARTICLE XIX
FAILURE TO PERFORM; ALLOCATION — 38

| 19.1 | General Contingencies; Force Majeure | 38 |
| 19.2 | Allocation | 38 |

ARTICLE XX
MISCELLANEOUS — 39

| 20.1 | Significance of Terms and Conditions | 39 |
| 20.2 | Approvals and Consents | 39 |
| 20.3 | Strict Compliance | 39 |
| 20.4 | Notices | 40 |
| 20.5 | ExxonMobil Legal Fees and Costs | 40 |
| 20.6 | Claims | 40 |
| 20.7 | Limitation of Liability | 40 |
| 20.8 | Entire Agreement; Modifications | 40 |
| 20.09 | Severability and Construction | 41 |
| 20.10 | Third Party Rights | 41 |
| 20.11 | Headings | 41 |
| 20.12 | Joint and Several Obligations | 41 |
| 20.13 | ExxonMobil Approval | 41 |
| 20.14 | Terms on Renewal | 41 |

ARTICLE XXI
ADDITIONAL FRANCHISE DEALER REPRESENTATIONS AND WARRANTIES     41
| 21.1 | Business Risks | 41 |
| 21.2 | Representations | 41 |
| 21.3 | Receipt of Attachments and Disclosures | 42 |
| 21.4 | Understanding of Agreements; Core Values | 42 |

## PMPA FRANCHISE AGREEMENT

This PMPA Franchise Agreement ("Agreement") between ExxonMobil Oil Corporation ("ExxonMobil"), having an office at 3225 Gallows Road, Fairfax, Virginia 22037 and PETER AMAEFULE ("Franchise Dealer"), having a place of business at 4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000 ("Marketing Premises"), takes effect on the date specified in Section 1.5.

## DEFINITIONS

A glossary of the terms used in this Agreement is contained in the attachment entitled "Definitions" which is incorporated into this Agreement.

## RECITALS

A.    As the result of the substantial expenditure of time, skill, effort and money, ExxonMobil has developed and owns a unique and distinctive system ("System") for the sale of Exxon-branded products at Exxon Outlets. For purposes of this Agreement, an "Exxon Outlet" means an Exxon-branded retail motor-fuels outlet operated under the System by: (1) ExxonMobil, or any subsidiary or affiliate of ExxonMobil Oil Corporation, or (2) another person who is subject to an agreement with ExxonMobil, an ExxonMobil Affiliate or an ExxonMobil-authorized person allowing the operator of the outlet to sell Exxon motor fuels as an Exxon-branded product.

B.    In developing the System, ExxonMobil has conducted extensive consumer research to determine ExxonMobil's customers' needs and preferences, has conducted extensive analysis of customer-service and franchise retail and operating practices, and, based on this research and analysis and ExxonMobil's marketing strategies, has established the following core values (the "Core Values"):

---

ExxonMobil's tradition of excellence is aimed at building and maintaining lasting relationships with its customers, the motoring public. In continuing this tradition, the dedication of ExxonMobil and its franchise dealers and distributors to the customer is reflected in these simple commitments:

· To deliver quality products that customers can trust.

· To employ friendly, helpful people.

· To provide speedy, reliable service.

· To provide clean and attractive retail facilities.

· To be a responsible, environmentally conscious neighbor.

Living up to these commitments is the heart of our spirit and purpose. It is the key to delighting our customers and the key to success and prosperity for all dealers, distributors, ExxonMobil and everyone connected with the ExxonMobil System.

---

C.  The distinguishing characteristics of the System include: (1) supply of Exxon-branded products; (2) certain procedures and methods of Exxon-branded product sales; (3) distinctive appearance, decor, design, trademark and uniform standards; (4) unique and specialized training, management, marketing techniques and materials and socially responsible programs; and (5) advertising and promotional programs - all of which are integral and important to Franchise Dealer, ExxonMobil, and other Exxon Outlets.

D.  ExxonMobil identifies the System by means of certain trade names, service marks, trademarks, logos, emblems and indicia of origin ("Proprietary Marks") including the name and mark "Exxon", "the Exxon Tiger logo ", "On the Run", "Exxon Tiger Mart", "Exxon Tiger Market", "Exxon Service", "Exxon Car Wash" and such other names, marks, logos, emblems and indicia as ExxonMobil may from time to time use in connection with the System - all of which are identified by customers as being standards of excellence for Exxon Outlets and products bearing Exxon's trademarks.

E.  ExxonMobil relies upon the personal qualifications of the Franchise Dealer and the Franchise Dealer's commitment to the Core Values (if Franchise Dealer is an individual), or the personal qualifications of the Key Individual and the Key Individual's commitment to the Core Values (if Franchise Dealer is not an individual), in entering into this Agreement with Franchise Dealer.

F.  Upon the following terms and conditions and consistent with the System and the Core Values, ExxonMobil and the Franchise Dealer desire to enter into this Agreement for the retail sale of the Products and for the conduct of the Related Businesses at the Marketing Premises.

The Parties, therefore, agree as follows:


### ARTICLE I
### GRANT


1.1  <u>PMPA Franchise Relationship</u>. By this Agreement, ExxonMobil and Franchise Dealer establish a "Franchise" and a "Franchise Relationship" as defined by the Petroleum Marketing Practices Act, 15 U.S.C. Sections 2801-2806 (the "PMPA"). Subject to the terms and conditions of this Agreement:

(a)  ExxonMobil grants Franchise Dealer the right to use those Proprietary Marks specified by ExxonMobil from time to time for use in connection with the sale of the Products at the Marketing Premises;

(b)  Franchise Dealer shall purchase the Products from ExxonMobil for retail sale at the Marketing Premises; and

(c)  ExxonMobil grants Franchise Dealer the right to operate at the Marketing Premises a retail motor-fuels business under the System (the "Motor Fuels Business").

1.2  <u>Related Businesses</u>. Subject to the terms and conditions of this Agreement,

(a)  ExxonMobil grants Franchise Dealer the right to operate at the Marketing Premises only the additional related business(es) initialed by the Parties in Section 1.2(c) (the "Related Businesses"*), and to use in connection with the Related Businesses the Proprietary Marks specified by ExxonMobil from time to time for use in connection with the Related Businesses*. Franchise Dealer acknowledges that Franchise Dealer's operation of the Related Businesses impacts customers' buying experience at the Marketing Premises and customers' perception and acceptance of Exxon-branded products, the System and the Proprietary Marks. Accordingly, Franchise Dealer may operate a Related Business only if Franchise Dealer complies with ExxonMobil's requirements for that Related Business and the attachments referred to in Section 1.3. If Franchise Dealer fails to comply with the requirements for a Related Business, without limiting ExxonMobil's other rights or remedies under applicable Law or under this Agreement or a related or supplemental agreement including termination or non-renewal of this Agreement and the Franchise Relationship, ExxonMobil may require Franchise Dealer to stop operating the Related Business at the Marketing Premises.

(b) During the Term, Franchise Dealer shall operate the Related Businesses at the Marketing Premises under the System and shall not operate any other businesses or activities at the Marketing Premises or change, delete or add a Related Business unless agreed in writing by the Parties, which agreement may not be unreasonably withheld. Nothing contained in this Section 1.2 may be construed as limiting or preventing ExxonMobil from changing, deleting or adding:

    (i)    a Related Business if this Franchise Agreement is terminated or renewed or upon the termination or renewal of any supplemental or related agreement,

    (ii)    any Proprietary Marks used in connection with an Exxon Related Business, or

    (iii)    a Related Business as permitted under an agreement relating to that business.

(c) The Related Businesses permitted under this Agreement consist of the following:

| Initials | | |
| ExxonMobil | Franchise Dealer | |
| --- | --- | --- |
| 1. _____ | _____ | On the Run Convenience Store* |
| 2. _____ | _____ | Exxon Tiger Mart |
| 3. _____ | _____ | Exxon Tiger Market |
| 4. _____ | | Exxon Snack Shop |
| 5. _____ | _____ | Exxon Service |
| 6. _____ | _____ | Exxon Car Wash |
| 7. _____ | _____ | Other Exxon Offerings (as specified): |
| | | _____ |
| 8. _____ | _____ | Co-Brand or Non-Exxon Offering* (as specified): |
| | | _____ |

    * The On the Run Convenience Store and the use of related Proprietary Marks are available to Franchise Dealer only upon the signing of a separate written agreement with ExxonMobil. Franchise Dealer acknowledges that ExxonMobil does not offer Co-Brand or Non-Exxon Offerings. Franchise Dealer must obtain operating, trademark and other rights to any Co-Brand or Non-Exxon Offering directly from any third party having the authority to grant those rights.

The Related Businesses specified in items 1 through 8 of this Section 1.2(c) are collectively referred to as the "Exxon Related Businesses".

1.3 Related Business Attachments

    (a) In operating Related Business, Franchise Dealer shall comply with those attachments listed below applicable to the Related Businesses, which applicable attachments are incorporated into this Agreement.

        1.    Additional Exxon Tiger Mart/Market Provisions
        2.    Additional Exxon Service Provisions
        3.    Additional Exxon Car Wash Provisions
        4.    Additional Exxon Offerings Provisions
        5.    Additional Co-Brand/Non-Exxon Offerings Provisions

    (b) If Franchise Dealer leases the Marketing Premises from ExxonMobil, Franchise Dealer shall comply with the attachment entitled "CODO Lease Provisions", which is incorporated into this Agreement (the "CODO Lease Provisions").

(c)  If Franchise Dealer does not lease the Marketing Premises from ExxonMobil, Franchise Dealer shall comply with the attachment entitled "DOSS Additional Provisions" which is incorporated into this Agreement.

(d)  Franchise Dealer acknowledges receipt of all applicable attachments referred to in this Section 1.3.

1.4  <u>No Exclusive Marketing Rights</u>. This Agreement and the Franchise Relationship created by this Agreement do not give Franchise Dealer an exclusive right in any market or geographic area to sell the Products or conduct any of the Related Businesses. At ExxonMobil's sole discretion, it may compete with Franchise Dealer by:

(a)  establishing or continuing at locations of its choice the Exxon Outlets, Mobil Outlets, franchises, enterprises and other related businesses; or

(b)  directly selling Products or operating retail service stations, convenience stores, automotive repair and other services, and other related businesses, at locations of its choice.

1.5  <u>Term</u>. The term of this Agreement is for a fixed period of 3 years, beginning on APRIL 1, 2006 and ending on MARCH 31, 2009, unless terminated earlier under the provisions of this Agreement (the "Term"). By writing furnished to Franchise Dealer, ExxonMobil may grant temporary extensions of the Term for periods not exceeding 180 days for each extension. An extension is not to be construed as a renewal of this Agreement or of the Franchise Relationship.

## ARTICLE II
## PURCHASE AND DELIVERY OF PRODUCTS

2.1  <u>Purchase Obligation</u>.

(a)  Franchise Dealer shall use good-faith and best efforts to maximize the sale at the Marketing Premises of the Products. "Products" means motor fuel which is:

(i)  sold by ExxonMobil with authorization for resale as an Exxon-branded product;

(ii)  sold consistent with that authorization; and

(iii)  specified in the schedule entitled "Purchase Schedule" attached and incorporated into this Agreement (the "Purchase Schedule").

(b)  Without limiting the general requirement that Franchise Dealer maximize Product sales and subject to the terms and conditions of this Agreement, Franchise Dealer shall purchase directly from ExxonMobil, during the term of this Agreement and for delivery at the Marketing Premises, not less than 70% of the monthly and contract-year quantities of the Products specified in the Purchase Schedule (the "Contract Volumes"). The Contract Volumes and the percentage of the Contract Volumes that Franchise Dealer is obligated to purchase directly from ExxonMobil are subject to modification as provided in the CODO Lease Provisions or the DOSS Additional Provisions, whichever is applicable.

(c)  ExxonMobil, in its sole discretion, may sell more than the Contract Volumes to Franchise Dealer, but is not obligated to do so. If the first or last month of the Term is not a full month, the Contract Volume for that month is the Contract Volume specified in the Purchase Schedule for the corresponding month, prorated for the number of days in the partial month. All Product sales above the Contract Volume are subject to the terms and conditions of this Agreement.

(d)  DEALER agrees to buy and receive directly from EXXONMOBIL all of the EXXON-branded gasoline/diesel sold by DEALER.

2.2  <u>Prices</u>. For all Products purchased under this Agreement, Franchise Dealer shall pay ExxonMobil the price that is in effect at the time of loading of the delivery vehicle. Unless otherwise specified by ExxonMobil in writing, prices are prior to taxes and are subject to change by ExxonMobil at any time and without notice.

2.3   Terms of Payment. Except to the extent ExxonMobil extends credit to Franchise Dealer under Section 2.4, Franchise Dealer shall:

(a)   pay all amounts due ExxonMobil under this Agreement in U.S. currency in the manner specified by ExxonMobil; and

(b)   pay for Products and services prior to delivery and provision of services.

The method of payment specified by ExxonMobil may include ExxonMobil's Electronic Settlement Program, Automated Direct Debit System, certified check, bank or other financial-institution check or any other method as ExxonMobil may designate from time to time. ExxonMobil may charge, and Franchise Dealer shall pay, fees as ExxonMobil may from time to time specify and as are permitted by Law, for any late payments, for any checks or bank or other financial-institution debits that are not honored by Franchise Dealer's bank or other financial institution or are otherwise returned or reversed by Franchise Dealer's bank or financial institution. If, as a result of any un-honored checks or debits, ExxonMobil revokes or does not extend credit to Franchise Dealer, ExxonMobil may also charge, and Franchise Dealer shall pay, fees as ExxonMobil may from time to time specify and as are permitted by Law, which fees are determined by ExxonMobil to recoup its costs and expenses in administering Franchise Dealer's payments under this Agreement. Cash discounts, if any, do not apply to taxes, freight charges or container charges. ExxonMobil may withhold, setoff or recoup any amount due and owing Franchise Dealer or held by ExxonMobil on behalf of Franchise Dealer under this Agreement, any related or supplemental agreement or any other agreement between the Parties from or against any amount owed by Franchise Dealer to ExxonMobil.

2.4   Credit; Security.

(a)   In its sole discretion, ExxonMobil may extend credit to Franchise Dealer on terms and conditions as specified by ExxonMobil, and ExxonMobil may modify the terms and conditions of credit, or revoke credit, at any time or from time to time. If requested by ExxonMobil, Franchise Dealer shall provide to ExxonMobil and maintain security sufficient to secure payment for one or more loads of Product in such amounts and forms as ExxonMobil may specify in its sole discretion ("Product Security"), including a letter of credit or cash deposit.

(b)   ExxonMobil may use, without prior notice or demand, any or all of the Product Security to setoff or satisfy all or any part of any indebtedness or obligation of Franchise Dealer to ExxonMobil including indebtedness arising from purchases under this Agreement. If ExxonMobil uses any Product Security to satisfy all or any part of any indebtedness or obligation, Franchise Dealer immediately shall provide ExxonMobil with additional security, as directed by ExxonMobil, to replace the Product Security used by ExxonMobil. Following non-renewal or termination of the Franchise Relationship between ExxonMobil and Franchise Dealer, ExxonMobil shall return to Franchise Dealer, in accordance with ExxonMobil's procedures then in effect, any remaining portion of the Product Security not required to satisfy all or any part of any indebtedness or other obligation of Franchise Dealer to ExxonMobil.

(c)   At ExxonMobil's request at any time during the Term, Franchise Dealer shall sign and deliver to ExxonMobil a Security Agreement, Financing Statement, Mortgage, Deed of Trust or other documentation, as ExxonMobil may reasonably specify, to establish or perfect ExxonMobil's security interest in the Product Security. By written notice to ExxonMobil and payment of any outstanding sums, Franchise Dealer may elect to reduce or discontinue any credit extended to it under this Section 2.4. Upon such election and payment or if ExxonMobil reduces or revokes credit, Franchise Dealer's obligation to furnish ExxonMobil with Product Security or documentation to establish or perfect Product Security will be reduced to the extent that any Product Security exceeds any continuing credit extended by ExxonMobil and any outstanding sums owed to ExxonMobil.

(d)   If Franchise Dealer defaults in the payment of any obligation or indebtedness to ExxonMobil (including any indebtedness arising from purchases under this Agreement) or otherwise fails to comply with any credit terms imposed by ExxonMobil, ExxonMobil may without notice or demand, in addition to any other rights it may have (including termination or non-renewal of this Agreement and the Franchise Relationship):

(i)   immediately suspend deliveries of all Products; and

(ii)   apply any Product Security which Franchise Dealer may have given to ExxonMobil to the payment of the indebtedness or obligation.

2.5   Deliveries. ExxonMobil will deliver Products to the Marketing Premises on terms and conditions as specified by ExxonMobil in its sole discretion from time to time. Franchise Dealer shall take all actions necessary to facilitate the receipt of deliveries, including prompt removal of snow and ice from all fill cap areas. ExxonMobil may, but is not obligated to, make single deliveries of Product of less than its standard delivery quantity as specified by ExxonMobil from time to time. Franchise Dealer shall participate in and comply with ExxonMobil's Product delivery programs and policies in effect from time to time including ExxonMobil's Inventory Management System. If Franchise Dealer fails to comply with or participate in ExxonMobil's delivery program or policy, without limiting any other remedies available to ExxonMobil, Franchise Dealer shall pay to ExxonMobil a reasonable charge imposed in accordance with ExxonMobil's delivery policy or program to recover administrative or delivery costs resulting from Franchise Dealer's noncompliance with the program or policy. Franchise Dealer shall accept delivery of Product whether or not Franchise Dealer or anyone else representing Franchise Dealer is on the Marketing Premises to receive the delivery. Franchise Dealer shall pay for all Product delivered.

2.6   Other Terms and Conditions of Sale. Franchise Dealer shall use the dispensing and storage facilities that are owned by ExxonMobil or bear the ExxonMobil name or Proprietary Marks only for the storage or sale of the Products. Franchise Dealer shall purchase and resell the Products, and use the Proprietary Marks, brand names and packaging that are marketed and used by ExxonMobil as determined by ExxonMobil. ExxonMobil may, at any time, add new products or change the grade, specifications, characteristics or delivery package, brand name or other distinctive designation of any Product sold by ExxonMobil under this Agreement, and the Products so added or changed are subject to this Agreement. ExxonMobil may discontinue the sale of any Product without affecting other rights or obligations of ExxonMobil and Franchise Dealer under this Agreement. Only ExxonMobil has the right to determine what ExxonMobil products will be offered at the Marketing Premises.

2.7   ExxonMobil Product Certification. ExxonMobil certifies that, at the time of delivery, the Products delivered by it will comply with the following:

    (a)   all fuel requirements under applicable Laws in effect at the time of delivery in the area of the Marketing Premises including requirements relating to octane, oxygen content, Reid Vapor Pressure, cetane rating, sulfur content, aromatic content, dye content, benzene content, emission reduction percentages for volatile organic compounds or nitrogen oxides and other regulated components or characteristics of a motor fuel or motor-fuel additive ("Fuel Requirements").

2.8   Franchise Dealer Product Control; Safeguards. Franchise Dealer shall exercise the highest degree of care and diligence in handling, storing, selling and using Products delivered to the Marketing Premises. Franchise Dealer shall not cause or allow any contamination, mixing or adulteration of any Products. Franchise Dealer shall not sell, or offer for sale, from the Marketing Premises, Products which are contaminated or adulterated or fail to meet the Fuel Requirements or Unleaded Gasoline Requirements. ExxonMobil may refuse to make Product deliveries into any tank until in ExxonMobil's judgment quality problems are corrected. Franchise Dealer also shall:

    (a)   protect Product from adulteration, mixing or contamination by water or other substances;

    (b)   comply with the provisions in the CODO Lease Provisions or DOSS Dealer Additional Provisions, whichever is applicable, and the environmental Standards;

    (c)   inspect all storage tanks daily for water accumulation; where automated water readings are used, a manual stick reading shall be performed and recorded at least monthly to confirm the accuracy of the automated reading

    (d)   comply with any procedures developed by ExxonMobil from time to time to safeguard the integrity of all fuels being marked;

    (e)   comply with all Fuel Requirements;

    (f)   immediately notify Territory Manager by telephone, and confirm in writing,

        (i)   any suspicion that Product is contaminated, mixed or adulterated or fails to meet the Fuel Requirements or the Unleaded Gasoline Requirements,

        (ii)   if water exceeds 3/4 inch depth in any tank

    (iii)  any governmental testing or sampling of Products at the Marketing Premises, or

    (iv)  any suspicion that any Product has been released to the environment from any tank, line or other source at the Marketing Premises;

(g)  If requested, provide ExxonMobil with the results of any test of Product conducted by or for the Franchise Dealer and permit ExxonMobil to conduct tests as ExxonMobil may determine; and

(h)  upon any suspicion of adulteration, mixing, contamination or noncompliance with Fuel Requirements , take such action as ExxonMobil may direct.

(i)  ensure that the fuel filters, specified by ExxonMobil for use at CODO sites, are used for all products dispensed. For DOSS non-lessee, fuel filters used by Franchise Dealer must meet industry standards;

(j)  where blending dispensers are utilized, use blending ratios as directed by ExxonMobil.

(k)  immediately stop sales of any product whose storage tank contains 2 inches of water or more.

2.9    <u>Effect of Quality Violations; Samples</u>. Franchise Dealer acknowledges that the sale of quality products the customer can trust is one of Franchise Dealer's fundamental commitments and obligations under this Agreement. Franchise Dealer's failure to comply with the obligations under Section 2.8 constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship. Franchise Dealer permits ExxonMobil, its employees, agents and contractors to enter the Marketing Premises at all reasonable times to obtain Product samples and review all Franchise Dealer's documents and records relating to compliance with Section 2.8.

2.10   <u>Product Quality or Quantity Claims</u>. ExxonMobil is not liable to Franchise Dealer for any defect in quality (including failure to meet the requirements under Section 2.7), or shortage in quantity, of any Products delivered, unless:

(a)  Franchise Dealer gives ExxonMobil notice of the claim of quality defect or shortage in quantity or disputes or disagreements regarding the prices charged for the price of product within 96 hour after delivery.

(b)  Franchise Dealer provides ExxonMobil and all federal or state regulatory agencies, including their designated sub-contractors, with reasonable opportunity to inspect the Products and take test samples.


### ARTICLE III
### SERVICES BY EXXONMOBIL


3.1    <u>ExxonMobil Services</u>. ExxonMobil shall make available to Franchise Dealer, or assist Franchise Dealer in obtaining, the following:

(a)  Standard plans, specifications, equipment, decor and signs identified with Exxon Outlets as ExxonMobil makes available to all franchise dealers from time to time.

(b)  Initial franchise-management training and ongoing training in the System as ExxonMobil makes available to all franchise dealers from time to time (including training on standards, methods, procedures and techniques) at times and places designated by ExxonMobil.

(c)  Standards Handbooks, as ExxonMobil makes available to all franchise dealers from time to time.

(d)  Periodic individual or group advice, consultation and assistance, rendered by personal visit, telephone, voicemail, facsimile, newsletter, bulletin or other means of communication, made available from time to time as ExxonMobil may deem necessary or appropriate.

(e)  Merchandising, marketing and other data and advice as ExxonMobil may from time to time develop for distribution to all franchise dealers and determine in its sole discretion to be helpful in the operation of the Marketing Premises.

(f)    Other services as ExxonMobil may develop and offer to all franchise dealers.

# ARTICLE IV
## PARTICIPATION/ORGANIZATIONAL FORM

4.1    Organizational Form; Key Individual.

(a)    Except as provided in Section 4.4(a), Franchise Dealer must be in the form of an individual, or a corporation meeting the requirements of Section 4.3, and may not take any other form including a partnership or trust.

(b)    If Franchise Dealer is in a form other than an individual, Franchise Dealer shall comply with the requirements of Sections 4.3 or 4.4, whichever is applicable, and shall designate an individual as the key individual (the "Key Individual") who must:

    (i)    be reasonably acceptable to ExxonMobil and have received ExxonMobil's prior written approval;

    (ii)    meet the requirements of a key individual under this Article IV;

    (iii)    meet all of ExxonMobil's normal requirements for a key individual as may be in effect from time to time including ExxonMobil's normal requirements for a franchise dealer under Section 12.3(a); and

    (iv)    satisfactorily attend and complete all training programs required from time to time by ExxonMobil for franchise dealers or key individuals. The Parties shall designate the Key Individual on the signature page of this Agreement or by separate written agreement.

4.2    Participation in Business; Multi-Unit Operators.

(a)    Franchise Dealer acknowledges that ExxonMobil has entered into this Agreement with Franchise Dealer in reliance on Franchise Dealer's or the Key Individual's personal qualifications and commitment to the Core Values.

(b)    Franchise Dealer or Key Individual may own or operate more than one Exxon and/or Mobil Outlet only if the Franchise Dealer or Key Individual is authorized by ExxonMobil in writing under ExxonMobil's Multi-Unit Policy in effect from time to time. A Franchise Dealer or Key Individual is a "Multi-Unit Operator" if the Franchise Dealer or the Key Individual, separately or collectively:

    (i)    owns or operates more than one Exxon and/or Mobil Outlet;

    (ii)    is the franchise dealer for more than one Exxon and/or Mobil Outlet; or

    (iii)    is the key individual for more than Exxon and/or Mobil Outlet.

(c)    If Franchise Dealer or Key Individual is not a Multi-Unit Operator, the franchise dealer or key individual must devote good-faith and best efforts to the day-to-day operation and management of the Related Businesses.

(d)    If Franchise Dealer or Key Individual is a Multi-Unit Operator, the Franchise Dealer or Key Individual must devote good-faith and best efforts to the day-to-day operations and management of the Related Businesses at all of the Exxon/Mobil Outlets where he or she is the franchise dealer, the key individual or the owner or operator.

4.3    Corporation. If Franchise Dealer is a corporation, the Key Individual must comply with the following requirements:

(a)    if Franchise Dealer is an CODO Dealer, have legal and beneficial ownership of at least 51% of the outstanding voting stock or other ownership interests in the Franchise Dealer, unless:

    (i)    ExxonMobil consents in writing to a lesser ownership interest in accordance with an applicable written policy as may be in effect from time to time, and

    (ii)   Franchise Dealer and the Key Individual comply with all requirements and conditions under that policy;

(b)   the Key Individual must be the officer of the Franchise Dealer with authority and responsibility for the operation and management of the Businesses; and

(c)   the Key Individual must be authorized to represent and bind Franchise Dealer in all matters arising under this Agreement and all supplemental and related agreements including all matters relating to the Businesses.

Franchise Dealer represents and warrants that the Key Individual has, and at all times will have, the ownership, responsibility and authority required in this Section 4.3(a) and, upon request by ExxonMobil from time to time, shall furnish to ExxonMobil supporting documentation reasonably satisfactory to ExxonMobil.

(d)   Franchise Dealer shall confine its activities to the establishment and operation of the Related Businesses or, if Franchise Dealer is a Multi-Unit Operator, Franchise Dealer shall confine its activities to the establishment and operation of the Related Businesses at all its Exxon Outlets, unless:

    (i)   ExxonMobil consents in writing to Franchise Dealer's conducting other activities in accordance with an applicable written policy as may be in effect from time to time; and

    (ii)   Franchise Dealer complies with all requirements and conditions under that policy.

(e)   Franchise Dealer shall furnish ExxonMobil, at ExxonMobil's request from time to time, documentation as specified by ExxonMobil in its sole discretion to confirm the compliance of Franchise Dealer and the Key Individual with the provisions of this Section 4.3. Without limiting the immediately preceding sentence, ExxonMobil may request, and Franchise Dealer shall furnish ExxonMobil with, copies of Franchise Dealer's Articles of Incorporation, Bylaws and other governing documents, and any other documents ExxonMobil may reasonably request (including shareholder agreements relating to the Franchise Dealer). Franchise Dealer shall promptly notify ExxonMobil of any event or occurrence which may result in Franchise Dealer's or the Key Individual's noncompliance with any provision of this Section 4.3.

(f)   The transfer of any voting stock or other ownership interests in Franchise Dealer is subject to Articles XII and XIII.

(g)   The Key Individual must provide ExxonMobil, and maintain in full force and effect, a continuing, unconditional personal guarantee of Franchise Dealer's payment and performance obligations under this Agreement and all related and supplemental agreements, which guarantee must be in form and substance acceptable to ExxonMobil. If the Key Individual holds less than 51% of the ownership interest in the Franchise Dealer, ExxonMobil may require additional personal guarantees to be furnished ExxonMobil by one or more individuals who:

    (i)   are specified by ExxonMobil; and

    (ii)   directly or indirectly, hold in the aggregate at least 51% of the ownership interest in Franchise Dealer.

(h)   EXXONMOBIL'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISE DEALER. NOTHING IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY SHAREHOLDER OF A CORPORATE FRANCHISE DEALER.

4.4   Other Business Forms.

(a)   Franchise Dealer must be an individual, a corporation, or a limited liability company meeting the requirements of Section 4.3, and may not take any other business form including a partnership or trust unless:

    (i)   the Franchise Dealer was in a business form other than an individual, a corporation or limited liability company meeting the requirements of Section 4.3 prior to; or

(ii)  ExxonMobil permits another business form under an applicable written policy as may be in effect and Franchise Dealer complies with all requirements and conditions under that policy. (See Form of Organization Policy).

(b)  If Franchise Dealer is authorized under Section 4.4(a) to be in a business form other than an individual, a corporation or a limited liability company meeting the requirements of Section 4.3, the Key Individual must comply with the following requirements:

    (A)  if Franchise Dealer is a CODO Dealer, have legal and beneficial ownership of at least 51% of the ownership interests in the Franchise Dealer, unless:

        (1)  ExxonMobil consents in writing to a lesser ownership interest in accordance with an applicable written policy as may be in effect from time to time; and

        (2)  Franchise Dealer and the Key Individual comply with all requirements and conditions under that policy.

    (B)  be Franchise Dealer's manager, managing partner or other person with authority and responsibility for the operation and management of the Businesses; and

    (C)  be authorized to represent and bind Franchise Dealer in all matters arising under this Agreement and all supplemental and related agreements including all matters relating to the Businesses.

Franchise Dealer represents and warrants that the Key Individual has, and at all times will have, the ownership, responsibility and authority required in this Section 4.4(b) and, upon request by ExxonMobil, shall furnish to ExxonMobil supporting documentation reasonably satisfactory to ExxonMobil.

(i)  Franchise Dealer shall furnish ExxonMobil, at ExxonMobil's request, documentation as specified by ExxonMobil in its sole discretion to confirm the compliance of Franchise Dealer and the Key Individual with the provisions of this Section 4.4. Without limiting the immediately preceding sentence, ExxonMobil may request, and Franchise Dealer shall furnish ExxonMobil with, copies of its partnership agreement, trust agreement and other documents as ExxonMobil may request relating to Franchise Dealer's ownership, operation and organization. Franchise Dealer shall promptly notify ExxonMobil of any event or occurrence which may result in Franchise Dealer's or the Key Individual's noncompliance with the provisions of this Section 4.4.

(ii)  Franchise Dealer shall maintain a current list of all shareholders, general and limited partners, beneficiaries or other legal and beneficial owners of Franchise Dealer and shall furnish the list to ExxonMobil. Without limiting Section 4.4(b)(i), Franchise Dealer shall promptly notify ExxonMobil of any changes in ownership and furnish ExxonMobil with information relating to any owners as ExxonMobil may reasonably request.

(iii)  Franchise Dealer shall confine its activities to the establishment and operation of the Businesses or, if Franchise Dealer owns or operates more than one Exxon/Mobil Outlet, Franchise Dealer shall confine its activities to the establishment and operation of the Businesses at all its Exxon/Mobil Outlets; unless:

    (A)  ExxonMobil consents in writing to Franchise Dealer's conducting other activities in accordance with an applicable written policy as may be in effect from time to time; and

    (B)  Franchise Dealer complies with all requirements and conditions under that policy.

(iv)  The Key Individual must provide ExxonMobil, and maintain in full force and effect, a continuing, unconditional personal guarantee of Franchise Dealer's payment and performance obligations under this Agreement and all related and supplemental agreements, which guarantee must be in form and substance acceptable to ExxonMobil. If the Key Individual holds less than 51% of the ownership interest in the Franchise Dealer, ExxonMobil may require additional personal guarantees to be furnished to ExxonMobil by one or more individuals who:

    (A)  are specified by ExxonMobil; and

(B)  directly or indirectly, hold in the aggregate at least 51% of the ownership interest in Franchise Dealer.

(v)  The transfer of any ownership interest in Franchise Dealer is subject to Articles XII and XIII.

(vi)  EXXONMOBIL'S FRANCHISE RELATIONSHIP IS EXCLUSIVELY WITH FRANCHISE DEALER. NOTHING CONTAINED IN THIS AGREEMENT MAY BE CONSTRUED AS CREATING ANY FRANCHISE OR FRANCHISE RELATIONSHIP WITH THE KEY INDIVIDUAL OR ANY OTHER PERSON HAVING AN OWNERSHIP INTEREST IN FRANCHISE DEALER. IF FRANCHISE DEALER IS A PARTNERSHIP, THE FRANCHISE RELATIONSHIP IS ONLY WITH THE PARTNERSHIP AS CONSTITUTED ON THE DATE OF THE ORIGINAL FRANCHISE RELATIONSHIP WITH EXXONMOBIL.

(c)  This Article IV does not prevent Franchise Dealer, if an individual, from entering into a partnership, forming a corporation or using another business form that does not comply with Section 4.3 or 4.4 and is solely established to assist Franchise Dealer in managing and operating the Businesses, but:

(i)  the Franchise Dealer remains the sole franchisee under this Agreement and is responsible for all obligations of Franchise Dealer under this Agreement; and

(ii)  the partnership, corporation or other business form has no rights under this Agreement including any Franchise or Franchise Relationship with ExxonMobil.

4.5  <u>Disclosure of Ownership Interests</u>. Franchise Dealer represents and warrants that Franchise Dealer has disclosed to ExxonMobil in writing all information pertaining to any direct or indirect ownership interest Franchise Dealer or the Key Individual may have in the franchise, business or operation of any Exxon Outlet or any other motor-fuel outlet or convenience-store business ("Ownership Interest") including location of the site(s), business name (s), brand of motor fuels and the extent and nature of the Ownership Interest. Franchise Dealer's obligation of disclosure under this Section 4.5 continues during the Term. Upon acquisition of an Ownership Interest, Franchise Dealer shall promptly disclose in writing to ExxonMobil information relating to the Ownership Interest. For purposes of this Section 4.5, an Ownership Interest includes:

(a)  the direct or indirect ownership by Franchise Dealer or the Key Individual of a beneficial interest in a Exxon Outlet, other motor-fuel outlet or convenience-store business, where legal title is held in the name of another person or entity; and

(b)  direct or indirect ownership by Franchise Dealer or the Key Individual of shares in a corporation where that corporation or any subsidiary corporation has a legal or beneficial interest in an Exxon Outlet, other motor-fuel outlet or convenience-store business.

4.6  <u>Waiver</u>. ExxonMobil's receipt of any documentation or information will not be a waiver by ExxonMobil of any requirements under this Article IV or of its right at any time to require full compliance with these requirements.


**ARTICLE V**
**CONFIDENTIALITY**

5.1  <u>Confidential Information</u>. Franchise Dealer acknowledges that ExxonMobil, its Affiliates and their respective employees, contractors and agents will be disclosing and transmitting to Franchise Dealer certain confidential and proprietary information ("Confidential Information") in connection with the System and the operation of the Related Businesses. Accordingly, Franchise Dealer shall:

(a)  treat and maintain Confidential Information as confidential;

(b)  subject to Section 5.3, use Confidential Information only for the operation of the Businesses under this Agreement; and

(c) restrict disclosure of Confidential Information to only those managers, employees, contractors or agents who are directly connected with the performance of work and who require knowledge of the Confidential Information. Franchise Dealer shall use reasonable efforts to require its managers, employees, contractors or agents to comply with the provisions of this Section.

5.2    <u>Examples of Confidential Information; Compelled Disclosures</u>.

(a) Confidential Information includes, but is not limited to:

     (i) information, records, knowledge, techniques, and know-how in any form relating to the System or the Related Businesses including the Standards Handbook;

     (ii) ExxonMobil training materials and materials relating to the recruiting and management of employees and contractors;

     (iii) ExxonMobil marketing strategies, technologies, programs, policies, procedures and methods of doing business;

     (iv) information relating to ExxonMobil, its Affiliates or their respective franchisees, contractors and vendors;

     (v) information which ExxonMobil designates in writing from time to time as confidential or proprietary;

     (vi) information relating to Product or additive formulation; and

     (vii) information described in this Section 5.2(a) disclosed by ExxonMobil on the Intranet or by any other electronic-transmission or data-communications system.

(b) Confidential Information does not include information:

     (i) Franchise Dealer can demonstrate that was not:

         (A) acquired directly or indirectly from ExxonMobil or its Affiliates, or

         (B) subject to confidentiality obligations on the part of the source that provided the information;

     (ii) at the time of disclosure was a part of the public domain; or

     (iii) after the time of disclosure becomes a part of the public domain through publication or communication by a person (other than Franchise Dealer, its officers, directors, owners, employees, contractors or agents) who is not subject to a confidentiality obligation.

(c) Confidential Information is not excluded under Section 5.2(b) merely because it is embraced by more general information in the public domain or in Franchise Dealer's possession. Information consisting of a combination of features or information is not excluded under Section 5.2(b) merely because individual features or information are in the public domain or in Franchise Dealer's possession, but only if the combination is in the public domain or in Franchise Dealer's possession.

(d) Franchise Dealer may disclose Confidential Information to the extent required by a legally binding order or governmental directive if Franchise Dealer has given ExxonMobil:

     (i) prompt notice of the order or directive; and

     (ii) reasonable opportunity to challenge the order or directive or protect the confidentiality of any disclosed Confidential Information.

5.3    <u>Use of Confidential Information</u>. During the Term and for a period of two (2) years after the expiration or termination of the Franchise Relationship, Franchise Dealer may not, either directly or indirectly, for itself, or on behalf of or in conjunction with any other person, partnership or corporation, use any Confidential Information for purposes other than operating the Businesses under this Agreement. Nothing contained in this Section 5.3 may be construed to limit Franchise Dealer's obligations under Sections 5.1(a) and (c).

5.4    Remedy; Survival. Franchise Dealer acknowledges that any failure to comply with the requirements of this Article V will cause ExxonMobil irreparable injury. The provisions of this Article V will survive the termination or expiration of this Agreement and apply to all Confidential Information disclosed or transmitted to Franchise Dealer during the Franchise Relationship, whether prior to, during or after the Term.


## ARTICLE VI
## STANDARDS HANDBOOK


6.1    Standards Handbook. For the reasons acknowledged by Franchise Dealer under Section 9.1, Franchise Dealer shall comply with the standards (the "Standards") contained in ExxonMobil's National Standards Handbook ("Standards Handbook"). Franchise Dealer acknowledges that:

(a)    compliance with the Standards, and any revisions under Section 6.2, may require the expenditure of reasonable sums of money by Franchise Dealer;

(b)    the Standards are in addition to other obligations and requirements of Franchise Dealer under this Agreement; and

(c)    compliance with the Standards does not relieve or excuse Franchise Dealer from other obligations or requirements, whether more general or specific, contained in this Agreement or any related or supplemental agreements.

6.2    Revisions. ExxonMobil may, from time to time, revise the contents of the Standards Handbook. The revision may include implementing new or modified requirements for the System or any Business. Franchise Dealer shall comply with standards as revised. The revisions to the Standards Handbook are effective upon receipt of written notice to Franchise Dealer, unless a later date is specified by ExxonMobil.

6.3    Minimum Acceptable Ratings.

(a)    ExxonMobil may, but is not obligated to, establish by written policy minimum acceptable ratings ("Minimum Acceptable Ratings") for the Standards contained in the Standards Handbook.

(b)    If ExxonMobil establishes Minimum Acceptable Ratings, Franchise Dealer shall conduct the Businesses to achieve the Minimum Acceptable Ratings. The method for determining and measuring compliance with the Standards and calculating any ratings will be determined by ExxonMobil and set out in the Standards Handbook or other written materials furnished by ExxonMobil. ExxonMobil may add, delete or change Minimum Acceptable Ratings at any time upon not less than 90 days' written notice to Franchise Dealer.

(c)    Franchise Dealer acknowledges that:

(i)    Franchise Dealer's failure to achieve the Minimum Acceptable Rating for any Standard constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship;

(ii)    over time the Standards and any Minimum Acceptable Ratings may be raised; and

(iii)    while it is critical that Franchise Dealer achieve the Minimum Acceptable Ratings, this does not relieve or excuse Franchise Dealer from other obligations or requirements, whether more general or specific, contained in this Agreement or any related or supplemental agreements.

(d)    Nothing contained in this Section 6.5 prevents or limits ExxonMobil from:

(i)    requiring full compliance with any Standard for which ExxonMobil has established a Minimum Acceptable Rating,

(ii)    lowering or raising the Minimum Acceptable Rating for any Standard or group or category of Standards.

## ARTICLE VII
## PROPRIETARY MARKS

7.1   Use of Proprietary Marks. In using the Proprietary Marks, Franchise Dealer shall:

(a)   Use only the "Exxon" mark and such other Proprietary Marks as are designated in writing by ExxonMobil for Franchise Dealer's use, and use them only in the manner authorized and permitted by ExxonMobil.

(b)   Use the Proprietary Marks only for the operation of the Motor-Fuels Business and the Exxon Related Businesses and only at the Marketing Premises and in advertising for the Motor-Fuels Business and the Exxon Related Businesses conducted at the Marketing Premises, and not use the Proprietary Marks for any other purpose or in any manner which may confuse or deceive the public.

(c)   Not mix any other products with the Products or contaminate or adulterate the Products in any way, and not use the Proprietary Marks or Exxon signs in connection with the storage, handling, dispensing or sale of any adulterated, mixed or substituted products.

(d)   Keep legible and visible all Exxon signs and all Proprietary Marks on Exxon pumps, containers and equipment at any time located on the Marketing Premises, and use those pumps, containers and equipment solely for the Products.

(e)   Except as permitted in writing by ExxonMobil, not use the Proprietary Marks as part of franchise dealer's corporate or other name, including a DBA.

(f)   Comply with ExxonMobil's instructions in filing and maintaining requisite trade name or fictitious name registrations, and sign and deliver to ExxonMobil any consents necessary for the registration of ExxonMobil's corporate name in the state where Franchise Dealer conducts the Businesses.

(g)   Sign and deliver to ExxonMobil any documents deemed necessary by ExxonMobil or its counsel to obtain protection for the Proprietary Marks or to maintain their continued validity and enforceability.

(h)   On the effective date of the termination or non-renewal of the Franchise Relationship immediately stop using the Proprietary Marks and ExxonMobil's color scheme, trade dress, service marks, logos, slogans and advertising and promptly return to ExxonMobil all advertising and promotional materials in Franchise Dealer's possession.

(i)   If ExxonMobil requires Franchise Dealer to stop, or Franchise Dealer otherwise stops, operating any Related Business, Franchise Dealer shall immediately stop using the Proprietary Marks and ExxonMobil's color scheme, trade dress, service marks, logos, slogans and advertising relating to the affected Related Business and promptly return to ExxonMobil all advertising and promotional materials relating to that Related Business in Franchise Dealer's possession.

7.2   Non-Exclusive Use. Franchise Dealer's right to use the Proprietary Marks under this Agreement is non-exclusive. Without limiting the immediately preceding sentence, ExxonMobil may:

(a)   grant other rights and franchises for the Proprietary Marks;

(b)   use the Proprietary Marks for any purpose; and

(c)   develop and establish other systems for the same or similar Proprietary Marks, or any other proprietary marks, and grant rights or franchises relating to any marks without providing Franchise Dealer any rights to those marks.



7.3 <u>Ownership of Proprietary Rights</u>. Franchise Dealer acknowledges that ExxonMobil is the sole and exclusive owner of the Proprietary Marks and no ExxonMobil act or failure to act will give Franchise Dealer any ownership interest or right in the Proprietary Marks. All goodwill resulting from the use of the Proprietary Marks by Franchise Dealer inures to the benefit, and is the property, of ExxonMobil. ExxonMobil may, at any time, change any Proprietary Marks and ExxonMobil's color schemes, trade dress, service marks, logos, slogans and advertising used in connection with the Products or any Business and substitute any trademark, service mark, trade name or service name for use in connection with the System. In case of any change, Franchise Dealer shall use the Proprietary Marks, color schemes, trade dress, service marks, logos, slogans and advertising as changed. Nothing contained in this Section 7.3 obligates Franchise Dealer to pay to ExxonMobil any compensation received by Franchise Dealer for goodwill in connection with the Franchise Dealer's Transfer of an Interest in the Franchise in compliance with Articles XII and XIII.

**ARTICLE VIII**
**MANAGEMENT AND TRAINING**

8.1 <u>Franchise Dealer Management</u>.

    (a)    Franchise Dealer shall use, and cause the Key Individual to use, sound business practices by using a total quality management approach in managing the Businesses and shall maintain high standards of retail service-station operations as provided in Article IX.

    (b)    Unless otherwise provided by applicable ExxonMobil written policy, a Franchise Dealer is not required to hire a manager if franchise dealer is the owner, franchise dealer or key individual for 2 stores or less. HOWEVER, for each additional store, franchise dealer is required to hire a manager.

    For example, if Franchise Dealer operates five Exxon/Mobil Outlets, Franchise Dealer shall employ at least three Managers.

    Each Manager must be qualified and experienced in operating the Businesses located at the Exxon/Mobil Outlets, must attend initial and ongoing training as required by ExxonMobil from time to time, must have authority to act on behalf of Franchise Dealer in the conduct of day-to-day business at the Exxon/Mobil Outlets and must meet other reasonable qualifications as established by ExxonMobil from time to time. Franchise Dealer shall furnish ExxonMobil with written notice specifying each Manager and the Exxon/Mobil Outlets for which the Manager has authority and responsibility and shall notify ExxonMobil in writing of any change in Managers or in their respective responsibilities or authority.

8.2 <u>Franchise Management Training</u>. Prior to Franchise Dealer's commencement of operation ( the effective date of the franchise agreement of the Businesses, the following persons must attend, complete and pass, to ExxonMobil's satisfaction, an initial franchise management training program which may include written, computer-based, and/or home-study courses, as required by ExxonMobil from time to time:

    (a)    if Franchise Dealer is an individual, Franchise Dealer;

    (b)    if Franchise Dealer is not an individual, the Key Individual; and

    (c)    each Manager and any other owner, contractor or employee of Franchise Dealer who is, or subsequently becomes, actively involved in the management of the Motor-Fuels and related Businesses, if any.

8.3 <u>Employee Training</u>. Franchise Dealer shall cause its sales associates and other non-management employees and contractors to satisfactorily complete all training including basic and advanced training, refresher courses, and technical or business seminars, as ExxonMobil may require from time to time. Training may include written, computer-based and home-study courses.

8.4  Educational Meetings and Seminars. Franchise Dealer acknowledges that, in order to continue to meet customer needs and preferences and customer expectations of excellence for Exxon Outlets and Exxon-branded products, it is critical for Franchise Dealer, any Key Individual, any Manager and Franchise Dealer's management employees and contractors to keep abreast of current System developments and new procedures or programs which ExxonMobil deems, in its reasonable judgment, to be of major importance to the operation of the Businesses. Franchise Dealer shall attend and participate in, and shall cause any Key Individual, any Manager and any person described in Section 8.2(c) to attend and participate in, all local, regional or national educational meetings and seminars that ExxonMobil may conduct from time to time.

8.5  Training Expenses. Franchise Dealer shall pay, or cause its employees, contractors or any Key Individual to pay, all expenses incurred by Franchise Dealer, its employees, contractors or a Key Individual in connection with Franchise Dealer's fulfilling its obligations under Sections 8.2, 8.3 and 8.4 including costs and expenses of transportation, lodging, meals, wages and employee benefits. Franchise Dealer shall also pay to ExxonMobil or any ExxonMobil-designated third party reasonable fees or charges that ExxonMobil may impose from time to time to recover costs and expenses incurred by ExxonMobil or the third party relating to any training or meetings under this Article VIII including but not limited to, the cost of materials, production cost of videos, audio tapes, CD-Rom's, diskettes or manuals and costs relating to staff and meeting space.


## ARTICLE IX
## OPERATIONS


9.1  Importance of Operational Requirements. Franchise Dealer acknowledges that operation of the Marketing Premises and the Related Businesses in accordance with this Article IX and in compliance with the Standards is:

(a)  reasonable and of material significance to the Franchise and Franchise Relationship; and

(b)  of critical importance to Franchise Dealer, ExxonMobil and other Exxon Outlets in order to:

   (i)  meet the commitments contained in the Core Values and meet customer needs and preferences and customer expectations of excellence for the System, Exxon Outlets and Exxon-branded products,

   (ii)  maintain uniform and high operating standards,

   (iii)  increase demand for, and customer loyalty to, the services and products sold at all Exxon Outlets, and

   (iv)  protect the reputation and goodwill associated with the Proprietary Marks.

9.2  Operation of Related Businesses. Franchise Dealer shall operate the Businesses in strict conformity with the methods, procedures, standards and specifications as ExxonMobil may prescribe from time to time in writing including the Standards. Without limiting the general requirements of the immediately preceding sentence, the specific requirements of this Article IX also apply.

9.3  Operating Hours.

(a)  In accordance with ExxonMobil's National Hours of Operation Policy as in effect from time to time and subject to applicable Laws, Franchise Dealer shall keep the Marketing Premises open for the retail sale of the Products for the following hours as indicated:

Initials

ExxonMobil        Franchise Dealer

(i)  _____        _____  24 hours, 7 days per week; or

(ii)  _____        _____  Other as specified below:
      Monday - Friday:  _____ a.m. to _____ p.m.
      Saturday:  _____ a.m. to _____ p.m.
      Sunday & Holidays: _____ a.m. to _____ p.m.

(b) Subject to applicable Laws, Franchise Dealer shall prominently and clearly post the operating hours at the Marketing Premises. During the Term and except as provided in Section 9.3(c), operating hours may be modified only by written agreement of the Parties. Upon any renewal of the Franchise Agreement, operating hours will be determined in accordance with ExxonMobil's National Hours of Operation Policy in effect at that time.

(c) If the Term is more than 5 years, ExxonMobil may modify the operating hours under Section 9.3(a) at any time after the fifth anniversary date of this Agreement as may be required to address changes in circumstances affecting the Marketing Premises. ExxonMobil shall provide Franchise Dealer with written notice of the new operating hours. The new hours will take effect on the later of:

    (i) any date to which the Parties agree; or

    (ii) if the operating hours were not the result of a mutual determination by the Parties, but not less than 60 days following the date the dealer receives the notice.

9.4   <u>Use of Marketing Premises</u>. Franchise Dealer shall:

(a) use the Marketing Premises solely for the operation of the Businesses;

(b) keep the Motor-Fuels Business open and in normal operation for the periods specified in Section 9.3;

(c) refrain from using, or permitting the use of, the Marketing Premises for any other purpose or activity at any time; and

(d) not allow the use of the Marketing Premises in connection with any purpose prohibited by Law, covenant, condition or restriction.

9.5   <u>Installation of Additional Tanks</u>. Subject to applicable Laws, Franchise Dealer may install on the Marketing Premises additional tanks, dispensers or equipment for storing, selling or dispensing motor fuel other than Exxon Products with ExxonMobil's express written approval, after written application by Franchise Dealer to ExxonMobil, which approval may not be unreasonably withheld. Upon receipt of Franchise Dealer's application, ExxonMobil shall provide Franchise Dealer with a written statement of the procedures, requirements, conditions and limitations governing Franchise Dealer's installation and use of the additional tanks and equipment. This statement may impose requirements which are necessary or appropriate in ExxonMobil's sole discretion to address the following:

(a) protect the integrity of ExxonMobil's Proprietary Marks, image and System;

(b) provide for appropriate customer safety and access to facilities;

(c) maintain an appropriate appearance of the Marketing Premises; and

(d) provide safeguards for environmental protection and acceptable means to respond to potential environmental or other liability or costs.

If, after review of the statement, Franchise Dealer elects to go forward with the installation and ExxonMobil consents to the proposed installation, Franchise Dealer shall sign and deliver to ExxonMobil, prior to beginning any construction or other activities related to the installation, a written agreement (in form and substance acceptable to ExxonMobil) incorporating ExxonMobil's procedures, requirements, conditions and limitations. Dealer shall bear all installation costs including any environmental remediation and disposal costs incurred during or as a result of the installation and operation of the additional tanks, dispensers and equipment and any costs incurred in modifying or improving the Marketing Premises.

9.6   <u>Equipment, Fixtures, Signs</u>. Franchise Dealer shall install and use in and about the Marketing Premises only such equipment, fixtures, furnishings, interior and exterior signs and other items as strictly conform to the Standards and specifications in the Standards Handbooks or are otherwise permitted by ExxonMobil in writing from time to time.

9.7   Customer Service. Franchise Dealer shall provide, and ensure that Franchise Dealer's employees and contractors are in approved uniform, provide, prompt, fair, courteous and efficient service to customers. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with the customer-service Standards. If applicable Laws prohibit self-serve and mini-serve operations, Franchise Dealer also shall provide the services normally associated with a full-serve service station including voluntarily washing windshields and checking oil levels. Dealer shall manage the franchise so as to minimize customer complaints. Dealer shall promptly investigate any customer complaint received and shall make such adjustments as are reasonable and appropriate. Customer complaints arising out of credit card transactions shall be subject to the provisions of ExxonMobil's Credit Card Instructions.

9.8   Clean, Attractive and Functional Operations. Franchise Dealer shall maintain the Marketing Premises and all adjacent areas in clean, attractive and functional condition at all times. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with the Standards governing clean, attractive and functional operations.

9.9   Maintenance Obligations. Subject to the provisions of the CODO Lease Provisions or DOSS Additional Provisions, as applicable, Franchise Dealer shall undertake, at its expense, all maintenance and make all repairs, replacements, alterations and additions as may be required to maintain the Marketing Premises in good repair and condition including periodic cleaning, landscaping, repainting and repairs, replacing obsolete signs, equipment and fixtures, and complying with the Standards.

9.10  Compliance with Laws; Covenants and Restrictions. Franchise Dealer shall operate and maintain the Marketing Premises and the Businesses in compliance with all applicable Laws including those concerning the environment, hazardous substances or waste, toxic substances, right to know and occupational safety and health. Franchise Dealer shall comply with all applicable covenants, conditions or restrictions applicable to the operation and maintenance of the Marketing Premises and the Businesses. Franchise Dealer shall also comply with the Americans with Disability Act and relevant or related state and local statutes.

9.11  Safety Procedures. Without limiting Franchise Dealer's status and obligations as an independent businessperson under Article XVII, Franchise Dealer shall implement and maintain procedures for safe operation of the Marketing Premises and the Businesses including safe cash handling and employee training. ExxonMobil and Franchise Dealer expressly acknowledge that Franchise Dealer has sole responsibility for the security of all persons at the Marketing Premises including Franchise Dealer's customers, contractors and employees at the Marketing Premises. Nothing contained in this Agreement is to be construed as:

   (a)   an assumption by ExxonMobil of any duty owed by Franchise Dealer to any person including any customer, contractor or employee of Franchise Dealer; or

   (b)   giving ExxonMobil the right to control Franchise Dealer's provision of security measures employed by Franchise Dealer at the Marketing Premises.

9.12  Image and Trade Mark Standards; Promotion Programs. Franchise Dealer shall use and display sales, marketing and promotional materials provided by ExxonMobil from time to time, in the manner and for the time periods designated by ExxonMobil. Franchise Dealer shall ensure that all stationery, signage and other printed materials used in connection with the Businesses bear the Proprietary Marks in the form, colors, location and manner prescribed by ExxonMobil. Subject to applicable Laws, Franchise Dealer shall participate fully in all ExxonMobil national promotional programs including point-of-purchase programs. Without limiting the preceding provisions of this Section 9.12, Franchise Dealer shall comply with the image and trademark Standards.

9.13  Staffing. Franchise Dealer shall hire and maintain a competent, conscientious and trained staff (including a Manager if required under this Agreement) and shall take all steps necessary to ensure that Franchise Dealer's employees preserve good customer relations and comply with ExxonMobil's requirements for dress and appearance as ExxonMobil may prescribe from time to time in writing. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with all personnel and customer-contact Standards.

9.14  Conduct.

   (a)   Franchise Dealer and its employees, contractors and agents shall not engage or cooperate in, any conduct that:

(i)  reflects unfavorably on the reputation of Franchise Dealer, ExxonMobil or the System;

(ii)  impairs the goodwill associated with the Proprietary Marks including conduct which jeopardizes Franchise Dealer's good relations with customers and creditors of the Businesses or ExxonMobil's relationship with its contractors or vendors; or

(iii)  constitutes a deceptive or unfair trade practice under applicable Laws.

(b)  Franchise Dealer shall cooperate, and shall ensure that its employees, vendors, contractors and agents cooperate, fully with ExxonMobil and its employees, vendors and contractors in the performance of Franchise Dealer's obligations or the exercise of ExxonMobil's rights under this Agreement and any related or supplemental agreements. Franchise Dealer shall not permit on the Marketing Premises:

(i)  any consumption of intoxicating beverages;

(ii)  the sale or use of illegal drugs or drug paraphernalia; or

(iii)  the sale of any pornographic material or other material that ExxonMobil in its judgment determines may be offensive to the general public.

(iv)  the sale of tobacco and/or alcohol products to underage customers as prescribed in any local, state or federal regulation.

(c)  Franchise Dealer will notify ExxonMobil within 5 business days, in writing, at the Customer Service Center address noted in 20.4(i) of any Notices of Violation received from local, state or federal authorities, concerning the sale of tobacco and/or alcohol to minors.

9.15  System Modifications. Franchise Dealer acknowledges and agrees that ExxonMobil, in its sole discretion, may modify or vary aspects of the System with respect to any Franchise Dealer or Exxon Outlet or group of Franchise Dealers or Exxon Outlets based on conditions or circumstances that ExxonMobil determines appropriate including local site conditions, state or local Laws, property use restrictions, sales potential, demographics, local economic conditions, competition and local business practices. Franchise Dealer further acknowledges that ExxonMobil has no obligation to disclose or offer the same or similar modifications or variances to Franchise Dealer.

9.16  Retail Credit and Debit Program. For so long as ExxonMobil offers to Franchise Dealer the opportunity to participate in ExxonMobil's Retail Credit or Debit Program ("Program"), Franchise Dealer shall comply with the Program, as it may be amended by ExxonMobil from time to time.

(a)  If Franchise Dealer fails to comply with the Instructions, POS Participation Agreement or Maintenance and System Access Agreement for Electronic Credit Card Point of Sale Terminals including the requirement that Franchise Dealer take reasonable precautions to prevent sales to unauthorized persons, ExxonMobil may, in addition to any other remedy that may be available to it including termination or non-renewal of this Agreement and the Franchise Relationship, take any one or more of the following actions as it deems necessary or appropriate in its sole discretion:

(i)  charge back to Franchise Dealer's account the amount of any credit or debit transaction and any Losses incurred by ExxonMobil;

(ii)  on notice to Franchise Dealer, impose special terms and procedures on Franchise Dealer's participation in the Program; or

(iii)  on notice to Franchise Dealer, exclude Franchise Dealer from participation in the Program.

(b)  Franchise Dealer is in default of this Agreement if:

(i)  Franchise Dealer fails to comply with the Instructions, POS Participation Agreement or Maintenance and System Access Agreement for Electronic Credit Card Point of Sale Terminals; or

(ii)  Franchise Dealer fails to pay promptly any charge to Franchise Dealer's account resulting from non-compliance.

Franchise Dealer shall, upon ExxonMobil's request, immediately return to ExxonMobil any manual credit card imprinter and electronic credit card point of sale terminal leased to Franchise Dealer by ExxonMobil.

9.17  Improvements and Investments in Marketing Premises. If Franchise Dealer is a DOSS, Franchise Dealer shall make improvements and investments in the Marketing Premises as required in the DOSS Dealer Additional Provisions.

9.18  Technological and Communication Updates. Franchise Dealer acknowledges that the use of current technology and communications systems in the operation of the Businesses is of critical importance in meeting customer needs and preferences and adjusting to competitive conditions. Franchise Dealer further acknowledges that technology and communications systems are expected to change over time requiring periodic addition, replacement or updating of equipment or systems used in the Businesses. Accordingly, Franchise Dealer shall:

    (a)  as required by ExxonMobil in Franchise Dealer's marketing area, install and maintain in good operating condition, at Franchise Dealer's expense:

        (i)  a facsimile machine for sending and receiving written communications, and

        (ii)  equipment that allows access to the Internet, e-mail or other electronic- transmission or data-communications system designated by ExxonMobil;

    (b)  as required by ExxonMobil in Franchise Dealer's marketing area, subscribe at Franchise Dealer's expense to a voicemail system for transmitting and receiving telephonic communications, as designated by ExxonMobil from time to time; and

    (c)  make other expenditures or investments as may be reasonably required in writing by ExxonMobil from time to time to update equipment, technology and communications systems at the Marketing Premises including the addition, replacement or updating of point of purchase equipment, pump dispensing technology, credit and cash processing equipment and software. ExxonMobil will provide Franchise Dealer with reasonable notice specifying the required expenditures or investment and any specifications or requirements necessary to assure uniformity and compatibility with the System.

9.19  Inspection. At all reasonable times, Franchise Dealer shall permit ExxonMobil or its contractors, employees and agents to enter and inspect the Marketing Premises and the Business operations to determine compliance with this Agreement. Franchise Dealer shall cooperate fully with ExxonMobil and its contractors, employees and agents in conducting any inspection and shall render assistance as may be reasonably requested. Upon notice from ExxonMobil of any deficiencies detected in an inspection, Franchise Dealer promptly shall take such steps as may be necessary to correct the deficiencies including the temporary closing of the Marketing Premises if so directed by ExxonMobil.

9.20  Pricing. Franchise Dealer shall determine its own retail prices, pricing policies and discounting policies in accordance with applicable Laws. ExxonMobil may, from time to time, communicate with Franchise Dealer about prices and periodically may counsel Franchise Dealer on retail pricing. Franchise Dealer is not required to accept any pricing suggestions of ExxonMobil.

9.21  Environmental Standards. Franchise Dealer shall comply with all environmental Laws and shall conduct the Businesses in an environmentally conscientious manner with due regard for the health and safety of the surrounding community. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with Article II and the environmental Standards.

9.22  Maintain Inventory. Franchise Dealer shall maintain an inventory of Products sufficient to serve customers during the hours specified in Section 9.3.

## ARTICLE X
## ADVERTISING, PROMOTION, AND MARKETING

10.1    General Advertising. Franchise Dealer shall comply with the requirements of all ExxonMobil advertising, promotional and marketing programs including requirements relating to graphics, concepts, materials, placement and media. Without limiting the general requirements of the immediately preceding sentence, Franchise Dealer shall comply with Standards in the Standards Handbook relating to advertising, promotional and marketing programs.

10.2    Local Advertising Approval. Franchise Dealer shall obtain ExxonMobil's prior approval of all advertising, promotional and marketing activities by Franchise Dealer in its local market area. Franchise Dealer shall submit to the Territory Manager (TM) for its prior approval (except with respect to prices to be charged) Franchise Dealer's proposal for all local advertising, promotional and marketing plans and samples of all local advertising materials not prepared or previously approved by ExxonMobil or its designated contractors or agents. If ExxonMobil does not furnish Franchise Dealer with notice withholding approval within 30 business days after the date of receipt of the proposal by ExxonMobil, the proposal will be deemed approved. If any plans or materials previously approved by ExxonMobil are later disapproved, Franchise Dealer shall discontinue their use promptly upon notice from ExxonMobil.

10.3    Advertising Contributions. Subject to applicable Laws, ExxonMobil may, in good faith and the normal course of business, establish a regionally-focused media advertising contribution program to fund regional advertising incremental to ExxonMobil's historical advertising levels for promoting the Exxon brand in one or more Key Markets (the "Contribution Program").

If ExxonMobil establishes a Contribution Program, it will be developed in consultation with ExxonMobil's National Dealer Business Improvement Council. Upon consultation with a regional advertising steering committee consisting of ExxonMobil-designated franchisees and ExxonMobil personnel, ExxonMobil will control and direct all advertising under the Contribution Program, including location, media, content and extent of any advertising under the Contribution Program.

Franchisees' contributions will be collected in Key Markets and allocated for advertising in those markets. All contributions under the Contribution Program may be collected by ExxonMobil and paid to one or more ExxonMobil-designated third parties who will administer the program. Franchise Dealer's contributions will be nonrefundable. The Contribution Program will not create a trust or fiduciary relationship. The contributions may be spent in the year of contribution or any subsequent year and may be applied against any costs or expenses associated with the Contribution Program including administrative costs.


**ARTICLE XI**
**INSURANCE**


11.1    Types of Insurance Required.

During the time this agreement is in effect, in addition to any other insurance or surety bonding required by LAWS, Franchise Dealer will carry and maintain in force with companies satisfactory to ExxonMobil , solely at Franchise Dealer's expense, insurance satisfactory to ExxonMobil as follows:

(a)    Comprehensive/Commercial General Liability Insurance or Garage Liability insurance including, but not limited to, coverage for the sale of motor fuel, operation of retail motor fuel stores, premises operations, products, completed operations, contractual liabilites, with a minimum combined single limit of $1,000,000 providing coverage for injury, death or property damage resulting from each occurrence.

(b)    In the event Franchise Dealer has alcoholic beverages for sale at any location, a limit of $1,000,000 will be obtained to include coverage for liabilities arising out of the dispensing or selling of alcoholic beverages including, without limitation, any liabilities by a dram shop or alcoholic beverages control act.

(c)    Business Auto Liability insurance coverage for operation of vehicles hired, owned or non-owned with a minimum combined single limit of $1,000,000 providing coverage for injury, death or property damage resulting from each occurrence.

(d)    Garagekeepers' Legal Liability insurance (if PREMISES includes service bays) including, but not limited to, coverage for fire, theft, riot, vandalism, and collision with limits of at least $50,000 for each occurrence.

(e)    Fire Legal Liability Insurance for an amount of at least the full replacement cost of FIXTURES and EQUIPMENT on PREMISES.

(f)    Workers Compensation and Employers Liability Insurance, or similar social insurance, for all Franchise Dealers employees engaged in performing services where required by laws which may be applicable to Franchise Dealers employees with a waiver of all rights of subrogation and/or contribution against ExxonMobil where such waiver is permitted by law.

(g)    Environmental impairment insurance coverage with at least limits of $1,000,000 on a continuous and uninterrupted basis insuring Franchise Dealer for environmental legal liabilities arising out of, or in any manner associated with, related to, Franchise Dealers use of, and/or presence on the PREMISES if any TANK SYSTEM is installed on PREMISES, in whole or in part, by anyone other than ExxonMobil or a contractor hired by ExxonMobil.

(h)    ExxonMobil periodically may reasonably require Franchise Dealer to carry additional types of insurance coverages and amounts, including modifications to existing insurance under this Article.

(i)    Each policy of insurance described in this Article 11.1 shall cover ExxonMobil as additional insured (except Workers Compensation and Employers Liability) and shall be primary as to all other policies which may provide coverage.

11.2    CODO Additional Insurance Clause.

Types of Insurance Required:

(a)    plate glass insurance acceptable to ExxonMobil, in an amount sufficient tot replace all plate glass and security glazing with like plate glass and security glazing in the event of loss or damage;

(b)    fire and extended coverage insurance in an amount sufficient to cover Franchise Dealers inventory and equipment, with a waiver of subrogation against ExxonMobil.

11.3    DOSS Additional Insurance Clause.

In addition to any other insurance required under the Agreement, the DOSS Franchise Dealer shall also obtain and maintain coverage for:

(a)    property insurance for the replacement value of all ExxonMobil property located at the Marketing premises including the Leased Equipment and other Exxon signs and equipment with ExxonMobil named as the mortgagee to the extent of its property, monetary and security interest.

11.4    Evidence of Insurance.

Prior to the date of this Agreement and any time upon request by ExxonMobil, Franchise Dealer shall have its insurance carrier(s) furnish to the requester certified copies of the required insurance policies, and/or certificates of insurance specifying the types and amounts of coverage in effect, expiration dates, confirmation that each policy complies with the requirements of Article 11.1 Specifying that no insurance shall be cancelled or materially changed during the time this Agreement is in effect without ten (10) calendar days prior written notice to the requester.

11.5    Other Provisions.

Nothing in this Article 11 in any way limits or waives Franchise Dealer's legal or contractual responsibilities to ExxonMobil or others.


# ARTICLE XII
## TRANSFER OF INTEREST; SURVIVORSHIP

12.1  <u>Consent Requirements</u>. Franchise Dealer acknowledges that the rights and duties of Franchise Dealer are personal to Franchise Dealer, and that ExxonMobil has granted this Franchise in reliance on the qualifications, business skills, financial capacity and personal character of Franchise Dealer or, if Franchise Dealer is not an individual, of the Key Individual. Accordingly, Franchise Dealer shall obtain ExxonMobil's express prior written consent as a condition precedent to the sale, assignment or transfer (collectively, the "Transfer") of any of the following (collectively, an "Interest"):

    (a)   any interest in this Agreement and any supplemental or related agreements, the Franchise, the Franchise Relationship and any lease, right or license granted under this Agreement or any supplemental or related agreements;

    (b)   any direct or indirect ownership interest of the Key Individual or any other person in Franchise Dealer; or

    (c)   all or substantially all of the assets of any of the Businesses.

Except as specifically provided in this Article XII, any Transfer, not having the express prior written consent of ExxonMobil is null and void and constitutes a failure by Franchise Dealer to comply with a reasonable and materially significant requirement of this Agreement and the Franchise Relationship. Any Transfer of an Interest is also subject to ExxonMobil's rights under Article XIII.

If Franchise Dealer, the Key Individual or any other person with an Interest in Franchise Dealer (the "Transferor") intends to Transfer an Interest, the Franchise Dealer shall furnish ExxonMobil with written notice of the Transferor's intent, which notice must be at least 90 days prior to any proposed Transfer. Franchise Dealer shall furnish to ExxonMobil all information and take all actions, and cause the Transferor and any proposed transferee to furnish to ExxonMobil all information and take all actions, as may be reasonably required by ExxonMobil to review the proposed Transfer including all documents and actions referred to in this Article XII. ExxonMobil is not obligated except as otherwise provided by law, to review or respond to any Transfer until:

      (i)   all required information is received by ExxonMobil; and

      (ii)   all required actions are taken by Franchise Dealer or the Transferor.

12.2  <u>Consent to Transfer</u>. ExxonMobil may not unreasonably withhold its consent to a Transfer of an Interest, except that ExxonMobil may, in its sole discretion, require any or all of the following as conditions of its consent:

    (a)   Franchise Dealer shall pay:

      (i)   all indebtedness, monetary obligations and all other outstanding obligations to ExxonMobil, its Affiliates or any financial institutions or other persons that have loaned money or leased property to Franchise Dealer in connection with an arrangement under which ExxonMobil or its Affiliate furnished any consideration including any inducement, guarantee or credit enhancement. Without limiting the preceding general requirements of this Section 12.2(a), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under ExxonMobil-backed loan programs, direct ExxonMobil loans or ExxonMobil reimbursement agreements; and

      (ii)   all indebtedness to contractors or vendors that have furnished services or goods to the Marketing Premises. _____

    (b)   If the Interest is that of the Key Individual, the proposed transferee must be designated as the Key Individual, must meet the requirements of Sections 12.2(e)(ii) and (e)(iii) and must furnish a guarantee pursuant to Article IV.

    (c)   Except as otherwise provided by law, the Transferor must sign and deliver to ExxonMobil a general release in form and substance satisfactory to ExxonMobil, of any and all claims against ExxonMobil and its Affiliates and their respective officers, directors, shareholders, employees, and agents, in their corporate and individual capacities, including claims arising under applicable Laws.

    (d)   Franchise Dealer may not Transfer less than all Interest in this Agreement, all supplemental and related agreements, the Businesses and assets relating to the Businesses. A Key Individual may not Transfer less than 51% of the total ownership interest in the Franchise Dealer unless:

     (i)    ExxonMobil expressly allows the Transfer under an applicable written policy as may be in effect from time to time; and

     (ii)   the Key Individual and the Franchise Dealer comply with all requirements and conditions under that policy.

(e)   Franchise Dealer may not Transfer an Interest to any person except to an individual, a corporation meeting the requirements of Section 4.3 or to another business form permitted under and meeting the requirements of Section 4.4. If a Transfer of an Interest in Franchise Dealer is to a corporation meeting the requirements of Section 4.3 or is the Transfer of an Interest in Franchise Dealer that is another business form permitted under Section 4.4, the following applies:

     (i)    If Franchise Dealer is another business form permitted under Section 4.4(a)(i), the Transfer may only be to a person holding, and known by ExxonMobil at the time of formation of the original Franchise Relationship to have held, an ownership interest in the other business form.

     (ii)   A new Key Individual must be designated on the signature page of the assignment agreement or other document reasonably requested by ExxonMobil. The Franchise Dealer, transferee and new Key Individual must comply with Article IV.

(iii) The new Key Individual must be reasonably acceptable to ExxonMobil, meet the requirements of Article IV and meet all of ExxonMobil's normal requirements for a Key Individual as may be in effect from time to time including ExxonMobil's normal requirements for a franchise dealer under Section 12.3(a).

(iv) If Franchise Dealer is not an individual, the term "Transfer" additionally includes any change in ownership of an Interest in Franchise Dealer:

    (A) by will, bequest or applicable Laws governing descent;

    (B) by merger, consolidation or operation of Law; or

    C) by the foreclosure, attachment, execution or sale of any Interest that is used as collateral or security for financing, but does not include any pledging, mortgaging, hypothecating, granting of a security interest or encumbering of such property in order to secure bona fide financing from a financial institution if:

        (1) the pledging, mortgaging, hypothecating, granting of a security interest or encumbering does not:

            (I) result in the foreclosure, attachment, execution or sale of such property,

            (II) cover any property of ExxonMobil including any interest of ExxonMobil in equipment, fixtures or improvements, and

            (III) if Franchise Dealer is a CODO Dealer, cover the Marketing Premises, and

        (2) Franchise Dealer furnishes ExxonMobil prior written notice of such pledging, mortgaging, hypothecating, granting of a security interest or encumbering.

12.3    Conditions to Transfer. If a Transfer, alone or together with other previous, simultaneous or proposed Transfers, will have the effect of transferring financial or management control of Franchise Dealer or the Franchise, ExxonMobil may require, in its sole discretion and in addition to any other conditions, any or all of the following as conditions of its approval except as otherwise provided by law:

    (a) The transferee must demonstrate to ExxonMobil's satisfaction that the transferee meets ExxonMobil's then-current requirements for new franchise dealers under the System; including requirements relating to credit, financial capability, business and personal qualifications, business experience and training.

    (b) The transferee must sign and deliver to ExxonMobil an agreement, in form and substance acceptable to ExxonMobil, to assume all obligations of the Franchise Dealer under this Agreement and all supplemental and related agreements.

    (c) The transferee must complete, and cause its Managers and management and non-management employees to complete, to ExxonMobil's satisfaction, such initial and refresher training as ExxonMobil may require.

    (d) Franchise Dealer must not be in default of this Agreement or any supplemental or related agreement.

12.4    Administrative Fees. Prior to any Transfer, Dealer or the transferee of any Interest shall pay to ExxonMobil a non-refundable administrative fee in connection with each Transfer in an amount to be specified by ExxonMobil. The Administrative Fee compensates ExxonMobil for costs and expenses incurred with Transfers. Without limiting ExxonMobil's right to change the fee, the fee in effect on the effective date of this Agreement is $10,000, except if the Transfer results in the transferee becoming a Multi-Unit Operator with two sites or more, the Franchise Dealer or the transferee shall pay an administrative fee of $7,500.00. Franchise Dealer shall also pay to ExxonMobil administrative fees from time to time imposed by ExxonMobil which are in connection with changes in Franchise Dealer's operations, name or business structure, result in administrative costs or expenses to ExxonMobil and are in an amount determined by ExxonMobil to recoup those costs and expenses.

12.5    Survivorship.

(a)  If Franchise Dealer is an individual, the provisions of this Section 12.5 apply. Franchise Dealer may, by written notice to ExxonMobil, designate his or her qualified spouse or adult child to succeed Franchise Dealer as franchisee upon Franchise Dealer's death. Franchise Dealer also may designate his or her qualified spouse or adult child as an alternate successor if the designated successor dies. If Franchise Dealer has no living spouse or adult children, Franchise Dealer may designate another qualified individual as successor. Franchise Dealer shall comply with all applicable Laws governing survivorship or succession subject to the provisions of any policy which ExxonMobil may have in effect. A designated successor must:

    (i)  meet all ExxonMobil's requirements for a franchise dealer that are in effect at the time of succession and are applicable to the Businesses;

    (ii)  attend and complete all training requirements applicable to a franchise dealer at the time of succession; and

    (iii)  must sign and deliver to ExxonMobil a written agreement or agreements, in form and substance acceptable to ExxonMobil, assuming all obligations and liabilities of the Franchise Dealer under this Agreement and all related and supplemental agreements including all agreements relating to the Businesses.

(b)  If Franchise Dealer is a corporation meeting the requirements of Section 4.3 and the Key Individual has legal and beneficial ownership of at least 51% of the outstanding voting shares or other ownership interests in the Franchise Dealer, the provisions of this Section 12.5(b) apply. The Key Individual of a Franchise Dealer covered by this Section 12.5(b) may, by written notice to ExxonMobil, designate his or her qualified spouse or adult child to succeed the Key Individual upon the Key Individual's death. That Key Individual also may designate his or her qualified spouse or adult child as an alternate successor if the designated successor dies. If that Key Individual has no living spouse or adult children, the Key Individual may designate another qualified individual as successor. That Key Individual shall comply with all applicable laws governing survivorship succession. A designated successor must:

    (i)  meet all of ExxonMobil's requirements for a Key Individual that are in effect at the time of succession and are applicable to the Businesses;

    (ii)  attend and complete all training requirements applicable to a Key Individual at the time of succession;

    (iii)  furnish to ExxonMobil a personal guarantee pursuant to Section 4.3(g); and

    (iv)  cause Franchise Dealer to comply with all obligations under Section 4.3 including furnishing to ExxonMobil any documentation requested by ExxonMobil under Section 4.3(d).

(c)  By express written policy, ExxonMobil may, but is not obligated to, allow Franchise Dealer or the Key Individual to designate persons as successors in addition to those specified in Sections 12.5(a) and (b). Designation of any additional persons will be subject to those terms and conditions as may be specified in that policy.(See Transfer & Survivorship Policy).

12.6  Waivers.

(a)  ExxonMobil does not waive any claims or rights under this Agreement or any related or supplemental agreements, including any right to demand strict compliance with any terms of those agreements by any Transferor or transferee or any rights in connection with any future Transfers, if:

    (i)  ExxonMobil consents to any proposed Transfer; or

    (ii)  ExxonMobil fails to exercise its right to purchase any Interest of a Transferor under Article XIII.

(b)  ExxonMobil does not consent to any Transfer by:

    (i)  acceptance of any money;

    (ii)  any course of dealing; or

    (iii)  any interviews, counseling, correspondence or other communications with any proposed transferee including communications under Section 12.8.

(c)   No Transfer of an Interest or consent to a Transfer may be construed as releasing or discharging:

    (i)   any Franchise Dealer from any obligation or liability arising out of this Agreement or any supplemental or related agreement; or

    (ii)  a Key Individual from his or her obligations under any guarantee.

12.7  <u>Assignment by ExxonMobil</u>. This Agreement shall inure to the benefit of ExxonMobil, its successors, and assigns. ExxonMobil may transfer or assign all or part of its rights or interest in this Agreement, or delegate all or part of its duties or obligations under this Agreement, without restriction, to any person or entity. Upon any assignment or delegation by ExxonMobil, ExxonMobil's assignee or delegatee will be substituted for ExxonMobil with respect to all assigned rights or interests and to all delegated duties and obligations and ExxonMobil will be released from any delegated duties and obligations.

Franchise Dealer acknowledges that:

(a)   an assignment or delegation by ExxonMobil may impact Franchise Dealer's rights and obligations under this Agreement to the extent that an assignee or delegatee has policies or programs that differ from ExxonMobil's policies and programs;

(b)   this impact is contemplated by the Parties under this Agreement; and

(c)   Franchise Dealer, the Key Individual and any other person with an Interest in Franchise Dealer hereby waives any claim for constructive termination or claim for damages.

12.8  <u>Communications with Transferees</u>. ExxonMobil may communicate directly with any prospective transferee. Franchise Dealer expressly consents to ExxonMobil, its Affiliates, contractors or vendors disclosing to the prospective transferee any information or projections requested by the prospective transferee including information relating to the Marketing Premises, the Businesses, this Agreement or any related or supplemental agreements. Franchise Dealer releases ExxonMobil, its Affiliates, contractors and vendors, and their respective directors, officers, employees and agents from any claims, losses or liability of Franchise Dealer resulting from any disclosure made by ExxonMobil in good faith. Nothing contained in this Section 12.8 is intended to obligate ExxonMobil to provide any information or projections to a prospective franchisee.


**ARTICLE XIII**
**<u>RIGHT OF FIRST REFUSAL</u>**

13.1  <u>Right of First Refusal</u>.

(a)   In connection with the proposed Transfer of an Interest, ExxonMobil shall have the right to meet the offer of any transferee which offer is acceptable to the Transferor of the Interest and acquire the Interest on the same terms and conditions as those contained in the transferee's offer. If the offer relates to an Interest in Franchise Dealer and Franchise Dealer owns property or businesses unrelated to this Agreement and the Businesses, Franchise Dealer shall offer to sell to ExxonMobil only that property (including any interest in the Marketing Premises and property related to the Businesses) and those businesses (including the Businesses) which are related to this Agreement or any supplemental or related agreements (the "Covered Interests"). The offer must not be more than the value of that consideration attributed to the Covered Interests in the proposed transferee's offer.

(b)   No later than 90 days before the proposed sale or closing date, Franchise Dealer or other Transferor must furnish to ExxonMobil:

    (i)   if the proposed transferee's offer relates to an Interest in Franchise Dealer and if Franchise Dealer owns property or businesses other than the Covered Interests, a written offer to sell ExxonMobil the Covered Interests in accordance with Section 13.1(a), or

(ii) if Section 13.1(b)(i) does not apply, a copy of the proposed transferee's offer, which will be a binding offer (the "Offer") by the Transferor or Franchise Dealer to ExxonMobil on the terms and conditions of the Offer. The Offer must be bona fide, in writing and contain all terms and conditions of the proposed Transfer. Franchise Dealer also shall furnish ExxonMobil with such additional information relating to the Interest, the Transferor, the proposed Transfer, the proposed transferee, the Interest and the Covered Interests, as ExxonMobil may reasonably request in order to evaluate the offer or review the proposed Transfer under Article XII and ensure compliance with this Article XIII.

(c) Upon receipt of the Offer and all requested information, ExxonMobil will have 60 days (unless otherwise required by law) within which to evaluate the Offer, and to advise in writing Franchise Dealer or any other Transferor whether ExxonMobil exercises its right to acquire the Interest or the Covered Interests, whichever is applicable. An Offer that includes the exchange of other property interests for any Interest or Covered Interests may be accepted by ExxonMobil by substituting for that other property payment of an amount equal to the fair-market value of that other property but not more than the value attributed to that other property in the Offer. Franchise Dealer shall provide ExxonMobil with full access to Franchise Dealer's books and records if the Offer:

(i) includes an exchange of property; or

(ii) is an offer by Franchise Dealer to sell the Covered Interests at fair-market value as required under Section 13.1(a).

(d) If ExxonMobil chooses to exercise its right of first refusal under this Article XIII, closing and the effective date of any termination of this Agreement as provided below in this Section 13.1(d) will be the proposed sale or closing date:

(i) specified in the proposed transferee's offer if the Offer is that of a proposed transferee; or

(ii) as agreed by ExxonMobil and Franchise Dealer if the Offer is an offer by Franchise Dealer to sell the Covered Interests. The closing will take place at ExxonMobil's offices. At closing, Franchise Dealer shall deliver to ExxonMobil documentation satisfactory to ExxonMobil conveying good, marketable and clear title to all property subject only to reasonable liens and conditions expressly provided in the Offer. If the Interest or Covered Interests subject to the offer includes Franchise Dealer's Interests in this Agreement and the Franchise Relationship, this Agreement and all related and supplemental Agreements will terminate on the sale or closing date, subject to any obligations or liability of Franchise Dealer or the Key Individual to ExxonMobil accrued prior to termination or which survive termination, and Franchise Dealer shall sign and deliver to ExxonMobil, at least 7 business days prior to the sale or closing date, a binding mutual termination agreement in form and substance acceptable to ExxonMobil.

(e) If ExxonMobil does not exercise its right under this Section 13.1 with respect to any Interest, ExxonMobil shall:

(i) notify Franchise Dealer in writing of its decision;

(ii) review the proposed Transfer in accordance with Article XII; and

(iii) notify Franchise Dealer as to whether ExxonMobil consents to the Transfer and as to which conditions will apply to the Transfer.

(f) If ExxonMobil notifies Franchise Dealer that ExxonMobil consents to the Transfer, the Franchise Dealer or other Transferor of the Interest may proceed with the Transfer of the Interest only in accordance with the terms and conditions in the proposed transferee's offer constituting, or giving rise to, the Offer. Franchise Dealer shall provide ExxonMobil with documentation satisfactory to ExxonMobil that the Transfer was completed in accordance with the proposed transferee's offer.

(g) ExxonMobil's rights under this Article XIII will apply to each offer by a transferee to Transfer an Interest and include any material renegotiations or material modifications of all or any part of an offer. Each offer (including any material renegotiation or modification of any offer) is a separate offer entitling ExxonMobil to its rights under this Section 13.1.

(h) Except as otherwise provided by law, if any transferee fails to meet any requirements or conditions under Article XII including ExxonMobil's then-current requirements for new franchise dealers, ExxonMobil, in addition to withholding its consent to the Transfer and in lieu of exercising its rights under this Section 13.1 may, consistent with applicable Laws, substitute another transferee who meets those requirements and conditions and who accepts and is able to meet the terms and conditions of the Offer.

(i) ExxonMobil's failure to exercise its purchase rights under this Section 13.1 on one or more occasions:

    (i) does not affect ExxonMobil's rights under this Section 13.1 on other occasions whether or not involving the same Interest;

    (ii) does not constitute ExxonMobil's consent to the Transfer of an Interest; and

    (iii) does not preclude ExxonMobil's right to substitute a transferee under Section 13.1(h).

13.2 <u>Transfers to Immediate Family</u>. ExxonMobil's purchase rights under Section 13.1 do not apply to the following Transfers:

(a) if Franchise Dealer is an individual, Franchise Dealer's Transfer of all Franchise Dealer's Interests under this Agreement and all related and supplemental agreements including all agreements relating to the Businesses, to:

    (i) Franchise Dealer's qualified spouse or adult child; or

    (ii) a corporation with respect to which the Franchise Dealer or the Franchise Dealer's spouse or adult child qualifies as the Key Individual.

(b) if Franchise Dealer is a corporation and the Key Individual holds legal and beneficial ownership of at least 51% of the outstanding voting stock and other ownership interests in the Franchise Dealer, a Transfer by the Key Individual of all the Key Individual's Interests in Franchise Dealer to a spouse or adult child who qualifies as a Key Individual.

The Transfers referred to in this Section 13.2 are subject to all other provisions of this Agreement including the provisions of Articles IV and XII. This Section 13.2 does not authorize any Transfer that is merely a means or device to Transfer an Interest to a person other than as described in this Section

## ARTICLE XIV
## DEFAULT AND TERMINATION

14.1 <u>Termination or Non-renewal of Agreement and Franchise Relationship</u>. ExxonMobil may terminate or nonrenew this Agreement, the Franchise and the Franchise Relationship between ExxonMobil and Franchise Dealer as follows:

(a) in accordance with the applicable provisions of the PMPA if the PMPA then applies to this Agreement; or

(b) if the PMPA no longer applies to this Agreement:

    (i) for breach of any provision of this Agreement, or

(c) if Franchise Dealer is not an individual, also:

    (i) upon the occurrence of an event with respect to the Key Individual that would be grounds for termination or non-renewal under the PMPA if the event had instead occurred to an individual Franchise Dealer including:

(A)   the death of the Key Individual,

(B)   the fraud or criminal misconduct of the Key Individual relevant to the operation of the Marketing Premises,

(C)   the continuing severe physical or mental disability of the Key Individual of at least three months' duration which renders the Key Individual unable to contribute to the proper operation of the Marketing Premises,

(D)   the conviction of the Key Individual for any felony involving moral turpitude, and

(E)   a declaration of bankruptcy or a judicial determination of insolvency of any guarantor ` referred to in Sections 4.3(e) or 4.4(b)(v).

(F)   the knowing failure of the Key Individual to comply with any Laws relevant to the operation of the Marketing Premises;

(ii)   the dissolution or winding-up of Franchise Dealer,

(iii)   upon the withdrawal or change of interest of any partner, if a partnership, or

(iv)   upon loss of Franchise Dealer's rights under applicable Law to conduct the Businesses.

Upon any termination or non-renewal, Franchise Dealer shall comply with the provisions of Article XV and with ExxonMobil's normal post-termination procedures as furnished in writing to Franchise Dealer from time to time.

14.2   Right of Termination Due to Governmental Action. Either Party may terminate this Agreement upon not less than 180 days' prior written notice to the other Party if any federal, state or local governmental action results in the adoption or imposition of Laws that:

(a)   significantly alter the reasonable expectations of the Parties at the time of entering into this Agreement including the expectation that Franchise Dealer will be obligated to pay rent as specified in the CODO Lease Provisions (if Franchise Dealer leases the Marketing Premises from ExxonMobil) or purchase the Products from ExxonMobil in accordance with Section 2.1;

(b)   result in the imposition of an obligation upon ExxonMobil to install or construct equipment, facilities or improvements on the Marketing Premises and, in ExxonMobil's sole judgment, the cost of such installation would be uneconomical to ExxonMobil; or

(c)   modify in any way the present relationship of ExxonMobil's exploration, production, supply, transportation, refining or marketing functions.

14.3   Accrued Rights. Any termination or non-renewal is subject to ExxonMobil's accrued rights.

14.4   Remedies of ExxonMobil. If Franchise Dealer defaults on any obligation contained in this Agreement or any related or supplemental agreement, ExxonMobil may, but is not obligated to, exercise any or all of the following remedies, whether or not ExxonMobil exercises its right to terminate or nonrenew:

(a)   suspend all deliveries of Products to Franchise Dealer until the default is corrected or remedied; or

(b)   apply any sums or security (including the Product Security) furnished by Franchise Dealer to ExxonMobil under this Agreement or any related or supplemental agreement to the payment of any indebtedness. Franchise Dealer immediately shall provide additional security, as directed by ExxonMobil, to replace the sums or security applied by ExxonMobil.

ExxonMobil's rights and remedies under this Agreement are distinct, separate and cumulative, and no one of them, whether or not exercised by ExxonMobil, is in exclusion of any others under this Agreement or any related or supplemental agreement, or at Law or in equity.

**ARTICLE XV**

## OBLIGATIONS UPON TERMINATION OR EXPIRATION

15.1    Termination of Business Operation. Upon the termination or non-renewal of this Agreement, the Franchise and the Franchise Relationship, Franchise Dealer's rights under this Agreement and all related and supplemental agreements terminate, and Franchise Dealer shall stop all operation of the Motor-Fuels Business and the Related Businesses and all use of the Proprietary Marks and the System. In particular, and without limiting the general requirements of the preceding provisions of this Section 15.1, Franchise Dealer shall:

(a)    Immediately stop operating the Motor-Fuels Business and the ExxonMobil Related Businesses and at no time after termination or non-renewal represent Franchise Dealer, directly or indirectly, as a current or former Exxon franchise dealer.

(b)    Immediately and permanently stop using, in any manner whatsoever, any Confidential Information, the ExxonMobil name and all signs, advertising, materials, displays, stationery and forms containing the Proprietary Marks.

(c)    Promptly pay:

(i)    all sums owing to ExxonMobil and its Affiliates and to all financial institutions and other persons that have loaned money or leased property to Franchise Dealer in connection with an arrangement under which ExxonMobil or its Affiliate furnished any consideration including any inducement, guarantee or credit enhancement. Without limiting the preceding general requirements of this Section 15.1(c), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under ExxonMobil-backed loan programs, direct ExxonMobil loans and ExxonMobil reimbursement agreements; and

(ii)    if Franchise Dealer leases the Marketing Premises from ExxonMobil, all indebtedness to contractors or vendors that have furnished goods or services to the Marketing Premises.

(d)    Immediately return to ExxonMobil all ExxonMobil signs and other personal property of ExxonMobil. Franchise Dealer grants, and shall cause any other person in possession of the Marketing Premises to grant, to ExxonMobil a non-revocable license to enter the Marketing Premises to remove Exxon signs and property. Franchise Dealer shall bear all removal, site-restoration and transportation costs relating to the removal of Exxon signs and equipment under this Section 15.1(e).

## ARTICLE XVI
## TAXES, PERMITS, INDEBTEDNESS

16.1    Tax, Duty, Fee Due ExxonMobil. Franchise Dealer shall pay to ExxonMobil any present or future governmental charges imposed on ExxonMobil (including any tax, duty, fee or other charge imposed by governmental authority) and calculated on any basis, including by volume, cost or receipts, which is on or measured by (1) this Agreement or any related or supplemental agreement; (2) the Products; (3) the raw materials or constituent materials from which the Products are derived; or (4) the importation, refining, manufacture, sale, use, possession, transportation, handling or disposal of any raw or constituent materials, or the Products. Franchise Dealer shall pay all governmental charges to ExxonMobil unless they are included by ExxonMobil in the price of the Products or unless Franchise Dealer pays the charge directly to the applicable governmental authority.

16.2    Local, State, Federal Taxes and General Indebtedness. Franchise Dealer shall pay when due all governmental charges imposed on Franchise Dealer (including withholding, unemployment and sales taxes, fees and other charges imposed by governmental authority), and all accounts and indebtedness incurred by Franchise Dealer in the conduct of the Businesses.

16.3  <u>Indebtedness Dispute</u>. Notwithstanding any dispute by Franchise Dealer of its liability to pay any governmental charges under Section 16.2, Franchise Dealer shall not permit a tax sale, foreclosure or seizure by levy or execution or similar writ or warrant, or any attachment, lien or encumbrance by a creditor or governmental authority, of or on the Marketing Premises, any Business or any improvements, equipment or fixtures on the Marketing Premises.

16.4  <u>Permits and Licenses</u>. Franchise Dealer shall timely obtain and comply with all permits, certificates or licenses necessary for the full and proper conduct of the Businesses, including licenses to do business, fictitious name registration, underground storage tank permits and licenses, sales tax permits and fire clearances. Franchise Dealer shall pay all fees or charges relating to these permits, certificates and licenses.

16.5  <u>Notices</u>. Franchise Dealer shall notify ExxonMobil in writing within 5 days of:

(a)  the commencement of any action, suit or proceeding,

(b)  the issuance of any writ, injunction or award or of a decree of any court, agency, or other governmental authority, or

(c)  any indebtedness, event or occurrence,

which may adversely affect the operation or financial condition of the Businesses, the Franchise Dealer, the Key Individual or the Marketing Premises.

## ARTICLE XVII
## INDEPENDENT CONTRACTOR

17.1  <u>Relationship of the Parties</u>. The relationship of the Parties is as follows:

(a)  neither Party has a fiduciary relationship with the other;

(b)  Franchise Dealer is an independent business person with responsibility for and control over the manner and means of the day-to-day operations of the Businesses including Product deliveries, Product leak or release detection, Product leak or release reporting and compliance with all Laws;

(c)  neither Party is an agent, legal representative, subsidiary, joint venturer, partner, employee or servant of the other for any purpose; and

(d)  no person performing work for Franchise Dealer at the Marketing Premises or in connection with the Businesses is an agent, legal representative, joint venturer, partner, employee or servant of ExxonMobil or its Affiliates. Franchise Dealer has exclusive control and direction over the duties, supervision, compensation, hiring and firing of its employees, contractors and agents.

17.2  <u>Public Notification</u>. Franchise Dealer shall represent itself to the public as an independent business person operating the Motor-Fuels Business under a franchise from ExxonMobil. Franchise Dealer shall take necessary action to effect this representation, including placing a notice of Franchise Dealer's status in a conspicuous place on the Marketing Premises and on stationery and written or graphic materials.

17.3  <u>Other Franchise Dealer Obligations</u>. Franchise Dealer shall not:

(a)  make any contract, agreement, warranty or representation on behalf of ExxonMobil or its Affiliates;

(b)  incur any debt or obligation in the name of ExxonMobil or its Affiliates; or

(c)  by act or omission, cause ExxonMobil or its Affiliates to be liable, or be found to have assumed liability, for any activities of Franchise Dealer at the Marketing Premises or relating to the Businesses including any claim or judgment arising from Franchise Dealer's act or omission.

## ARTICLE XVIII
## INDEMNIFICATION

18.1   <u>Definition of Losses</u>. "Losses" includes all compensatory, exemplary or.punitive damages, fines, penalties, charges, costs, lost profits, legal fees and costs, accountants' and expert witness fees, expenses (including expenses for environmental personnel), settlement amounts, judgments, damage to ExxonMobil's reputation and goodwill and any other amounts incurred in connection with the matters described.

18.2   <u>Indemnity</u>. Except as provided in Section 18.9 Franchise Dealer assumes the risk of and sole responsibility for and agrees to defend (with counsel acceptable to ExxonMobil, unless such defense, but not ExxonMobil's defense costs, is waived by ExxonMobil), indemnify, release and hold harmless ExxonMobil, its Affiliates and each of their officers, its employees, agents, successors, and assigns, from and against any and all expenses, costs (including , without limitation, professional fees), penalties, fines (without regard to the amount of such fines), liabilities, claims, demands and cause of action, at law or in equity (including, without limitation, any arising out of the Comprehensive Environmental Response Compensation and Liability Act (CERCLA), the Resource Conservation and Recovery Act (RCRA), the Clean Air Act, or any other LAWS or STANDARDS), for violations of LAW or STANDARDS, or injuries, death, loss, or damage of any kind or character to person, property, or natural resources, by whomever suffered or asserted including Franchise Dealer, its agents, officers, directors, servants, contractors, partners, affiliates, shareholders, employees, invitees, licensees, and/or trespassers, owner or representative of Franchise Dealer or of the operator of any Co-Brand or Non-ExxonMobil Offering ("Related Party") resulting from, related to, or arising out of the actual or alleged:

   (a)   violation or asserted violation, by Franchise Dealer or any Related Party of any Laws;

   (b)   Franchise Dealer's breach or alleged breach of any contract;

   (c)   libel, slander or any other form of defamation by Franchise Dealer or any Related Party;

   (d)   violation or breach by Franchise Dealer of any warranty, representation or obligation of this Agreement or any related or supplemental agreement;

   (e)   any environmental contamination or occurrence as follows:

      (i)   unless Section 18.2(e)(ii) applies, any environmental contamination or occurrence in whole or in part arising out of the operation of the Marketing Premises during any period when Franchise Dealer was or is in possession of the Marketing Premises or arising out of any act or omission of Franchise Dealer or any Related Party, or

      (ii)   if Franchise Dealer and all Related Parties have no interest in the storage tanks, lines or dispensing equipment located at the Marketing Premises and have no interest in the underlying estate of the Marketing Premises (excluding only a lease from ExxonMobil in accordance with the CODO Lease Provisions or the DOSS Additional Provisions), any environmental contamination or occurrence in whole or in part arising out of any act or omission of Franchise Dealer or any Related Party;

   (f)   Use of PREMISES by Franchise Dealer, its agents, contractors, and/or employees;

   (g)   Purchase, delivery, receipt, storage, dispensing, or sale of motor fuel not bought from ExxonMobil;

   (h)   Installation, existence, use, or removal of any TANK SYSTEM, in whole or part, not owned by ExxonMobil, and the delivery of products into or out of that TANK SYSTEM;

   (i)   Defective condition of PREMISES whether due to any latent or patent defect,

   (j)   failure by Franchise Dealer to comply with Franchise Dealer's maintenance obligations under this agreement or any related or supplemental agreement including any agreement relating to a Related Business ("Failure" shall include any reasonable delay);

   (k)   Acts or omissions, whether occuring on or off PREMISES, of any person(s) including, without limitation, Franchise Dealer, its agents, contractors, employees and/or any third parties, and excepting only ExxonMobil, its agents, and/or employees, even if such acts or omissions, by whomever committed, constitute CRIMINAL ACT (as defined in Section 18.8)

(l)    activities of third parties acting on behalf of or pursuant to any joint venture, partnership, co-branding arrangement, sublease, license or other agreement with, Franchise Dealer with respect to the Marketing Premises, management of the Franchise or conduct of the Businesses;

(m)    claims by creditors of Franchise Dealer or any Related Party;

(n)    failure by Franchise Dealer to obtain or keep current the amounts and types of insurance required by this Agreement or to comply with the terms and conditions of the insurance obtained; or

(o)    Failure by Franchise Dealer, its agents, contractors, and/or employees, to fully comply with:

    (i)    Any LAWS, Standards; or

    (ii)    Any provisions, covenant, or requirement of this Agreement; or

(p)    Liens or claims of any contractors, subcontractors, suppliers, material men, workers, other persons or entities (excepting only ExxonMobil), its agents, contractors, and/or employees) relating to PREMISES.

18.3    <u>Notices; Choice of Counsel.</u> Franchise Dealer shall promptly notify ExxonMobil of any Proceeding. If ExxonMobil is or may be named as a party in the Proceeding, ExxonMobil may elect (but is not obligated) to undertake the defense or settlement of the Proceeding with counsel of ExxonMobil's choice. If ExxonMobil does not elect to undertake the defense or settlement of the Proceeding, Franchise Dealer shall use counsel acceptable to ExxonMobil. If Franchise Dealer fails to use counsel acceptable to ExxonMobil or if ExxonMobil, in its discretion, determines that a conflict of interest exists between ExxonMobil and Franchise Dealer in the defense of the Proceeding, ExxonMobil may engage counsel of its choice to separately represent it in the Proceeding. No undertaking or separate representation of counsel by ExxonMobil under this Section 18.3 in any manner limits or waives Franchise Dealer's obligation to indemnify and defend, or pay for the defense of, ExxonMobil.

18.4    <u>Remedies.</u> With respect to any Proceeding, ExxonMobil may, at any time and without notice, in order to protect persons or property or the reputation or goodwill of ExxonMobil or others, consent or agree to any settlement or remedial or corrective action as ExxonMobil deems expedient, if, in ExxonMobil's sole judgment, there are reasonable grounds to believe that:

(a)    any of the acts or circumstances enumerated in Section 18.2 have occurred; or

(b)    any act or omission of Franchise Dealer or any Related Party may result directly or indirectly in future damage, injury or harm to any person or any property.

18.5    <u>Defenses.</u> All Losses incurred under this Article XVIII shall be chargeable to and paid by Franchise Dealer, regardless of any actions, activities or defenses undertaken by the Indemnitees, or subsequent success or failure of any actions, activities or defenses.

18.6    <u>Recovery Obligations.</u> Under no circumstances will Indemnitees be obligated to seek recovery from third parties or mitigate their Losses in order to maintain a claim against Franchise Dealer. Any Indemnitee's failure to pursue a recovery or mitigate a Loss will in no way reduce the amounts recoverable by that Indemnitee from Franchise Dealer.

18.7    <u>Claims against ExxonMobil.</u> Franchise Dealer represents and warrants that Franchise Dealer has no knowledge of any claim by Franchise Dealer or any Related Party against the Indemnitees on the date of this Agreement except for any claims disclosed by Franchise Dealer in a written schedule initialed by the Parties and attached to this Agreement. Franchise Dealer's obligation to disclose claims includes the disclosure of claims of which Franchise Dealer would have acquired knowledge upon reasonable inquiry or the exercise of due diligence.

18.8    <u>Criminal Act.</u> "CRIMINAL ACT" as used in the Agreement means any act(s) or omission(s) having the nature of crime. CRIMINAL ACT does not require proof of arrest, the filing of criminal charges, formal criminal processing, indictment, or conviction.

18.9    **<u>Negligence; Willful Misconduct.</u> Notwithstanding the terms of 18.2 it is the intention of the parties that Franchise Dealer will fulfill its obligations set forth in Section 18.2 even if ExxonMobil, its agents and/or employees are jointly or concurrently negligent and/or jointly or concurrently act with willful misconduct, but not if ExxonMobil, its agents, and/or employees are solely negligent and/or solely act with willful misconduct.**

# ARTICLE XIX
## FAILURE TO PERFORM; ALLOCATION

19.1    General Contingencies; Force Majeure.

(a)    ExxonMobil is not liable for any consequences to Franchise Dealer, including loss, damage or demurrage due to any delay or failure in performance, arising out of any cause beyond ExxonMobil's reasonable control including:

    (i)    Governmental Action: compliance with any action, order, direction, request or control of any governmental authority or person purporting to act for any governmental authority; or

    (ii)    Force Majeure: interruption, unavailability or inadequacy of the supply of the Products or of any facility of production, manufacture, storage, transportation, distribution or delivery, for any reason, including wars, hostilities, public disorders, acts of enemies, sabotage, strikes, lockouts, labor or employment difficulties, fires, floods, acts of God, accidents or breakdowns, plant shutdowns for repairs, maintenance or inspection, or weather conditions.

(b)    ExxonMobil shall not be required to remove any cause or replace the affected source of supply or facility if ExxonMobil determines the action would involve additional expense or a departure from its normal practices.

(c)    Franchise Dealer is not liable for failure to receive Products if Franchise Dealer is prevented from receiving and using them in Franchise Dealer's customary manner by any cause beyond Franchise Dealer's reasonable control.

19.2    Allocation.

(a)    If there is, or ExxonMobil determines there may be, a shortage of supplies, for whatever reason, so that ExxonMobil is or may be unable to meet the demands of some or all of its customers, ExxonMobil may allocate to and among its retail dealers those quantities of Product that ExxonMobil determines it has available for distribution to that class of trade, or subgroup within that class of trade, from any specific terminal or point of supply. ExxonMobil's plan of allocation must not unreasonably discriminate between Franchise Dealer and ExxonMobil's other retail dealers that are in Franchise Dealer's class of trade or subgroup within that class of trade and are supplied by the same terminal or point of supply. ExxonMobil is not required to make up any deliveries or quantities omitted as a result of any cause or allocation under this Article XIX including deliveries or quantities omitted by ExxonMobil in allocating Products among its retail dealers under this Section 19.2, and ExxonMobil is not liable for any damages or losses in connection with those omitted deliveries or quantities.

(b)    If any allocation occurs, the Contract Volumes will be adjusted to reflect the allocation. In all situations of perceived or actual supply shortages, ExxonMobil may join or comply with any voluntary or non-mandatory price, supply, allocation or delivery restriction systems or programs designed or supported by any governmental authority. Any decision or determination made by ExxonMobil under this Article XIX will be made in ExxonMobil's sole discretion when acting in good faith in the ordinary course of business.

# ARTICLE XX
## MISCELLANEOUS

20.1    Significance of Terms and Conditions.

    (a)    FRANCHISE DEALER ACKNOWLEDGES THE SIGNIFICANCE OF EACH TERM AND CONDITION AND THAT ANY BREACH OF THE TERMS AND CONDITIONS IS SUBSTANTIAL. THE PARTIES ALSO ACKNOWLEDGE THAT THIS AGREEMENT IS SUBJECT TO THE PMPA, AND NOTHING CONTAINED HEREIN IS INTENDED TO REDUCE THE RIGHTS OF EITHER PARTY UNDER THAT LAW.

    (b)    Franchise Dealer has expressly acknowledged in this Agreement that the failure to meet certain obligations constitutes a failure to comply with a reasonable and materially significant provision of this Agreement or the Franchise Relationship. These acknowledgments may not be construed as intending that other provisions, which are not so acknowledged, are not reasonable and materially significant provisions of this Agreement and the Franchise Relationship.

20.2    Approvals and Consents. If this Agreement requires the prior approval or consent of ExxonMobil, Franchise Dealer shall make a timely written request to ExxonMobil for its approval or consent, and any approval or consent must be obtained in writing. ExxonMobil makes no warranties or assurances upon which Franchise Dealer may rely, and assumes no liability or obligation to Franchise Dealer by:

    (a)    providing any waiver, approval, consent, or suggestion to Franchise Dealer in connection with any approval or consent; or

    (b)    reason of any neglect, delay or denial of any request.

20.3    Strict Compliance. Subject to the PMPA, ExxonMobil's rights at any time to:

    (a)    demand strict compliance with any obligation or condition under this Agreement or any related or supplemental agreement, or

    (b)    exercise any rights or remedies in connection with Franchise Dealer's default under this Agreement or any related or supplemental agreement,

are not waived or impaired by:

    (i)    ExxonMobil's failure to exercise any right under this Agreement or any supplemental or related agreement,

    (ii)    ExxonMobil's failure to insist upon strict compliance by Franchise Dealer with any obligation or condition in this Agreement or any supplemental or related agreement,

    (iii)    any course of dealing of the parties or any trade practice or practice of the Parties at variance with this Agreement or any related or supplemental agreement,

    (iv)    ExxonMobil's waiver of any prior default, whether or not similar, or

    (v)    ExxonMobil's delay, forbearance or failure to exercise any power or right arising out of default by Franchise Dealer under this Agreement or any related or supplemental agreement.

20.4    Notices. Unless otherwise expressly provided in this Agreement, all notices, communications and delivery of information must be in writing and must be:

    (a)    if to ExxonMobil:

        (i)    posted by registered or certified mail, return receipt requested, to the following address and directed to the attention of the U.S. Dealer Sales Manager:

            ExxonMobil Fuels Marketing U.S. Customer Service
            3225 Gallows Road, Room 6D-0217
            Fairfax, VA 22037

(b)  if to Franchise Dealer

    (i)   delivered to the Marketing Premises; or

    (ii)  posted by registered or certified mail, return receipt requested, to the address specified in the preamble to this Agreement.

Where commercially reasonable, ExxonMobil may also communicate or deliver information to Franchise Dealer by electronic or telephonic means including those means of communication specified in Section 9.18

ExxonMobil may change the address for delivery of notices to it by furnishing written notice pursuant to this Section 20.4. Notice is deemed furnished on the first to occur of the following:

(a)  if made by personal delivery, the date the notice is personally delivered;

(b)  if made by registered or certified mail, three (3) business days after the date the notice is deposited in the United States mail, postage prepaid, and properly addressed; or

(c)  if made by ExxonMobil using electronic or telephonic communications, upon receipt by Franchise Dealer.

20.5   <u>ExxonMobil Legal Fees and Costs</u>. Franchise Dealer will promptly reimburse ExxonMobil on demand for all costs, fees (including attorneys and expert witness fees), and expenses incurred by ExxonMobil in enforcing it's rights or remedies under this agreement.

20.6   <u>Claims</u>. All claims by Franchise Dealer whether or not arising out of this agreement are barred unless asserted by the commencement of a lawsuit naming ExxonMobil as a defendant in a court of competent jurisdiction within 12 months after the event, act or omission to which the claim relates.

20.7   <u>Limitation of Liability</u>. ExxonMobil is not liable to Franchise Dealer or any other person for:

(a)  prospective profits or special, incidental, indirect, punitive or consequential damages in any circumstances arising out of the subject matter of this Agreement or ExxonMobil's acts or omissions relating to that subject matter; or

(b)  claims under Section 2.10 in excess of Franchise Dealer's purchase price of the Products to which the claims relate.

20.8   <u>Entire Agreement; Modifications</u>. This Agreement, (including the attachments and addenda, if any, which are incorporated for all purposes) contains the entire Agreement and understanding between Franchise Dealer and ExxonMobil pertaining to the covered subject matter, and supersede all prior agreements relating to that subject matter. There are no binding oral representations, stipulations, warranties, or "understandings" relating to this Agreement that are not fully set out in this Agreement. Except for those permitted to be made unilaterally by ExxonMobil under this Agreement, no amendment, change or variance from this Agreement is binding on either Party unless agreed in writing by the Franchise Dealer and ExxonMobil's authorized representative.

20.9   <u>Severability and Construction</u>. Except as otherwise expressly provided in this Agreement, each provision, and portion of any provision, of this Agreement is severable. If, for any reason, a provision or portion of any provision of this Agreement is determined by a court of competent jurisdiction to be invalid or unenforceable, the invalidity or unenforceability will not affect the validity or enforceability of any other provision or portion of a provision. The unaffected provisions, and portions of provisions, will remain in full force and effect.

20.10  <u>Third Party Rights</u>. Except as otherwise expressly provided in this Agreement, no person or entity not a party to this Agreement has any rights or remedies under this Agreement.

20.11  <u>Headings</u>. All headings in this Agreement are intended solely for convenience and do not affect the meaning or construction of any provision of this Agreement.

20.12  <u>Joint and Several Obligations</u>. All acknowledgments, representations, warranties and obligations of Franchise Dealer under this Agreement are made by, and binding on, all those signing this Agreement jointly and severally as Franchise Dealer.

20.13 <u>ExxonMobil Approval</u>. This Agreement is not binding on ExxonMobil until approved and signed on ExxonMobil's behalf by ExxonMobil's authorized representative.

20.14 <u>Terms on Renewal</u>. Nothing in this Agreement is to be construed as preventing ExxonMobil, upon renewal of the Franchise Relationship, from offering Franchise Dealer terms and conditions in good faith and the normal course of business which differ from or are in addition to those in this Agreement, including terms and conditions relating to the Related Businesses or other businesses which may be operated at the Marketing Premises.

**ARTICLE XXI**
**ADDITIONAL FRANCHISE DEALER REPRESENTATIONS AND WARRANTIES**

21.1 <u>Business Risks</u>. Franchise Dealer represents and warrants that it has conducted an independent investigation of the Related Businesses and recognizes that the related businesses involve business risks and that its success will be largely dependent upon the ability of Franchise Dealer as an independent businessperson. ExxonMobil expressly disclaims the making of, and Franchise Dealer represents that it has not received, any representation, warranty or guarantee, express or implied, as to the potential volume, profits or success of the Businesses covered by this Agreement.

21.2 <u>Representations</u>. Franchise Dealer represents and warrants that it has no knowledge of any representation or warranty by ExxonMobil or any ExxonMobil Affiliate or their respective officers, directors, shareholders, employees, agents or contractors concerning the Businesses that is contrary to the terms of this Agreement or the documents referred to in this Agreement. Franchise Dealer represents and warrants that:

    (a)   ExxonMobil has made no representation or warranty to Franchise Dealer that Franchise Dealer will earn or is likely to earn a positive return on any investment made by Franchise Dealer;

    (b)   the Franchise includes no right of exclusivity;

    (c)   ExxonMobil has made no representation or warranty that it will buy back or otherwise accept from Franchise Dealer any Products, supplies or equipment purchased or leased by Franchise Dealer in connection with the Businesses;

    (d)   Franchise Dealer has made no misrepresentation in applying for the Franchise or entering into this Agreement; and

    (e)   if Franchise Dealer is a corporation:

        (i)   Franchise Dealer is duly organized and validly existing,

        (ii)   Franchise Dealer is authorized to do business and in good standing under the laws of the state of its incorporation and under the laws of any state in which this Agreement is to be performed,

        (iii)   Franchise Dealer has the corporate power and authority to enter into this Agreement, to perform its obligations under this Agreement and to consummate the transactions contemplated by this Agreement, and

        (iv)   Franchise Dealer's signing, delivery and performance of this Agreement has been duly authorized by all required corporate action.

21.3 <u>Receipt of Attachments and Disclosures</u>. Franchise Dealer represents and warrants that it received a copy of the complete Agreement, the schedules and attachments to the Agreement, and any supplemental and related disclosures required by applicable Law.

21.4 <u>Understanding of Agreements; Core Values</u>. Franchise Dealer represents and warrants that it has read and understands this Agreement, any attachments, and any related or supplemental agreements, and that ExxonMobil has accorded Franchise Dealer ample time and opportunity to consult with advisers of Franchise Dealer's own choosing about the potential benefits and risks of entering into this Agreement. Franchise Dealer represents and warrants that Franchise Dealer understands and agrees with the Core Values and shall operate the Businesses and the Marketing Premises in a manner so as to meet the commitments contained in the Core Values.

Signed by the Parties.

Reviewed By:                          ExxonMobil Oil Corporation

_[signature]_                         By: _[signature]_
_____                       _____

                                      Title: _[signature]_
                                            _____


Witness:                              PETER AMAEFULE

_[signature]_                         By: _[signature]_
_____                       _____

                                      Title: _president_
                                            _____


                                      (For Franchise Dealers that are
                                      corporations or other permitted
                                      business forms) Franchise Dealer
                                      designates the following person as the
                                      Key Individual:


                                      Peter Amaefule
                                      _____
                                      Print Name

## ATTACHMENT TO
## PMPA FRANCHISE AGREEMENT
### DEFINITIONS

| | |
|---|---|
| "Affiliate" | means a corporation that controls, is controlled by or under common control with, another corporation. |
| "Agreement" | has the meaning indicated in the preamble and includes all schedules, attachments, definitions and recitals to this Agreement. |
| "authorized representative of ExxonMobil" | means the Marketing Support & Controls Manager of the ExxonMobil business unit responsible for Franchise Dealer's geographic area or an authorized ExxonMobil representative of higher authority, or an authorized person in ExxonMobil's U.S. Customer Service Center (or other successor group) as designated by ExxonMobil. |
| "business day" | means any day, except weekends and ExxonMobil-recognized holidays. |
| "Co-Brand or Non-ExxonMobil Offering" | means the Co-Brand or Non-ExxonMobil Offering specified in Section 1.2. |
| "CODO Dealer" | means for the purpose of this Agreement Franchise Dealer, if ExxonMobil owns, leases or otherwise has the right to grant the use or possession of the Marketing Premises and ExxonMobil Leases, or offers to lease, the Marketing Premises to the Franchise Dealer in accordance with the CODO lease Provisions. |
| "CODO Lease Provisions" | has the meaning indicated in Section 1.3(b). |
| "Confidential Information" | has the meaning indicated in Article V. |
| "Contract Volumes" | has the meaning indicated in Section 2.1. |
| "Contribution Program" | has the meaning indicated in Section 10.3. |
| "Core Values" | has the meaning indicated in Recital B. |
| "Covered Interests" | has the meaning indicated in Section 13.1(a). |
| "day" | means calendar day. |
| "DOSS Dealer" | means Franchise Dealer, if Franchise Dealer is not CODO Dealer for purposes of the Agreement. |
| "DOSS Additional Provisions" | has the meaning indicated in Section 1.3(c). |
| "ExxonMobil" | Means ExxonMobil Oil Corporation, as identified by in the opening paragraph of this Agreement. |
| "failure" | has the meaning indicated in Section 18.2(g). |
| "Fuel Requirements" | has the meaning indicated in Section 2.7(a). |
| "Franchise" | has the meaning indicated in Section 1.1. |
| "Franchise Dealer" | has the meaning indicated in the preamble. |
| "franchise dealer" | means a person that operates an Exxon Outlet under a franchise agreement with ExxonMobil. |
| "Franchise Relationship" | has the meaning indicated in Section 1.1. |
| "includes" | means "includes, but is not limited to,". |
| "including" | means "including, but not limited to," |
| "Indemnitees" | has the meaning indicated in Section 18.2. |
| "individual" | means a single natural person. |
| "Interest" | has the meaning indicated in Section 12.1. |

| | |
|---|---|
| "Key Individual" | has the meaning indicated in Section 4.1(b). |
| "key individual" | means an individual, with respect to a franchise dealer, who meets the definition of the Key Individual. |
| "Key Market" | means a geographic area designated by ExxonMobil from time to time as a key market for the retail sale of the Products. |
| "Laws" | means laws, case law, rules, regulations and orders of governmental authority, whether federal, state or local, with jurisdiction over the Parties, property or this Agreement. |
| "legal fees and costs" | includes court costs, expert and attorneys' fees and disbursements (including reasonable allocated costs of in-house counsel and staff) whether or not incurred pursuant to litigation. |
| "Losses" | has the meaning indicated in Section 18.1. |
| "Manager" | has the meaning indicated in Section 8.1(b). |
| "Minimum Acceptable Rating" | has the meaning indicated in Section 6.3. |
| "Exxon Outlet" | has the meaning indicated in Recital A. |
| "Exxon Related Business" | has the meaning indicated in Section 1.2(c). |
| "Motor-Fuels Business" | has the meaning indicated in Section 1.1(c). |
| "Multi-Unit Operator" | has the meaning indicated in Section 4.2. |
| "Offer" | has the meaning indicated in Section 13.1(b). |
| "Ownership Interest" | has the meaning indicated in Section 4.5. |
| "Party" | means ExxonMobil and Franchise Dealer and their successors and assigns as permitted by this Agreement. |
| "person" | means any natural person or any corporation, company, partnership, joint venture or other form of organization. |
| "PMPA" | has the meaning indicated in Section 1.1. |
| "Proceeding" | has the meaning indicated in Section 18.2. |
| "Product Security" | has the meaning indicated in Section 2.4. |
| "Products" | has the meaning indicated in Section 2.1. |
| "Program" | has the meaning indicated in Section 9.16. |
| "Proprietary Marks" | has the meaning indicated in Recital D. |
| "Purchase Schedule" | has the meaning indicated in Section 2.1 |
| "Related Business" | has the meaning indicated in Section 1.2. |
| "Related Party" | has the meaning indicated in Section 18.2. |
| "Standards" | has the meaning indicated in Section 6.1. |
| "Standards Handbooks" | has the meaning indicated in Section 6.1. |
| "System" | has the meaning indicated in Recital A. |
| "Term" | has the meaning indicated in Section 1.5. |
| "Transfer" | has the meaning indicated in Section 12.1. |
| "Transferor" | has the meaning indicated in Section 12.1. |
| "Unleaded Gasoline Requirements" | has the meaning indicated in Section 2.7(b). |

All references in this Agreement to the masculine, neuter or singular are to be construed to include the masculine, feminine, neuter or plural, where applicable.

**PURCHASE SCHEDULE (3 Year Term)**
**TO**
**PMPA FRANCHISE AGREEMENT**

This Purchase Schedule is a part of, and incorporated into, the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil") and PETER AMAEFULE , 4650 S CAPITOL STREET SE , WASHINGTON , DC 20032-0000 ("Franchise Dealer") with a term beginning on APRIL 1, 2006 (the "Effective Date").

1.  Subject to the provisions of the Agreement, the monthly and yearly Contract Volume are as follows:

| | **GASOLINE** | | | | **DIESEL** * | | |
| | **Contract Year** | | | | **Contract Year** | | |
| **Month** | **1** | **2** | **3** | **Month** | **1** | **2** | **3** |
| JANUARY | 104000 | 104000 | 104000 | JANUARY | 0 | 0 | 0 |
| FEBRUARY | 104000 | 104000 | 104000 | FEBRUARY | 0 | 0 | 0 |
| MARCH | 104000 | 104000 | 104000 | MARCH | 0 | 0 | 0 |
| APRIL | 104000 | 104000 | 104000 | APRIL | 0 | 0 | 0 |
| MAY | 104000 | 104000 | 104000 | MAY | 0 | 0 | 0 |
| JUNE | 104000 | 104000 | 104000 | JUNE | 0 | 0 | 0 |
| JULY | 104000 | 104000 | 104000 | JULY | 0 | 0 | 0 |
| AUGUST | 104000 | 104000 | 104000 | AUGUST | 0 | 0 | 0 |
| SEPTEMBER | 104000 | 104000 | 104000 | SEPTEMBER | 0 | 0 | 0 |
| OCTOBER | 104000 | 104000 | 104000 | OCTOBER | 0 | 0 | 0 |
| NOVEMBER | 104000 | 104000 | 104000 | NOVEMBER | 0 | 0 | 0 |
| DECEMBER | 104000 | 104000 | 104000 | DECEMBER | 0 | 0 | 0 |
| Contract Year Total | 1248000 | 1248000 | 1248000 | Contract Year Total | 0 | 0 | 0 |

2.  A "contract year" means a 12-month period beginning on the Effective Date or any anniversary of the Effective Date.

I acknowledge the receipt and applicability of this Purchase Schedule:

_____
PETER AMAEFULE

**ADDITIONAL EXXON SERVICE PROVISIONS**
**TO**
**PMPA FRANCHISE AGREEMENT**

These Additional Exxon Service Provisions ("Attachment") are part of, and incorporated into, the PMPA Franchise Agreement (the "Agreement") between ExxonMobil Oil Corporation ("ExxonMobil") and PETER AMAEFULE , 4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000 ("Franchise Dealer") with a Term beginning on APRIL 1, 2006 (the "Effective Date").

**ARTICLE I**
**COMPLIANCE WITH AGREEMENTS**

1.1    Applicability. If Exxon Service is specified under Section 1.2(c) of the Agreement as a permitted Related Business, this Attachment applies. "Exxon Service" means an automobile repair and maintenance business operated by Franchise Dealer under the System at the Marketing Premises under the designation "Exxon Service".

1.2    Compliance with Agreements.

(a)    Subject to Section 1.2(c), Franchise Dealer shall conduct the Exxon Service Business (the "Exxon Service Business") in compliance with all applicable agreements including:

(i)    any agreement relating to the Exxon Service Business between Franchise Dealer and ExxonMobil or a ExxonMobil Affiliate for:

(A)    the construction, alteration or improvement of all or a portion of the Marketing Premises for use as a Exxon Service Business,

(B)    the purchase or lease of equipment, fixtures or other property to be used in the Exxon Service Business, or

(C)    any services provided by ExxonMobil, its Affiliate or its designee in connection with the Exxon Service Business;

(ii)    any agreement

(A)    that is:

(1)    between Franchise Dealer and ExxonMobil or a ExxonMobil Affiliate, or

(2)    between Franchise Dealer and a financial institution or other person pursuant to an arrangement under which ExxonMobil or a ExxonMobil Affiliate furnished consideration including any inducement, guarantee or credit enhancement, and

(B)    under which:

(1)    Franchise Dealer has borrowed funds for:

(a)    the construction, improvement or alteration of all or a portion of the Marketing Premises for use as a Exxon Service Business, or

(b)    the purchase of equipment, fixtures or other property for use in the operation of the Exxon Service Business; or

(2)    Franchise Dealer has leased any equipment, fixtures or other property for use in the Exxon Service Business; and

(iii)  any agreement for services or the purchase of merchandise for use in the Exxon Service Business

pursuant to an arrangement under which ExxonMobil or a ExxonMobil Affiliate furnished any consideration including any purchase commitments, inducement, guarantee or credit enhancement.

(b)  Franchise Dealer shall operate the Exxon Service Business at the Marketing Premises and may not delegate operation, or Transfer any rights in the business, to any other person, except in compliance with Articles XII and XIII of the Agreement. Franchise Dealer may not Transfer its rights under this Attachment except in connection with a Transfer of its Interests in the Agreement.

(c)  Franchise Dealer shall operate the Exxon Service Business in compliance with all provisions of the Agreement and all related and supplemental agreements. Unless expressly indicated otherwise in writing by ExxonMobil, the provisions of the Agreement control over any contrary provision in any agreement relating to the Exxon Service Business.

## ARTICLE II
## BUSINESS OPERATIONS

2.1  Operation of Exxon Service Business. In accordance with the Agreement and this Attachment, Franchise Dealer shall operate the Exxon Service Business at the Marketing Premises. Franchise Dealer shall use advertising and signs using those Proprietary Marks designated by ExxonMobil from time to time for use in the Exxon Service Business. ExxonMobil, in its sole discretion, may determine the color, size and design of all signs and promotional materials for the Exxon Service Business.

2.2  Compliance with Core Values and Standards. Franchise Dealer acknowledges that the operation of the Exxon Service Business impacts customers' buying experiences at the Marketing Premises and customers' perceptions and acceptance of Exxon-branded products, the System and the Proprietary Marks. Accordingly, Franchise Dealer's operation of the Exxon Service Business is subject to Franchise Dealer complying with all requirements contained in this Attachment and the Agreement, including Section 9.15 of the Agreement. Without limiting any other requirement in this Attachment or the Agreement, Franchise Dealer shall operate the Exxon Service Business in a manner so as to meet the commitments contained in the Core Values and in compliance with the Standards relating to the Marketing Premises including those contained in the ExxonMobil Standards Handbook as may be in effect from time to time.

2.3  Failure to Comply.

(a)  Franchise Dealer acknowledges that the failure to meet its obligations under this Attachment constitutes a failure to comply with a reasonable and materially significant provision of this Agreement and the Franchise Relationship. If Franchise Dealer fails to comply with any requirements for a Exxon Service Business under this Attachment or the Agreement, without limiting ExxonMobil's other rights or remedies under applicable Law or under the Agreement, any related or supplemental agreement or any agreement relating to the Exxon Service Business, ExxonMobil may, by written notice, require Franchise Dealer to stop operating the Exxon Service Business.

(b)  If ExxonMobil requires Franchise Dealer to stop operating the Exxon Service Business under this Section 2.3 or if Franchise Dealer's rights under this Attachment terminate under Section 3.1, in addition to any other obligations under the Agreement, Franchise Dealer shall:

(i)  immediately stop operating the Exxon Service Business at the Marketing Premises;

(ii)  immediately, and permanently stop using, in any manner whatsoever, any Confidential Information, the Exxon Service trade dress and Proprietary Marks and all signs, logos, slogans, advertising, materials, displays, stationery and forms containing those Proprietary Marks or relating to the Exxon Service Business;

(iii)  promptly pay:

(A) all sums owing to ExxonMobil, any ExxonMobil Affiliates and any financial institution or other person that has loaned money or leased property to Franchise Dealer in connection with an arrangement under which ExxonMobil or a ExxonMobil Affiliate furnished any consideration including any agreement referred to under Sections 1.2(a)(ii) or (iii) of this Attachment. Without limiting the preceding general requirements of this Section 2.3(b)(iii), Franchise Dealer shall pay all the outstanding principal balance and all interest and other charges under ExxonMobil-backed loan programs, direct ExxonMobil loans and ExxonMobil reimbursement agreements relating to the Exxon Service Business, and

(B) if Franchise Dealer leases the Marketing Premises from ExxonMobil, all indebtedness to contractors or vendors that have furnished goods or services in connection with the Exxon Service Business;

(iv) immediately return to ExxonMobil all Exxon signs and other personal property of ExxonMobil relating to the Exxon Service Business. Franchise Dealer grants, and shall cause any other person in possession of the Marketing Premises to grant, to ExxonMobil a non-revocable license to enter the Marketing Premises to remove Exxon signs and property relating to the Exxon Service Business. Franchise Dealer shall bear all removal, site-restoration and transportation costs relating to the removal of these Exxon signs and equipment.

2.4  No Property Interests. Franchise Dealer's right to operate the Exxon Service Business neither creates for, nor conveys to, Franchise Dealer any ownership, leasehold or possessory interest in the Marketing Premises. If Franchise Dealer leases the Marketing Premises from ExxonMobil, Franchise Dealer's right to occupy the Marketing Premises, or any portion of the Marketing Premises, arises only out of and is subject to the "CODO Lease Provisions" attachment to the Agreement. If Franchise Dealer does not lease the Marketing Premises from ExxonMobil, Franchise Dealer's right to occupy the Marketing Premises arises out of the Franchise Dealer's ownership of the underlying premises or out of leasehold or contractual arrangements between Franchise Dealer and the owner of the premises.

2.5  Location; Relationship to System. Franchise Dealer acknowledges that:

(a) the Agreement and this Attachment do not confer any right to operate the Exxon Service Business at any location other than the Marketing Premises; and

(b) the Exxon Service Business is part of the System and is designed to be operated only in connection with a Motor-Fuels Business and not as an independent business.

## ARTICLE III
## MISCELLANEOUS

3.1  Agreement Provisions. Except as expressly provided otherwise in this Attachment or in the Agreement, the provisions of the Agreement apply to this Attachment. Any termination or nonrenewal of the Franchise and Franchise Relationship will automatically operate to terminate Franchise Dealer's rights under this Attachment and any right to conduct the Exxon Service Business at the Marketing Premises.

3.2  Definitions.

(a) Terms used in this Attachment have the meaning indicated in this Attachment or the Agreement.

(b) Unless indicated as a reference to provisions of the Agreement, references in this Attachment to Sections and Articles are to those contained in this Attachment.

I acknowledge the receipt and applicability of these Additional Exxon Service Provisions:

_____
PETER AMAEFULE

## ExxonMobil's Multi-Unit Program Policy:

ExxonMobil has developed the Grow With ExxonMobil program as a tool to help build the strong and highly motivated franchise dealer system we need to meet competitive conditions and the needs of our customers. This program identifies qualified existing Exxon and Mobil franchise dealers interested in operating additional Exxon or Mobil CODO service stations. The following applies to existing Exxon/Mobil DOSS and CODO franchise dealers who seek to obtain an Exxon/Mobil CODO service station (the "additional CODO station").

### Criteria

To be eligible as a candidate for the additional CODO station and subject to applicable law, the candidate is required to meet each of the following criteria (the "Multi-Unit Criteria"):

- The candidate has the financial capability to operate the additional CODO station. Dealer will need to meet, among other criteria, ExxonMobil's current working capital and cash flow criteria and to have been in good financial standing with Mobil and other creditors for at least 18 months prior to the grant of the additional franchise.
- If a candidate operates more than two service stations, the candidate has or will employ trained and qualified service station managers at each service station.
- The candidate has the franchise business experience and management competencies to manage the additional CODO station.
- The candidate is in full compliance with all requirements and obligations under existing franchise agreements.
- The candidate consistently meets or exceeds annual gasoline volume objectives for each service station.
- All Exxon/Mobil service stations operated by the candidate meet an acceptable rating, as determined by ExxonMobil, for standards under ExxonMobil's current National Standards Handbook.
- The candidates business plan for all service stations meet ExxonMobil's marketing and property development strategies for the franchise system and the respective sites and marketing areas.
- The candidate continues to meet ExxonMobil's current franchise-dealer criteria requirements.

### Multi-Unit Pool

Franchise dealers interested in an additional CODO station will be allowed to preliminarily qualify under the Multi-Unit Criteria. Preliminarily qualified candidates will be placed in a pool for possible selection as franchise opportunities arise. If placed in a pool, a candidate will need to continue to meet the Multi-Unit Criteria and additional information may be required from time to time to continue eligibility.

### Competitive Business

In granting franchises for additional CODO stations:

- The existence of a competitive business interest will be a major factor in selecting multi-unit candidates for an additional CODO station.
- Existing DOSS dealer multi-unit candidates that are exclusively Exxon/Mobil branded or have positioned Exxon/Mobil as their number 1 brand will be preferred over similarly qualified candidates who have positioned Exxon/Mobil lower in their hierarchy.
- In determining eligibility under the Multi-Unit Criteria, all direct and indirect interests of a franchise dealer in Mobil and/or competitive brand service stations will be considered.

## Other Limitations

- Franchise dealers who do not meet the Multi-Unit Criteria will not be given the opportunity to operate an additional CODO station. Franchise dealers grandfathered under any previous policy will continue to be grandfathered; however, only existing service stations are grandfathered and the franchise dealer may not replace or add additional service stations without qualifying under this policy.
- ExxonMobil reserves the right to limit the number of additional CODO stations for which franchise dealers may qualify.

ExxonMobil may change this policy as may be appropriate to address changes in market conditions or ExxonMobil's marketing strategies. This policy is not intended to give any franchise dealer the right to obtain an additional franchise, which ExxonMobil reserves the right to grant in its sole discretion. ExxonMobil also reserves the right to require the franchise dealer to provide additional information not contained or provided for in the Multi-Unit Dealer Application.

June 11, 2002

**Test-Out Procedure for Survivorship (Subject to Applicable State Law) :**

The following only applies if survivor has not been formally trained and/or if survivor has not worked for at least one year with the original dealer:

**Non OTR Dealer:**

The Performance & Support Manager or TM will contact the survivor 2 months after survivor has assumed management of the location. The PSM or TM will send the new dealer a pre-test and arrange a time to meet within the next six months. At the meeting of the dealer and training director, dealer will be given the test (this is the "pre-test"), and must receive a passing score of 70%. If the dealer passes the test they must attend Business Operations training at the CORE within the next 6 months. If the dealer fails the exam, the dealer must retake the test within one month.

**OTR Dealer:**

The same format applies to an OTR dealer with the exception that the dealer must attend Business Operations and Convenience Retailing at the CORE within one year of passing the test in the field. In addition, to satisfy the TSW component of training the dealer must pass the TSW Pre-Test prior to attending the CORE.

**Alternative Format for Pre-Designated Survivors:**

Alternatively, for those dealers who have planned their succession and have a pre-designated survivor who has worked for at least one year with the existing dealer at a non-OTR facility, the following will apply:

1. The "pre-test" will be administered once, every three years, to the designated survivor and kept as part of the survivorship documentation in the existing dealer's file. The pre-designated survivor must receive a passing score of at least 70% for any test taken, and will have had to be an active manager at the existing dealer's site for at least one year in order to meet these alternative requirements.

2. As long as the pre-designated survivor meets the requirements in #1 above, then no training at the CORE will be required.

For pre-designated survivors at OTR facilities, those individuals can schedule formal Business Operations training and formal OTR training at the CORE at the earliest possible time (prior to the death or incapacitation of the existing dealer). Once they have completed both formal programs they will have been deemed to meet the training requirement to operate the site.

XOM_SurvTstOut.htm

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
**Tuesday, June 25, 1996**

**AGENCY:** Department of Energy.

**ACTION:** Notice.

---

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**FOR FURTHER INFORMATION CONTACT:** Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

**SUPPLEMENTARY INFORMATION:** Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d) (1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

## Summary of Legal Rights of Motor Fuel Franchisees

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

## I. Reasons for Termination

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated,

however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

*A. Non-Compliance with Franchise Agreement*

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, for State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

*B. Lack of Good Faith Efforts*

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

*C. Mutual Agreement To Terminate the Franchise*

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

*D. Withdrawal From the Market Area*

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. §2802(b) (E).

*E. Other Events Permitting a Termination*

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:

(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.

(2) You declare bankruptcy or a court determines that you are insolvent.

(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.

(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer

from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that

renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:

(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;

(2) The date the termination or non-renewal takes effect; and

(3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I-Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

## B. Franchise Relationship

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

## C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel.

## D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

## E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

## F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

## G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

## A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

## B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the

expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

*C. Burden of Proof*

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

*D. Damages*

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

*E. Franchisor's Defense to Permanent Injunctive Relief*

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:

(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;

(2) To materially alter, add to, or replace such premises;

(3) To sell such premises;

(4) To withdraw from marketing activities in the geographic area in which such premises are located; or

(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
**Marc W. Chupka,**
Acting Assistant Secretary for Policy.

**COMPANY OWNED DEALER OPERATED ("CODO")**
**LEASE PROVISIONS**
**TO**
**PMPA FRANCHISE AGREEMENT**

This Indenture of Lease and CODO Lease Provisions (collectively, "Lease") are a part of, and incorporated into, the PMPA Franchise Agreement ("Agreement") between ExxonMobil Oil Corporation ("ExxonMobil") and PETER AMAEFULE ("Franchise Dealer") with a Term beginning on APRIL 1, 2006 (the "Effective Date").

**ARTICLE I**

**LEASE OF MARKETING PREMISES**

1.1    <u>Lease</u>. Subject to the terms and conditions of this Lease and the Agreement, ExxonMobil leases to Franchise Dealer, and Franchise Dealer leases from ExxonMobil, the following marketing premises (the "Marketing Premises"):

4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000

which includes the improvements, now or at any time during the Term, located on the Marketing Premises and all equipment listed on the attachment entitled "CODO Lease Schedule" which attachment is incorporated into this Lease. The CODO Lease Schedule may be amended in writing by the Parties from time to time or by ExxonMobil as provided in this Lease.

1.2    <u>Underlying Lease</u>.

    (a)    Franchise Dealer acknowledges:

        (i)    that Franchise Dealer has received notice in writing prior to the commencement of the Term that this Lease, the Agreement and all or a material portion of the Marketing Premises are subject to one or more underlying leases held by ExxonMobil which expire as follows:

        <u>Expiration Date</u>: N/A

        and

        (ii)    that any underlying lease or leases might expire and not be renewed.

    (b)    If any underlying lease expires or is terminated during the Term or any extension of the Term, ExxonMobil may terminate or nonrenew this Lease, the Agreement and the Franchise Relationship as of the date of expiration or termination of the underlying lease. ExxonMobil is under no obligation to seek an extension or renewal of any underlying lease or to exercise any options including any option to renew or purchase. This Section 1.2 may not be construed as a waiver of any other right of termination or non-renewal which ExxonMobil may have.

1.3    <u>Exclusions; Reservations</u>. This Lease:

    (a)    is subject to:

        (i)    any state of facts that an accurate survey might show,

        (ii)    existing or future easements, encumbrances, covenants, restrictions and reservations, if any,

(iii)   existing or future mortgages or deeds of trust,

(iv)   any underlying lease or leases,

(v)   a 10-foot wide strip along the perimeter of the Marketing Premises, or

(vi)   other area or areas, as determined necessary or appropriate by ExxonMobil, for any reasonable use including:

    (A)   erecting and maintaining signs,

    (B)   installing and maintaining any utilities or storm-water drainage systems,

    (C)   providing access for vehicles and pedestrians,

    (D)   conducting construction activities, and

    (E)   locating, operating and maintaining communication facilities and services (including wireless communication facilities); and

(b)   reserves to ExxonMobil the right, but not the obligation, to exclude from this Lease and the Agreement at any time or from time to time a portion of the Marketing Premises used for a Related Business if Franchise Dealer does not operate, stops operating, or is required by ExxonMobil under the Agreement or any related or supplemental agreement to stop operating, that Related Business at the Marketing Premises. Upon such exclusion:

(i)   Franchise Dealer may use only nonexcluded portions of the Marketing Premises including those structures or improvements on the Marketing Premises designated by ExxonMobil for Franchise Dealer's use in operating the remaining Businesses;

(ii)   ExxonMobil shall reduce the Rent by an amount determined by ExxonMobil to reflect the value of the excluded portion of the Marketing Premises;

(iii)   ExxonMobil, its Affiliates, any lessee or licensee of ExxonMobil or its Affiliates and their respective employees, agents, lessees, licensees, customers, contractors and vendors may use the nonexcluded portion of the Marketing Premises for ingress and egress to the excluded portion of the Marketing Premises; and

(iv)   Franchise Dealer shall cooperate fully with ExxonMobil, its Affiliates and their respective employees, agents, lessees, licensees, customers, contractors and vendors in operating any business or conducting any activities on the excluded portion of the Marketing Premises including reaching reasonable agreements on utility expenses and other matters of mutual interest.

ExxonMobil's rights under this Section 1.2(d) are in addition to other rights and remedies that ExxonMobil may have in connection with Franchise Dealer's failure to comply with provisions of the Agreement and any related or supplemental agreements including the right to terminate or nonrenew the Agreement, the Franchise and the Franchise Relationship.

1.4   <u>Condition of Marketing Premises and Equipment</u>. FRANCHISE DEALER ACCEPTS THE MARKETING PREMISES AND ALL EQUIPMENT LISTED IN THE CODO LEASE SCHEDULE IN THEIR PRESENT CONDITION, AS IS, WITHOUT WARRANTY, EXPRESS OR IMPLIED, INCLUDING ANY WARRANTY AS TO THEIR CONDITION, INTERFERENCE, INFRINGEMENT, MERCHANTABILITY OR FITNESS FOR ANY PURPOSE. ExxonMobil is not responsible or liable to Franchise Dealer, its employees, agents, customers, vendors or contractors for any defect or change in the condition of the Marketing Premises.

1.5   <u>Subordination</u>. This Lease and all rights of Franchise Dealer under this Lease, the Agreement and all related and supplemental agreements are subject and subordinate in all respects to all existing and future:

(a)   ground leases, overriding leases and underlying leases of all, or any portion of, the Marketing Premises now or hereafter existing;

(b)     mortgages, which may now or later affect the Marketing Premises, any equipment, fixtures, leases and leasehold estates, whether or not any mortgages also cover property other than the Marketing Premises or leases;

(c)     each and every advance made or to be made under any mortgages;

(d)     all renewals, modifications, replacements and extensions of any leases or mortgages; and

(e)     all spreaders, consolidations and correlation's of any mortgages.

The term "mortgages" includes deeds of trust and other financing agreements. The provisions of this Section 1.5 are self-executing and do not require further documentation. Without limiting the preceding sentence, upon ExxonMobil's request, Franchise Dealer shall sign and deliver any and all documents and take such action, as ExxonMobil may request to evidence any subordination.

1.6   Holding Over. Any holding over by Franchise Dealer does not constitute a renewal or extension of this Lease or the Agreement. ExxonMobil, at its option, may elect to treat a holdover as either a trespass or a tenancy at will. If, under the laws of the state in which the Marketing Premises are located, holding over creates a periodic tenancy, the holding over will, notwithstanding anything in this Section 1.6, create a month-to-month tenancy.

1.7   Subletting.

(a)     Unless Franchise Dealer receives ExxonMobil's prior express written approval, which approval may be withheld in ExxonMobil's sole discretion, Franchise Dealer may not:

(i)      sublet or license all or any part of the Marketing Premises;

(ii)     grant any right to any person to establish or operate a Related Business or any other business at the Marketing Premises including a Co-Brand or Non-ExxonMobil Offering;

(iii)    except in compliance with Articles XII and XIII of the Agreement, Transfer any Interest in this Lease;

(iv)     grant any other person a possessory interest in the Marketing Premises;

(v)      encumber or hypothecate the Marketing Premises; or

(vi)     grant any person any easement or concession in the Marketing Premises.

(b)     Any attempt by Franchise Dealer to take any of the actions specified in Section 1.7(a) without ExxonMobil's prior written approval is a default under this Lease and the Agreement and shall be null and void. If ExxonMobil does approve any actions specified in Section 1.7(a), Franchise Dealer shall comply with all conditions and requirements imposed by ExxonMobil on Franchise Dealer in giving the approval.

# ARTICLE II

## RENT

2.1 <u>Rent; National Rent Guidelines</u>. Franchise Dealer shall pay to ExxonMobil rent for the scheduled period as specified in the attachment entitled "Rent Schedule" which is attached and incorporated in this Lease. Dealer shall pay to ExxonMobil rent for the Marketing Premises determined in accordance with ExxonMobil's National Rent Guidelines. (Attachment I) a ExxonMobil's National Rent Guidelines means a written policy adopted by ExxonMobil in good faith and in the ordinary course of business governing the rent to be charged ExxonMobil's lessee franchise dealers, as that policy may be modified by ExxonMobil at any time or from time to time. Except as provided in ExxonMobil's National Rent Guidelines, changes to ExxonMobil's National Rent Guidelines after the Effective Date will not affect the calculation of the Asset-Based maximum Rent under this Lease during the Term. Upon any renewal of the Franchise and Franchise Relationship, the rent, including the Asset-Based Maximum Rent, will be determined in accordance with ExxonMobil's National Rent Guidelines or any successor ExxonMobil policy or program in effect at the time of renewal, or in the case of a 10 year term, at the 5 year re-opener.

2.2 <u>Payment of Rent</u>. Without offset or recoupment, Franchise Dealer shall pay Rent in 4 equal installments throughout the month in which payment is due or upon other timing specified by ExxonMobil in writing. Subject to applicable Laws, ExxonMobil may impose a late payment charge as designated by ExxonMobil from time to time for each Rent payment not received by ExxonMobil when due, which charge is in addition to other remedies available to ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

2.3 <u>Rent and Maintenance Security</u>. Upon request by ExxonMobil, and in addition to any Product Security, Franchise Dealer shall provide and maintain security in a minimum amount equal to two months rental ("Rent and Maintenance Security"). ExxonMobil may use, without prior notice or demand, any or all of the Rent and Maintenance Security to setoff or satisfy all or any part of any indebtedness or obligation of Franchise Dealer to ExxonMobil including indebtedness for failure to pay rent or perform Franchise Dealer's maintenance obligations. If ExxonMobil uses any Rent and Maintenance Security to satisfy all or part of an indebtedness or obligation, Franchise Dealer immediately shall provide ExxonMobil with additional security, as directed by ExxonMobil, to replace the Rent and Maintenance Security. Following non-renewal or termination of the Franchise Relationship between ExxonMobil and Franchise Dealer, ExxonMobil shall return to Franchise Dealer, in accordance with ExxonMobil's procedures then in effect, any remaining portion of the Rent and Maintenance Security not required to satisfy all or any part of any indebtedness or other obligation of Franchise Dealer to ExxonMobil.

2.4 <u>Modifications Upon Renewal</u>. No provision of this Lease or the Agreement may be construed to prevent or limit ExxonMobil's right to modify the terms or conditions of the Agreement, or offer additional or different terms to Franchise Dealer, upon a renewal of the Franchise and Franchise Relationship including ExxonMobil's right to offer any modification or new terms relating to rent.

2.5 <u>Personal Property</u>.

    (a) All personal property and equipment listed on the CODO Lease Schedule:

        (i) is subject to the terms and condition of this Lease and the Agreement; and

        (ii) is to be considered loaned personal property or equipment and, unless expressly specified in the CODO Lease Schedule, is not to be allocated any portion of the Rent under this Article II.




(b)     Maintenance, repairs or replacement of loaned personal property or equipment by Franchise Dealer does not entitle Franchise Dealer to any abatement of rent. ExxonMobil may at any time or from time to time alter, change, remove or add to the personal property or equipment loaned or leased to Franchise Dealer in ExxonMobil's sole discretion. Franchise Dealer shall not remove from the Marketing Premises any personal property or equipment loaned or leased by ExxonMobil to Franchise Dealer.

**ARTICLE III**

**FRANCHISE DEALER OBLIGATIONS**

3.1     <u>Utilities, Taxes and Licenses.</u> In addition to Rent under Article II, Franchise Dealer shall pay:

(a)     all utility charges and other expenses incurred in the operation of the Marketing Premises, except as may expressly be provided otherwise in this Lease; and

(b)     all taxes, fees and charges imposed by governmental authority on the Marketing Premises or its use including business use taxes and license fees, but excluding real and personal property taxes on the land and buildings and on ExxonMobil's equipment unless those real and personal property taxes are to be paid by Franchise Dealer pursuant to any underlying lease between ExxonMobil and Franchise Dealer.

3.2     <u>Agreement Provisions.</u> Franchise Dealer shall comply with all provisions of the Agreement including compliance with the Standards.

3.3     <u>No Liens.</u> Franchise Dealer shall keep the Marketing Premises and any ExxonMobil equipment or other property free of all liens, claims and encumbrances.

3.4     <u>Condemnation.</u> Without limiting any provisions of the Agreement, Franchise Dealer shall comply with all Laws governing condemnation or eminent domain awards. All sums payable by a condemning authority for a taking of any portion of the Marketing Premises, whether payable due to a purchase in lieu of condemnation, a settlement reached after the initiation of condemnation proceedings, a final judgment or otherwise, will be paid to ExxonMobil and Franchise Dealer has no interest whatsoever in those sums; except that Franchise Dealer may receive any sum payable by the condemning authority for loss of goodwill by Franchise Dealer. Franchise Dealer shall notify ExxonMobil promptly upon Franchise Dealer's receipt of any notice, or other communication, of a taking or proposed taking of any portion of the Marketing Premises from any condemning authority. ExxonMobil shall have the right to settle or dispute any condemnation proceedings in its sole discretion. Franchise Dealer may not independently participate in any condemnation proceedings affecting the Marketing Premises, but shall cooperate fully with ExxonMobil in any condemnation proceedings. Franchise Dealer shall sign and deliver any documents, and take other action, requested by ExxonMobil in connection with condemnation proceedings or any settlement of those proceedings.

3.5     <u>Surrender in Good Condition.</u>

(a)     Upon termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship:

(i)     Franchise Dealer immediately shall surrender the Marketing Premises to ExxonMobil in good order and condition; and

(ii)     in addition to any other rights or remedies of ExxonMobil, ExxonMobil may repossess the Marketing Premises and operate the Marketing Premises through ExxonMobil's employees, contractors or agents.

(b)    Upon exclusion of any portion of the Marketing Premises under Section 1.3(d), Franchise Dealer immediately shall surrender the excluded portion of the Marketing Premises to ExxonMobil in good order and condition.

3.6    <u>Business Records</u>. Franchise Dealer shall maintain current, accurate and complete business records, including all records required under Articles IV and V of this Lease.

3.7    <u>Telephones; Devices</u>.

(a)    Unless Franchise Dealer obtains ExxonMobil's prior written consent (which consent ExxonMobil may withhold in its sole discretion), Franchise Dealer shall not place on the Marketing Premises, or permit the placement anywhere on the Marketing Premises of:

    (i)    any pay telephones;

    (ii)    pay air towers, pay toilets or coin-operated devices;

    (iii)    dispensing devices;

    (iv)    vending machines;

    (v)    merchandising equipment for any products (including beverages, ice, candy or tobacco products);

    (vi)    ice vending or storage machines; or

    (vii)    trailers.

(b)    If ExxonMobil consents to the placement of any item under Section 3.7(a), Franchise Dealer shall comply with all conditions or requirements that ExxonMobil may impose in giving its consent.

3.8    <u>Storage; Parking</u>. Franchise Dealer shall not use, or permit the use of, the Marketing Premises for the rental, storage or parking of any devices, vehicles or equipment. Franchise Dealer shall not place on the Perimeter any property or improvements, including signs, vehicles or structures, without ExxonMobil's prior written consent.

3.9    <u>Equipment</u>. Franchise Dealer shall provide and maintain at its sole cost all equipment and personal property necessary for Franchise Dealer's operation of the Businesses which equipment is not supplied by ExxonMobil.

3.10    <u>Use</u>. Franchise Dealer shall use the Marketing Premises in compliance with all provisions of the Agreement (including this Lease) and only for operation of the Businesses specified in the Agreement.

### ARTICLE IV

### <u>MAINTENANCE OBLIGATION</u>

4.1    <u>Allocation of Maintenance Obligations</u>. As provided in this Article IV, each Party shall maintain that equipment and property allocated to it in the schedule entitled "Maintenance Schedule" attached to and incorporated into this Lease. Franchise Dealer also shall maintain any property or equipment located at the Marketing Premises or otherwise used in the Businesses which property or equipment is not specified in the Maintenance Schedule. ExxonMobil reserves the right, in its sole discretion, to periodically add to, change or delete from, the Maintenance Schedule. Franchise Dealer acquires no ownership interest in property or equipment belonging to ExxonMobil, but leased or loaned to Franchise Dealer, because of Franchise Dealer's compliance with Franchise Dealer's maintenance,

repair and replacement obligations.

4.2    ExxonMobil Obligations.

(a)    Subject to this Section 4.2 and Section 4.4, ExxonMobil shall repair or replace the equipment and property allocated to it in the Maintenance Schedule as determined by ExxonMobil as necessary to keep them in good operating condition, if the need for any repair or replacement is due to ordinary wear and tear or damage by the elements. ExxonMobil's obligation to repair or replace does not arise unless and until:

    (i)    Franchise Dealer notifies by telephone ExxonMobil's Maintenance Center or designated contractor that the equipment or property is not in good operating condition; and

    (ii)    ExxonMobil determines in its sole discretion (which determination shall be made within a reasonable period of time) that the repair is necessary and is due to ordinary wear and tear or damage by the elements.

(b)    Franchise Dealer shall:

    (i)    render any damaged or malfunctioning equipment or property harmless;

    (ii)    not use the equipment or property, or permit it to be used, until repaired or replaced; and

    (iii)    take action as may be necessary to make the area safe including posting warnings and preventing access.

(c)    If, within five business days following Franchise Dealer's telephone notification, ExxonMobil does not commence the repairs or replacement or notify Franchise Dealer that ExxonMobil will not make any repairs or replacement, Franchise Dealer shall furnish additional notice in writing to the Marketing Support & Controls Manager of the ExxonMobil business unit responsible for Franchise Dealer's geographic area or an authorized ExxonMobil representative of higher authority. In lieu of any repairs, ExxonMobil may make replacements.

(d)    ExxonMobil is not obligated to make any repairs or replacements under this Article IV, if ExxonMobil has furnished to Franchise Dealer a notice of termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship including termination or non-renewal based on ExxonMobil's determination:

    (i)    to withdraw from a geographic market area;

    (ii)    to convert the Marketing Premises to a use other than the sale of motor fuel;

    (iii)    to materially alter, add to or replace the Marketing Premises;

    (iv)    to sell the Marketing Premises; or

    (v)    , that renewal is likely to be uneconomical to ExxonMobil.

(e)    Notwithstanding ExxonMobil's obligations under this Section 4.2, ExxonMobil may, in its sole discretion, elect:

    (i)    not to repair or replace any underground storage tank listed in the CODO Lease Schedule;

    (ii)    remove or abandon in-place that tank in accordance with applicable Law with no further use by Franchise Dealer; and

    (iii)    amend the CODO Lease Schedule to reflect the deletion of the tank or tanks.

(f)     If ExxonMobil exercises its right to remove or abandon any tank under Section 4.2(e), the following applies:

    (i)     ExxonMobil may not exercise its rights under Section 4.2(e) so as to reduce Franchise Dealer's ability to market Products by more than one grade;

    (ii)    ExxonMobil will determine which grade of Products will be eliminated if ExxonMobil exercises its rights under Section 4.2(e); and

    (iii)   the Contract Volumes for that grade of Product will be reduced to reflect the eliminated Product grade.

4.3    <u>Additional Maintenance Obligations</u>. Franchise Dealer shall:

(a)    at Franchise Dealer's expense and except as expressly provided under Section 4.2, maintain the Marketing Premises and all equipment and property located on the Marketing Premises in good, safe and operating condition and promptly make all necessary repairs or replace with equipment or property of comparable value;

(b)    operate and maintain all emission control equipment including:

    (i)     maintaining the equipment in accordance with the instructions of the manufacturer,

    (ii)    repairing or replacing the equipment, as necessary, and

    (iii)   complying with all applicable Laws relating to operation or maintenance of the equipment;

(c)    promptly notify ExxonMobil if Franchise Dealer believes any equipment or property which is ExxonMobil's responsibility under Section 4.2 is not in good operating condition;

(d)    implement a maintenance program in accordance with Section 4.4 and Franchise Dealer's obligations under the Maintenance Schedule; and

(e)    keep accurate and updated records of all preventive maintenance inspections and of all maintenance performed by Franchise Dealer and show the records to ExxonMobil upon request.

4.4    <u>Maintenance Adjustment</u>.

(a)    In lieu of directly meeting its maintenance obligations under Section 4.2, ExxonMobil may, but is not obligated to, issue a credit against Franchise Dealer's rent as a contribution toward Franchise Dealer's maintenance costs (maintenance adjustment) as described in this Section 4.4. Franchise Dealer shall apply the maintenance adjustment for the purpose of, and in accordance with, this Section 4.4. Upon 90 days prior written notice, ExxonMobil may discontinue or adjust the maintenance adjustment at any time. Franchise Dealer's application of the maintenance adjustment creates no ownership interest in Franchise Dealer in any equipment or property belonging to ExxonMobil but loaned or leased to, and maintained, repaired or replaced by, Franchise Dealer.

(b)    The amount of the maintenance adjustment is specified in the "maintenance adjustment Schedule" attached to and incorporated into this Agreement. ExxonMobil shall issue the credit against Franchise Dealer's rent monthly by journal entry to Franchise Dealer's account.

(c)    Franchise Dealer shall apply the maintenance adjustment only to meet ExxonMobil's maintenance obligations under this Article IV except that Franchise Dealer may apply any portion of the maintenance adjustment in excess of the amount of funds needed to meet ExxonMobil's current maintenance obligations to:

    (i)     meet future maintenance obligations of ExxonMobil as budgeted under Section 4.4(d);

(ii)    comply with the Standards if any portion of the maintenance is in excess of the amount required under Section 4.4(c)(i); or

(iii)    meet Franchise Dealer's maintenance obligations under this Article IV if any portion of the maintenance adjustment is in excess of the amounts required under Sections 4.4(c) (i) and (ii).

(d)    Franchise Dealer acknowledges that the amount of the maintenance adjustment may be more than necessary to pay for maintenance in some months and less than necessary to pay for maintenance in other months. Franchise Dealer shall budget the maintenance adjustment in a manner designed to balance (approximately) over the Term. Franchise Dealer's budget, as it may be amended as circumstances warrant, is subject to ExxonMobil's reasonable approval.

(e)    Franchise Dealer shall perform all maintenance:

(i)    in compliance with all Laws including local building, or other, codes and ordinances; and

(ii)    in a safe and workmanlike manner.

(f)    If Franchise Dealer receives the maintenance adjustment and fails to comply timely with Franchise Dealer's obligations under this Section 4.4, after written notice to Franchise Dealer, ExxonMobil may, but is not obligated to, perform Franchise Dealer's obligations under this Section 4.4 and, at ExxonMobil's sole discretion, debit Franchise Dealer's account or offset against amounts owed ExxonMobil or any security held by ExxonMobil (including the Rent Security and Maintenance Security) ExxonMobil's actual cost incurred in performing the obligations. ExxonMobil's rights under this Section 4.4(f) are in addition to any other rights or remedies of ExxonMobil including the termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

(g)    Without limiting Section 4.4(a) and based on the maintenance expense history of the Marketing Premises, ExxonMobil may adjust the maintenance adjustment from time to time as ExxonMobil determines appropriate.

(h)    Nothing contained in this Section 4.4 relieves Franchise Dealer of its obligation to comply, at its sole expense, with its maintenance obligations under any other provision of this Lease and the Agreement including Section 4.3.

## ARTICLE V

## ENVIRONMENTAL PROTECTION

5.1    <u>Inventory Reconciliation</u>.

(a)    Franchise Dealer acknowledges that the Marketing Premises contain underground tanks for the storage of petroleum products and that the release of the Products into the environment can cause serious damage to property, soil and ground water. To detect tank or piping leaks in order to safeguard the environment and prevent loss to either Franchise Dealer or ExxonMobil, Franchise Dealer shall measure the inventory of all underground storage tanks daily by tank sticking or other ExxonMobil-supplied measurement techniques, and reconcile the measured inventory with meter readings daily. Franchise Dealer shall keep a daily log of all underground tank inventory readings at the Marketing Premises, which shall be available for inspection by ExxonMobil or government authorities as required by applicable Law.

(b) To the extent that other requirements relating to environmental protection, including sampling of monitoring wells, preparing records of reports, or complying with notification requirements, are communicated by ExxonMobil to Franchise Dealer and without limiting Franchise Dealer's obligation to comply with the provisions of this Article V, Franchise Dealer additionally shall fully comply with all such requirements including any environmental Standards.

(c) Franchise Dealer shall maintain all loss, inventory-reconciliation and other environmental records or reports on the Marketing Premises for a period of three years. Franchise Dealer shall also make available these loss records or reports for inspection by ExxonMobil or by government authorities as required by applicable Laws.

(d) If Franchise Dealer fails to properly measure and reconcile inventory, maintain records and perform other environmental protection activities as required by applicable Law, this Lease, the Agreement or any related or supplemental agreements, or as specified by ExxonMobil from time to time, Franchise Dealer waives any and all rights that Franchise Dealer may have against ExxonMobil resulting from any environmental contamination or leakage including any claims for the value of lost Products. This waiver is in addition to other remedies and indemnities of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

(e) Franchise Dealer shall permit ExxonMobil, its Affiliates and their respective employees, agents and contractors to enter the Marketing Premises at all times to inspect or test for contamination or leakage and conduct any excavation, remediation, monitoring or other activities in connection with any environmental contamination or leakage.

5.2 <u>Notice; Remedy.</u>

(a) Franchise Dealer shall notify ExxonMobil immediately by telephone, confirmed in writing, of any indication or suspicion of environmental contamination or leakage. As required by Laws, Franchise Dealer also shall notify all local governmental authorities of any contamination or leakage. If Franchise Dealer fails to notify ExxonMobil immediately of any indication or suspicion of contamination or leakage, Franchise Dealer waives any and all rights that Franchise Dealer has, or may have, against ExxonMobil resulting from the contamination or leakage including any claims for the value of lost Product. This waiver is in addition to other remedies or indemnities of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

(b) Upon receipt of Franchise Dealer's notice, ExxonMobil shall use reasonable efforts to repair or otherwise remedy the cause of the leakage and return the Marketing Premises to full operation. Where determined appropriate in its judgment, ExxonMobil shall reduce or eliminate Rent due ExxonMobil during any repair period. ExxonMobil is not liable for lost business or profits, or for incidental or consequential damages arising from or relating to repairs, removal of equipment from service or other actions taken in response to environmental contamination or leakage.

5.3 <u>Compliance With Laws.</u> Franchise Dealer shall comply fully with all applicable Laws including those covering water, soil and air environmental protection and public health and nothing contained in this Lease may be construed to limit Franchise Dealer's obligation to comply with Laws. If Franchise Dealer does not dispose of waste in a proper manner or is not, in ExxonMobil's determination, complying with the requirements of these Laws, ExxonMobil may, but is not obligated to, enter upon the Marketing Premises and take such action as it deems necessary without liability to Franchise Dealer for business loss. Any cost incurred by ExxonMobil shall be paid by Franchise Dealer upon demand. This remedy is in addition to any remedies and indemnities of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

5.4 <u>Franchise Dealer's Acknowledgment.</u> Franchise Dealer acknowledges that Franchise Dealer's failure to comply fully with this Article V constitutes a failure to comply with a reasonable and materially significant provision of the Agreement and the Franchise Relationship.

## ARTICLE VI

## ADDITIONAL INDEMNITY AND INSURANCE

6.1    <u>Indemnity</u>. In addition to the other indemnities provided in the Agreement, Franchise Dealer shall defend and indemnify the Indemnitees to the fullest extent permitted by Law for all Losses resulting or arising from:

(a)    any failure by Franchise Dealer to notify ExxonMobil of the need for repairs or any failure by Franchise Dealer to otherwise comply with Franchise Dealer's maintenance obligations as set forth in this Lease, the Agreement or any supplemental or related agreement; or

(b)    any default or breach of an underlying lease as a result of the acts or omissions of Franchise Dealer.

6.2    <u>Types of Insurance Required</u>. Refer to Article XI of the Agreement for Insurance Requirements.

6.3    <u>Agreement Provisions</u>. The provisions of Article XI or XVIII of the Agreement apply to the insurance and indemnity requirements under this Article VI.

6.4    <u>Use of Proceeds</u>. ExxonMobil may in its sole discretion elect to keep any insurance proceeds in lieu of repairing, replacing or rebuilding the Marketing Premises or any personal property or equipment.

## ARTICLE VII

## REDEVELOPMENT OF MARKETING PREMISES

7.1    <u>ExxonMobil's Redevelopment Right</u>. ExxonMobil may, but shall not be obligated to, redevelop the Marketing Premises at any time and from time to time during the Term. Redevelopment may include altering, reconstructing, remodeling, demolishing or adding to buildings, equipment and facilities, and changing configuration, which may include the elimination or conversion of the service bays or merchandise sales areas. ExxonMobil is under no obligation to undertake any redevelopment. The decision to redevelop, and the nature of any redevelopment, shall be within ExxonMobil's sole discretion.

7.2    <u>Notice</u>. ExxonMobil shall notify Franchise Dealer verbally or in writing at least 30 days prior to the beginning of any demolition or construction.

7.3    <u>Right of Entry</u>. Franchise Dealer shall permit ExxonMobil and its Affiliates and their respective employees, agents, vendors or contractors to enter upon the Marketing Premises for the purpose of making any proposed redevelopment. Franchise Dealer shall fully cooperate with ExxonMobil in any redevelopment of the Marketing Premises.

7.4    <u>Limitation of Liability</u>. ExxonMobil will not be liable to Franchise Dealer for loss, inconvenience or annoyance to Franchise Dealer arising out of or in connection with any redevelopment including any loss, damage to or removal of any or all alterations or improvements previously installed by Franchise Dealer, or any claim by Franchise Dealer for loss of business or profits arising out of the redevelopment.

7.5    <u>Adjustments in Rental and Product Quantities</u>.

(a) During the period of demolition or construction, ExxonMobil shall reduce the Contract Volumes and the Rent by an amount which, in its sole judgment, will adequately compensate Franchise Dealer for the restrictions in use of the Marketing Premises resulting from the demolition or construction. Upon completion of any redevelopment, ExxonMobil may, for the balance of the Term:

    (i) increase the Contract Volume and minimum purchase requirements specified in Article II of the Agreement and ExxonMobil may amend the Purchase Schedule to reflect the increase; and

    (ii) increase the Rent and the Asset-Based Maximum Rent in accordance with Section 2.5.

(b) Within 30 days after receipt of notice from ExxonMobil of any Product quantity, minimum purchase or Rent increase, Franchise Dealer may terminate this Agreement by providing written notice to ExxonMobil if the increase is not satisfactory to Franchise Dealer. Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 7.5(b). The effective date of termination shall be 30 days after the date of Franchise Dealer's notice to ExxonMobil. Franchise Dealer shall sign and deliver to ExxonMobil, upon request by ExxonMobil, a mutual termination agreement and other agreements or instruments as requested by ExxonMobil for orderly termination of the Agreement, the Franchise and the Franchise Relationship.

7.6   <u>Franchise Dealer Improvements</u>. Franchise Dealer may not alter or improve all or any part of the Marketing Premises unless ExxonMobil has provided its prior written consent which ExxonMobil may withhold in its sole discretion. If ExxonMobil consents to any improvement or alteration, Franchise Dealer shall comply with:

(a) all provisions of this Lease, the Agreement and any underlying lease;

(b) all restrictions, covenants and reservations applicable to the Marketing Premises;

(c) all applicable Laws including building codes, permit requirements and zoning; and

(d) any conditions or requirements imposed by ExxonMobil in giving its consent.

Permitted improvements or alterations to the extent funded by Franchise Dealer during the Term may not be included by ExxonMobil in determining the Assessed Value for purposes of determining Rent during the Term if the inclusion would increase Rent above that paid by Franchise Dealer prior to the improvement or alteration. Nothing in this Lease may be construed as preventing ExxonMobil upon any renewal of the Franchise or the Franchise Relationship from including any Franchise Dealer-funded improvements or alterations in determining the Assessed Value for purposes of determining Rent even if inclusion would increase Rent. Any Franchise Dealer-funded improvements or alterations to the Marketing Premises are the sole property of ExxonMobil. Upon ExxonMobil's request, Franchise Dealer shall sign and deliver documentation, and take other action, requested by ExxonMobil to evidence ExxonMobil's ownership in any improvements or alterations.

# ARTICLE VIII

## CONTRACT VOLUME INCREASES

8.1    <u>ExxonMobil's Right to Increase</u>. If the Term is more than 5 years, ExxonMobil may at any time after the fifth anniversary of the Effective Date increase the Contract Volumes and minimum purchase requirements under Section 2.1 of the Agreement to an amount that ExxonMobil determines to be appropriate for the Marketing Premises. ExxonMobil shall furnish Franchise Dealer with at least 60 days prior written notice of any Contract Volume or minimum purchase requirement increase. ExxonMobil's rights under this Section 8.1 are in addition to other rights of ExxonMobil (including those under Section 7.5) to increase the Contract Volume and minimum purchase requirements under this Lease. Unless Franchise Dealer terminates the Agreement and the Franchise Relationship under Section 8.2, the increase will be effective on the date specified in ExxonMobil's notice of the increase.

8.2    <u>Franchise Dealer's Right to Terminate</u>. If the Contract Volume or minimum purchase requirement increase is unacceptable to Franchise Dealer, Franchise Dealer may terminate the Agreement, the Franchise and the Franchise Relationship by furnishing ExxonMobil with written notice of termination within 30 days following ExxonMobil's notice of increase. Failure by Franchise Dealer to furnish timely notice of termination is a waiver of Franchise Dealer's right to terminate under this Section 8.2 Upon ExxonMobil's request, Franchise Dealer shall sign and deliver to ExxonMobil a mutual termination agreement and other agreements or instruments as may be reasonably requested by ExxonMobil for orderly termination of the Agreement, the Franchise and the Franchise Relationship.

# ARTICLE IX

## EQUIPMENT LEASE

9.1    <u>Leased Equipment</u>. During the Term, ExxonMobil leases to Franchise Dealer, and Franchise Dealer leases from ExxonMobil, for use at the Marketing Premises the personal property and proprietary equipment (the "Leased Equipment") listed in the attachment entitled "Lease Schedule", which is incorporated into this Attachment. Without offset or recoupment, Franchise Dealer shall pay rent to ExxonMobil at the times and in the amounts specified in the Lease Schedule. Franchise Dealer shall pay the rent in any manner specified by ExxonMobil and permitted under Section 2.3 of the Agreement. The lease under this Article IX terminates on the earliest to occur of the following:

(a)    termination of the Agreement and the Franchise Relationship;

(b)    expiration of the Term; or

(c)    Franchise Dealer's default under this Article IX.

9.2    <u>Dealer's Obligations</u>.

(a)    With respect to the Leased Equipment, Franchise Dealer shall:

(i)    make no additions or alterations without ExxonMobil's prior written consent;

(ii)    keep legible and visible all brand names, trademarks and signs of ExxonMobil;

(iii)    comply with all Laws covering its use;

(iv)    not do or permit to be done anything prejudicial to ExxonMobil's title to the Lease Equipment;

(v)    not remove it or deliver it to anyone but ExxonMobil or ExxonMobil's designee;

(vi)    use it solely for Products at the Marketing Premises;

(vii)    exercise reasonable care to prevent damage;

(viii)    comply with all provisions of the Agreement (including the Standards) and any related or supplemental agreements; and

(ix)    keep Leased Equipment free from all liens and encumbrances.

(b)    Franchise Dealer, at Franchise Dealer's sole expense, shall:

(i)    pay and discharge any and all taxes, fees and charges imposed by governmental authority on any Leased Equipment while in Franchise Dealer's possession, or upon its use or any business in which it is employed;

(ii)    adequately insure the Leased Equipment in the amount of its replacement value while it is in Franchise Dealer's possession; and

(iii)    maintain the Leased Equipment in good repair and condition and, if necessary, replace the Lease Equipment to ensure that it is fit for its intended use and in accordance with applicable Laws. If Franchise Dealer fails to maintain, repair or replace the Leased Equipment:

(A)    ExxonMobil may, but is not obligated to, maintain, repair or replace it, as ExxonMobil determines, and

(B)    Franchise Dealer promptly shall reimburse ExxonMobil for the costs of any maintenance, repair or replacement performed by ExxonMobil. In addition to any other rights or remedies of ExxonMobil including termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship, ExxonMobil may debit any account of Franchise Dealer or offset any security held by ExxonMobil, in the amount of the costs.

(c)    Franchise Dealer acquires no ownership interest in the Leased Equipment because of Franchise Dealer's compliance with Franchise Dealer's maintenance, repair or replacement obligations.

9.3    <u>Equipment Removal</u>. ExxonMobil reserves the right to remove any Leased Equipment at any time and to replace it with similar equipment. Any replacement equipment will be subject to this Article IX. ExxonMobil may discontinue leasing any Leased Equipment at any time without any obligation to replace it, and ExxonMobil has no obligation to reimburse Franchise Dealer rent paid in advance for discontinued items of Leased Equipment. Upon termination of the lease under this Article IX:

(a)    ExxonMobil may elect, in its sole discretion, to:

(i)    remove the Leased Equipment,

(ii)    have Franchise Dealer remove and return the Leased Equipment to ExxonMobil or ExxonMobil's designee, or

(iii)    direct Franchise Dealer to dispose of the Leased Equipment;

(b)    Franchise Dealer shall bear all removal, site-restoration, transportation and disposal costs relating to the removal, return or disposal of the Leased Equipment;

(c)    ExxonMobil has no obligation to reimburse Franchise Dealer for any rent paid in advance for the Leased Equipment; and

(d)   ExxonMobil may abandon the Leased Equipment without liability or obligation to Franchise Dealer and without limiting any obligations of Franchise Dealer relating to the Proprietary Marks.

9.4   <u>ExxonMobil's Rights in the Equipment</u>. The Leased Equipment at all times is the property of and owned by ExxonMobil, and title to the Leased Equipment is and will remain in ExxonMobil. ExxonMobil's rights relating to the Leased Equipment (including its rights under Section 9.5) will survive any termination or non-renewal of the Agreement, the Franchise and the Franchise Relationship.

9.5   <u>Right of Entry</u>. In addition to any other right of entry under this Lease or the Agreement, ExxonMobil has the unrestricted right to enter upon the Marketing Premises at any time to inspect or to remove any and all of its property including the Leased Equipment.

9.6   <u>Assignment</u>. Notwithstanding any contrary provision in the Agreement, Franchise Dealer may not assign its rights or delegate its duties under this Article IX, in whole or in part, without ExxonMobil's prior written consent which ExxonMobil may withhold in its sole discretion.

**ARTICLE X**

**MISCELLANEOUS**

10.1   <u>Agreement Provisions</u>. Except as expressly provided otherwise in this Lease or in the Agreement, the provisions of the Agreement apply to this Lease. Any termination or non-renewal of the Agreement, the Franchise and Franchise Relationship will automatically operate to terminate this Lease.

10.2   <u>Definitions; Construction</u>.

(a)   Terms used in this Lease have the meaning indicated in this Lease or the Agreement.

(b)   Unless expressly provided otherwise, any determination made by ExxonMobil under this Lease will be in ExxonMobil's sole discretion when acting in good faith and in the normal course of business.

(c)   All consents or approvals on behalf of ExxonMobil under this Lease must be by an authorized representative of ExxonMobil.

(d)   Unless indicated as a reference to provisions of the Agreement, references in this Lease to Sections and Articles are to those contained in this Lease.

10.3   <u>Time of Essence</u>. Time is of the essence in the performance of Franchise Dealer's obligations (including payment of Rent), and the exercise of Franchise Dealer's rights, under this Lease.

I acknowledge the receipt and applicability of these CODO Lease Provisions:

PETER AMAEFULE

# CODO LEASE SCHEDULE
## TO
## CODO LEASE PROVISIONS
## OF PMPA FRANCHISE AGREEMENT

This CODO Lease Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil"), **PETER AMAEFULE, 4650 S CAPITOL STREET SE, WASHINGTON, DC 20032** (Franchise Dealer") with a Term beginning on **04/01/2006** (the "Effective Date").

Pursuant to Section 1.1 of the CODO Lease Provisions to the PMPA Franchise Agreement, dated _____ 12/14 , 20 05 the Marketing Premises leased by ExxonMobil to Dealer include the improvements and equipment listed on the attached or below, for which Dealer acknowledges receipt. DEALER ACCEPTS THE IMPROVEMENTS AND EQUIPMENT IN THEIR PRESENT CONDITION, AS IS, WITHOUT ANY WARRANTY, EXPRESS OR IMPLIED, AS TO THEIR CONDITION OR FITNESS FOR ANY PURPOSE.

| Quantity | Item Description |
|---|---|
| 1 | COMPRESSOR AIR |
| 2 | DISPENSER ELECTRONIC |
| 1 | DISPENSER-G/SITE-VERIFON |
| 2 | DRAINAGE SYSTEM |
| 1 | FURNITURE-OFFICE |
| 2 | LIFT |
| 1 | RADIO COMMUNICATION SYSTEM |
| 1 | SAFE FREE STANDING |
| 1 | SIGN BULLETIN BOARD PRIC |
| 1 | SIGN POLE |
| 1 | SIGN-MAJOR ID |
| 1 | TANK 550 GALS OR LESS |
| 1 | TANK MONITORING SYSTEM |
| 1 | TANKS 10000 GAL |
| 1 | TANKS 6000 GAL |
| 1 | TANKS 8000 GAL |

I acknowledge the receipt and applicability of this CODO Lease Schedule:

Dealer Signature

XOM_OGLLEASE.htm

## MAINTENANCE ADJUSTMENT SCHEDULE
## TO
## THE CODO LEASE PROVISIONS
## OF THE PMPA FRANCHISE AGREEMENT

This Maintenance Adjustment Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corporation ("ExxonMobil"), and PETER AMAEFULE ("Franchise Dealer") with a Term beginning on APRIL 1, 2006 (the "Effective Date").

Pursuant to Section 4.4(b) of the CODO Lease Provisions to the PMPA Franchise Agreement, ExxonMobil shall issue the credit against Franchise Dealer's rent monthly by journal entry to Franchise Dealer's account. The amount of Franchise Dealer's maintenance adjustment is set forth below.

| | | | |
|---|---|---|---|
| **STATION #:** | 25050 | **BUSINESS UNIT:** | 54 |
| **DEALER NAME:** | PETER AMAEFULE | | |
| **STATION ADDRESS:** | 4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000 | | |
| **ANNUAL MAINTENANCE ADJUSTMENT:** | $3,498.00 | | |

EXXONMOBIL MAY DISCONTINUE OR ADJUST THE MAINTENANCE ADJUSTMENT IN ACCORDANCE WITH THE CODO LEASE PROVISIONS.

ExxonMobil will not notify dealer in cases where the maintenance adjustment is increased.

I acknowledge the receipt and applicability of this maintenance adjustment Schedule:

_____
PETER AMAEFULE

MAINTENANCE SCHEDULE
TO
THE CODO LEASE PROVISIONS
OF THE PMPA FRANCHISE AGREEMENT

LOC: 54 - 25050

**Repair/Replacement Responsibility and Discretionary/Non-discretionary Guidelines for Service Station Maintenance**

This Maintenance Schedule is a part of, and incorporated into, the CODO Lease Provisions of the PMPA Franchise Agreement between ExxonMobil Oil Corportation ("ExxonMobil") and PETER AMAEFULE , 4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000 ("Franchise Dealer") with a Term beginning on APRIL 1, 2006 (the "Effective Date").

Pursuant to Section 4.1 of the CODO Lease Provisions to the PMPA Franchise Agreement, dated _12/14/2K.S_ the allocation of maintenance obligations is as follows:

Legend:

D       Dealer responsibility
EM      ExxonMobil responsibility
EM*     Joint responsibility. ExxonMobil is responsible for 90% of the cost of the work scope and the Dealer for a 10% deductible. The dealer may incur a maximum of $1,000 in deductible payments for any given calendar year.
MCC     Call Maintenance Call Center
POS     Call Houston POS Help Desk

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| I. BUILDING, CANOPY, AND CAR WASH | | | | |
| A. STRUCTURE | | | | |
| Cabinets | D | D | | |
| Canopy | EM | EM | MCC | 1 |
| Doors | | | | 2 |
| Overhead | D | EM* | MCC | |
| Walkthrough | D | D | | |
| Electrical | | | | |
| Above ground (incl. replace. of int./ext. bulbs & ballasts) | D | D | | |
| Below ground (req. excavation) | EM | EM | MCC | |
| Panels/upgrades | D | EM or D | MCC | 3 |
| Extermination | (Dealer is responsible for extermination) | | | 1 |
| Floor tile and walk-off mats | D | D | | |
| Glass | D | D | | |
| Gutters & downspouts, bldg. (incl. clean-outs) | D | D | | |
| Locks (incl. manual and electric on all doors) | D | D | | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| Painting & washing | D | D | | |
| Pass-through drawer | D | D | | 4 |
| Plumbing | | | | |
|     Backflow devices (incl. certif.) | D | D | | |
|     Fixtures | D | D | | |
|     Sink, toilets, urinals, faucets, stoppages of faucets, flush mechanisms, floats, valves, etc. | | | | |
|     Floor drains (Dlr. resp. for clean-outs) | EM | EM | MCC | |
|   Water Piping | | | | |
|     Above ground | D | D | | |
|     Below ground (req. excavation) | EM | EM | MCC | |
|   Restroom exhaust fans | D | D | | |
| Roofs | D | EM* | MCC | |
| Sewer system | | | | |
|     Holding tanks (Dlr. resp. for pump-outs) | EM | EM | MCC | |
|     Main sewer line (Dlr. resp. for blockages) | EM | EM | MCC | |
|     Septic System (Dlr. resp. for pump-outs) | EM | EM | MCC | |
| Shelving | D | D | | |
| Walls | | | | |
|     Non-structural repairs | D | D | | |
|     Structural repairs | EM | EM | MCC | |
| Window frames | D | D | | |
| B. EQUIPMENT | | | | |
| Air conditioner | | | | |
|     Unit/condenser | D | EM* | MCC | |
|     Ducts | D | D | | |
| Car vacuum (car wash and bay) | D | D | | |
| Car wash equipment | D | D | | |
| Car wash reclaim pits (Dlr. resp. for clean-outs) | EM | EM | MCC | |
| Cigarette intrusion detectors | D | D | | |
| Cigarette racks (incl. installation) | D | D | | |
| Fire extinguishers (incl. recharging & inspec.) | D | D | | |
| Fire suppression systems (Dlr. resp. for inspec.) | D | EM | MCC | |
| Furnace, oil tanks, heaters, heat pumps (Dlr. resp. for filter replacements) | D | EM* | MCC | |
|     Ducts | D | D | | |
| Lockbox | D | D | | |
| Refrigeration equipment | | | | |
|     Chest freezer, reach-in cooler | | | | |
|       ExxonMobil owned | D | EM | MCC | |
|       Dealer owned | D | D | | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| Ice maker and ice dispenser | D | D | | |
| Walk-in cooler/condenser | D | EM* | | |
| Restroom furnishings | D | D | | |
| Coat hooks, mirrors, shelves, soap dispensers, toilet tissue dispensers, towel dispensers, etc | | | | |
| Safes and autobanks (incl. recombinations and lock changes) | D | D | | |
| Store accessories | D | D | | |
| Coffee makers, juice and soda dispensers, cup dispensers, ice dispensers, microwaves, etc. | | | | |
| Snackshop/Bay Planning | D | D | | |
| Customer record desk, lubritory backwall, overhead tire racks, salesroom backwall and module, stools, utility room shelving, etc. | | | | |
| Waste baskets | D | D | | |
| Water cooler/fountain | D | D | | |
| Water heater | D | D | | |
| **II. SERVICE & DISPENSING EQUIPMENT** | | | | |
| Air compressor | D | EM | MCC | |
| Air Piping | EM | EM | MCC | |
| Above Ground | D | D | | |
| Below Ground (Req. Excavation) | EM | EM | MCC | |
| Air/water tower and islanders (incl. hoses, chucks, nozzles, and bibs) | D | D | | |
| Cash register/console (combination unit)/printer | D | D | | |
| Console (separate unit) | EM | EM | MCC | |
| Credit card imprinter | D | D | | |
| Dispensers | | | | |
| Round/electric/MPD (incl. filter replacement) | EM | EM | MCC | |
| CATS/CRINDS | EM | EM | POS | 5 |
| Hoses, nozzles, swivels, retractors, breakaway cables, and price signs required by law | D | D | | |
| Calibrations | EM | EM | MCC | |
| Express Lube drain with articulating arm (not portable) and repl. of funnel, quart oil cans, and ATF can opener | D | D | | |
| Intercoms (self-serve) | D | EM | MCC | |
| Leak detectors | EM | EM | MCC | |
| Leak monitoring and secondary containment systems | EM | EM | MCC | |
| Lifts (Dlr. resp. for maint./repl. of oil) | D | EM | MCC | 6 |
| Lube equipment | D | D | | |
| Piping in front of walls (visible) | D | D | | |
| Piping behind walls | EM | EM | MCC | |
| Monitoring wells | EM | EM | MCC | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| POS terminal | EM | EM | POS | 5 |
| Submersible pumps | EM | EM | MCC | |
| Sump and grease traps (Dlr. resp. for clean-outs) | EM | EM | MCC | |
| Tanks: product, waste oil, and fuel oil | | EM | MCC | |
|     Fill boxes (incl. covers, caps, tags, painting) | EM | EM | MCC | |
|     Fill locks | D | D | | |
|     Overfill containment | EM | EM | MCC | |
|     Piping (lines) | EM | EM | MCC | |
|     Product switch (called in by District to correct imbalance problem) | | | MCC | |
|     Underground storage tanks | EM | EM | MCC | |
|     Test tanks/lines | | | MCC | |
|     Water/sludge pump out | | | MCC | |
| Waste oil and product tank gauge sticks, and water paste | D | D | | |
| Water cans or buckets | D | D | | |
| Work benches, gondolas, and desks | D | D | | |
| **III. SIGNAGE** | | | | |
|     A. ID signs (up to 25 feet off the ground) | D | EM | MCC | 7 |
|     Hi-rise signs (over 25 feet off the ground) | EM | EM | MCC | |
|     B. Dealer-owned signs (Price, snaplock, service, merchandise, IMU, POS, stamp and restroom signs, dealer name plates) | D | D | | |
|     C. ExxonMobil-owned signs | | | | 7 |
|         Building/canopy legends, pegasus discs, IDU's | D | EM | MCC | |
|         Decals and no smoking signs | D | D | | |
| **IV. ISLAND AND YARD** | | | | |
|     Air piping | | | | |
|         Above ground | D | D | | |
|         Below ground (req. excavation) | EM | EM | MCC | |
|     Asphalt (Dlr. resp. for sealcoating) | | | | |
|         Potholes | D | | | |
|         Repaving/skin coat | | EM | MCC | |
|     Concrete | | | | |
|         Patching | D | | | |
|         Island/drive mat replacement | | EM | MCC | |
|     Driveway signal system and hoses | D | D | | |
|     Electrical (Area light fixtures and poles, disc island lights, low level lights, other light fixtures, canopy uplights and downlights) | | | | 8 |
|         Above ground | D | EM | MCC | |
|         Below ground (req. excavation) | EM | EM | MCC | |
|     Fence | D | D | | |
|     Landscaping and planting | D | D | | |
|     Security equipment (cameras, mirrors, etc.) | D | D | | |

| | REPAIR RESP. | REPLACE RESP. | IF BY EXXONMOBIL DISC/NONDISC | FOOT NOTES |
|---|---|---|---|---|
| Sprinklers (incl. winterizing) | D | D | | |
| Tire racks, portable | D | D | | |
| Water piping | | | | |
|     Above ground (incl. faucets and bibs) | D | D | | |
|     Below ground | EM | EM | MCC | |
| Water well | D | EM | MCC | |
| Yard drain (Dlr. resp. for clean-outs) | EM | EM | MCC | |
| **V. MISCELLANEOUS** | | | | |
|     Divestments | EM | EM | MCC | |
|     Environmental | | | | |
|         Spills, leaks, clean up, make safe, product recovery | EM | EM | MCC | |
|         Vapor recovery piping system | EM | EM | MCC | |

I acknowledge the receipt and applicability of this Maintenance Schedule:

_(signature)_

PETER AMAEFULE

1 Dealer is responsible for preventative maintenance including, but not limited to, gutter/drain clean-outs, panel replacement and securing, replacement of missing screws, and caulking. Dealer is responsible for notifying ExxonMobil of excessive pigeon waste. ExxonMobil is responsible for removal of pigeon waste.

2 Dealer is responsible for notifying TM if a security enclosure or a walk-through door involving bullet-resistant glass needs replacement. The Dealer is also responsible for the replacement of weatherstripping on overhead and walk-through doors.

3 Upgrades to the electrical service and replacement of existing services will fall into the following schedule of responsibility:

1) Upgrades to existing services should be performed with building/configuration modifications.

a) ExxonMobil is responsible for upgrading the service at stations where ExxonMobil performed a capital project and failed to update the service accordingly.

b) If the need for upgrade is the result of the dealer/sal-op manager having increased the electrical demands at the location, the dealer/sal-op station is responsible for updating the service.

2) Unusual circumstances will be investigated with ExxonMobil making the final decision.

3) ExxonMobil is responsible for replacing worn out electrical services.

4 ExxonMobil is responsible for painting canopy if and only if canopy cannot be power washed. Canopy painting is discretionary maintenance and subject to District Approval after power washing has been attempted.

5 Call Houston POS Help Desk 800-231-1122 for software questions/problems.

6 ExxonMobil is responsible for the purchase and installation of a single post semi-hydraulic lift. The Dealer may have a dual-post lift installed, but will pay the incremental cost of installing the dual-post instead of the single-post lift. The Dealer may also purchase and install an above-ground lift; ExxonMobil would be responsible for the removal of the existing in-ground lift.

7 Dealer is responsible for the resecuring and relamping of all signs, the pinning of a rotating sign, and the replacement of lamps and ballasts in ID signs, price signs, pegasus discs, and legends. ExxonMobil is responsible for the replacement of bulbs, ballasts and fixtures in Hi-rise ID signs.

8 Dealer is responsible for replacement of lamps and ballasts, and ExxonMobil is responsible for replacement of light fixtures and poles due to normal wear and tear.

**MAINTENANCE AND INFORMATION SERVICES AGREEMENT**
For Electronic Point of Sale Terminal and Related Equipment

THIS AGREEMENT DATED *12/14* , 20*05* , between ExxonMobil Oil Corporation ("ExxonMobil") having an office at 3225 Gallows Road, Fairfax, Virginia 22037, and PETER AMAEFULE ("System User") having a place of business at 4650 S CAPITOL STREET SE , WASHINGTON , DC , 20032-0000 ("Marketing Premises").

## ARTICLE I-DEFINITIONS

The following terms, when capitalized in this Agreement, have the meanings set forth below:

1.1   **"Effective Date"** means the date of this Agreement.

1.2   **"Equipment"** includes the Point-of-Sale ("POS") Terminals, Electronic Cash Registers ("ECRS"), Customer Activated Terminals ("CATS") and Hand Activated Terminals ("HATS") set forth in Attachment A of this Agreement.

1.3   **"POS Program"** means ExxonMobil's proprietary system designed to process credit, debit and prepaid cash transactions.

## ARTICLE II-PARTICIPATION

2.1   **Acknowledgment.** System User acknowledges that a ExxonMobil Representative has fully described to System User ExxonMobil's POS Program, which will enable System User to electronically authorize and process credit, debit and prepaid card transactions under ExxonMobil's Retail Credit Card Program in accordance with ExxonMobil's Credit Card Instructions as modified from time to time ("Instructions"). As a participant in the POS Program, System User understands that System User must comply with these Instructions.

2.2   **Discontinuance of POS Program.** System User agrees that ExxonMobil may modify, amend or discontinue its POS Program or any portion of the POS Program at ExxonMobil's sole discretion.

2.3   **Warranties.** ExxonMobil does not warrant or guarantee the Equipment.

## ARTICLE III-MAINTENANCE, INSTALLATION & TRAINING

3.1   **Maintained Equipment-Lease Locations.** ExxonMobil agrees to maintain the ExxonMobil authorized Equipment set forth in Attachment A for use by System User to access the ExxonMobil POS Program at the Marketing Premises. System User shall pay for the services at rate set forth in Attachment A. System User agrees that Attachment A may be amended from time to time by ExxonMobil.

3.2   **Maintained Equipment- Non-Lease Location.** For locations where ExxonMobil does not own or have a long term lease interest in the marketing premises, System User agrees to maintain the Equipment if System User furnishes ExxonMobil with written evidence on or before the Effective Date that System User or its designated contractor is certified and qualified by the original Equipment Vendor to perform such service during the term of this Agreement. System User shall provide such evidence to ExxonMobil on the Effective Date of this Agreement. If System User fails to furnish the evidence on or before the Effective Date, ExxonMobil shall perform the maintenance services and System User shall pay for such services at the rates set forth in Section 3.3.

XOM_POSAGREE.htm                                    1

3.3 **Maintenance and Information Services**. As payment for ExxonMobil providing satellite and telephone line access and maintaining the Equipment, System User agrees to pay ExxonMobil monthly Maintenance and Information Services fees for the Equipment as set forth in Attachment A. All fees and charges are payable monthly and in advance. ExxonMobil may, at any time during the term of this Agreement, increase Maintenance and Information Services Fees by giving System User not less than 30 days' prior written notice. If ExxonMobil exercises its option to increase fees, System User may terminate this Agreement by providing ExxonMobil with written notice prior to the effective date of the increase in fees.

3.4 **ExxonMobil's Obligations**. ExxonMobil will repair and maintain all Equipment covered by this Agreement. ExxonMobil's maintenance and repair obligations do not include the cost of providing or paying for appropriate electric current. ExxonMobil's repair and maintenance obligations arise only when a repair is required as a result of ordinary wear and tear or defects in material or workmanship and if System User notifies ExxonMobil that the Equipment is not in good operating condition. Any repairs or maintenance, which are determined in ExxonMobil's sole discretion, arising as the result of (i) damage by accident, negligence, abuse or misuse; or (ii) operation for which the Equipment was not intended; or (iii) any alteration or modification of the dedicated power source, telephone connecting line, or satellite equipment; or (iv) acts of God, fire, explosion, strike, serious and adverse weather conditions, civil or public disturbance, riots, governmental regulations or requirements shall be at the expense of System User.

3.5 **System User's Specific Maintenance Obligations**. System User agrees to replace at its expense and as required, Terminal ribbons, batteries, battery chargers and paper except for CO-65 forms, and System user agrees to pay for recurring local electric charges. System User shall allow ExxonMobil to make such changes in both User owned and ExxonMobil owned Equipment, and software as ExxonMobil deems necessary.

3.6 **Installation Obligations and Telephone Line and Satellite Expenses.**

    A. **ExxonMobil-Owned Lease Line or Satellite POS Equipment**. ExxonMobil will arrange for the installation and connection of the required telephone line or satellite equipment to the Equipment located at the marketing Premises, and ensure that the Equipment is in operable condition. ExxonMobil will pay for installation of POS Terminal(s) and for site preparation, including an appropriate dedicated A/C power outlet at locations where ExxonMobil owns or has a long term Lease interest in the real property. System User shall bear the expense for site preparation at all other locations. ExxonMobil will pay for recurring charges for the telephone or satellite line connecting the Equipment to ExxonMobil's system.

    B. **ExxonMobil-Owned Auto-dial Equipment**. System User agrees to arrange for and pay the costs of installation of the necessary telephone line. ExxonMobil will connect the telephone lines to the Equipment located at the Marketing Premises and ensure the Equipment is in operable condition. ExxonMobil will pay for site preparation, including an appropriate dedicated A/C power outlet at locations where ExxonMobil owns or has a long term Lease interest in the real property. System User shall bear the expense for site preparation at all other locations. System User will pay for the recurring local telephone line expense.

    C. **System User Owned POS Equipment**. ExxonMobil will arrange for installation of the necessary telephone line or satellite equipment and connect the Terminal(s) to the lines. System User will pay all installation costs of the POS equipment. ExxonMobil will pay for site preparation costs at those locations where ExxonMobil has an ownership or long term Lease interest in the real property or improvements. System User will pay all site preparation expenses at any other location. ExxonMobil will pay for recurring charges for the telephone line or satellite connecting the Terminal(s). Only System User owned equipment which has been previously approved by ExxonMobil may be connected to and access the ExxonMobil System/Network. System User will be responsible for acquiring any necessary PIN Pads.

3.7 **Training**. Prior to installation of the POS equipment, System User will receive operating instructions from ExxonMobil and shall be required to complete all necessary training programs approved by ExxonMobil. System User pays for all lodging, meals and transportation expenses to and from the training site. ExxonMobil will maintain a "Help Desk" to answer any day-to-day questions regarding the operation of the POS system.

## ARTICLE IV-SYSTEM USER'S GENERAL OBLIGATIONS

4.1   **General Obligations**. With respect to the Equipment, System User shall (a) make no additions or alterations; (b) make no movement or rearrangement of the Terminal(s); (c) comply with all applicable credit/debit card policies covering use of the Terminal(s); (d) comply with all laws and regulations applicable to the use of the Terminal(s); (e) do or permit to be done nothing prejudicial to any title or ownership interest ExxonMobil may have in the Terminal(s) or equipment; (f) not remove the ExxonMobil owned Terminal(s) or deliver the Terminal(s) to anyone but ExxonMobil or ExxonMobil's representative; (g) not sell a System User owned Terminal(s) without first removing and returning to ExxonMobil any ExxonMobil owned software contained in said Terminal(s); and (h) exercise the degree of care necessary to prevent damage to the terminals and other related equipment; (i) grant access to the premises to allow ExxonMobil authorized maintenance representatives to perform their obligations under this agreement

4.2   **Indemnity**. System User agrees to indemnify and hold ExxonMobil harmless against all losses and claims (including those of the parties, their agents and employees) for death, personal injury or property damage arising out of the use of or conditions of the Terminal(s) and related equipment.

## ARTICLE V-TERM AND TERMINATION

5.1   **Term**. The term of this Agreement shall begin on the later of APRIL 1, 2006, or the date the POS equipment is installed and operational and shall end on MARCH 31, 2009, unless terminated earlier as provided in this Agreement.

5.2   **Termination by System User**. Notwithstanding Section 5.1 of this Article, System User may terminate this Agreement at any time provided that System User gives ExxonMobil 90 days' advance written Notice of its desire to terminate this Agreement.

5.3   **Termination by ExxonMobil**. Notwithstanding Section 5.1 of this Article, this Agreement shall automatically terminate (a) on the Effective Date of any termination or nonrenewal of any PMPA Motor Fuels Franchise Agreement, or PMPA Distributor Franchise Agreement, or PMPA Franchise Agreement between the parties; (b) in the event System User elects not to participate in the ExxonMobil Credit/Debit Card Program at the Marketing Premises; (c) in the event that System User's participation in the ExxonMobil Credit/Debit Card Program is terminated by ExxonMobil; (d) in the event that ExxonMobil withdraws from electronic point-of-sale credit/debit card processing in System User's area; or (e) ExxonMobil discontinues the POS Program as outlined herein. In addition, ExxonMobil reserves the right to terminate this Agreement, in the event of any default by System User or failure of System User to meet any performance criteria established by ExxonMobil from time to time or for any other reason if ExxonMobil gives System User 90 days' advance written notice of the termination. In the event of termination of the Agreement, ExxonMobil may terminate System User's access to the POS network system. ExxonMobil also reserves the right to terminate maintenance on any POS hardware or software if it or any part(s) become unsupported by ExxonMobil's maintenance providers. At which time, ExxonMobil will give System User 90 days advance notice to either contract for their own maintenance service, replace the equipment with approved hardware or software, or remove the equipment from the POS network system. On the Effective Date of any termination of the Agreement, ExxonMobil may also remove ExxonMobil owned Terminal(s), equipment and software without liability and without obligation for any restoration of the Marketing Premises or damage incidental to such removal.

5.4   **Performance Criteria**. Notwithstanding any other provision in this Agreement, ExxonMobil reserves the right to remove any ExxonMobil owned Terminal(s), at any time and cancel this Agreement under the terms of Section 5.3 in the event that the System User processes fewer than the minimum credit and debit transaction volumes per dealer equipment via the POS system in any given calendar month during the Term of this Agreement as follows:

CATS

Other lease line or satellite terminals                    1200 transactions per month

Auto-dial terminals                                        1000 transactions per month

                                                           400 transactions per month

or in the event that the System User processes fewer than 80% of all credit and debit card transactions with said Terminal(s) in any given calendar month during the Term of this Agreement.

## ARTICLE VI-MISCELLANEOUS

6.1 **Replacement of ExxonMobil-owned Equipment**. ExxonMobil reserves the right to remove ExxonMobil owned POS Terminal(s) at any time and to replace same with similar or different equipment

6.2 **Force Majeure**. ExxonMobil shall not be responsible for or liable to system User for any loss or damage due to down-time of the Terminal(s) and related equipment because of repair or maintenance or due to failure of connecting telephone lines or satellite to ExxonMobil Oil Corporation's equipment.

6.3 **Assignments**. Any assignment of this Agreement without ExxonMobil's express written consent shall be void.

6.4 **Notices**. All notices shall be in writing and shall be delivered personally (to an officer or manager in ExxonMobil) or sent by registered or certified mail to the parties at the addresses specified in the paragraph immediately preceding Article I of this Agreement. Notice by mail shall be deemed given on the date such notice is deposited in the United States mail, postage prepaid and properly addressed. This instrument contains the entire agreement covering the subject matter and supersedes any and all prior understandings or dealings between the parties relative to this subject matter.

6.5 **Amendments**. No modification of the Agreement shall be binding on ExxonMobil unless in writing and signed by ExxonMobil's Business Unit Manager or such authorized representative.

IN WITNESS WHEREOF, the parties hereto have executed this Agreement the day and year first above written.

REVIEWED BY:                                   ExxonMobil Oil Corporation

_____                        By: _____


                                               PETER AMAEFULE
                                               SYSTEM USER:


_____                        By: _____

## ATTACHMENT A
## POS MONTHLY FEE SCHEDULE

| *Single Cash Register (Integrated)* | *Dealer Fees Monthly ($)* |
|---|---|
| POS Terminal Maintenance | $110 |
| Outside Speedpass (per MPD) | $5 |
| Inside Speedpass (per indoor unit) | $5 |
| Pay at the Pump (per MPD) | $30 |
| Telecommunications (VSAT Network Access) | $140 |

| *Dual Cash Register (Integrated)* | *Dealer Fees Monthly ($)* |
|---|---|
| POS Terminal Maintenance | $160 |
| Outside Speedpass (per MPD) | $5 |
| Inside Speedpass (per indoor unit) | $5 |
| Pay at the Pump (per MPD) | $30 |
| Telecommunications (VSAT Network Access) | $140 |

| *Low End - Stand Alone Credit Card Terminal (DataCard 840 with VSAT Network Access)* | *Dealer Fees Monthly ($)* |
|---|---|
| Maintenance | $30 |
| Telecommunications (VSAT Network Access) | $140 |

| *Low End - Stand Alone Credit Card Terminal (DataCard 840 with Dial-up Network Access)* | *Dealer Fees Monthly ($)* |
|---|---|
| Maintenance | $30 |
| Telecommunications (dial-up network access) | $70 |

| *Low End - Stand Alone Credit Card Terminal (DataCard 640 with Dial-up Network Access)* | *Dealer Fees Monthly ($)* |
|---|---|
| Maintenance | $30 |
| Telecommunications (dial-up / network access) | $70 |

# TRANSFER AND SURVIVORSHIP POLICY

Preamble

This policy is adopted pursuant to Articles XII and XIII of ExxonMobil's Fuels Franchise dealer PMPA Franchise Agreements (the "Franchise Agreement") and applies to ExxonMobil dealers and distributors governed by those agreements ("Franchisees"). Consistent with ExxonMobil's requirements and developments in the law and in the relevant business environment, this policy is intended to provide additional flexibility to individual Franchisees and the owners of Franchisee business organizations to support estate and business-continuity planning.

A.  Designation of Successors.

  1.  This Paragraph A is adopted in accordance with Section 12.5(c) of the Franchise Agreements.

  2.  If a Franchisee is an individual, the Franchisee may designate, as the successor or alternate successor upon the Franchisee's death under Section 12.5(a), an individual who is qualified and meets the conditions and requirements provided or contemplated by the Franchise Agreement applicable to designated successors. Subject to the following provisions, a designated successor of an individual Franchisee need not be a spouse or adult child.

  3.  Subject to minimum ownership requirements applicable to CODO Franchisees, a Key Individual or other individual owning an Interest in a non-individual Franchisee may designate, as a successor or an alternate successor upon the death of such individual under Section 12.5(b), one or more individuals who meet the conditions and requirements provided or contemplated by the Franchise Agreement applicable to designated successors and, if a successor is to become the Key Individual, meets the qualifications and conditions and requirements provided or contemplated by the Franchise Agreement applicable to a Key Individual. Except with respect to CODO Franchisees to which minimum ownership requirements apply, 51% ownership interest in a non-individual Franchisee will not be a condition to a Key Individual's designation of a successor or to a transfer to that designated successor under Sections 12.5(b) and 13.2 (b) of the Franchise Agreement. Subject to the following provisions, a designated successor of a Key Individual owning an Interest in a non-individual Franchisee need not be a spouse or adult child under Sections 12.5 (b) and 13.2 (b).

  4.  As a condition to any Transfer to a designated successor, an individual Franchisee, Key Individual or other Transferor must comply with all applicable laws governing or affecting survivorship or succession. Upon designating a successor, an individual Franchisee, Key Individual or other Transfer must obtain all consents, assignments of rights, releases or waivers from any persons having rights or claims under such laws including, but not limited to, state community property and succession laws. An individual Franchisee, Key Individual or other Transferor must indemnify and defend ExxonMobil against any such rights or claims (and, upon ExxonMobil's request, must furnish ExxonMobil with a written indemnification agreement in form and substance specified by ExxonMobil) and, upon ExxonMobil's request, also must provide documentation sufficient in ExxonMobil's judgment to confirm that all such laws have been complied with and all such consents, assignment of rights, releases or waivers have been obtained including, without limitation, providing an opinion of counsel acceptable to ExxonMobil.

  5.  Subject to Paragraph A.4 above and all conditions and requirements provided or contemplated by the Franchise Agreement and subject to prior written notice to ExxonMobil:

     (a)  an individual Franchisee may assign the Franchise Agreement during the Franchisee's lifetime to that individual properly designated as the Franchisee's successor under the preceding provisions of this Paragraph A; and

(b)    subject to minimum ownership requirements applicable to CODO Franchisees, a Key Individual or other individual owning an Interest in a non-individual Franchisee may transfer the Interest during their lifetime to that individual or those individuals properly designated as their successor or successors under the preceding provisions of this Paragraph A. Except with respect to CODO Franchisees to which minimum ownership requirements apply, the requirement in Section 12.2(d) of the Franchise Agreement that a Key Individual not transfer less than 51% ownership in a non-individual Franchisee will not apply.

6.    A transferee, whether as a successor upon the death of any Franchisee, Key Individual or other Transferor or as a transferee under Paragraph A.5 above, must meet all conditions and requirements of this policy and all conditions and requirements provided or contemplated by the Franchise Agreement at the time of such succession or other Transfer. Such conditions and requirements include, among others, providing personal guarantees, demonstrating that the successor or other transferee meets all then required applicable Key Individual or Franchise Dealer qualifications, attending training and signing any applicable agreement or agreements. To be effective, all designations must be in writing on such forms as ExxonMobil may designate from time to time and must be furnished to the Contract Services Supervisor, PO Box 2245, Buffalo, NY 14240-2245, or such other person as ExxonMobil may indicate in writing from time to time.

B.    Transfers to Trusts.

1.    This Paragraph B is adopted in accordance with Section 12.5(c) of the Franchise Agreement and applies only to those Franchisees that are corporations.

2.    An individual who owns shares in a corporate Franchisee may transfer those shares to a trust subject to the following:

a.    The trust must be established and maintained primarily for estate planning purposes.

b.    The Franchisee corporation must continue to meet all other conditions and requirements provided or contemplated by the Franchise Agreement including, without limitation, those relating to the appointment of a qualified Key Individual acceptable to ExxonMobil.

c.    On behalf of the trust (but not in their personal capacities), its trustee or trustees (if more than one) must furnish ExxonMobil, and maintain in full force and effect, a continuing, unconditional guarantee in accordance with Article IV of the Franchise Agreement.

d.    If the trust is a revocable living trust, the grantor of the trust must be a trustee of the trust.

e.    If the shares are those of a Key Individual of a Franchisee subject to minimum ownership requirements applicable to CODO Franchisees, at least 51% of the Franchisee's shares must be held by one or more trusts, one of the trustees of each of which must be the Key Individual.

f.    Upon distribution of the shares to the trust's beneficiaries, the distribution must meet all conditions and requirements provided in or contemplated by the Franchise Agreement relating to transferees including, without limitation, meeting Key Individual ownership requirements applicable to CODO Franchisees and providing required guarantees.

g. As a condition to transferring shares to a trust, the Transferor must comply with all applicable laws governing or affecting survivorship or succession and must obtain all consents, assignments of rights, releases or waivers from any person having rights or claims under such laws including, but not limited to, state community property and succession laws. The Key Individual or other Transferor must indemnify and defend ExxonMobil against any such rights or claims (and, upon request by ExxonMobil, must furnish ExxonMobil with a written indemnification agreement in form and substance specified by ExxonMobil) and, upon ExxonMobil's request, also must furnish ExxonMobil with documentation sufficient in ExxonMobil's judgment to confirm that all such laws have been complied with and all such consents, assignment of rights, releases or waivers have been obtained, including, but not limited to, providing an opinion of counsel acceptable to ExxonMobil.

h. Prior to any Transfer to a trust, the Franchisee must notify ExxonMobil in writing of the proposed transfer at the following address: Contract Services Supervisor, PO Box 2245, Buffalo, NY 14240-2245.

3. Subject to the conditions and requirements of Paragraph B.2. above, a Key Individual or other individual owning shares in a corporate Franchisee may designate a testamentary trust as a successor under Section 12.5 (b) of the Franchise Agreement.

4. Nothing contained in this policy is intended to allow any Franchisee to Transfer to a trust any Interest in a Franchise Agreement or in the franchise relationship established by such agreement.

C. Employee Incentive Transfers.

1. This Paragraph C applies to those Franchisees that are corporations.

2. Pursuant to a formal written employee incentive compensation plan of which the Franchisee has furnished ExxonMobil with a copy and subject to minimum ownership requirements applicable to CODO Franchisees, a corporate Franchisee may issue its shares to its employees, provided that the shares issued under such plan may not exceed in the aggregate 20% of the Franchisee's total outstanding shares.

D. General Provisions.

1. Unless otherwise indicated, terms used in this policy have the meanings provided in the Franchise Agreement.

2. Transfers pursuant to and complying with this policy and made for the purposes contemplated by this policy will not be subject to ExxonMobil's prior consent or its right of first refusal under the Franchise Agreement.

3. This policy is effective April 1, 1998, and applies only to Franchisees under a Franchise 2000 or ExxonMobil's Fuels Franchise form Agreement. To take advantage of this policy, Franchisees under other Exxon or Mobil form agreements must enter into a ExxonMobil Fuels Franchise form Agreement.

4. ExxonMobil may change this policy at any time. Any change to this policy will not invalidate Transfers of shares made in accordance with this policy prior to the change. ExxonMobil, however, may impose additional or different requirements or conditions applicable to shares of corporate Franchisees transferred to a trust under this policy.

## FORM OF ORGANIZATION POLICY

Preamble

This policy is adopted pursuant to Article IV of ExxonMobil's Fuels Franchise form dealer PMPA Franchise Agreements (the "Franchise Agreement") and applies to Exxon dealers governed by those agreements ("Franchisees"). It is intended to provide additional flexibility regarding the form and ownership of Franchisee business organizations consistent with ExxonMobil's requirements and developments in the law and in the relevant business environment.

A. LLC Policy.

1. This Paragraph A is adopted in accordance with Section 4.4(a)(ii) of the Franchise Agreement.

2. A dealer or distributor governed by a Franchise Agreement and meeting the requirements of this policy may take the form of a limited liability company ("LLC").

3. The LLC Franchisee must meet each of the following requirements:

   a. must be validly organized and existing under one of the following: (i) the laws of the state in which the franchised service station is located, if a dealer; (ii) the laws of the state in which the Franchisee has its principal place of business, if a distributor; or (iii) the laws of another state, if such LLCs in that state are recognized, and the Franchisee has qualified to do business, under the laws of a state referred to in Paragraph 3.a.(i) or (ii).

   b. must have a date of dissolution on or after the expiration date of the Franchise Agreement.

   c. must provide ExxonMobil with a current copy of its Articles of Organization and its most recent annual state filing (or equivalent documentation acceptable to ExxonMobil) certified by the Secretary of State or other relevant authority of the state in which the LLC is organized. These documents must confirm the LLC's status consistent with the matters specified in Paragraphs 3.a. and b. above and must also demonstrate consistency with the following: (i) the person or persons signing the Franchise Agreement, representation letters and other documents on behalf of the Franchisee have the requisite authority to bind the Franchisee; and (ii) the Key Individual has the authority and responsibility required under the Franchise Agreement.

4. The Franchisee and its Key Individual and members must meet all other conditions and requirements provided or contemplated by the Franchise Agreement including, among others, providing personal guarantees, representation letters and other documentation as ExxonMobil may specify.

5. This policy allowing LLC Franchisees applies only to Franchisees in those states with respect to which ExxonMobil has conducted a prior evaluation of the relevant statutes and prepared applicable administrative guidelines for reviewing LLC documentation and status. While all states in which ExxonMobil has franchise operations are expected eventually to be covered by this policy, initially, this policy applies to Franchisees in the states of California, Arizona, Massachusetts, Nevada, and Connecticut. Contact Services Supervisor, Room H-10, 436 Creamery Way, Suite 300, Exton, PA 19341, Should be consulted to obtain a current list of applicable states.

B. Key Individual Ownership Requirements for Multi-Unit Franchise Dealers.

1. This Paragraph B is adopted in accordance with Sections 4.3(a)(i) and 4.4(b)(i)(A) of the dealer Franchise Agreement.

2. If a Franchise Dealer has applied for and been qualified by ExxonMobil as a Multi-Unit Dealer under ExxonMobil's Multi-Unit Policy, the Key Individual for that Franchise Dealer will not be required to have any ownership interest in the Franchisee Dealer.

C. Guarantee Cap.

1. The liability to ExxonMobil of a person furnishing ExxonMobil with a written guarantee pursuant to Article IV of the Franchise Agreements for any single occurrence giving rise to private third party claims and related Losses will be limited to $5 million. This limit is subject to that person or the Franchisee having obtained and maintained in full force insurance that has minimum limits of $5 million per occurrence that meets the requirements of Article XI of the Franchise Agreement (including, but not limited to, naming ExxonMobil as an additional insured) and actually covers and provides compensation for such claims and related Losses up to that limit.

2. This limitation of liability does not apply to liability or other Losses other than those arising from private third party claims and, without limitation, expressly excludes: (a) any Losses that ExxonMobil or an Indemnitee may incur arising out of the Franchisee's or a guarantor's breach of the Franchise Agreement or a guarantee; (b) any Losses that ExxonMobil may suffer arising out of any tortious act or omission committed by a Franchisee, its employees, agents or contractors, or its guarantor against ExxonMobil or any Indemnitee; (c) any Losses of ExxonMobil or any Indemnitee related to damage to, or destruction or loss of, the property of ExxonMobil or an Indemnitee; or (d) any fines, penalties, clean-up costs, payments or liability to or assessed or ordered by any governmental authority. This limitation of liability also does not apply to any Losses resulting from the Franchisee's gross negligence or willful misconduct.

3. This Paragraph C does not apply to guarantees requested or required by ExxonMobil for purposes other than meeting the requirements of Article IV including, but not limited to, guarantees required by ExxonMobil as security for product or equipment purchases, Conversion Costs, Improvement Funds or ExxonMobil or third-party loans.

D.  General Provisions.

1. Unless otherwise indicated, terms used in this policy have the meanings provided in the Franchise Agreement.

2. This policy is effective April 1, 1998, and applies only to Franchisees under a ExxonMobil Fuels Franchise form PMPA Agreement. To take advantage of this policy, franchisees under other Exxon form agreements must enter into a ExxonMobil Fuels Franchise form Franchise Agreement.

3. ExxonMobil may change this policy at any time. Any changes to Paragraph A of this policy will not affect the status of any LLC Franchisee that enters into a PMPA franchise relationship with ExxonMobil in accordance with this policy prior to the change, except ExxonMobil may impose additional requirements or conditions relating to such LLC Franchisees.

# ExxonMobil
## *Fuels Marketing*

3225 Gallows Road
Fairfax, VA 22037-0001

Re: Tobacco Sales Compliance Issues;
Prevention of Tobacco Products Sales to Minors

Dear ExxonMobil Dealer:

Last year, we sent letters to all Exxon-branded and Mobil-branded dealers and distributors announcing Exxon Mobil Corporation's ("ExxonMobil") efforts to enhance measures at its company-operated retail stores ("CORS") to help prevent sales of tobacco products to minors. As you know, these efforts are part of a mutual cooperation agreement that the company entered into with the Attorneys General of 43 states in 2002. On behalf of ExxonMobil, we are sending this letter to highlight recent efforts by the company that we think will be useful for you.

The efforts include strengthening ExxonMobil's tobacco sales compliance check program, which now includes "external" compliance checks performed in connection with the mutual cooperation agreement as well as "internal" compliance checks. Both checks are performed for ExxonMobil by New Image Marketing, Inc. ("New Image"), a consulting firm that specializes in conducting "controlled substance" programs for retailers and uses independent "checkers" or "shoppers" to test compliance at retail outlets. Our external compliance checks follow a protocol that has been mutually agreed upon by ExxonMobil and the Attorneys General. These checks are conducted semi-annually at 150 of our CORS units randomly selected by New Image. New Image also conducts internal compliance checks quarterly at *all* of our CORS units under a protocol established by ExxonMobil, which currently is identical to the external protocol. We regularly share the results of both sets of compliance checks with our store personnel and grant rewards to employees who pass the compliance checks and impose discipline on those who fail.

The compliance checks, along with tobacco sales training, are critical components of our overall tobacco sales compliance program. We have found the checks particularly useful in identifying opportunities to improve our compliance efforts, in reinforcing this important issue with our store employees and in enabling us to measure our progress in this area generally. We strongly recommend that you establish your own compliance check program. New Image has indicated that it will make its services available to ExxonMobil dealers and distributors at discounted rates. The contact at New Image for this purpose is Joe Saura. His contact information is provided below:

XOM_Tobacco.htm

2

Mr. Joe Saura
Vice President of Operations
New Image Marketing, Ltd.
43 Barkley Circle, Suite 101
Fort Myers, Florida 33907
Phone: (239) 275-9979
Fax: (239) 275-6309
Email: joseph.saura@NIMLTD.com

For your convenience, we have enclosed some background materials on New Image's services, including an enrollment form and a sample survey form. There are also a number of other consultants throughout the nation who can help you set up a compliance check program.

We also have developed signs and decals to remind our store personnel and customers of our policies concerning tobacco sales transactions. These materials generally indicate that customers must be 18 to buy tobacco and that identification will be checked for all persons appearing to be under the age of 30 years. The signs and decals will be placed in the following locations in our CORS units:

- Decals on each door (facing out) as the customer enters the establishment;

- A plastic "tent" card sign on the counter next to the cash register, on the counter;

- A decal on each cash register and on each product display;

- A decal on the door by which employees leave the employee area to enter the sales area; and

- A sign at the cash register (if applicable) informing customers that security cameras (if applicable) are used to detect any attempt by underage customer to purchase tobacco products.

We recommend that you display these or comparable materials in your stores. Please contact the Harte-Hanks company at 1 (800) 636-4767 for information on ordering them and on their cost. We remind you that some states may require store operators to display specific signage concerning the sale of tobacco products. You will need to comply with these requirements.

As you can see from our efforts, compliance with tobacco sales laws continues to be a matter of critical importance for ExxonMobil. The retail practices that form the basis for our compliance program and training program are summarized fully in ExxonMobil's Tobacco Awareness brochure. This brochure may be found on ExxonMobil's internet Portal under the "Programs" section in a folder entitled "Tobacco Compliance". Although we developed these retail practices specifically for our CORS operations, you may find them helpful in setting up a compliance program for your store(s).

3

Finally, as you know, your motor fuels agreement with ExxonMobil contains provisions that prohibit the sale of tobacco products to underage customers as prescribed in any local, state or federal regulation. The agreement also requires that dealers and distributors comply with all tobacco sales laws and that they promptly inform us of any notices of violations received from authorities. These provisions are material and significant to our franchise relationship and will be treated as such by ExxonMobil. If you receive such a notice, you must report the matter to:

> ExxonMobil Fuels Marketing
> Attention: Tobacco Sales Compliance - Dealer Coordinator
> PO Box 2245
> Buffalo, NY 14240-2245

Please contact your Territory Manager if you have any questions concerning the issue of tobacco sales compliance. We encourage you to work with your store managers and sales associates to maintain the highest level of compliance with tobacco sales regulations.

Thank you for your cooperation in this important matter.

> Sincerely,
>
> Jim J. McDonald
> U.S. Dealer Business Manager

Enclosures

XOM_Tobacco.htm

# EXHIBIT B



3225 Gallows Road
Fairfax, VA 22037-0001

November 20, 2006

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Peter Amaefule
Exxon Service Station
4650 S Capitol Street SE
Washington, DC 20032

LOCATION #: **25050**
**NOTICE OF TERMINATION:**
**FAILURE TO OPERATE PREMISES**
**FOR SEVEN (7) CONSECUTIVE DAYS**

Dear Peter,

We are writing on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). ExxonMobil is terminating your PMPA Franchise Agreement and franchise relationship with ExxonMobil, effective December 08, 2006. This decision is based upon your failure to operate your service station for the sale of motor fuel for at least seven (7) consecutive days, beginning on October 30, 2006 continuing through and possibly beyond November 19, 2006. It is also based upon your violation of Articles 2.1 and IX of the Franchise Agreement, which require you to use your best efforts to maximize the sale of ExxonMobil's motor fuel products at your station. All of these provisions are reasonable and of material significance to your franchise relationship with ExxonMobil.

Article XIV of the Franchise Agreement provides that ExxonMobil may terminate the Franchise Agreement, franchise, and franchise relationship pursuant to applicable provisions of the Petroleum Marketing Practices Act, 15 U.S.C. 2801 et. seq. (the "PMPA").

Your failure to comply with the provisions of the Franchise Agreement set forth above provides grounds for termination of your Franchise Agreement, franchise, and franchise relationship under the PMPA. Pursuant to Article XIV of the Franchise Agreement and Sections 2802(b)(2)(A) and 2802(b)(2)(C) of the PMPA, ExxonMobil hereby terminates its Franchise Agreement, franchise, and franchise relationship with you, along with all related supplemental agreements, effective December 08, 2006. This decision is final and irrevocable.

Please remove your personal property from the premises by the effective date set out above.

A copy of the summary statement of Title I of the PMPA, as prepared by the Department of Energy, is enclosed.

Very truly yours,

John Bednash
John Bednash
Area Manager
Mid Atlantic

Encl:  PMPA Summary Statement _____

cc:    R. Alexandrowicz
       E. Robichaud

**Revised Summary of Title I of the Petroleum Marketing Practices Act**
**Tuesday, June 25, 1996**

**AGENCY:** Department of Energy.
**ACTION:** Notice.

---

**SUMMARY:** This notice contains a summary of Title I of the Petroleum Marketing Practices Act, as amended (the Act). The Petroleum Marketing Practices Act was originally enacted on June 19, 1978, and was amended by the Petroleum Marketing Practices Act Amendments of 1994, enacted on October 19, 1994. On August 30, 1978, the Department of Energy published in the Federal Register a summary of the provisions of Title I of the 1978 law, as required by the Act. The Department is publishing this revised summary to reflect key changes made by the 1994 amendments.

The Act is intended to protect franchised distributors and retailers of gasoline and diesel motor fuel against arbitrary or discriminatory termination or nonrenewal of franchises. This summary describes the reasons for which a franchise may be terminated or not renewed under the law, the responsibilities of franchisors, and the remedies and relief available to franchisees. The Act requires franchisors to give franchisees copies of the summary contained in this notice whenever notification of termination or nonrenewal of a franchise is given.

**FOR FURTHER INFORMATION CONTACT:** Carmen Difiglio, Office of Energy Efficiency, Alternative Fuels, and Oil Analysis (PO-62), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-4444; Lawrence Leiken, Office of General Counsel (GC-73), U.S. Department of Energy, Washington, D.C. 20585, Telephone (202) 586-6978.

**SUPPLEMENTARY INFORMATION:** Title I of the Petroleum Marketing Practices Act, as amended, 15 U.S.C. §§2801-2806, provides for the protection of franchised distributors and retailers of motor fuel by establishing minimum Federal standards governing the termination of franchises and the nonrenewal of franchise relationships by the franchisor or distributor of such fuel. Section 104(d) (1) of the Act required the Secretary of Energy to publish in the **Federal Register** a simple and concise summary of the provisions of Title I, including a statement of the respective responsibilities of, and the remedies and relief available to, franchisors and franchisees under that title. The Department published this summary in the **Federal Register** on August 30, 1978. 43 F.R. 38743 (1978).

In 1994 the Congress enacted the Petroleum Marketing Practices Act Amendments to affirm and clarify certain key provisions of the 1978 statute. Among the key issues addressed in the 1994 amendments are: (1) termination or nonrenewal of franchised dealers by their franchisors for purposes of conversion to "company" operation; (2) application of state law; (3) the rights and obligations of franchisors and franchisees in third-party lease situations; and (4) waiver of rights limitations. See H.R. REP. NO. 737, 103rd Cong., 2nd Sess. 2 (1994), reprinted in 1994 U.S.C.C.A.N. 2780. Congress intended to: (1) make explicit that upon renewal a franchisor may not insist on changes to a franchise agreement where the purpose of such changes is to prevent renewal in order to convert a franchisee-operated service station into a company-operated service station; (2) make clear that where the franchisor has an option to continue the lease or to purchase the premises but does not wish to do so, the franchisor must offer to assign the option to the franchisee; (3) make clear that no franchisor may require, as a condition of entering or renewing a franchise agreement, that a franchisee waive any rights under the Petroleum Marketing Practices Act, any other Federal law, or any state law; and (4) reconfirm the limited scope of Federal preemption under the Act. Id.

The summary which follows reflects key changes to the statute resulting from the 1994 amendments. The Act requires franchisors to give copies of this summary statement to their franchisees when entering into an agreement to terminate the franchise or not to renew the franchise relationship, and when giving notification of termination or nonrenewal. This summary does not purport to interpret the Act, as amended, or to create new legal rights.

In addition to the summary of the provisions of Title I, a more detailed description of the definitions contained in the Act and of the legal remedies available to franchisees is also included in this notice, following the summary statement.

**Summary of Legal Rights of Motor Fuel Franchisees**

This is a summary of the franchise protection provisions of the Federal Petroleum Marketing Practices Act, as amended in 1994 (the Act), 15 U.S.C. §§2801-2806. This summary must be given to you, as a person holding a franchise for the sale, consignment or distribution of gasoline or diesel motor fuel, in connection with any termination or nonrenewal of your franchise by your franchising company (referred to in this summary as your supplier).

You should read this summary carefully, and refer to the Act if necessary, to determine whether a proposed termination or nonrenewal of your franchise is lawful, and what legal remedies are available to you if you think the proposed termination or failure to renew is not lawful. In addition, if you think your supplier has failed to comply with the Act, you may wish to consult an attorney in order to enforce your legal rights.

The franchise protection provisions of the Act apply to a variety of franchise agreements. The term "franchise" is broadly defined as a license to use a motor fuel trademark which is owned or controlled by a refiner, and it includes secondary arrangements such as leases of real property and motor fuel supply agreements which have existed continuously since May 15, 1973, regardless of a subsequent withdrawal of a trademark. Thus, if you have lost the use of a trademark previously granted by your supplier but have continued to receive motor fuel supplies through a continuation of a supply agreement with your supplier, you are protected under the Act.

Any issue arising under your franchise which is not governed by this Act will be governed by the law of the State in which the principal place of business of your franchise is located.

Although a State may specify the terms and conditions under which your franchise may be transferred upon the death of the franchisee, it may not require a payment to you (the franchisee) for the goodwill of a franchise upon termination or nonrenewal.

The Act is intended to protect you, whether you are a distributor or a retailer, from arbitrary or discriminatory termination or nonrenewal of your franchise agreement. To accomplish this, the Act first lists the reasons for which termination or nonrenewal is permitted. Any notice of termination or nonrenewal must state the precise reason, as listed in the Act, for which the particular termination or nonrenewal is being made. These reasons are described below under the headings "Reasons for Termination" and "Reasons for Nonrenewal."

The Act also requires your supplier to give you a written notice of termination or intention not to renew the franchise within certain time periods. These requirements are summarized below under the heading "Notice Requirements for Termination or Nonrenewal."

The Act also provides certain special requirements with regard to trial and interim franchise agreements, which are described below under the heading "Trial and Interim Franchises."

The Act gives you certain legal rights if your supplier terminates or does not renew your franchise in a way that is not permitted by the Act. These legal rights are described below under the heading "Your Legal Rights."

The Act contains provisions pertaining to waiver of franchisee rights and applicable State law. These provisions are described under the heading "Waiver of Rights and Applicable State Law."

This summary is intended as a simple and concise description of the general nature of your rights under the Act. For a more detailed description of these rights, you should read the text of the Petroleum Marketing Practices Act, as amended in 1994 (15 U.S.C. §§2801-2806). This summary does not purport to interpret the Act, as amended, or to create new legal rights.

**I. Reasons for Termination**

If your franchise was entered into on or after June 19, 1978, the Act bars termination of your franchise for any reasons other than those reasons discussed below. If your franchise was entered into before June 19, 1978, there is no statutory restriction on the reasons for which it may be terminated. If a franchise entered into before June 19, 1978, is terminated, however, the Act requires the supplier to reinstate the franchise relationship unless one of the reasons listed under this heading or one of the additional reasons for nonrenewal described below under the heading "Reasons for Nonrenewal" exists.

*A. Non-Compliance with Franchise Agreement*

Your supplier may terminate your franchise if you do not comply with a reasonable and important requirement of the franchise relationship. However, termination may not be based on a failure to comply with a provision of the franchise that is illegal or unenforceable under applicable Federal, for State or local law. In order to terminate for non-compliance with the franchise agreement, your supplier must have learned of this non-compliance recently. The Act limits the time period within which your supplier must have learned of your non-compliance to various periods, the longest of which is 120 days, before you receive notification of the termination.

*B. Lack of Good Faith Efforts*

Your supplier may terminate your franchise if you have not made good faith efforts to carry out the requirements of the franchise, provided you are first notified in writing that you are not meeting a requirement of the franchise and you are given an opportunity to make a good faith effort to carry out the requirement. This reason can be used by your supplier only if you fail to make good faith efforts to carry out the requirements of the franchise within the period which began not more than 180 days before you receive the notice of termination.

*C. Mutual Agreement To Terminate the Franchise*

A franchise can be terminated by an agreement in writing between you and your supplier if the agreement is entered into not more than 180 days before the effective date of the termination and you receive a copy of that agreement, together with this summary statement of your rights under the Act. You may cancel the agreement to terminate within 7 days after you receive a copy of the agreement, by mailing (by certified mail) a written statement to this effect to your supplier.

*D. Withdrawal From the Market Area*

Under certain conditions, the Act permits your supplier to terminate your franchise if your supplier is withdrawing from marketing activities in the entire geographic area in which you operate. You should read the Act for a more detailed description of the conditions under which market withdrawal terminations are permitted. See 15 U.S.C. §2802(b) (E).

*E. Other Events Permitting a Termination*

If your supplier learns within the time period specified in the Act (which in no case is more than 120 days prior to the termination notice) that one of the following events has occurred, your supplier may terminate your franchise agreement:
(1) Fraud or criminal misconduct by you that relates to the operation of your marketing premises.
(2) You declare bankruptcy or a court determines that you are insolvent.
(3) You have a severe physical or mental disability lasting at least 3 months which makes you unable to provide for the continued proper operation of the marketing premises.
(4) Expiration of your supplier's underlying lease to the leased marketing premises, if: (a) your supplier gave you written notice before the beginning of the term of the franchise of the duration of the underlying lease and that the underlying lease might expire and not be renewed during the term of the franchise; (b) your franchisor offered to assign to you, during the 90-day period after notification of termination or nonrenewal was given, any option which the franchisor held to extend the underlying lease or to purchase the marketing premises (such an assignment may be conditioned on the franchisor receiving from both the landowner and the franchisee an unconditional release from liability for specified events occurring after the assignment); and (c) in a situation in which the franchisee acquires

possession of the leased marketing premises effective immediately after the loss of the right of the franchisor to grant possession, the franchisor, upon the written request of the franchisee, made a bona fide offer to sell or assign to the franchisee the franchisor's interest in any improvements or equipment located on the premises, or offered the franchisee a right of first refusal of any offer from another person to purchase the franchisor's interest in the improvements and equipment.

(5) Condemnation or other taking by the government, in whole or in part, of the marketing premises pursuant to the power of eminent domain. If the termination is based on a condemnation or other taking, your supplier must give you a fair share of any compensation which he receives for any loss of business opportunity or good will.

(6) Loss of your supplier's right to grant the use of the trademark that is the subject of the franchise, unless the loss was because of bad faith actions by your supplier relating to trademark abuse, violation of Federal or State law, or other fault or negligence.

(7) Destruction (other than by your supplier) of all or a substantial part of your marketing premises. If the termination is based on the destruction of the marketing premises and if the premises are rebuilt or replaced by your supplier and operated under a franchise, your supplier must give you a right of first refusal to this new franchise.

(8) Your failure to make payments to your supplier of any sums to which your supplier is legally entitled.

(9) Your failure to operate the marketing premises for 7 consecutive days, or any shorter period of time which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate.

(10) Your intentional adulteration, mislabeling or misbranding of motor fuels or other trademark violations.

(11) Your failure to comply with Federal, State, or local laws or regulations of which you have knowledge and that relate to the operation of the marketing premises.

(12) Your conviction of any felony involving moral turpitude.

(13) Any event that affects the franchise relationship and as a result of which termination is reasonable.

## II. Reasons for Nonrenewal

If your supplier gives notice that he does not intend to renew any franchise agreement, the Act requires that the reason for nonrenewal must be either one of the reasons for termination listed immediately above, or one of the reasons for nonrenewal listed below.

### A. Failure To Agree on Changes or Additions To Franchise

If you and your supplier fail to agree to changes in the franchise that your supplier in good faith has determined are required, and your supplier's insistence on the changes is not for the purpose of converting the leased premises to a company operation or otherwise preventing the renewal of the franchise relationship, your supplier may decline to renew the franchise.

### B. Customer Complaints

If your supplier has received numerous customer complaints relating to the condition of your marketing premises or to the conduct of any of your employees, and you have failed to take prompt corrective action after having been notified of these complaints, your supplier may decline to renew the franchise.

### C. Unsafe or Unhealthful Operations

If you have failed repeatedly to operate your marketing premises in a clean, safe and healthful manner after repeated notices from your supplier, your supplier may decline to renew the franchise.

### D. Operation of Franchise is Uneconomical

Under certain conditions specified in the Act, your supplier may decline to renew your franchise if he has determined that renewal of the franchise is likely to be uneconomical. Your supplier may also decline to renew your franchise if he has decided to convert your marketing premises to a use other than for the sale of motor fuel, to sell the premises, or to materially alter, add to, or replace the premises.

## III. Notice Requirements for Termination or Nonrenewal

The following is a description of the requirements for the notice which your supplier must give you before he may terminate your franchise or decline to renew your franchise relationship. These notice requirements apply to all franchise terminations, including franchises entered into before June 19, 1978 and trial and interim franchises, as well as to all nonrenewals of franchise relationships.

### A. How Much Notice Is Required

In most cases, your supplier must give you notice of termination or non-renewal at least 90 days before the termination or nonrenewal takes effect.

In circumstances where it would not be reasonable for your supplier to give you 90 days notice, he must give you notice as soon as he can do so. In addition, if the franchise involves leased marketing premises, your supplier may not establish a new franchise relationship involving the same premises until 30 days after notice was given to you or the date the termination or nonrenewal takes effect, whichever is later. If the franchise agreement permits, your supplier may repossess the premises and, in reasonable circumstances, operate them through his employees or agents.

If the termination or nonrenewal is based upon a determination to withdraw from the marketing of motor fuel in the area, your supplier must give you notice at least 180 days before the termination or nonrenewal takes effect.

### B. Manner and Contents of Notice

To be valid, the notice must be in writing and must be sent by certified mail or personally delivered to you. It must contain:
(1) A statement of your supplier's intention to terminate the franchise or not to renew the franchise relationship, together with his reasons for this action;
(2) The date the termination or non-renewal takes effect; and
(3) A copy of this summary.

## IV. Trial Franchises and Interim Franchises

The following is a description of the special requirements that apply to trial and interim franchises.

### A. Trial Franchises

A trial franchise is a franchise, entered into on or after June 19, 1978, in which the franchisee has not previously been a party to a franchise with the franchisor and which has an initial term of 1 year or less. A trial franchise must be in writing and must make certain disclosures, including that it is a trial franchise, and that the franchisor has the right not to renew the franchise relationship at the end of the initial term by giving the franchisee proper notice.

The unexpired portion of a transferred franchise (other than as a trial franchise, as described above) does not qualify as a trial franchise.

In exercising his right not to renew a trial franchise at the end of its initial term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

### B. Interim Franchises

An interim franchise is a franchise, entered into on or after June 19, 1978, the duration of which, when combined with the terms of all prior interim franchises between the franchisor and the franchisee, does not exceed three years, and which begins immediately after the expiration of a prior franchise involving the same marketing premises which was not renewed, based on a lawful determination by the franchisor to withdraw from marketing activities in the geographic area in which the franchisee operates.

An interim franchise must be in writing and must make certain disclosures, including that it is an interim franchise and that the franchisor has the right not to renew the franchise at the end of the term based upon a lawful determination to withdraw from marketing activities in the geographic area in which the franchisee operates.

In exercising his right not to renew a franchise relationship under an interim franchise at the end of its term, your supplier must comply with the notice requirements described above under the heading "Notice Requirements for Termination or Nonrenewal."

## V. Your Legal Rights

Under the enforcement provisions of the Act, you have the right to sue your supplier if he fails to comply with the requirements of the Act. The courts are authorized to grant whatever equitable relief is necessary to remedy the effects of your supplier's failure to comply with the requirements of the Act, including declaratory judgment, mandatory or prohibitive injunctive relief, and interim equitable relief. Actual damages, exemplary (punitive) damages under certain circumstances, and reasonable attorney and expert witness fees are also authorized. For a more detailed description of these legal remedies you should read the text of the Act. 15 U.S.C. §§2801-2806.

## VI. Waiver of Rights and Applicable State Law

Your supplier may not require, as a condition of entering into or renewing the franchise relationship, that you relinquish or waive any right that you have under this or any other Federal law or applicable State law. In addition, no provision in a franchise agreement would be valid or enforceable if the provision specifies that the franchise would be governed by the law of any State other than the one in which the principal place of business for the franchise is located.

## Further Discussion of Title I-Definitions and Legal Remedies

### I. Definitions

Section 101 of the Petroleum Marketing Practices Act sets forth definitions of the key terms used throughout the franchise protection provisions of the Act. The definitions from the Act which are listed below are of those terms which are most essential for purposes of the summary statement. (You should consult section 101 of the Act for additional definitions not included here.)

*A. Franchise*

A "franchise" is any contract between a refiner and a distributor, between a refiner and a retailer, between a distributor and another distributor, or between a distributor and a retailer, under which a refiner or distributor (as the case may be) authorizes or permits a retailer or distributor to use, in connection with the sale, consignment, or distribution of motor fuel, a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such use.

The term "franchise" includes any contract under which a retailer or distributor (as the case may be) is authorized or permitted to occupy leased marketing premises, which premises are to be employed in connection with the sale, consignment, or distribution of motor fuel under a trademark which is owned or controlled by such refiner or by a refiner which supplies motor fuel to the distributor which authorizes or permits such occupancy. The term also includes any contract pertaining to the supply of motor fuel which is to be sold, consigned or distributed under a trademark owned or controlled by a refiner, or under a contract which has existed continuously since May 15, 1973, and pursuant to which, on May 15, 1973, motor fuel was sold, consigned or distributed under a trademark owned or controlled on such date by a refiner. The unexpired portion of a transferred franchise is also included in the definition of the term.

*B. Franchise Relationship*

The term "franchise relationship" refers to the respective motor fuel marketing or distribution obligations and responsibilities of a franchisor and a franchisee which result from the marketing of motor fuel under a franchise.

### C. Franchisee

A "franchisee" is a retailer or distributor who is authorized or permitted, under a franchise, to use a trademark in connection with the sale, consignment or distribution of motor fuel.

### D. Franchisor

A "franchisor" is a refiner or distributor who authorizes or permits, under a franchise, a retailer or distributor to use a trademark in connection with the sale, consignment, or distribution of motor fuel.

### E. Marketing Premises

"Marketing premises" are the premises which, under a franchise, are to be employed by the franchisee in connection with the sale, consignment, or distribution of motor fuel.

### F. Leased Marketing Premises

"Leased marketing premises" are marketing premises owned, leased or in any way controlled by a franchisor and which the franchisee is authorized or permitted under the franchise, to employ in connection with the sale, consignment, or distribution of motor fuel.

### G. Fail to Renew and Nonrenewal

The terms "fail to renew" and "nonrenewal" refer to a failure to reinstate, continue, or extend a franchise relationship (1) at the conclusion of the term, or on the expiration date, stated in the relevant franchise, (2) at any time, in the case of the relevant franchise which does not state a term of duration or an expiration date, or (3) following a termination (on or after June 19, 1978) of the relevant franchise which was entered into prior to June 19, 1978 and has not been renewed after such date.

## II. Legal Remedies Available to Franchisee

The following is a more detailed description of the remedies available to the franchisee if a franchise is terminated or not renewed in a way that fails to comply with the Act.

### A. Franchisee's Right to Sue

A franchisee may bring a civil action in United States District Court against a franchisor who does not comply with the requirements of the Act. The action must be brought within one year after the date of termination or nonrenewal or the date the franchisor fails to comply with the requirements of the law, whichever is later.

### B. Equitable Relief

Courts are authorized to grant whatever equitable relief is necessary to remedy the effects of a violation of the law's requirements. Courts are directed to grant a preliminary injunction if the franchisee shows that there are sufficiently serious questions, going to the merits of the case, to make them a fair ground for litigation, and if, on balance, the hardship which the franchisee would suffer if the preliminary injunction is not granted will be greater than the hardship which the franchisor would suffer if such relief is granted.

Courts are not required to order continuation or renewal of the franchise relationship if the action was brought after the expiration of the period during which the franchisee was on notice concerning the franchisor's intention to terminate or not renew the franchise agreement.

*C. Burden of Proof*

In an action under the Act, the franchisee has the burden of proving that the franchise was terminated or not renewed. The franchisor has the burden of proving, as an affirmative defense, that the termination or nonrenewal was permitted under the Act and, if applicable, that the franchisor complied with certain other requirements relating to terminations and nonrenewals based on condemnation or destruction of the marketing premises.

*D. Damages*

A franchisee who prevails in an action under the Act is entitled to actual damages and reasonable attorney and expert witness fees. If the action was based upon conduct of the franchisor which was in willful disregard of the Act's requirements or the franchisee's rights under the Act, exemplary (punitive) damages may be awarded where appropriate. The court, and not the jury, will decide whether to award exemplary damages and, if so, in what amount.

On the other hand, if the court finds that the franchisee's action is frivolous, it may order the franchisee to pay reasonable attorney and expert witness fees.

*E. Franchisor's Defense to Permanent Injunctive Relief*

Courts may not order a continuation or renewal of a franchise relationship if the franchisor shows that the basis of the non-renewal of the franchise relationship was a determination made in good faith and in the normal course of business:
(1) To convert the leased marketing premises to a use other than the sale or distribution of motor fuel;
(2) To materially alter, add to, or replace such premises;
(3) To sell such premises;
(4) To withdraw from marketing activities in the geographic area in which such premises are located; or
(5) That the renewal of the franchise relationship is likely to be uneconomical to the franchisor despite any reasonable changes or additions to the franchise provisions which may be acceptable to the franchisee.

In making this defense, the franchisor also must show that he has complied with the notice provisions of the Act.

This defense to permanent injunctive relief, however, does not affect the franchisee's right to recover actual damages and reasonable attorney and expert witness fees if the nonrenewal is otherwise prohibited under the Act.

Issued in Washington, D.C. on June 12, 1996.
**Marc W. Chupka,**
Acting Assistant Secretary for Policy.