## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER C. AMAEFULE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Case No: 1:06-cv-02087-RWR |
| | ) | |
| EXXONMOBIL OIL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

### DEFENDANT EXXONMOBIL OIL CORPORATION'S MEMORANDUM OF POINTS AND AUTHORITIES IN OPPOSITION TO PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

Defendant ExxonMobil Oil Corporation ("ExxonMobil"), through counsel and pursuant to Rule 56 of the Federal Rules of Civil Procedure (the "Rules") and LCvR 7(h) and 56.1 of the Rules of the United States District Court of the District of Columbia, respectfully submits this Memorandum of Points and Authorities in Opposition to plaintiff's Motion for Summary Judgment ("Pl. Mot.").[1] For the reasons set forth below, plaintiff's motion should be denied.

The key facts in this case remain undisputed. Plaintiff failed to purchase any motor fuel (of any grade) from ExxonMobil between October 4 and November 23, 2006. (Deposition of Peter Amaefule ("Amaefule Dep.") at 164, 184-185 & exhs. 15-16 thereto) (attached hereto as Exh. A). He was completely out of motor fuel (of all grades) and did not sell any gasoline between October 29 and November 22 – *i.e.*, 25 consecutive days. (*Id.*). This conduct is grounds for termination under Sections 2802(b)(2)(A) and 2802(b)(2)(C) of the Petroleum

---

[1] Plaintiff's motion for summary judgment was filed on March 2 (Dkt. 20), after the March 1 deadline (*see* Feb. 12, 2007 Order). His prior summary judgment motion also was filed late, on February 9 (Dkt. 19), after the February 8 deadline (*see* Jan. 12, 2007 Order (Dkt. 14)).

Marketing Practices Act ("PMPA"), 15 U.S.C. §§ 2801 *et. seq*.  Plaintiff's motion offers no evidence to contravene these facts, which are dispositive of both summary judgment motions.[2]

Since the termination, matters have not improved.  Plaintiff was completely out of fuel for nine days in December 2006 (including eight consecutive days, one of which was the day (December 13) on which plaintiff's motion for preliminary injunction was heard); two days in January 2007; seven days in February; and eight days in March.  (Feb. 8, 2007 Declaration of Ron Alexandrowicz ("Alexandrowicz II"), exh. 8 thereto (Dkt. 18); Mar. 15, 2007 Declaration of Ron Alexandrowicz ("Alexandrowicz III"), exhs. 1-3 thereto (attached hereto as Exh. B)).  In fact, as of today's date (March 15), ***plaintiff has been completely out of all grades of gasoline for another seven consecutive days.***  This marks the second time since he was terminated that he has failed to operate his service station for the sale of motor fuel for at least seven consecutive days.  Plaintiff also has been out of at least one grade of gasoline for ***48 days*** thus far in 2007.  His actions mean that ExxonMobil is essentially unable to sell its own product at one of its branded service stations while this litigation remains pending.

Despite these facts, plaintiff now argues that he should prevail on his PMPA claim as a matter of law.  That plaintiff would seek summary judgment affirmatively is curious.  Plaintiff previously prevailed on his application for a preliminary injunction by arguing that there were issues of fact on the "reasonableness" of plaintiff's termination.  (Pl. Mot. for Prelim. Inj. (Dkt. 2) at 14 (arguing that "reasonability of the notice" is an issue of fact)).  Without controverting any of the facts set forth above, and without presenting any affirmative evidence of his own – other than a self-serving affidavit – plaintiff now asserts that the propriety of his termination should be decided, in his favor, without a trial.  Plaintiff cannot have it both ways.

---

[2]    ExxonMobil hereby incorporates by reference all legal authority, arguments and evidence from the motion for summary judgment that it filed on February 8, 2007 ("EM Mot. for SJ") (Dkt. 18).

## STATEMENT OF FACTS

Plaintiff's motion for summary judgment does not contain a statement of undisputed material facts. Rather, plaintiff has cobbled together throughout his motion various theories and allegations, most of which are legally and factually irrelevant to his PMPA claim. Thus, ExxonMobil is unable to provide a separate statement opposing plaintiff's facts, as is usually required of an opposition under Rule LCvR 7(h) and Rule LCvR 56.1. Instead, ExxonMobil incorporates by reference its own statement of undisputed material facts, filed as part of its summary judgment motion.[3] (Dkt. 18).

## ARGUMENT[4]

Summary judgment is proper only if "the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). As the moving party, plaintiff has the burden of proving that reasonable minds could not differ as to the material facts of his case.[5] *See Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250-51 (1986). The Court must resolve all factual ambiguities and draw all reasonable inferences in favor of ExxonMobil. *See Matsushita Elec. Indus. Co. v. Zenith Radio Corp.*, 475 U.S. 574, 588-89 (1986), *quoting United States v. Diebold, Inc.*, 369 U.S. 654, 655 (1962). Plaintiff cannot satisfy his burden. He has provided no competent evidence in support of his motion. Conversely, in its summary judgment motion,

---

[3]    ExxonMobil's opposition to plaintiff's motion is based on the absence of any issue of material fact and ExxonMobil's entitlement to judgment on plaintiff's claim as a matter of law.

[4]    There are no decisions of the D.C. Circuit interpreting the provisions of the PMPA that are at issue here. In fact, there are only 15 reported D.C. District Court cases addressing the PMPA, and none of those decisions bear on the present case. ExxonMobil therefore has relied on decisions of district and appellate courts in other jurisdictions that are factually on point with this case and/or involve the sections of the PMPA on which ExxonMobil relies here. Plaintiff's amended motion for summary judgment also concedes this point. (Pl. Mot. at 7).

[5]    Plaintiff's reliance on *Khorenian v. Union Oil Co.*, 761 F.2d 533, 535 (9th Cir. 1985), to support his claim that the summary judgment standard is more liberal in PMPA cases (Pl. Mot. at 5) is misplaced. *Khorenian* is a preliminary injunction case. 761 F.2d at 535 ("[T]he test for the issuance of a **preliminary injunction** under the PMPA is more liberal than that in the general run of cases . . . .") (emphasis added).

ExxonMobil made a sufficient showing on all elements essential to its case on which ExxonMobil would have the burden of proof at trial. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Indeed, ExxonMobil demonstrated that it was entitled to judgment as a matter of law. As such, plaintiff's motion should be denied.

Plaintiff advances three primary arguments in support of his contention that the Franchise Agreement was improperly terminated: 1) he did not fail to operate the marketing premises for seven consecutive days; 2) his failure to sell gasoline "for a few days" resulted from financial hardship which was caused "at least partially" by ExxonMobil; and 3) ExxonMobil failed to comply with the notice provisions of the PMPA As explained below, each of these arguments is unsupported by the record and therefore without merit.[6]

## I.    THERE IS NO DISPUTE THAT PLAINTIFF FAILED TO OPERATE THE MARKETING PREMISES FOR SEVEN CONSECUTIVE DAYS

The undisputed record evidence demonstrates that (1) plaintiff purchased no motor fuel (of any grade) from ExxonMobil between October 4 and November 23, 2006; (2) the inventory levels in plaintiff's underground storage tanks were below the pump-stops point (*i.e.*, empty) from October 29 through November 22, 2006; and (3) plaintiff was therefore completely out of motor fuel (of all grades) and failed to operate his service station between October 29 and November 22 – *i.e.*, 25 consecutive days. (Alexandrowicz II, ¶¶ 25-27, exhs. 3, 6 & 8 thereto; Amaefule Dep. at 164, 184-85 & exhs. 15-16 thereto). Mr. Amaefule himself agrees that he did not sell any motor fuel during this time period. (Amaefule Dep. at 164, 184-185). This conduct constitutes grounds for termination under Sections 2802(b)(2)(C) and 2802(c)(9) of the PMPA.

---

[6] ExxonMobil has advanced two separate and independent grounds for termination, Sections 2802(b)(2)(A) and 2802(b)(2)(C). Each ground constitutes a sufficient basis to sustain plaintiff's termination. To prevail on his motion, plaintiff must demonstrate the absence of a genuine issue of material fact as to **both** grounds. Plaintiff's motion, however, addresses only Section 2802(b)(2)(C). He completely ignores his failure to comply with reasonable and material provisions of his franchise agreement, such as the minimum purchase obligation of Article 2.1 or any of the Article IX provisions. (*See* EM Mot. for SJ at 17-20). The Court would be justified in denying his motion for this reason alone.

Plaintiff's only response to this evidence is to argue that he "operated" the marketing premises because his service bays and snack stand were open while he was completely out of fuel, and that Section 2802(c)(9) should be interpreted to preclude termination where a franchisee continues to operate "other aspects of the business." (Pl. Mot. at 9-10). Plaintiff cites no legal authority to support this interpretation. That is because it is contrary to the express terms and purpose of the PMPA. The PMPA defines a "franchise" as a contract giving the franchisee the right to use the franchisor's trademark in connection with *the sale of branded motor fuel*. PMPA, § 2801(1)(A) (emphasis added). The PMPA also defines "marketing premises" as the "premises which, under such franchise, are to be employed by the franchisee *in connection with sale, consignment, or distribution of motor fuel*." *Id.* § 2801(8) (emphasis added). Finally, as courts have recognized, the sale of branded petroleum products is central to the purpose of a PMPA franchise. *See, e.g.*, *Smoot v. Mobil Oil Corp.*, 722 F. Supp. 849, 855 (D. Mass. 1989). Thus, plaintiff's failure to sell motor fuel for 25 days is a failure to operate the marketing premises as the PMPA has defined that term.

Plaintiff's construction of Section 2802(c)(9) also fails as a matter of logic. The reason ExxonMobil has branded service stations is so that it may have venues through which it can sell its branded motor fuel to the public. ExxonMobil licenses to franchisees like plaintiff the right to use ExxonMobil's trademark, trade name and image and, in return, expects that franchisees will sell ExxonMobil's products. Under plaintiff's argument, the franchisee would get the entire benefit of the bargain because the franchisee would not have any obligation to sell the very product that forms the basis for the franchise relationship in the first place – so long as some other portion of the station is open and operating. Given the multitude of "related" businesses that franchisees can operate at their service stations – a service bay, convenience store, car wash, ATM, air hose, vacuum or pay phone – plaintiff's argument would render Section 2802(c)(9) completely meaningless.

Nor do the definitions in plaintiff's Franchise Agreement offer him any solace. (*See* Pl. Mot. at 10-11). The application of Section 2802(c)(9) does not depend on how the franchise

agreement defines "marketing premises" (assuming it does at all), because the PMPA contains its own definition of that term. Plaintiff cites no authority holding that a definition in the franchise agreement should trump the statutory definition.[7] Moreover, even if plaintiff's contract is somehow relevant to an interpretation of this provision in this instance, plaintiff conveniently overlooks the provisions that require him to keep the "motor-fuels business" at his station open 24 hours a day, 7 days a week. (Alexandrowicz II, exh. 2 thereto, art. 9.3(a)). Plaintiff cannot seriously claim that his service bays or snack stand are part of the "motor-fuels business" or that, in the case of the service bays, they are actually open and operating 24 hours a day.

## II.    PLAINTIFF'S FAILURE TO SELL MOTOR FUEL FOR 25 CONSECUTIVE DAYS WAS NOT BEYOND HIS REASONABLE CONTROL

The claim that plaintiff's failure to sell motor fuel "for a few days" resulted from financial hardship, allegedly caused by ExxonMobil (Pl. Mot. at 12), fails for several reasons.[8] Presumably, plaintiff is relying on Section 2801(13)(B) of the PMPA, which defines failure to exclude causes "beyond the reasonable control" of the franchisee. If so, plaintiff has the burden of establishing that his conduct here was the result of such a cause. *See Mobil Oil Corp. v. Shah*, 671 F. Supp. 503, 508 (N.D. Ill. 1987). Plaintiff's motion, however, contains no competent evidence to support his claim, other than an affidavit containing a laundry list of complaints about ExxonMobil. (*See* Pl. Mot. at 12-13 & Mar. 1, 2007 Affidavit of Peter Amaefule ("Amaefule Aff.")).[9] None of these excuses are of the type that courts typically find are truly

---

[7]    In his motion, plaintiff refers to the franchise agreement as a "contract of adhesion." (Pl. Mot. at 10). Such an argument is misplaced and irrelevant because plaintiff does not claim that the franchise agreement is invalid or unenforceable as an adhesion contract. Nor does not explain why he continued to renew the franchise agreement on numerous occasions if it was so onerous. (Amaefule Dep. at 34, 42).

[8]    As explained above, plaintiff did not merely fail to sell motor fuel for a "few"days. He failed to sell for **25 consecutive days**. Plaintiff conceded that his outage was for more than a "few" days. (Amaefule Dep. at 296).

[9]    Plaintiff's "affidavit" does not conform to LCvR 5.1(h)(2), because he did not declare under penalty of perjury that the contents of the affidavit are true and correct. The notarization stamp simply indicates that plaintiff "executed" the document. Moreover, plaintiff does not remember if the notary had him swear an oath to tell the

beyond the reasonable control of a franchisee – *e.g.*, flood.  Moreover, many of them do not even appear to relate to his failure to sell gasoline for 25 days – *e.g.*, complaints that his station needed repairs.  In any event, none of them are factually or legally sufficient to establish an event beyond plaintiff's reasonable control.

**Alleged "Price Gouging"**

First, plaintiff alleges that ExxonMobil "pushed" gas on him on September 30, 2006 and October 4, 2006, when he did not "need" it and when the price was "falling," so that he would "bear the loss of price," instead of ExxonMobil.  (Amaefule Aff. at 4).  Plaintiff previously referred to this alleged conduct as a gasoline "hoarding and profiteering" scheme in which ExxonMobil supplied "old inventory of gasoline" to plaintiff at higher prices when competitors' prices were lower.  (Pl. Mot. at 12).  (*See* Pl. Mot. for Prelim. Inj. (Dkt. 2) at 4-5).  Regardless of the description, plaintiff's affidavit is devoid of evidentiary support for this theory.  Plaintiff does not identify his inventory levels on September 30 or October 4 (or any other day during 2006), nor does he explain why he did not "need" the fuel.  Plaintiff also does not specify any DTW prices (his own or competitors') for either of the two days in question or any subsequent day.

The reality is that neither of these two deliveries were unneeded or unusual, let alone an attempt to "push" unwanted gas on him.  On September 30, 2006, plaintiff's regular underground storage tank ("UST") was 60% empty; he had only 4,065 gallons in a 10,000-gallon tank; his mid-grade/plus UST was 65% empty (2,829 gallons in an 8,000 gallon tank); and his premium UST was 55% empty (2,623 gallons in a 6,000 gallon tank).  (Alexandrowicz II, exh. 8 thereto).  ExxonMobil delivered motor fuel on September 30 sufficient to raise those inventory levels to 8,824 gallons (regular); 3,859 gallons (mid-grade/plus) (which still was less than half of that UST capacity) and 5,037 gallons (supreme).  *Id*.  The subsequent delivery of mid-grade/plus only

---

truth before signing.  (Amaefule Dep. at 247).  The Court would be justified in disregarding plaintiff's affidavit in its entirety for this reason.  ExxonMobil's response to the assertions made therein in no way constitutes a waiver of its objection to this defect.

on October 4, 2006 still left plaintiff with only 4,711 gallons in that UST.  (Alexandrowicz II, exh. 8 thereto).  Plaintiff's own inventory records support these figures.  (Amaefule Dep., exh. 15 thereto).  Given this data, there is no basis to plaintiff's claim that he did not "need" this fuel.[10]

With respect to the timing of these deliveries – vis-à-vis the dealer tank wagon (DTW) price that plaintiff pays for fuel – ExxonMobil previously demonstrated in its summary judgment motion that any suggestion that deliveries are timed to coincide with price decreases is without evidentiary support.  (EM Mot. for SJ at 14-15).  For 22 of the 27 deliveries (81.5%) that plaintiff received in 2006, the DTW price the following day was the ***same or higher*** than the price that plaintiff paid.  Only 5 times (18.5%) did the DTW price decrease immediately after one of plaintiff's fuel deliveries.  In sum, there is no link between the timing of fuel deliveries and DTW prices, and plaintiff offers no facts in his affidavit to counter this conclusion.

Finally, as part of his "price gouging" theory, plaintiff contends that he could not buy additional fuel because ExxonMobil "refused" to supply motor fuel to him on credit.  (Pl. Mot. at 12).  Yet ExxonMobil has the right under the Franchise Agreement to revoke credit in its sole discretion.  (Alexandrowicz II, exh. 1 thereto, art. 2.4(a)).  Its policy is to revoke credit if a dealer incurs five NSFs (bounced checks or electronic drafts) in any twelve-month period and put the dealer on "pre-pay" with respect to motor fuel purchases.  This policy is entirely reasonable, and plaintiff does not suggest otherwise.  In fact, plaintiff was well-aware of ExxonMobil's policy, as he had been on prepay for close to half the calendar year 2005 and a substantial portion of 2006.  (*See id.*, exh. 4 thereto; Amaefule Dep. at 75-76).  In plaintiff's case, he bounced the drafts for both his September 26 and September 30 fuel loads.  (Dec. 11, 2006 Declaration of Ron Alexandrowicz, ¶ 17 & n.4 (Dkt. 4)).  Plaintiff cannot seriously be

---

[10]  To the extent plaintiff is complaining that the September 30 and October 4 deliveries were somehow unusual because the deliveries were separated by only four days, that argument also is undercut by the inventory figures noted above.  Moreover, there were at least three other instances in 2006 where only four days separated fuel deliveries:  January 23-27, 2006, February 8-12, 2006, and March 11-15, 2006.  (Alexandrowicz II, exh. 3 thereto).

contending that ExxonMobil should have continued to supply him with fuel, on credit, in October and November 2006 when he had not even paid for the previous two deliveries.

### Alleged "Refus[al]" To Maintain And Renovate The Station

Plaintiff spends close to half of his affidavit listing various complaints about the physical condition of his station.[11]  (Amaefule Aff. at 1-2).  Nowhere does he explain how the condition of his station caused him to be out of fuel for 25 consecutive days.  Indeed, plaintiff appears to be complaining that he lost customers as a result of ExxonMobil's "failure" to renovate and repair his station, which would suggest that his fuel sales should have been sluggish.  Yet his problem was not that he had full USTs and could not sell any product; rather, his problem was that he sold out (quickly) and did not replenish his inventory for days at a time.  In any event, as plaintiff himself conceded, he was responsible for a good portion of repairs and renovations at his station.  (Alexandrowicz II, exh. 2 thereto, art. 9.9 & CODO Lease provisions, arts. 1.4, 4.3 & Maintenance Schedule; Amaefule Dep. at 60-64).  ExxonMobil even gives plaintiff a yearly credit of $3,500 to contribute to repair costs at his station.  (Alexandrowicz II, exh. 2 thereto, CODO Lease provisions, art. 4.2 & Maintenance Schedule; Amaefule Dep. at 65-66).

### "Withholds Our Credit Card Sales"

Finally, plaintiff claims that ExxonMobil's withholding of credit card monies while he is on pre-pay causes him to bounce additional items, extending his prepay period and causing him to incur additional fees.[12]  (Amaefule Aff. at 3).  Again, plaintiff offers no explanation of how this practice contributed to his failure to sell any gasoline for 25 consecutive days.  His pre-pay

---

[11]  Plaintiff suggests that ExxonMobil's recent decision to replace the fuel dispenser skirts was an acknowledgment of his complaints and was somehow related to this litigation.  (Amaefule Dep. at 60-61, 205; Amaefule Aff. at 2).  Plaintiff has no offered evidence to support that claim.  That is because it is untrue. (Alexandrowicz III, ¶ 2).

[12]  Plaintiff is referring to the proceeds from credit card transactions at his station, which are routed through ExxonMobil's bank and constitute monies due and owing to plaintiff.  Ironically, plaintiff admitted at his deposition that he has no quarrel with ExxonMobil's practice of withholding those monies while a franchisee is on pre-pay. (Amaefule Dep. at 79-81 ("Q:  I just want to make sure I understand.  You don't have a problem with them withholding the credit card monies while you were on prepay?  A:  No, no")).

term – which began on October 12 after he bounced the draft for the September 30 fuel load –

was ***not*** an extension of an earlier pre-pay term.  At the time of the September 26 and 30 (and

October 4) deliveries, plaintiff was receiving fuel on credit.  Moreover, plaintiff has the ability

while on pre-pay to apply credit card monies to outstanding debts, such as the money plaintiff

owed ExxonMobil for the September 26 and 30 fuel loads.  (Alexandrowicz II, exh. 4 thereto).

Thus, if plaintiff had outstanding credit card monies at that time, he could have applied them

toward that debt, as well as a future fuel load.  He did not have such monies available, so his

inability to purchase motor fuel for 25 days was not due to the practice of which he complains.

In sum, plaintiff has failed completely to meet his burden to establish that his failure to

sell motor fuel was ExxonMobil's "fault" and beyond his reasonable control.

### III.      THERE IS NO DISPUTE THAT EXXONMOBIL COMPLIED WITH THE NOTICE PROVISIONS OF THE PMPA

Plaintiff's contention that, as a matter of law, ExxonMobil failed to comply with the

notice provisions of the PMPA (Pl. Mot. at 13-14) is meritless.  ExxonMobil's November 20,

2006 Notice of Termination – which gave plaintiff three weeks' notice – fully complied with

Section 2804(b)(1) of the PMPA, which gives a franchisor the right to provide less than 90 days'

notice "[i]n circumstances where it would not be reasonable for the franchisor" to do so.

Plaintiff cites no legal authority to support his suggestion that the circumstances must be

"extreme" to warrant less than 90 days notice.  (Pl. Mot. at 6).  Moreover, although plaintiff

claims that "there is no uniformity of interpretation among the Circuits with respect to the

pertinent PMPA issues raised in this case" (Pl. Mot. at 7), the decisions are, in fact, uniform –

against plaintiff's position:  Failure to operate the marketing premises is precisely the type of

serious circumstance warranting less than 90 days' notice.  *See, e.g.*, *Dedvukaj v. Equilon*

*Enters., L.L.C.*, 301 F. Supp. 2d 664, 666, 669 (E.D. Mich. 2004) (immediate termination

deemed reasonable where franchisee failed to operate marketing premises for sales of motor fuel

for month of October 2001); (*see also* EM Mot. for SJ at 20-21).  Plaintiff cites nothing to the

contrary, nor anything suggesting that less than 90 days notice here was per se ***un***reasonable.

Plaintiff's reference to his having "cured" his failure to sell motor fuel for seven consecutive days is erroneous as a matter of law and irrelevant to the notice issue. (Pl. Mot. at 13). ExxonMobil relied on Sections 2802(b)(2)(A) and (C) in terminating plaintiff, and neither provision allows for an opportunity to cure. *See Wisser Co. v. Mobil Oil Corp.*, 730 F.2d 54, 59 (2d Cir. 1984) ("[T]erminations pursuant to 15 U.S.C. §§2802(b)(2)(A) and 2802(b)(2)(C) ***do not require notice and opportunity to cure*** . . .") (emphasis added). Plaintiff does not cite any authority supporting a right to cure in this context. In any event, plaintiff hardly has "cured" the violation. He was completely out of motor fuel for nine days in December (including the day on which his motion for preliminary injunction was heard), and he has been completely out of gas for another 17 days in 2007. (Alexandrowicz II, exh. 8 thereto; Alexandrowicz III, exhs. 1-3 thereto). As of the date of this opposition (March 15), plaintiff has been completely out of gasoline for yet another seven consecutive days. (Alexandrowicz III, exh. 3 thereto). His actions continue to violate the PMPA and his Franchise Agreement, and ExxonMobil continues to suffer damage to its brand name and trademark as a result of its continued association with plaintiff.

## IV.    PLAINTIFF'S "ADVERSE INFERENCE" REQUEST IS WITHOUT MERIT

Plaintiff's request that the Court apply the "adverse inference rule" (Pl. Mot. at 14) should be rejected. First, there is no factual basis for such an inference here. Plaintiff asserts that Exxon "failed to provide" documents that he requested relating to ExxonMobil's "pricing policies and practices" (Pl. Mot. at 14), but that claim is untrue. At the hearing on plaintiff's motion for a preliminary injunction, ExxonMobil and plaintiff mutually agreed to engage in an informal discovery process. (*See* Feb. 8, 2007 Declaration of Brian Howie ("Howie I") at ¶ 10 (Dkt. 18)). Specifically, the parties agreed to exchange informal document requests and to take a few depositions per side. This accelerated procedure was adopted primarily because the parties agreed with the Court's characterization of this case as one well-suited for expedited consideration of dispositive motions, pursuant to Fed. R. Civ. P. 65(a)(2).

The parties exchanged informal requests for documents, with ExxonMobil serving requests on January 4 and February 2, and plaintiff serving requests on January 29 and February 2. (Howie I, exhs. 3 & 4 thereto). ExxonMobil's fourteen requests were focused and limited, both in scope and time period (2006 only). By contrast, plaintiff's forty-two requests were largely overbroad and not relevant or reasonably calculated to lead to the discovery of admissible evidence. The requests contained no limitation as to time period and were not limited to plaintiff's termination. With respect to the subject of "pricing" alone, plaintiff served ***nine*** requests, seeking ***all*** documents on categories such as:

- the role of ExxonMobil (direct or indirect), its subsidiaries and/or affiliates in the determination of the price of crude oil;

- the role of ExxonMobil, its subsidiaries and/or affiliates in the determination of the retail price of gasoline;

- ExxonMobil's knowledge [of] impending increase[s] or decrease[s] in the retail price of gasoline;

- ExxonMobil's knowledge [of] impending increase[s] or decrease[s] in the price of crude oil;

- ExxonMobil's method, practice and procedure in determining the price of gasoline to be sold to retail franchisees; and

- ExxonMobil's practice and procedure with respect to the pricing of gasoline sold to retail franchisee[s].

(Howie I, exh. 3 thereto). These and other requests would have required an extremely burdensome search and a voluminous production, so ExxonMobil simply objected to them. By agreeing to informal discovery, ExxonMobil did not waive its right to make such objections, nor did it make any commitment to produce all documents sought by plaintiff. Nevertheless, ExxonMobil did produce documents in response to many of plaintiff's requests. (Mar. 15, 2007 Declaration of Brian A. Howie ("Howie II"), exhs. 2-5 thereto) (attached hereto as Exhibit C).

In an effort to compromise on the pricing issue, ExxonMobil made a proposal to plaintiff. Because his "theory" of the case related to the timing of fuel deliveries vis-à-vis fluctuations in the DTW price of gasoline, ExxonMobil produced the DTW prices for plaintiff's price zone, as well as his daily inventory level, for all of 2006.  ExxonMobil also offered to make available for deposition witnesses on two issues:  (1) the general method of setting DTW prices and (2) ExxonMobil's automated fuel inventory and ordering system.[13]  (Howie II, exhs. 1, 4-6 thereto).  Given the accelerated schedule under which the parties are operating, this proposal – which would have given plaintiff the information relevant to his claim – was a reasonable one. ExxonMobil reiterated this proposal on numerous occasions throughout February and early March.  (Howie II, exhs. 1, 4-6 thereto).  Plaintiff never responded to this proposal, and he made no effort to resolve this dispute through the meet and confer process.  More importantly, plaintiff never sought the Court's assistance, such as through a motion to compel.  Again, by agreeing to an informal discovery procedure, ExxonMobil did not relieve plaintiff of his obligation to seek the Court's assistance if he felt it was necessary to do so.

For these reasons, there is no legal basis for an adverse inference here.  Plaintiff does not claim that ExxonMobil disobeyed any discovery rulings (there have been none), nor does he claim that ExxonMobil destroyed or lost documents.  Even where such claims are made, an adverse inference is not appropriate where there is no showing of bad faith.  *See Bashir v. Amtrak*, 119 F.3d 929, 931 (11th Cir. 1997) ("[A]n adverse inference is drawn from a party's failure to preserve evidence only when the absence of that evidence is predicated on bad faith"); *Banco Latino, S.A.C.A. v. Lopez*, 53 F. Supp. 2d 1273, 1277 (S.D. Fla. 1999) (denying request for adverse inference based on party's destruction of a file because there was no evidence of bad faith), *summary judgment granted*, 95 F. Supp. 2d 1327 (S.D. Fla. 2000).  Plaintiff has not made that showing here.

---

[13]   In both cases, ExxonMobil made clear that plaintiff's taking these depositions was without prejudice to his right to request documents identified during the deposition.

Moreover, an adverse inference would not assist plaintiff in his case. An inference cannot serve as a surrogate for presenting affirmative evidence. *See Hartford Ins. Co. v. Am. Automatic Sprinkler Sys., Inc.*, 23 F. Supp. 2d 623, 627 (D. Md. 1998) (even if court were to permit an inference, such an inference would not serve as a surrogate for presenting affirmative evidence), *aff'd*, 201 F.3d 538 (4th Cir. 2000). Thus, plaintiff cannot use the adverse inference rule to satisfy any of the essential elements of his claim.[14] *See Stanojev v. Ebasco Services, Inc.*, 643 F.2d 914, 923-24 (2d Cir. 1981) (defendant's failure to produce personnel records at trial did not supply missing element of plaintiff's case).

## CONCLUSION

For all the foregoing reasons, plaintiff's motion for summary judgment should be denied.


Dated: March 15, 2007                              Respectfully submitted,


                                                   _____
                                                         s/Brian A. Howie
                                                   Brian A. Howie
                                                   Bar No.:  459329
                                                   HOWREY LLP
                                                   1299 Pennsylvania Ave., N.W.
                                                   Washington, D.C.  20004
                                                   Telephone:  (202) 783-0800
                                                   Facsimile:  (202) 383-6610

                                                   **Attorney for Defendant ExxonMobil Oil
                                                   Corporation**

---

[14]   In his motion, plaintiff states that application of the adverse inference rule would decide "the issue of Exxon's predatory pricing" in plaintiff's favor. (Pl. Mot. at 14). Plaintiff, however, has no predatory pricing (or any other antitrust) claim in this case, and predation is not an element of plaintiff's PMPA claim. Nor could it be, as predatory pricing involves the lowering of prices below cost to drive out competitors. *See Brooke Group Ltd. v. Brown & Willamson Tobacco Corp.*, 509 U.S. 209, 217 (1993). Plaintiff is not a "competitor" of ExxonMobil, and his allegations relate to the timing of fuel deliveries, not whether ExxonMobil prices its gasoline at or below cost.

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER AMAEFULE | ) | |
|  | ) | |
| Plaintiff, | ) | |
|  | ) | |
| v. | ) | Civil Action No. 1:06-cv-02087-RWR |
|  | ) | |
| EXXONMOBIL OIL CORPORATION | ) | **[Proposed] ORDER** |
|  | ) | |
| Defendant. | ) | |
|  | ) | |

## ORDER ON PLAINTIFF'S MOTION FOR SUMMARY JUDGMENT

The Court has before it for consideration Plaintiff's Motion for Summary Judgment; Defendant ExxonMobil Oil Corporation's Memorandum of Points and Authorities In Opposition to Plaintiff's Motion for Summary Judgment; and Plaintiff's Reply Memorandum.  A hearing on this matter was held on _____.  Upon due consideration of the legal memoranda, exhibits, pertinent legal authorities and the parties' arguments at the hearing, the Court hereby rules that plaintiff's motion for summary judgment is **DENIED**.


_____
Hon. Richard W. Roberts
UNITED STATES DISTRICT JUDGE

**CERTIFICATE OF SERVICE**

I hereby certify that, on March 15, 2007, I electronically filed the foregoing with the

Clerk of the Court by using the CM/ECF system, which will send notice of electronic filing to

the following:

Peter C. Ibe
1717 K St., N.W., Suite 600
Washington, D.C.  20036

Victor Mba-Jonas
8020 New Hampshire Ave., Suite 130
Adelphi, MD  20783

s/Brian A. Howie
Brian A. Howie

# EXHIBIT A

## (Excerpts From 03-05-07 Amaefule Deposition)

Page 1

1                    UNITED STATES DISTRICT COURT

2                    FOR THE DISTRICT OF COLUMBIA

3
        -----------------------------x
4    PETER AMAEFULE,                   :
                                       :
5              Plaintiff,             :     Civil Action No.
                                       :
6         vs.                          :     1:06-CV-02087-RWR
                                       :
7    EXXONMOBIL OIL CORPORATION,       :
                                       :
8              Defendant.             :
        -----------------------------x
9

10                         Washington, D.C.

11                         Monday, March 5, 2007

12

13    Deposition of:

14                    PETER AMAEFULE,

15    the Plaintiff, was called for examination by counsel
      for the Defendant, pursuant to notice, commencing at
16    11:15 a.m., at the law offices of Howrey LLP,

17    1299 Pennsylvania Avenue, Northwest, Washington,

18    D.C., before Dawn A. Jaques, Certified Shorthand
      Reporter and Notary Public in and for the District
19    of Columbia, when were present on behalf of the
      respective parties:
20    -------------------------------------------------
                    DIGITAL EVIDENCE GROUP
21              1111 16th Street, NW Suite 410
                    Washington, DC  20036
22                    (202) 232-0646

Page 2

1    APPEARANCES:
2       On behalf of the Plaintiff:
3          PETER C. IBE, ESQ.
4          Ibe Law Office
5          1717 K Street, N.W.
6          Suite 600
7          Washington, D.C.  20036
8          PHONE:   (202) 275-7662
9          FAX:    (208) 246-7051
10         E-MAIL:  Ibelawoffice@yahoo.com
11             - and -
12         VICTOR JONAS, ESQ.
13         Jonas Law Firm P.C.
14         8020 New Hampshire Avenue
15         Suite 130
16         Adelphi, Maryland  20783
17         PHONE:   (301) 431-0333
18         FAX:    (301) 431-0335
19         E-MAIL:  Jonaslawfirm@yahoo.com
20
21
22

Page 3

1    APPEARANCES (Continued):
2       On behalf of the Defendant:
3          BRIAN A. HOWIE, ESQ.
4          RENA ANDOH, ESQ.
5          Howrey LLP
6          1299 Pennsylvania Avenue, N.W.
7          Washington, D.C.  20004-2402
8          PHONE:   (202) 383-6876
9          FAX:    (202) 383-6610
10         E-MAIL:  Howieb@howrey.com
11
12
13
14    ALSO PRESENT:
15       Ron Alexandrowicz, ExxonMobil
16
17
18
19
20
21
22

Page 4

1                    I-N-D-E-X
2    WITNESS:                    PAGE:
3    PETER AMAEFULE
4       Examination by Mr. Howie  ...........   5
5       Examination by Mr. Ibe .............  310
6
7                E-X-H-I-B-I-T-S
8    EXHIBIT: PAGE:  EXHIBIT: PAGE:  EXHIBIT: PAGE:
9    No. 1 ...  38   No. 14 ... 170   No. 27  .. 284
10   No. 2  ...  43   No. 15 ... 174   No. 28A .. 301
11   No. 3  ...  45   No. 16 ... 183   No. 28B .. 305
12   No. 4  ...  98   No. 17 ... 185   No. 28C .. 308
13   No. 5  ... 103   No. 18 ... 188   No. 28D .. 308
14   No. 6  ... 105   No. 19 ... 216   No. 28E .. 308
15   No. 7  ... 106   No. 20 ... 229   No. 28F .. 308
16   No. 8  ... 118   No. 21 ... 225   No. 28G .. 308
17   No. 9  ... 129   No. 22 ... 234   No. 28H .. 308
18   No. 10 ... 132   No. 23 ... 230   No. 28I .. 308
19   No. 11 ... 136   No. 24 ... 246   No. 28J .. 308
20   No. 12 ... 139   No. 25 ... 243
21   No. 13 ... 142   No. 26 ... 270
22      (NOTE:  Exhibits 28A-J retained by counsel.)

Page 5

1                 P R O C E E D I N G S
2    Whereupon,
3                 PETER AMAEFULE,
4       Was called as a witness, after having been
5       first duly sworn by the Notary Public, was
6       examined and testified as follows:
7    EXAMINATION BY COUNSEL FOR THE DEFENDANT
8       BY MR. HOWIE:
9       Q   Sir, can you please state your full name
10   for the record?
11      A   My name is Peter Amaefule.
12      Q   Do you have a middle name?
13      A   Nwankwo.
14      Q   You're going to have to spell that for
15   the court reporter.
16      A   N-W-A-N-K-W-O.
17      Q   And can you give me your current home
18   and business address, please?
19      A   My home address is 8000 Hart Road, Fort
20   Washington, Maryland.  My business address is
21   4650 South Capitol Street, Southeast, Washington,
22   D.C.

Page 34

1　　A　Yeah.  Three months' trial period.
2　　Q　How long were you a trial franchisee
3　for?
4　　A　Three months.
5　　Q　And after the trial franchisee period
6　ended, you signed a three-year franchise term
7　agreement?
8　　A　Yes.
9　　　　Excuse me.  I don't know exactly if it's
10　three months, but it was before we signed the
11　actual, you know, Franchise Agreement.
12　　Q　There was some period during which you
13　were a trial franchisee?
14　　A　Yes.
15　　Q　And then when that period ended, you
16　became a full-fledged franchisee?
17　　A　Yes.
18　　Q　Why did you want to become an Exxon
19　franchisee?
20　　A　I wanted to go into business, and I saw
21　that Exxon station and the deal worked out between
22　me and the outgoing dealer.

Page 35

1　　Q　That was going to be my next question.
2　How did you find out that there would be a
3　possibility to operate a station at that location?
4　　A　I don't understand.
5　　Q　Let me ask you this.  Had you applied
6　with ExxonMobil -- or at that time, it would have
7　just been Exxon -- to become a dealer?
8　　A　No.  I was looking for a business to
9　buy.  I saw that one, and then started from there.
10　　Q　The station that you currently own and
11　operate, before you became a trial franchisee
12　there, that was being operated by somebody else as
13　an Exxon station?
14　　A　Yes.
15　　Q　And how did you become aware that that
16　station was for sale?
17　　A　Through an advertisement.
18　　Q　Do you remember the name of the
19　individual who owned the station before you bought
20　it?
21　　A　Yes.  Mr. Tony Ahmad.
22　　Q　And you purchased the station as a going

Page 36

1　concern from Mr. Ahmad?
2　　A　Yes.
3　　Q　Do you remember how much you paid for
4　it?
5　　A　$125,000.
6　　Q　As part of the sale transaction, did you
7　buy his current inventory of fuel and groceries?
8　　A　Yes.
9　　Q　And Mr. Ahmad also operated the station
10　with service bays?
11　　A　Yes.
12　　Q　Do you remember whether you had to
13　submit any materials to Exxon in connection with
14　your purchase of the station from Mr. Ahmad?
15　　　　In other words, did you have to submit a
16　business plan?
17　　A　Yes.
18　　Q　To Exxon?
19　　A　Yes.
20　　Q　Do you remember if you were interviewed
21　by anybody at Exxon?
22　　A　Yes.

Page 37

1　　Q　When you first became a trial
2　franchisee, did you have to take any training?
3　　A　Yes.
4　　Q　Do you remember anything about what that
5　training was?
6　　A　As a dealer training in -- dealer
7　training, yeah.
8　　Q　Was it how to operate a station?
9　　A　Yes.
10　　Q　And when you bought the station from
11　Mr. Ahmad, did you -- the $125,000 that you paid,
12　did you pay him cash outright or was that a
13　financed transaction?
14　　A　It was a financed transaction.
15　　Q　And over what term of years did you
16　repay the amount that you borrowed to buy the
17　station?
18　　A　I don't remember exactly the dates, but
19　it was like between four and five years.
20　　Q　And whatever loan you took to buy the
21　station has been paid off?
22　　A　Yes, during that time, '94 or '95.

10 (Pages 34 to 37)

Page 42

1  through March 31st, 2009?
2      A    Yes.
3      Q    Sir, did you review Exhibit 1 before you
4  signed it?
5      A    Yes.  We went over it with him.
6      Q    When you say "we" --
7      A    I went over it.  That's -- we went over
8  it.
9      Q    You reviewed the agreement with --
10  you're pointing to Mr. Alexandrowicz?
11      A    With Mr. Alexandrowicz, yes.
12      Q    And you have been a franchisee at this
13  location since 1990.  This is not the first
14  Franchise Agreement that you've signed with
15  ExxonMobil?
16      A    No, it's not.
17      MR. HOWIE:  Can I get this marked as
18  Exhibit 2?
19      (Amaefule Deposition Exhibit No. 2 was
20      marked for identification.)
21      BY MR. HOWIE:
22      Q    The court reporter has handed you a

Page 43

1  document that's been marked as Defendant's
2  Exhibit 2.  It's a letter to Peter Amaefule from
3  John Bednash, dated December 19th, 2005.
4      Do you recognize this document, sir?
5      MR. IBE:  I'm going to object.  We
6  haven't established that -- this is not a trial as
7  far as evidentiary purposes.
8      He didn't generate the document.  I
9  don't know the basis of asking him if he
10  recognizes it.
11      MR. HOWIE:  Your objection's noted.
12      BY MR. HOWIE:
13      Q    Sir, have you ever seen Exhibit 2
14  before?
15      A    Let me read it.
16      Yes.
17      Q    You've seen this document before?
18      A    Yes, I'm familiar with this.
19      Q    And Exhibit 2, sir, is a letter to you
20  stating that you have not signed the Franchise
21  Agreement and that your then current Franchise
22  Agreement will expire on March 31st, 2006.

Page 44

1      The letter also notes that you will be
2  non-renewed for failure to sign the agreement.
3      A    Yes.
4      Q    Why was it that you had not yet signed
5  what is now the current Franchise Agreement
6  between yourself and ExxonMobil?
7      A    We scheduled to meet.  Mr. Alexandrowicz
8  was to bring the package, and we had not met, I
9  think, at the time of this letter.  That is, I and
10  Mr. Alexandrowicz, we had not met.  He was
11  supposed to bring the package.
12      Q    I'm sorry, were you finished with your
13  answer?
14      A    We have not met.  We are scheduled to
15  meet for him to bring it for me to sign.
16      Q    Had ExxonMobil sent you the agreement
17  prior to that time for you to review?
18      A    I don't remember.
19      Q    If you look at the first sentence in
20  paragraph 2 on page 1 of Exhibit 2, it says,
21  "ExxonMobil has presented you with a new PMPA
22  Franchise Agreement (the 'new Franchise

Page 45

1  Agreement') to renew your current PMPA Franchise
2  Agreement and franchise relationship."
3      Had ExxonMobil sent you the new PMPA
4  Franchise Agreement prior to the date of
5  Exhibit 2?
6      A    Like I said, I don't remember sending
7  me -- or sending me that.
8      MR. HOWIE:  Can we get this marked as
9  Exhibit 3?
10      (Amaefule Deposition Exhibit No. 3 was
11      marked for identification.)
12      BY MR. HOWIE:
13      Q    The court reporter has handed you what's
14  been marked as Exhibit 3, sir.  It's a letter to
15  you from John Bednash, dated December 29th, 2005.
16      If you could just take a minute and read
17  it.
18      A    Yes, I've read it.
19      Q    Do you remember receiving Exhibit 3?
20      A    Yes.
21      Q    And you understood that the terms of
22  this letter were that your Notice of Non-renewal,

Page 58

1    Those things, I think, are beyond me.  I
2  can't handle that, I can't fix it, I can't find
3  those things.  Exxon could, and they didn't do it
4  until today.
5    Q    And any other damage to the property?
6    I think you mentioned the facia of the
7  canopy, the bricks.  You mentioned that you felt
8  the whole station was overdue for renovation.
9    Anything else?
10    A    Well, there are a lot of other factors.
11  I would say, for example, our dispensers had been
12  in a bad shape, and most other Exxon stations have
13  been renovated to -- or at least have been changed
14  to the new Exxon image.  Ours was neglected and
15  left until -- I don't remember the date -- after
16  the injunction hearing of this case --
17    Q    Yes.
18    A    -- they came and changed the state of
19  our pumps to the new Exxon image that other
20  stations had theirs since 1994-95 done.
21    Q    And with respect to the work that was
22  done at your station after the injunction in this

Page 59

1  case, is it your belief that that renovation was
2  done as a result of the injunction?
3    A    I don't know.
4    Q    Do you have any basis for knowing one
5  way or --
6    MR. IBE:  Objection -- objection to the
7  question.
8    THE WITNESS:  I don't.
9    BY MR. HOWIE:
10    Q    Let me just finish the question, please.
11    Do you have any basis for knowing one
12  way or the other?
13    A    I don't.
14    Q    Did anyone from Exxon ever tell you that
15  part of your station was being renovated because
16  of the injunction?
17    A    No, they didn't even tell me that it was
18  going to be renovated.  I just saw some team there
19  working.  I asked them what's going on.  They told
20  me.
21    Q    They told you they were fixing --
22  changing the skirts?

Page 60

1    A    Changing those skirts, yes.
2    Q    And with respect to the other concerns
3  that you had about the station, did you ever
4  express those concerns to Exxon in writing?
5    A    Not in writing, no.
6    Q    Now, if you could turn back to
7  Exhibit 1, the Franchise Agreement, Mr. Amaefule,
8  and turn to the page at the lower right, 00024.
9    A    Okay.
10    Q    Do you see the section that says 9.9,
11  Maintenance Obligations, which reads, "Subject to
12  the provisions of the CODO Lease Provisions or
13  DOSS Additional Provisions, as applicable,
14  Franchise Dealer shall undertake, at its expense,
15  all maintenance and make all repairs,
16  replacements, alterations and additions as may be
17  required to maintain the Marketing Premises in
18  good repair and condition, including periodic
19  cleaning, landscaping, repainting and repairs,
20  replacing obsolete signs, equipment and fixtures,
21  and complying with the Standards."
22    Do you see that provision?

Page 61

1    A    Yes.
2    Q    And do you understand what that
3  provision obligated you to do?
4    A    Yes.
5    Q    And you, Peter Amaefule, are the
6  franchise dealer?
7    A    Yes.
8    Q    If you could turn to the page marked
9  00050, do you see at the bottom of the page
10  there's a Section 1.4, Condition of Marketing
11  Premises and Equipment?
12    A    Yes.
13    Q    And it reads, "Franchise dealer accepts
14  the marketing premises and all equipment listed in
15  the CODO lease schedule in their present
16  condition, as is, without warranty, express or
17  implied, including any warranty as to their
18  condition, interference, infringement,
19  merchantability or fitness for any purpose.
20  ExxonMobil is not responsible or liable to
21  Franchise Dealer, its employees, agents,
22  customers, vendors or contractors for any defect

Page 62

1 or change in the condition of the marketing
2 premises."
3     Do you understand, sir, that that
4 provision meant that you accepted the condition of
5 the marketing premises as is?
6     A   Yes.  More about the equipment.
7     Excuse me.  I need to talk to my --
8     Q   If you want to talk to your counsel, you
9 might want to do it outside.
10     Before you take a -- before we go off
11 the record, I just want to make sure, were you
12 done answering the question?
13     A   No.  I want to --
14     Q   I'd like you to answer -- I don't want
15 you to disclose anything that's privileged, but
16 I'd like you to answer the question as best you
17 can.  And then if you want to talk to your
18 counsel, then we'll go ahead and take a break and
19 let you do that.
20     A   And I can do that if I answer the
21 question?
22     Q   All I'm asking is for your

Page 63

1 understanding.  If you don't understand what this
2 provision means, then that's fine.  I just -- I
3 don't -- I want to get your understanding, not
4 necessarily their understanding.
5     A   Can I talk to them before I answer the
6 question?
7     Q   I'd rather that you not.
8     MR. IBE:  You can answer the question to
9 the best of your recollection and knowledge.
10 That's all.
11     BY MR. HOWIE:
12     Q   That's all I'm asking, answer it the
13 best you can.
14     A   Okay.
15     Q   And I'm just asking again about this
16 Section 1.4 on page 50 of Exhibit --
17     A   Yes.  I would say there's an addendum to
18 that.  There's an Exxon Maintenance Agreement that
19 leased some -- some of the maintenance that are
20 our responsibility, the dealer's responsibilities,
21 and some of them that are Exxon's
22 responsibilities.

Page 64

1     Q   There's a schedule, in other words --
2     A   Right.
3     Q   -- that lists certain things that are
4 your responsibility, and then certain things that
5 are ExxonMobil's responsibility?
6     A   Right.  Yes.
7     Q   If you want to go ahead and take a break
8 to talk to your counsel, we can go ahead and do
9 that now.
10     A   It's okay.  We can move ahead now.
11     Q   Okay.  If you could turn to page -- the
12 page marked 00078 of Exhibit 1 --
13     A   Yes.
14     MR. IBE:  May we have just a minute to
15 confer with him?
16     MR. HOWIE:  With your --
17     MR. IBE:  Yes.  Just a minute to confer?
18     MR. HOWIE:  Sure.
19     MR. IBE:  You don't have any question on
20 the table?
21     MR. HOWIE:  No, that's fine.  That's
22 fine.

Page 65

1     MR. IBE:  Just a minute.
2     (A break was taken at 12:42 p.m.)
3     (Resume at 12:49 p.m.)
4     BY MR. HOWIE:
5     Q   I think, Mr. Amaefule, I had asked you
6 to just turn to page 78 of Exhibit 1, 00078.
7     A   Yes.
8     Q   It's the page titled "Maintenance
9 Adjustment Schedule to the CODO Lease Provisions
10 of the PMPA Franchise Agreement."
11     Paragraph 2 reads, "Pursuant to
12 Section 4.4(b) of the CODO Lease Provisions to the
13 PMPA Franchise Agreement, ExxonMobil shall issue
14 the credit against Franchise Dealer's rent monthly
15 by journal entry to Franchise Dealer's account."
16     And then it goes on to say that the
17 amount of the maintenance adjustment is $3,498
18 annually.
19     Do you see that?
20     A   Yes.
21     Q   What was your understanding of what this
22 annual rent adjustment was for, Mr. Amaefule?

17 (Pages 62 to 65)

Page 66

1    A    From the beginning of our Franchise
2    Agreement, Exxon was to maintain the premises
3    100 percent. At that time, along that line, they
4    adjusted the maintenance program. Exxon said that
5    they would give us a credit. They called it a
6    maintenance contribution. They would give us a
7    maintenance contribution to help maintain a
8    certain part of the -- well, take care of a
9    certain part of the maintenance while they still
10   have to maintain some part.
11        There's a list of what is Exxon's
12   responsibility and what is our responsibility.
13   That money there is that maintenance contribution.
14   Q    And if you turn to page 64 of the
15   agreement -- you may want to take the binder clip
16   off, if it will help you flip through easier.
17   A    Page what now?
18   Q    64.
19   A    Yes.
20   Q    -- this is the "Rent Schedule to the
21   CODO Lease Provisions of the PMPA Franchise
22   Agreement"?

Page 67

1    A    Yes.
2    Q    And the rent that you were paying on an
3    annual basis, as stated by this document, was
4    $78,000 a year?
5         Let me rephrase that.
6         According to this schedule, your rent
7    was $78,000 a year or $6500 a month. That
8    maintenance contribution on page 78 of Exhibit 1
9    would have been deducted from this rent amount?
10   A    No.
11   Q    Is it your testimony that you paid or
12   are currently still paying --
13   A    Right.
14   Q    -- $6500 a month in rent?
15   A    Yes.
16   Q    And how is it that the maintenance
17   adjustment that's listed on page 78 of Exhibit 1,
18   how is that given to you from Exxon?
19   A    It's credited to our account, to the
20   dealer's account.
21   Q    And how often is it credited to your
22   account?

Page 68

1    A    Every half a year, every six months.
2    Two times a year.
3    Q    It's not done on a monthly basis?
4    A    No.
5         MR. IBE: Excuse me. I'm sorry.
6         You cannot ask Mr. Alexandrowicz any
7    questions.
8         MR. HOWIE: Oh, I didn't see that.
9         THE WITNESS: I'm sorry.
10        BY MR. HOWIE:
11   Q    Just answer to the best of your
12   knowledge and understanding.
13        MR. IBE: I don't want to put you in a
14   bad spot.
15        BY MR. HOWIE:
16   Q    So, Mr. Amaefule, if I understand you
17   correctly, if I were to ask you what is your
18   annual rent that you pay ExxonMobil for the
19   station, it is $78,000?
20   A    I'm sorry, what is my annual or what was
21   my annual?
22   Q    What is your annual rent currently?

Page 69

1    A    Yes. It's $78,000.
2    Q    And just to make sure I'm clear, the
3    maintenance contribution on page 78 of Exhibit 1,
4    that amount of money was a contribution to you,
5    the franchisee, that you were to use to help
6    maintain the condition of the premises?
7    A    Again, there's part of the maintenance
8    that is the dealer's responsibility. There is a
9    part. Not all the premises. Not everything on
10   the premises.
11   Q    And is it your testimony that this
12   maintenance contribution was to contribute to that
13   portion of the maintenance that was the dealer's
14   responsibility?
15   A    Yes.
16        MR. HOWIE: Why don't we take a break
17   for lunch now, because I'm sort of at a natural
18   stopping point.
19        Why don't we come back in an hour, five
20   of?
21        MR. JONAS: Okay. Just curiously -- off
22   the record.

18 (Pages 66 to 69)

Page 70

1    (A discussion was held off the record.)
2    (Lunch break taken at 12:56 p.m.)
3    (Resume at 1:59 p.m.)
4    BY MR. HOWIE:
5    Q    Mr. Amaefule, one of the other concerns
6    that you had -- actually, let me back up.
7        The last concern that you felt that
8    ExxonMobil had failed to address, you were talking
9    about the physical condition of your station, and
10   you mentioned an inspection in 1998 that
11   ExxonMobil had conducted, if I understood you
12   correctly?
13   A    Yes.
14   Q    What exactly was this inspection, to the
15   best of your knowledge?
16   A    That's the annual inspection that Exxon
17   conducts.
18   Q    And is that --
19   A    Annual inspection.
20   Q    Annual?
21   A    Yes, that they conduct.
22   Q    Is that something that they continue to

Page 71

1    conduct every year since 1998?
2    A    Yes.
3    Q    And when was the last time you had such
4    an annual inspection?
5    A    Last year, 2006.
6    Q    And who on behalf of ExxonMobil
7    performed the inspection?
8    A    Their territory manager does the
9    inspection, and there's another contractor that
10   did the inspection last year also.
11   Q    Do you remember who did the inspection
12   in 1998?
13   A    Yes.
14   Q    And was it an ExxonMobil employee, or
15   was it a contractor?
16   A    ExxonMobil employee. The then territory
17   manager.
18   Q    And do you remember what his or her name
19   was? If you remember. That's all.
20   A    I don't remember. It's on the
21   inspection sheet. He signed the inspection sheet,
22   yes.

Page 72

1    Q    There was some sort of sheet that the
2    person filled out?
3    A    Yes, and wrote this recommendation that
4    the station is too old and is due for renovation.
5    Q    And did the person indicate to you that
6    a renovation would be performed at some point?
7    A    No, he didn't say, and -- no, he didn't
8    say.
9    Q    He just said the station was too old and
10   it would or it would not be renovated?
11   A    He wrote that the station was too old
12   and needed to be renovated.
13   Q    Do you --
14   A    As a recommendation on his inspection,
15   whatever.
16   Q    Do you still have that form that he gave
17   to you?
18   A    Yes.
19   Q    Would you consider producing it to us at
20   some point subsequent to this deposition?
21   A    Yes.
22   Q    Now, after you got that form in 1998,

Page 73

1    did you, subsequent to that time, ever write to
2    ExxonMobil and ask them when they were planning on
3    renovating the station?
4    A    Not in writing. I would ask the Exxon
5    representative.
6    Q    You would ask the Exxon representative?
7    A    Yes. We would discuss it and ask
8    everybody.
9    Q    But you never sent a letter to
10   ExxonMobil?
11   A    No.
12   Q    I think the next of the concerns that
13   you had mentioned was that while you were on
14   prepay, ExxonMobil had drafted some items from
15   your account and that had caused a lot of
16   problems.
17       Have I stated that accurately?
18   A    Yes. I had always laid that concern
19   with the territory managers -- you know, there
20   have been different ones over the years -- and
21   this had been ongoing, it had happened before, and
22   that when we were on prepay, they -- we told our

Page 74

1    credit card sales to offset a draft and a payment
2    that are due.  And, you know, they would charge
3    these credit cards and we have balance, credit,
4    our money, in deposition to offset any payments,
5    and yet they take some of that and credit -- I
6    mean draft us for something, usually a small
7    amount of money, and that balance, our money in
8    deposition, it would offset that too.
9         Why send -- have our money, I'll send it
10   to the bank, it will draft and they penalize me
11   for that, charge me more for my gas, charge me a
12   non-sufficient fee fund, and place me on another
13   term of prepay, three more months.
14        Q    Another term of prepay?
15        A    Yes, another term of prepay because of
16   that.
17        Q    Right.
18        A    I see that, another prepay, and I always
19   complained about it to them.
20        Q    And is this something that you had sent
21   anything in writing to ExxonMobil about?
22        A    No, not in writing.

Page 75

1         Q    Now, did you understand that one of
2    the -- let me start again.
3         You understand that one of the reasons
4    you were on prepay is for having drafts returned
5    for insufficient funds?
6         A    Yes.
7         Q    And did you also understand that one of
8    the terms and conditions of the prepay status was
9    that ExxonMobil would withhold credit card monies
10   and --
11        A    Yes.
12        Q    You don't dispute that for items that
13   you purchased from ExxonMobil, such as gasoline or
14   any other items, you have an obligation to pay
15   them for any of those items that you actually
16   receive?
17        A    No, I don't have any --
18        Q    You don't dispute that?
19        A    -- disputes.  No, I don't have any
20   disputes for this or that payment's due, but the
21   point is -- the dispute is why not pay for these
22   other ones the same way you're paying for these

Page 76

1    ones, and -- instead of you have my money, credit.
2    If that money had been in my bank account, it
3    would clear that draft.
4         Now, I don't have any problem for the
5    withholding of credit because it is the system.
6    That's not what the problem is.  Okay?  The
7    problem is since you're withholding and paying
8    what everybody is due from that, why not pay
9    with -- I mean pay these ones also instead of
10   having my money deposition and withholding -- I
11   mean paying some and now not paying this one, it
12   turn -- it comes and hurt me.  That's what the
13   concern is.
14        Q    The items that you're talking about that
15   were returned for insufficient funds and caused
16   you to be put on another term of prepay, how large
17   are those --
18        A    Usually it's small items.
19        Q    A few hundred dollars?
20        A    Yes, on the rent or on the gasoline and
21   the -- on the rent and some of the other items,
22   they take from the credit balance that they

Page 77

1    withhold.
2         Q    But if I understand you correctly,
3    you're saying that ExxonMobil drafts from your own
4    bank account certain items, and those items
5    bounce, and then ExxonMobil uses the credit card
6    monies that it's withheld to pay for those items?
7         A    No -- well, yes.  Eventually, they would
8    then send it to the account and pay for it from
9    the credit card that we charged it.  First of all,
10   they will send it to the bank, they will draft it.
11   It will return because they have the money that
12   would have been in the bank to pay for it.
13        I would have liked them to use that
14   money, pay for it in the first instance instead of
15   regularly drafting it.  If it returns, then they
16   would send it to the account and pay -- pay it
17   from that credit card that they have and still
18   penalize me.
19        Q    Now, while you're on prepay, you need to
20   affirmatively wire money to ExxonMobil to pay for
21   gasoline loads, correct?
22        A    Yes.

Page 78

1    Q    The gasoline drafts won't -- payment for
2  gasoline won't draft automatically while you're on
3  prepay?
4    A    No.
5    Q    That's a no?
6    A    No, it will not draft.
7    Q    If you could look back at Exhibit 1,
8  Mr. Amaefule, page 00011 --
9    A    Yes.
10   Q    -- and if you look at Section 2.3, Terms
11 of Payment, at the top of the page, you'll see an
12 (a) and then a (b) and then a paragraph that
13 begins, "The method of payment"?
14   A    Uh-huh.
15   Q    If you look down about six or seven
16 lines, you'll see a sentence that starts, "If, as
17 a result of any unhonored checks or debits."
18       Do you see that sentence?
19   A    I'm not seeing it yet.
20       MR. IBE:  What page?
21       BY MR. HOWIE:
22   Q    It's on the far right.  It says, "If, as

Page 79

1  a result of any unhonored checks" --
2    A    Okay.  I see the sentence.
3    Q    It reads, "If, as a result of any
4  unhonored checks or debits, ExxonMobil revokes or
5  does not extend credit to Franchise Dealer,
6  ExxonMobil may also charge, and Franchise Dealer
7  shall pay, fees as ExxonMobil may from time to
8  time specify and as are permitted by Law, which
9  fees are determined by ExxonMobil to recoup its
10 costs and expenses in administering Franchise
11 Dealer's payments under this Agreement."
12       Do you see that sentence, sir?
13   A    Yes, I see that sentence.
14   Q    And did you understand that the
15 Franchise Agreement allowed ExxonMobil to charge
16 you certain fees in connection with your being on
17 prepay status?
18   A    Yes, I understand that.
19   Q    And if you look further down on the
20 page, the Section 2.4 that says Credit, Security,
21 subsection (a)?
22   A    Yes.

Page 80

1    Q    "In its sole discretion, ExxonMobil may
2  extend credit to Franchise Dealer on terms and
3  conditions as specified by ExxonMobil, and
4  ExxonMobil may modify the terms and conditions of
5  credit, or revoke credit, at any time or from time
6  to time."
7        Do you see that?
8    A    Yes.
9    Q    And do you understand that ExxonMobil
10 had the right to rescind sales to you on credit
11 and place you on a prepay status in its sole
12 discretion?
13   A    Yes.
14   Q    And that ExxonMobil could modify and
15 shape the terms and conditions of that credit in
16 the manner that it saw fit, including withholding
17 credit card monies while you were on prepay?
18       MR. JONAS:  Objection, but he can
19 answer.
20       THE WITNESS:  Yes.  I have said to you
21 before that I don't have any problem with that.  I
22 don't have any questions.  I don't have any

Page 81

1  concerns about withholding credits.
2        BY MR. HOWIE:
3    Q    Withholding the credit card monies while
4  you're on prepay?
5    A    Yeah.  I explained to you what the
6  concern is.  It's quite outside of that.
7    Q    I just want to make sure I understand.
8  You don't have a problem with them withholding the
9  credit card monies while you were on prepay?
10   A    No, no.
11   Q    Now, I think the last of the concerns
12 you mentioned was price dropping -- the price of
13 gasoline that ExxonMobil charges you dropping and
14 that you were given some deliveries of fuel that
15 you didn't need?
16   A    Yes.
17   Q    Now, when you say "didn't need," do you
18 mean that you didn't want that much gasoline in
19 your tanks or that you didn't have room in your
20 tanks?
21   A    In the delivery system, scheduling on
22 delivery system --

21 (Pages 78 to 81)

Page 82

1     MR. IBE:  Excuse me.  Can you take your
2  hand down, please?
3     THE WITNESS:  In the schedule and the
4  delivery system, Exxon's scheduling and delivery
5  system, okay, takes account of how much inventory
6  that we have in the ground versus how much we
7  sell, how fast we sell, project that, how long
8  that gas we have in the ground will last, and,
9  therefore, generate when next we will need a load.
10  Okay?
11     That was not followed, because we had
12  large amount, almost a full tank of regular we
13  had.  That would last for -- with the ratio of
14  sale at that time, it would last for a few weeks.
15  We had enough of regular and plus that, at the
16  ratio of our sales at that time, would last for
17  weeks.  A week and a half at least.
18     Based on that, we did not need -- not
19  that I did not want, we did not need any gas.  We
20  have to sell down before we restock.
21     BY MR. HOWIE:
22     Q    You have underground storage tanks for

Page 83

1  each grade of gasoline at your station?
2     A    Yes.
3     Q    And there's one tank for each grade?
4     A    Yes.
5     Q    How large are each of the tanks in terms
6  of gallons?
7     A    We have a 10,000 gallon tank, we have an
8  8,000 gallon tank, and 6,000 gallon tank.
9     Q    And is the 10,000 tank for regular?
10     A    Regular, yes.
11     Q    And the 8,000 gallon tank is for plus or
12  intermediate?
13     A    Yes.
14     Q    And then the 6,000 is for supreme?
15     A    Yes.
16     Q    And when was it that you claim that you
17  received a load of gas that you did not need?
18     A    On September the 30th and October the
19  4th.
20     Q    And did you get shipments of all three
21  grades of gasoline on September 30th?
22     A    Yes.

Page 84

1     Q    And when you say September 30th, we're
2  talking about September 30th, 2006?
3     A    2006, correct.
4     Q    And what grades did you receive on
5  October 4th?
6     A    I think it would be plus and supreme.  I
7  don't think they included regular.
8     Q    Now, is it your testimony that on
9  September 30th, your tanks for all three grades of
10  gasoline were at or near capacity?
11     A    They were not at capacity.  The other
12  two grades were not at capacity, but we had enough
13  gasoline to last us long enough before we need
14  another delivery.
15     Q    You said plus and supreme were not at
16  capacity, but do you remember what the level of
17  the tank was in regular?
18     A    The regular was almost at full capacity.
19     Q    And is it your testimony that there was
20  no room in that regular tank for the shipment that
21  you received on September 30th?
22     A    There was no room --

Page 85

1     Q    Let me ask it this way.  I think before
2  lunch, you had said that there were some loads you
3  received that wouldn't fit in the tank and had to
4  be taken back.
5     A    Right.
6     Q    Is it your testimony that this delivery
7  on September 30th was one of those deliveries?
8     A    I don't remember if a part of it was,
9  but the record would show that.
10     Q    We'll get to your inventory documents
11  later, but I just want to ask if you remember that
12  the September 30th delivery was one such delivery
13  where the tanker had to take the gasoline back.
14     A    I don't remember if a part of that one
15  was taken back.
16     Q    Well, let me ask this.  In 2006, how
17  many gasoline loads were delivered to your station
18  that wouldn't fit in the tank and had to be taken
19  back by the tanker?
20     A    I don't remember right now, but the
21  record would tell me which if I look at it.
22     Q    If a tanker showed up at your station

Page 86

1 and there was no room in the tank, are you still
2 charged for that gasoline?
3    A    No.
4         You mean charged for the one that they
5 take back?
6    Q    That's what I'm asking.
7    A    No.
8    Q    And are there any records that you would
9 have that would show when loads of fuel were
10 delivered to your station that would not fit in
11 the tanks?
12    A    Record to show that?  Yes.
13    Q    What documents would reflect that?
14    A    The bill of lading.
15    Q    You would get a bill of lading even if
16 the fuel wasn't delivered?
17    A    Yes.  They would give us a bill of
18 lading showing what was dropped and what was
19 returned.
20    Q    Would you be willing to produce any
21 bills of lading that would show fuel loads that
22 were delivered in 2006 but were returned because

Page 87

1 there wasn't space in the tanks?
2    A    Yes.
3    Q    Now, I think you also mentioned that
4 there is a fuel inventory system that ExxonMobil
5 uses?
6    A    Yes.
7    Q    And if my understanding is correct,
8 there are computer sensors in each of the three
9 underground tanks?
10    A    Yes.
11    Q    And those sensors measure the inventory
12 level in each tank?
13    A    Yes.
14    Q    And based on the readings in the tanks
15 and based on your historical sales, the computer
16 system determines when you should receive your
17 next delivery of fuel?
18    A    Yes.
19    Q    And is your testimony, if I understood
20 you correctly from a few minutes ago, that
21 ExxonMobil disregards or does not follow that
22 system on occasion?

Page 88

1    A    Sometimes, yes.
2    Q    And when is it that ExxonMobil has
3 disregarded that computerized inventory system
4 with respect to you?
5    A    It has happened sometime in the past,
6 and on the 30th of September and the 4th of
7 October, 2006.
8    Q    And why is it that you say that the
9 deliveries that were made to your station on those
10 two days were the result of ExxonMobil
11 disregarding its inventory system?
12    A    I explained that before.  Again, let me
13 say again.
14         Because of we had enough gas in the
15 ground to last us for a long period of time before
16 we need load, before we would need to restock.
17 And that was clear to them.  It was clear to the
18 system.
19    Q    Do you have any documents to -- well,
20 let me ask it this way.  Is it your claim that --
21 is it your contention that the computer system
22 indicated that you didn't need a fuel delivery,

Page 89

1 but somebody affirmatively disregarded it and
2 scheduled a delivery anyway?
3    A    I didn't look at the computer system.
4 That's Exxon's computer system, not mine, and I
5 don't look at it.
6    Q    Well, then, how do you know that the
7 computer system didn't indicate that you did need
8 a fuel delivery?
9    A    I don't know.  I didn't look at the
10 computer system.  That's Exxon's computer system,
11 not mine.  I don't look at it.
12    Q    You don't know one way or the other how
13 that fuel was scheduled for delivery to your
14 station?
15    A    Okay.  I told you how we know, how Exxon
16 had told us and the system that had been followed
17 since the inception of that Veeder-Root.
18    Q    I guess what I'm trying to understand,
19 Mr. Amaefule, is are you claiming that the
20 Veeder-Root system was somehow affirmatively
21 ignored or disregarded by somebody at ExxonMobil
22 and that was why you ended up getting fuel on the

Page 94

1  generating the inventory.  I didn't set it.  It's
2  their standard.
3      Q   Do you understand this agreement and
4  that sentence that I just read to allow ExxonMobil
5  to change that standard from time to time in its
6  sole discretion?
7      A   No.
8      Q   You don't think that the agreement
9  allows them to do that?
10     A   No, I didn't think that's what it meant.
11     Q   Okay.
12         MR. HOWIE:  Can I get this marked as 4?
13         (Amaefule Deposition Exhibit No. 4 was
14         marked for identification.)
15     BY MR. HOWIE:
16     Q   Actually, before we get to this exhibit,
17  Mr. Amaefule -- sir?
18     A   Yes.
19     Q   Before we get to that exhibit, can you
20  tell me, other than the deliveries on
21  September 30th and October 4th of 2006, were there
22  any other fuel deliveries in 2006 that you

Page 95

1  received that you felt were inconsistent with the
2  standard under which you typically received fuel
3  deliveries?
4      A   Yes.
5      Q   There were?
6      A   Yes.
7      Q   And what other dates?
8      A   There was some incident in
9  February 2006.
10     Q   Okay.
11     A   I discussed it with Mr. Ron
12  Alexandrowicz, and he --
13         MR. IBE:  I'm sorry, I missed that.
14         THE WITNESS:  I said I discussed it with
15  Ron Alexandrowicz, and he took care of it.
16     BY MR. HOWIE:
17     Q   And can you explain in more detail what
18  the incident was in February 2006?
19     A   The same thing.  We had a lot of gas in
20  the ground, and I wasn't expecting any delivery
21  based on how much gas we had in the delivery -- I
22  mean how much gas we had in stock.  And they

Page 96

1  brought a delivery, and that caused us to have a
2  return draft.
3          I called him, and he asked me to fax the
4  inventory report showing how much gasoline that we
5  had and what were delivered.  I faxed it to him,
6  and he reversed the return draft.  So they
7  extended the draft in time and left it until
8  later, later on.
9      Q   I'm not sure I understand.  When you say
10  they extended the draft, you mean it was --
11     A   The draft time.
12     Q   The draft was re-presented?
13     A   Yes, later on.
14     Q   And did that return draft affect whether
15  or not you were on prepay?
16     A   Well, if he had not extended it,
17  corrected it, it would have extended the prepay.
18     Q   It would have extended prepay?
19     A   Yes, from that time for another three
20  months.
21     Q   So at the time this incident occurred,
22  you were already on prepay?

Page 97

1      A   No, no.  We weren't on prepay.  I don't
2  remember if we were on prepay at that particular
3  time.  Sorry.
4      Q   So you don't know whether or not this
5  return draft would have extended or put you on
6  prepay?
7      A   Yes, but I think he may -- I don't
8  remember, but I think he may have put us on
9  prepay, and that's why I got worried about it,
10  called him about it, and he reversed it.
11     Q   After Mr. Alexandrowicz reversed it, as
12  you say, did ExxonMobil take you off prepay or
13  were you still on prepay?
14     A   I don't remember if we were on prepay at
15  that time or not.  I don't remember.
16     Q   And this incident in February of 2006,
17  was this an incident where a fuel delivery was
18  made and there was not enough room in the tanks
19  and the fuel had to be taken back by the tanker?
20     A   I don't remember if a part of it was
21  taken back.  If I look at this, it will tell us.
22     Q   What would tell you, the bill of lading?

25 (Pages 94 to 97)

3/5/2007                 Peter Amaefule v. ExxonMobil Oil Corporation                 Peter Amaefule

Page 98

1      A    The bill of lading, yes.
2      Q    Other than the September 30th,
3  October 4th and this February incident, any other
4  delivery in 2006 that you felt was inconsistent
5  with the standard?
6      A    No.
7      Q    You don't dispute that for fuel that's
8  delivered by ExxonMobil to your station and goes
9  into the tanks, you have an obligation to pay
10 ExxonMobil for that fuel?
11     A    I don't dispute that.
12     Q    If you turn back to Exhibit 4, Exhibit 4
13 is a one-page document addressed to you. It's
14 dated January 26th. The year is cut off, but from
15 the handwritten note, I think it's probably safe
16 to infer that it was 1998.
17         If you could take a minute and read it,
18 Mr. Amaefule.
19         MR. IBE: I'd just note a quick
20 objection that the document is not properly dated,
21 and the inference is not necessarily allowable,
22 so --

Page 99

1          MR. HOWIE: Okay.
2          MR. JONAS: Brian, is this a one-page
3  document?
4          MR. HOWIE: This was all I had of it,
5  yeah.
6          MR. JONAS: It has no bottom to it?
7          MR. HOWIE: No, not that I have.
8          MR. JONAS: So we don't know whether
9  it's a full document or not at this point? Okay.
10         THE WITNESS: This is in 1997?
11         BY MR. HOWIE:
12     Q    I'm not entirely sure, Mr. Amaefule. I
13 believe that it's 1998, based on the fact that
14 there's a reference to an October 23rd, 1997,
15 letter in the text.
16         Just let me know when you're finished.
17     A    Yes.
18     Q    Exhibit 4 is part of a letter addressed
19 to you discussing your failure to pay timely in
20 accordance with the terms of your sales agreement,
21 and also notifying you that Exxon is canceling,
22 terminating and non-renewing your sales agreement

Page 100

1  and franchise relationship.
2          Do you recall receiving this letter,
3  sir?
4      A    Yes.
5      Q    And in the first paragraph of Exhibit 4,
6  it says, "We previously warned you, by letters
7  dated January 3rd, 1997, March 6th, 1997, and
8  October 23rd, 1997, that your failure to timely
9  pay in accordance with the terms of your Sales
10 Agreement with Exxon could lead to termination and
11 non-renewal of your franchise agreements and
12 franchise relationship with Exxon."
13         Do you recall that Exxon had sent you
14 letters in 1997 regarding your failure to timely
15 pay?
16     A    Yes.
17     Q    And had you, in fact, failed to timely
18 pay as the letters stated?
19         MR. JONAS: Objection, relevance.
20         Go ahead and answer.
21         THE WITNESS: No, because at that time,
22 the policy was different than what it is today.

Page 101

1  At that time, I think we had -- if you had certain
2  amount of returned drafts, they would terminate.
3          But I brought the letter from the bank
4  as the records showing that some of those returns
5  were not my fault. And that's why we had the
6  meeting on that topic, represented that, and they
7  rescinded this letter.
8          BY MR. HOWIE:
9      Q    Is it your testimony that none of the
10 returned items were your fault?
11     A    Not none of them, but some of them that
12 would accumulate to the amount that will
13 terminate. That will cause termination.
14     Q    And the second paragraph says that the
15 electronic funds transfer of your bank account for
16 a particular motor fuel invoice on December 10,
17 '97, was returned unpaid by your bank.
18         Do you recall whether that was one of
19 the items you claim was the bank's fault?
20     A    I don't know --
21         MR. JONAS: For the record -- Brian, I
22 don't want to keep interrupting, but I will note

26 (Pages 98 to 101)

Page 162

1  this Agreement."
2          Did you understand that by signing
3  Exhibit 1, you were representing that you read and
4  understood the agreement?
5      A   Yes, I understand as much as I'm able
6  to.
7      Q   And did you ever ask Mr. Alexandrowicz
8  what you were required to be purchasing on a
9  monthly basis or yearly basis under the Franchise
10  Agreement?
11     A   No.
12     Q   If you could turn to page 22 of the same
13  exhibit, 00022, you'll see there's an Article IX
14  entitled Operations.
15         Do you see that?
16     A   Article IX?  Yes.
17     Q   And then 9.3, which says Operating
18  Hours, subsection (a) reads, "In accordance with
19  ExxonMobil's National Hours of Operation Policy as
20  in effect from time to time and subject to
21  applicable Laws, Franchise Dealers shall keep the
22  Marketing Premises open for the retail sale of the

Page 163

1  Products for the following hours as indicated."
2          And for you, it's indicated 24 hours,
3  7 days a week?
4      A   Yes.
5      Q   And you understood that you were
6  required to keep your station open for the sale of
7  motor fuel for those hours?
8      A   Yes.
9      Q   And if you turn the page to 23 -- it's
10  just the next page back -- Section 9.4, Use of
11  Marketing Premises, subsection (b) reads
12  "Franchise Dealer shall keep the Motor-Fuels
13  Business open and in normal operation for the
14  periods specified in Section 9.3?
15     A   Yes.
16     Q   You understood that the agreement
17  required you to keep your motor-fuels business
18  open and in normal operation 24 hours a day,
19  7 days a week?
20     A   Yes.
21         MR. JONAS:  Objection.  I think -- I
22  don't believe that's what the -- the other

Page 164

1  document said, motor-fuel business.
2          BY MR. HOWIE:
3      Q   Can you turn to page --
4      A   I was open 24 hours.
5      Q   You were open for the sale of motor-fuel
6  24 hours a day?
7      A   We were open 24 hours.  We never closed
8  the station.
9      Q   Did you have motor fuel available all
10  24 hours?
11     A   We are open to sell motor fuel.
12     Q   That's not what I asked.  I asked if you
13  had motor fuel available to sell.
14     A   When?
15     Q   In October and November of 2006?
16     A   No, we didn't have motor fuel, but we
17  were open.
18     Q   If you turn to page 00026, Section 9.22
19  entitled Maintain Inventory reads, "Franchise
20  Dealer shall maintain an inventory of Products
21  sufficient to serve customers during the hours
22  specified in Section 9.3."

Page 165

1          You understand that the agreement
2  required you to maintain a sufficient inventory of
3  products which are motor fuel products?
4          MR. IBE:  Objection.  That's not what
5  was contained in the agreement.  If you want to
6  ask him about that specific line, you can, and I
7  don't see any mention of motor fuel in that line.
8          BY MR. HOWIE:
9      Q   Mr. Amaefule, if you could turn back to
10  page 00010 -- just keep your finger on that page
11  we were just on so you can go back to it --
12  Section 2.1(a), you see where it says, "Products
13  means motor fuel"?
14     A   Section 2.1(a)?
15     Q   The second line of subsection (a),
16  "'Products' means motor fuel which is sold by
17  ExxonMobil with authorization for resale as an
18  Exxon-branded product; sold consistent with that
19  authorization, and specified in the schedule
20  entitled 'Purchase Schedule' attached and
21  incorporated into this Agreement," you understand
22  that products in this agreement refers to motor

42 (Pages 162 to 165)

Page 246

1    Q    And that's what you use?
2    A    If you're making so much and you're
3  single, yes, those kind of things.
4    Q    In looking through Exhibit 25, it
5  appears to end sometime in October of 2006.
6        Do you have any payroll records for
7  November or December of 2006?
8    A    Yes.
9    Q    I would ask that they be produced.
10   A    Yeah, we have our taxes, the payroll
11 through December.
12   Q    I would just ask if you can locate and
13 produce those, I would appreciate it.
14   A    Okay.
15       MR. HOWIE:  If it's in here somewhere
16 and I've missed it, Peter or Victor, just tell me.
17       BY MR. HOWIE:
18   Q    It you could turn back to Exhibit 24,
19 Exhibit 24 is a four-page document entitled
20 "Affidavit."
21       Do you recognize this, sir?
22   A    Yes.

Page 247

1    Q    And is this your signature on page 3 and
2  4?
3    A    Yes.
4    Q    You signed this in front of a notary
5  public?
6    A    Yes.
7    Q    And did the notary public ask you to
8  raise your right hand and swear an oath to tell
9  the truth before you signed?
10   A    No.
11   Q    Did she ask you at any time to raise
12 your right hand and swear under oath to tell the
13 truth?
14   A    I don't remember actually we did that.
15 I don't remember doing this process.
16   Q    Is Exhibit 24 in your handwriting, sir?
17   A    Yes.
18   Q    And why did you prepare Exhibit 24?
19   A    My counsel --
20       MR. IBE:  I'll object, and I'll instruct
21 the witness not to answer anything that would be
22 privileged information.

Page 248

1        BY MR. HOWIE:
2    Q    Let me make that clear.  I'm not asking
3  you to disclose the contents of any conversations
4  that you had with your counsel.  And if you can't
5  answer the question without doing that, let me
6  know.
7    A    I can't answer it.
8    Q    Can you tell me, if you remember, when
9  you prepared Exhibit 24?
10   A    It was on the 2nd of -- 1st of -- I mean
11 on the 28th of February.
12   Q    Is that the date you remember, or is
13 that written somewhere on the document?
14   A    No.  That's the date I remember.  I know
15 I prepared it before the day I took it to the
16 notary.
17   Q    The first paragraph on page 1 begins,
18 "Exxon refused to switch our fuel storage tanks to
19 match and accommodate the change that occurred in
20 our sales pattern-ratio."
21       Is this the fuel tank swap that we were
22 discussing earlier?

Page 249

1    A    Yes.
2    Q    The last sentence of that paragraph
3  reads, "We lost customer base, lost business and
4  our volume sales kept plunging."
5        How much -- let me start again.
6        This fuel tank swap situation, this
7  occurred in 2005?
8    A    No.  It went on over some years before
9  2005 when our volume sales changed.
10       I don't remember exactly what dates, but
11 it was a gradual change.  I don't remember.  It
12 might have been 2003 through '04, something like
13 that.
14   Q    And at some point, then, in 2004, it
15 sounds like the tanks were swapped so that the
16 regular tank was the largest tank in?
17       MR. IBE:  Objection.
18       THE WITNESS:  No, it wasn't swapped.
19       BY MR. HOWIE:
20   Q    Not swapped, but the lines were -- I
21 mean it was redesignated as?
22   A    No.  It was in late 2005 that he did it.

63 (Pages 246 to 249)

Page 186

1  prepared yourself?
2      A    Yes.
3      Q    And is this a document that you complete
4  and prepare in the ordinary course of your
5  business as a service station operator?
6      A    Yes.
7      Q    Looking at page 1 of Exhibit 17, sir, it
8  appears that your supreme tank was completely
9  empty from December 7th through the 14th; is that
10 correct?
11     A    December 7th through the 14th?  Correct.
12     Q    And it looks like it was empty again on
13 the 25th through at least the 29th, and perhaps on
14 the 30th and 31st as well?
15     A    Yes.
16     Q    And on page 2 of Exhibit 17, it appears
17 that your plus tank in December of 2006 was empty
18 from December 7th through the 14th?
19     A    Yes.
20     Q    And turning to page 3 of Exhibit 17, it
21 appears that your regular tank was empty from
22 December 7th through the 14th, 2006?

Page 187

1          Sorry, page 3 of Exhibit 17, it appears
2  that your regular tank was completely empty from
3  the 7th through the 14th?
4      A    Yes.
5      Q    If I could have you turn back to
6  Exhibit 15?  It's the October inventory.
7      A    Yes.
8      Q    According to page 1 of Exhibit 15, how
9  many gallons of regular gasoline were delivered to
10 your station in October of 2006?
11     A    None.
12     Q    And the column 2 that says Deliveries,
13 that would be fuel delivered to you and purchased
14 by you from ExxonMobil?
15     A    Yes.
16     Q    Page 2 of Exhibit 15, which is the
17 supreme page for October of 2006, how many gallons
18 of fuel did you purchase from ExxonMobil in that
19 month?
20     A    None.
21     Q    On page 3 of Exhibit 15, the plus page,
22 how many gallons of plus gasoline did you purchase

Page 188

1  from ExxonMobil in October of 2006?
2      A    1300.
3      Q    If you could turn to Exhibit 16,
4  according to page 1 of Exhibit 16, how many
5  gallons -- I'm sorry, sir.
6          According to page 1 of Exhibit 16, how
7  many gallons of regular gasoline did you purchase
8  from ExxonMobil in November of 2006?
9      A    5700.
10     Q    And according to page 2, how many
11 gallons of supreme gasoline did you purchase from
12 ExxonMobil in November of 2006?
13     A    1301.
14     Q    And according to page 3 of Exhibit 16,
15 how many gallons of plus gasoline did you purchase
16 from ExxonMobil in November of 2006?
17     A    1801.
18          MR. HOWIE:  Can I get this marked as
19 Exhibit 18?
20          (Amaefule Exhibit No. 18 was marked for
21          identification.)
22          BY MR. HOWIE:

Page 189

1      Q    Exhibit 18, sir, is a document that was
2  produced on your behalf by your counsel.  I've had
3  it Bates labeled Amaefule 00045.  It appears to be
4  a profit or loss statement for the year 2006.
5          Have you seen this before?
6      A    Yes.
7      Q    Did you prepare Exhibit 18?
8      A    Yes, I did.
9      Q    When did you prepare Exhibit 18, sir?
10     A    I don't know what date.  It's in
11 January 2007.
12     Q    Do you generally prepare profit/loss
13 statements for your business yourself?
14     A    Sometimes, yes.
15     Q    When you don't prepare them, who does?
16     A    The bookkeeper will look it over and
17 make corrections or check if it's accurate.
18     Q    At the top of Exhibit 18, sir, it says
19 revenue.  In the first line, it says fuel
20 (gallons), 226,933.
21          Is that the total number of gallons of
22 gasoline that you purchased from ExxonMobil in

48 (Pages 186 to 189)

Page 190

1  2006?
2      A   Yes.
3      Q   And the next row over says sales,
4  $602,139.39?
5      A   Yes.
6      Q   Is that your gross revenue from the sale
7  of gasoline in 2006?
8      A   Yes.
9      Q   The next column over says profit, and
10  for fuel, it says $29,770.62.
11         Do I understand that line entry to be
12  your gross profit for the sale of gasoline in
13  2006?
14     A   Yes.
15     Q   So if I subtract the gross profit from
16  your sales, I would get the cost of the gasoline
17  that you paid ExxonMobil for?
18     A   Yes.
19     Q   According to Exhibit 18, your gross
20  profit for the sale of gasoline in 2006 was a
21  positive number.  It was $29,000?
22     A   Yes.

Page 191

1      Q   For groceries, the next line item,
2  according to Exhibit 18, you earned a gross profit
3  in 2006 of $102,716.60?
4      A   Yes.
5      Q   The next line item is repair shop, and
6  it says labor in parentheses?
7      A   Yes.
8      Q   It says that you earned a gross profit
9  of $21,000 in 2006?
10     A   Yes.
11     Q   The difference between your profit and
12  sales for labor on the repair shop appears to be
13  $21,000, if my math is correct; is that right?
14     A   Profit and sale.  That's not the sales
15  line.  That's the labor.
16     Q   I'm sorry, the what?
17     A   That's the labor we charge.
18     Q   Right.  I guess what I'm asking you is
19  the difference between $42,000 and $21,000 is
20  $21,000.
21     A   Yes.
22     Q   That $21,000 difference, is that the

Page 192

1  amount that you pay your mechanic?
2      A   Yes, the mechanic.
3      Q   The next line item, repair shop (sales),
4  would that refer to sales of cigarettes and gum
5  and sodas?
6      A   No.  That's --
7      Q   I'm sorry, sales of tires and batteries?
8      A   -- sales of tires and batteries.  We may
9  have auto parts of any kind, and we have markup on
10  each and we get discounts from the dealers.
11     Q   You mark up the auto parts --
12     A   We get discounts, okay, as dealers.
13     Q   Right.
14     A   Sometimes we pass it on to the
15  customers, sometimes we don't, depending on --
16     Q   The auto parts that you buy and sell to
17  customers, you don't buy those from ExxonMobil,
18  correct?
19     A   No, we don't.
20     Q   And according to Exhibit 18, you earned
21  a gross profit on the sales of auto parts and
22  related items of $6,480?

Page 193

1      A   Yes.
2      Q   The next line item is rebates?
3      A   Yes.
4      Q   It says $5200.  What does that refer to?
5      A   It would include the -- this maintenance
6  contribution that we get, we put it as what we
7  receive as rebates and other rebates that we may
8  get from other distributors.  That's what this is.
9      Q   Sir, if you turn to Exhibit 1 -- I'm
10  sorry, were you finished with your answer?
11     A   Yes.
12     Q   If you turn back to Exhibit 1, page 48,
13  page 00048 --
14     A   Yes.
15     Q   -- page 48 indicates that your minimum
16  purchase obligation in the first year of your
17  Franchise Agreement was 1,248,000 gallons.  And I
18  believe, as we've previously discussed,
19  Article 2.1 required that you purchase 70 percent
20  of that amount.
21         Do you dispute that your purchase of
22  gasoline as reflected in Exhibit 18 is less than

49 (Pages 190 to 193)

Page 194

1  the minimum purchase requirement that you were
2  obligated to make?
3      A    I haven't made that calculation to see
4  if 226,133 gallons is less than 70 percent, but I
5  can see it's less, yes.
6      Q    Sir, if you keep going on Exhibit 18
7  down to the expense category on Exhibit 18, the
8  first line is a little faded, but I will tell you
9  that it says rent --
10     A    Yes.
11     Q    -- $74,700?
12     A    Yes.
13     Q    I believe you had previously testified,
14 if you look at page 64 of the Franchise Agreement,
15 it says that your annual rent was $78,000.
16         Is there a reason why it's listed here
17 as only $74,700?
18     A    Well, yes.  That's from January to
19 December, but the new rent started from April.  So
20 we were paying a different rent, a much lower rent
21 on the previous lease that ended March 31st.
22         So from January to April 1st, we were

Page 195

1  paying different rent.
2      Q    January, February and March of 2006 --
3      A    2006, correct.
4      Q    -- you were paying a different rent?
5      A    Different rent, correct.
6      Q    The next line item down on Exhibit 18 is
7  equipment fees, and it's listed as $7700.
8      A    Uh-huh.
9      Q    What is that?
10     A    Equipment.  We bought a new lift.  On
11 the equipment, we bought a new lift in the shop.
12     Q    And that new lift cost you $7700, or was
13 there other equipment included in that?
14     A    I think it would be that, and I don't
15 know if we bought any other equipment that year.
16         Oh, yes.  We bought other things, like
17 fax machines, things like that, and we add to
18 that, yes.
19     Q    The next line item says accounting and
20 bookkeeping, $5800?
21     A    Uh-huh.
22     Q    What did you pay your accountant -- or

Page 196

1  who is your accountant?
2      A    Nike Associates.
3      Q    Can you spell that?
4      A    N-I-K-E Associates or & Associates.
5      Q    And what services did Nike Associates
6  perform for you?
7      A    They do our tax returns and like this
8  profit and loss statement or any accounting that
9  we need assistance, yes.
10     Q    They didn't prepare Exhibit 18, did
11 they?
12     A    No, they didn't prepare this one.
13     Q    Did they ever prepare financial
14 statements for you?
15     A    Yes.
16     Q    And you said they prepare tax returns
17 for you?
18     A    Yes.
19     Q    Do you still have copies of your tax
20 returns for 2006?
21     A    No.  We haven't prepared the tax return
22 for 2006.

Page 197

1      Q    That one has not been filed yet?
2      A    No.
3      Q    Do you operate on a calendar year or a
4  fiscal year?
5      A    I don't get the question.
6      Q    Don't worry about it.  I'll withdraw it.
7          MR. IBE:  Yeah, he's taxed.
8          BY MR. HOWIE:
9      Q    Did your accountant prepare any
10 tax return -- excuse me -- any financial
11 statements for you in 2006?
12     A    In 2006?  Yes.
13     Q    Were those financial statements
14 collecting data for any part of 2006, or were they
15 for a prior year?
16     A    It would be for a prior year.  I think
17 it was for -- yeah, it would be for in the prior
18 year.
19     Q    And do you anticipate having
20 your accountant --
21     A    The financial statement of the station
22 at a given time.  Yeah, financial statement of the

Page 202

1    Q   What licenses do you have?  Do you sell
2  alcoholic beverages?
3    A   No.  We have license for groceries that
4  we sell.  We have a gasoline license.  We have
5  numerous licenses.
6    Q   The next line item is advertising and
7  promotions, $1200.
8        What does that line item represent?
9    A   Yeah.  It represents the cost we incur
10  on advertisements and promotions that we make.
11    Q   What did you do to advertise?
12    A   We made some flyers that we advertised.
13  We have a -- that we put out in the area
14  advertising about our auto service and gasoline,
15  things like that, and other.  Like maybe a banner
16  that we --
17    Q   And what promotions did you run in 2006?
18    A   And Exxon charges us for -- I don't know
19  where I put that one there -- for the promotions
20  that they print out -- I mean advertisements and
21  promotions that they print out and send to us,
22  they charge us for it.  There's a cost.

Page 203

1    Q   The next line item says miscellaneous,
2  $6400.  What does that line item represent?
3    A   Miscellaneous would represent -- I have
4  a lot of other expenses.  For example, things that
5  we buy for cleaning, other expenses that we make
6  related to business.
7    Q   Can you tell me what any of them are?
8    A   Excuse me?
9    Q   Can you tell me what any of them are?
10    A   I just gave you an example.
11    Q   You said cleaning?
12    A   No, not cleaning.
13    Q   Okay.  I'm sorry.
14    A   The -- like equipment that we -- I mean
15  some materials that maybe we bought.  Like the
16  trash company that takes our Dumpster.  Any of the
17  costs related to the business.
18        I can't remember all of them here now
19  what I put in that category.
20    Q   Do you know what documents you relied on
21  to come up with the amount of $6400?
22    A   I don't remember all of them that I put

Page 204

1  under that category, but I just gave you an
2  example of what would go under there.
3    Q   Do you still have the backup documents
4  that you used to prepare Exhibit 18?
5    A   Yes, of course.  I have some backups,
6  yes.
7    Q   Would you be willing to produce those?
8    A   The ones I can produce, yes.
9    Q   I would ask that they be produced.
10        The next line item says repairs, $4200.
11  What did you repair for $4200?  What things did
12  you repair for $4200?
13    A   We had the lighting that went out.
14  Electrician came and checked it out, even though
15  it's not -- because we can't find the problem and
16  Exxon cannot help to find it.  It may be
17  underground shorting or something.  They don't
18  know.  They can't find it out, and Exxon cannot
19  help.
20        To find out, we dug in the ground to
21  find our shorts.  When we do the one that we're
22  supposed to do and we can't find it, we tell Exxon

Page 205

1  to help, they refuse.
2        We do repair our air conditioner,
3  something like that, those kind of repairs and
4  costs.  I can't remember all of them now, here
5  right now, that went under that.
6    Q   Didn't ExxonMobil pay five or $6,000 to
7  replace your air conditioning unit sometime in the
8  last year?
9    A   Yeah, that's what it was.  Eventually,
10  yes.
11    Q   But that was money that ExxonMobil paid,
12  correct?
13    A   Yes.
14    Q   The next line item says equipment
15  purchase, $4950.  What does that item represent?
16    A   Oh, excuse me, that's right.  Let me go
17  back to that first equipment fees, not equipment
18  purchase.  That was -- that one is the equipment
19  fees that Exxon charges us apart from the rent.
20  Correct.  Excuse me.  I remember what went in
21  there.  That's different.
22        This is the equipment that we purchased,

3/5/2007                          Peter Amaefule v. ExxonMobil Oil Corporation                      Peter Amaefule

Page 246

1    Q    And that's what you use?
2    A    If you're making so much and you're
3    single, yes, those kind of things.
4    Q    In looking through Exhibit 25, it
5    appears to end sometime in October of 2006.
6         Do you have any payroll records for
7    November or December of 2006?
8    A    Yes.
9    Q    I would ask that they be produced.
10   A    Yeah, we have our taxes, the payroll
11   through December.
12   Q    I would just ask if you can locate and
13   produce those, I would appreciate it.
14   A    Okay.
15       MR. HOWIE:  If it's in here somewhere
16   and I've missed it, Peter or Victor, just tell me.
17       BY MR. HOWIE:
18   Q    It you could turn back to Exhibit 24,
19   Exhibit 24 is a four-page document entitled
20   "Affidavit."
21       Do you recognize this, sir?
22   A    Yes.

Page 247

1    Q    And is this your signature on page 3 and
2    4?
3    A    Yes.
4    Q    You signed this in front of a notary
5    public?
6    A    Yes.
7    Q    And did the notary public ask you to
8    raise your right hand and swear an oath to tell
9    the truth before you signed?
10   A    No.
11   Q    Did she ask you at any time to raise
12   your right hand and swear under oath to tell the
13   truth?
14   A    I don't remember actually we did that.
15   I don't remember doing this process.
16   Q    Is Exhibit 24 in your handwriting, sir?
17   A    Yes.
18   Q    And why did you prepare Exhibit 24?
19   A    My counsel --
20       MR. IBE:  I'll object, and I'll instruct
21   the witness not to answer anything that would be
22   privileged information.

Page 248

1        BY MR. HOWIE:
2    Q    Let me make that clear.  I'm not asking
3    you to disclose the contents of any conversations
4    that you had with your counsel.  And if you can't
5    answer the question without doing that, let me
6    know.
7    A    I can't answer it.
8    Q    Can you tell me, if you remember, when
9    you prepared Exhibit 24?
10   A    It was on the 2nd of -- 1st of -- I mean
11   on the 28th of February.
12   Q    Is that the date you remember, or is
13   that written somewhere on the document?
14   A    No.  That's the date I remember.  I know
15   I prepared it before the day I took it to the
16   notary.
17   Q    The first paragraph on page 1 begins,
18   "Exxon refused to switch our fuel storage tanks to
19   match and accommodate the change that occurred in
20   our sales pattern-ratio."
21       Is this the fuel tank swap that we were
22   discussing earlier?

Page 249

1    A    Yes.
2    Q    The last sentence of that paragraph
3    reads, "We lost customer base, lost business and
4    our volume sales kept plunging."
5        How much -- let me start again.
6        This fuel tank swap situation, this
7    occurred in 2005?
8    A    No.  It went on over some years before
9    2005 when our volume sales changed.
10       I don't remember exactly what dates, but
11   it was a gradual change.  I don't remember.  It
12   might have been 2003 through '04, something like
13   that.
14   Q    And at some point, then, in 2004, it
15   sounds like the tanks were swapped so that the
16   regular tank was the largest tank in?
17       MR. IBE:  Objection.
18       THE WITNESS:  No, it wasn't swapped.
19       BY MR. HOWIE:
20   Q    Not swapped, but the lines were -- I
21   mean it was redesignated as?
22   A    No.  It was in late 2005 that he did it.

63 (Pages 246 to 249)

Page 294

1 incident that took place in September. That's the
2 one.
3    Q    My question was different. My question
4 was would you consider 20 days to be a few days?
5         MR. IBE: Objection. I will ask that
6 the witness be allowed to complete his previous
7 answer of correcting the month before you can ask
8 another question.
9         MR. HOWIE: I think he just did. He
10 said that November should have said September.
11        MR. IBE: Well, he was in the middle of
12 a sentence.
13        BY MR. HOWIE:
14   Q    Please go ahead and finish your answer.
15   A    Yes. The incident of -- I said it
16 before. The delivery of those gases -- I mean
17 those loads of gas on September 30th through
18 September 4th.
19   Q    Through October 4th?
20   A    Through -- through October 4th, yes.
21   Q    Are you done?
22   A    Yes.

Page 295

1    Q    My question is do you consider 20 days
2 to be a few days?
3    A    Consider 20 days to be a few days?
4 With -- I don't know. With reference to what?
5    Q    Do you understand what the word "few"
6 means?
7    A    Few?
8    Q    Yeah.
9    A    Well, if we are -- if our reference
10 point is 365 days of the year, 20 days may be a
11 few, depending on how you look at it for what
12 purpose --
13   Q    Isn't it a fact --
14   A    -- or not. So that's why I asked for
15 what reference. So what purpose?
16   Q    Is it your testimony that you're unable
17 to tell me whether 20 days is a few days?
18        MR. IBE: Objection. It's been asked
19 and answered. I know you don't like the answer
20 you got. He told you give him a reference point,
21 and he also supplied a reference point and
22 answered your question.

Page 296

1         BY MR. HOWIE:
2    Q    20 days in November -- 22 days in
3 November is over 75 percent of the month of
4 November?
5    A    22 days in a month; is that what you're
6 saying?
7    Q    Yeah. That's over 75 percent of the
8 month of November, isn't it?
9    A    I wouldn't say that's a few days in a
10 month. No, I wouldn't say that.
11   Q    You would say it's more than a few days?
12   A    I would not say that is a few days of
13 the month. No, it's not.
14   Q    I'm not sure I understand. Are you
15 telling me that -- let me ask it this way. Isn't
16 it the case that you were completely out of
17 gasoline in 2006 for far more than those 22 days
18 in November?
19        MR. JONAS: Objection. 22 days in
20 November?
21        MR. HOWIE: Yeah.
22        THE WITNESS: No.

Page 297

1         BY MR. HOWIE:
2    Q    It's your testimony under oath that you
3 were only out --
4    A    In the month of November.
5    Q    No. I'm asking all of 2006.
6         MR. JONAS: Objection. I don't know
7 what question is, all of 2006.
8         THE WITNESS: I don't understand your
9 question.
10        BY MR. HOWIE:
11   Q    Do you know how many days you were
12 completely out of fuel in 2006?
13   A    That whole year? No, I don't.
14   Q    Do you know whether -- if you could turn
15 back to Exhibit 17 --
16        MR. IBE: Which one is 17 again?
17        MR. HOWIE: It's December inventory.
18 I believe Exhibit 17, we've been
19 through, indicated that you were completely out of
20 gasoline from the 7th through the 14th?
21        MR. IBE: What page?
22        MR. HOWIE: Well, all three pages

75 (Pages 294 to 297)

Page 314

1      A    No.  I don't know how to put it.  They
2  just draft it and have us to sign it.  If we don't
3  agree with any part of it, you leave the business.
4      Q    Do you know whether or not your verbal
5  communications with Exxon were actually noted or
6  written down by Exxon?
7           MR. HOWIE:  Objection, calls for
8  speculation.
9           THE WITNESS:  I don't know if they write
10  down anything of our verbal communications.
11          BY MR. IBE:
12      Q    When you make phone calls to Exxon, do
13  you ever receive a recording that it warns you
14  that your phone call might be recorded?
15      A    Yes.
16          MR. IBE:  I have nothing further.
17          MR. HOWIE:  Okay.
18          (Whereupon, signature not having been
19          waived, the deposition was adjourned at
20          7:38 p.m.)
21
22

Page 315

1  Deponent Peter Amaefule c/o
2  Ibe Law Office
3  1717 K Street, N.W.
   Suite 600
4  Washington, D.C.  20036
5  Case: Amaefule v. ExxonMobil
   Date of deposition: 3/5/2007
6  Deponent: Peter Amaefule
7
8      Please be advised that the transcript in the above
9      referenced matter is now complete and ready for signature.
10     The deponent may come to this office to sign the transcript,
11     a copy may be purchased for the witness to review and sign,
12     or the deponent and/or counsel may waive the option of signing.
13     Please advise us of the option selected.
14
15     Please forward the errata sheet and the original signed
16     signature page to counsel noticing the deposition, noting the applicable
17     time period allowed for such by the governing Rules of Procedure.
18
       If you have any questions, please do not hesitate to call our office at
19     202-232-0646.
20  Sincerely,
21  Digital Evidence Group
    Copyright 2007 Digital Evidence Group
22  Copying is forbidden, including electronically, absent express written consent.

Page 316

1           CERTIFICATE OF NOTARY PUBLIC
2       I, DAWN A. JAQUES, a Notary Public in and for
3  the District of Columbia, before whom the foregoing
4  deposition was taken, do hereby certify that witness
5  whose testimony appears in the foregoing pages was
6  duly sworn by me; that the testimony of said witness
7  was taken by me in shorthand at the time and place
8  mentioned in the caption hereof and thereafter
9  reduced to typewriting under my supervision; that
10  said deposition is a true record of the testimony
11  given by said witness; that I am neither counsel
12  for, related to, nor employed by any of the parties
13  to the action in which this deposition is taken;
14  and, further, that I am not a relative or employee
15  of any attorney or counsel employed by the parties
16  thereto, nor financially or otherwise interested in
17  the outcome of the actions.
18
                    Dawn A. Jaques, C.S.R.
19                  Notary Public in and for
                    District of Columbia
20
    My commission expires:
21  December 14, 2010
22

Page 317

1       Digital Evidence Group, L.L.C.
2       1111 16th Street, Northwest, Suite 410
3       Washington, D.C. 20036
4       (202) 232-0646
5
6           SIGNATURE PAGE
6       Case Name:  Amaefule v. ExxonMobil
7
8       Witness Name:  Peter Amaefule
8       Deposition Date:  3/5/2007
9
10
11      I do hereby acknowledge that I have read
        and examined the foregoing pages
        of the transcript of my deposition and that:
12
13
14      (Check appropriate box):
15      ( ) The same is a true, correct and
            complete transcription of the answers given by
16          me to the questions therein recorded.
17      ( ) Except for the changes noted in the
            attached Errata Sheet, the same is a true,
18          correct and complete transcription of the
            answers given by me to the questions therein
19          recorded.
20
21
22  _____          _____
    DATE                 WITNESS SIGNATURE

Page 318

1    Digital Evidence Group, L.L.C.
2    1111 16th Street, Northwest, Suite 410
3    Washington, D.C. 20036
4    (202) 232-0646
5

    E R R A T A   S H E E T
6

    Case Name:  Amaefule v. ExxonMobil
7

    Witness Name:  Peter Amaefule
8

    Deposition Date:  3/5/2007
9

    Page No.   Line No.          Change
10
11
12
13
14
15
16
17
18
19
20
21

22    _____          _____
       Signature                    Date

# EXHIBIT 4

# (To Amaefule Deposition)

**EXXON COMPANY, U.S.A.**
6301 IVY LANE • GREENBELT, MARYLAND 20770

*Don Busby*

January 26, 1

MARKETING DEPARTMENT

*Peter —*

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

*this is all*
*that I have*

Peter Amaefule
Eastover Exxon
4650 South Capitol Street, S.E.
Washington, D.C.  20032

*Dan*
*3/25/98*

Dear Mr. Amaefule:

We previously warned you, by letters dated (January 3, 1997, March 6, 1997 and October 23, 1997), that your failure to timely pay in accordance with the terms of your Sales Agreement with Exxon could lead to termination and nonrenewal of your franchise agreements and franchise relationship with Exxon.

Despite those warnings the electronic funds transfer (EFT) debit of your bank account for motor fuel invoice number 303063 dated December 10, 1997, was returned unpaid by your bank.

Your failure to pay Exxon per the terms of your franchise agreements is ground for termination and nonrenewal of those agreements and is an event relevant to the franchise relationship for which termination and nonrenewal are reasonable under the Petroleum Marketing Practices Act. Additionally, your failure to pay Exxon per the perms of your sales agreement despite prior written warnings display a lack of good faith by you with respect to those franchise agreements.

For each of the above separate and distinct reasons, please be advised that Exxon hereby cancels, terminates and nonrenews, effective April 30, 1998 your Retail Service Station Lease, Retail Service Station Sales Agreement and related agreements, and the franchise relationship between Exxon company, U.S.A. and yourself relating to the captioned service station locations and the business conducted thereon.

Exxon also demands immediate payment of all sums due and owing by you to Exxon. Furthermore, all future payments for motor fuel purchases must be paid by Prepay Wire Transfer.

Please arrange to meet with your Territory Manager on or before the effective date of terminations and nonrenewal as state above to take the necessary steps to accomplish and orderly termination of our relationship.

A DIVISION OF EXXON CORPORATION

*Amaefule*
**EXHIBIT**
*3/5/07*
*4*
*DJ.*


RECYCLED

# EXHIBIT 6

# (To Amaefule Deposition)

**ExxonMobil**

436 Creamery Way, Suite 300  Exton, PA 19341-2556
CREDIT DEPARTMENT

**CERTIFIED MAIL**                                June 7, 2001
**RETURN RECEIPT REQUESTED**

                                                 Store #25050
                                                 RE: Account 2018865

*Peter Amaefule*
4650 S CAPITOL STREET SE
WASHINGTON, DC 20032

Our records show that ExxonMobil's electronic funds transfer (EFT) debit of your bank
account for payment of motor fuel invoice number 025449, for $15,144.33 was returned by
your bank unpaid and remains unpaid.

ExxonMobil hereby demands that your pay the referenced motor fuel invoice by 6/21/01.
Your failure to pay the returned draft by the above date could seriously jeopardize your
relationship with ExxonMobil.

You are required to pay the above listed invoice by wire transfer. Additionally, until
otherwise notified by ExxonMobil, payment for any future motor fuel purchases must be
made by Prepay Wire Transfer.

Complete instructions for Prepay Wire Transfer are enclosed. Your payment terms for
motor fuel cannot be changed back to EFT unless approved by ExxonMobil.

If you have any questions regarding this matter, please contact your Territory Manager
immediately.

                                    Sincerely,

                                    Exxon Mobil Corporation
                                    By: B. J. Clark
                                        B. J. Clark

Attachments

c:  J. R. Greco
    W. O. White, Jr.

Amaefule
EXHIBIT
3/5/07
O.J.

### Banking Instructions

When sending a wire transfer to ExxonMobil, you will need to include the information shown below. After your order is placed, it is put on hold until ExxonMobil receives the funds. Allow up to 5 business hours for the wire transfer to arrive at ExxonMobil's Bank and for ExxonMobil to be informed.

**Send the Wire Transfer to:**

    Chase Bank of Texas
    601 Travis Street
    Houston, Texas  77002
    ABA # 113000609

**For the Account of:**

    Credit Representative:   B. J. Clark
    Exxon Mobil Corporation
    800 Bell Street, Suite 3771
    Houston, Texas  77002
    TAX ID #135409005

**Bankwire Format**

    Dealer Wire Transfer Account

    Bank Account Number   **00100359430** (with no blanks between numbers)

    By Order of:

    Dealers ExxonMobil Trade Account number

    Service Station number                25050
    (all 5 digits, with no blanks between the digits)

    * Order Number          ######
    (all 6 digits, with no blanks between the digits
    *If sending a replacement Bankwire for a returned draft, please show
    invoice draft number, otherwise show order number.

Note:  Additional instructions to be given to the originating bank (Dealers's Bank):

1. Do not use dashes or spaces in the bank account number or in your ExxonMobil account or store numbers.

2. Leave the beneficiary bank (BBK) and intermediary bank fields blank on the fedwire format.

## FUEL CALCULATION WORKSHEET

After placing your order, complete this worksheet. It will assist you in figuring the amount of money to be prepaid via wire transfer to ExxonMobil. Included are instructions on the bank transaction portion of the PrePay Wire Transfer process.

**A.**        **How to figure the base cost of the motor fuel:**

| Grade | Gallons to Order | X | Base Price & Excise Taxes (1) | = | Price to Pay |
|-------|------------------|---|-------------------------------|---|--------------|
| Supreme |  | X |  | = |  |
| Plus |  | X |  | = |  |
| Regular |  | X |  | = |  |
| Diesel |  | X |  | = |  |
|  |  | Subtotal (A) $ |  |  |  |

(1) Use your current price, available through your POS system.

**B.**        **How to figure state and local taxes:**

| Type Tax | Gallons or Base Cost | X | Tax Rate, % or CPG (2) | = | Price to Pay |
|----------|---------------------|---|------------------------|---|--------------|
| State |  | X |  | = |  |
| Other |  | X |  | = |  |
|  |  | X |  | = |  |
|  |  | X |  | = |  |
|  |  | Subtotal (B) $ |  |  |  |

(2) State, local and other special tax information is detailed on your last gasoline invoice.

### Grand total to send to Exxon by Prepay Wire Transfer:

| Total Due (A+B) |
|-----------------|
| $ |

Before the load is released, ExxonMobil will compute the cost for your pending order and compare that with the money received from your wire transfer. The only difference between the money sent to ExxonMobil for this load and ExxonMobil's calculation of the money due should be the final gallons delivered, any difference in price caused by a price change from the time ordered/time delivered and differences related to temperature correction. Final billing is based upon the price in effect at the time of delivery. Providing the funds received are the same as the reconciled amount due, or reasonably close, the order will be dispatched. If the funds are not sufficient to cover the load, you will be contacted for the balance.

# EXHIBIT 7

# (To Amaefule Deposition)

ExxonMobil Fuels Marketing Company
Mid-Atlantic/South-East Business Unit

**ExxonMobil**
*Fuels Marketing*

June 24, 2005

PETER AMAEFULE
STATION # 25050
4650 S CAPITOL STREET SE
WASHINGTON, DC 20032

Re: Mystery Shopper 2005 YTD Results

Dear PETER AMAEFULE;

You are in receipt of this letter due to the poor performance you have shown regarding the Retail Image of the ExxonMobil facility you are operating. To date you have an average Mystery Shopper score of 39%, versus the Mid-Atlantic area's average score of 82%. These results are completely unacceptable and place you in jeopardy of loosing your franchise.

As outlined in your PMPA Franchise Agreement effective April 1, 2003 ,

Section 9.7:    'Customer Service.'   Franchise Dealer shall provide, and ensure that Franchise Dealer's employees and contractors are in approved uniform, provide, prompt, fair, courteous and efficient service to customers...

Section 9.8:    'Clean, Attractive and Functional Operations.'   Franchise Dealer shall maintain the Marketing Premises and all adjacent areas in clean, attractive and functional condition at all times...

Immediate attention is required by you to enhance the image of your facility. If a substantial improvement is not achieved at this facility, ExxonMobil will proceed with the termination process of your franchise agreement.

I will be contacting you to discuss opportunities on how to improve your Retail Excellence.

Sincerely;


Ron Alexandrowicz
Territory Manager

Cc:    John Bednash
       Paul Caponigro



# EXHIBIT 8

# (To Amaefule Deposition)

**ExxonMobil**
*Fuels Marketing*

3225 Gallows Rd
Fairfax, VA 22037

March 30, 2005

PETER AMAEFULE
EXXON SERVICE STATION
4650 S CAPITOL STREET SE
WASHINGTON, DC 20032

**Location: 25050**
**Minimum Volume Warning Letter**

Dear Dealer.

We are writing on behalf of ExxonMobil Oil Corporation ("ExxonMobil")  As an
ExxonMobil franchise dealer, your service station operations are subject to the provisions
of your PMPA Franchise Agreement effective 04/01/2003   Article 2 1(b) of your
Franchise Agreement contains specific provisions that govern the fuels purchase
obligations for your service station

A review of our records indicates that you failed to meet your purchase obligations for the
year 2004

| Purchase Obligations | Actual Purchases | % |
|---|---|---|
| 638,400 | 460,972 | 72 |

Your annual purchase obligation of **638,400** gallons represents 70% of your contract
volume  ExxonMobil considers the purchase obligation to be a material and significant
provision of your Franchise Agreement and the franchise relationship  Furthermore, the
sale of a minimum volume of fuels products is an important retailing and customer service
aspect of our business

You should take all necessary action to immediately correct this contract violation  Please
contact me if you have any questions, or if I can assist you in resolution of this matter

Sincerely

*John Bednash/kba*

John R  Bednash
Area Manager
Mid-Atlantic

CC  R  Alexandrowicz
L  Allam

EXXONMOBIL000149

Amaefule
EXHIBIT
8  3/5/07
D.J.

# EXHIBIT 14

# (To Amaefule Deposition)

Am... ule 000059

4091

EXHIBIT
Amoretile
14
3/5/07
07

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS#: ___

Business Name: Eastover Exxon    Retailer's Name: Peter Amberfield

Business Phone: 202 562 0693    Business Address: 4650 South Capitol St. SE Wash. DC

Quarter (Circle One) 1 2 3 4    Month: 7    Year: 06    Tank(s) #: ___    Total Capacity (Gals): 10,000    Contents: Regular

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st of Month Use Actual Stick Reading | | 2 Deliveries | | 3 Metered Sales | | 4 Total (Column 1+2+3+) | | 5 Closing Total Inventory (Dipstick Reading) | | 6 Closing Water Inventory (Dipstick Reading) | | 7 Closing Net Inventory (Column 5-6) | | 8 MTD Actual Variation (Subtract Column 4 From Column 7) | | 9 Prior To Delivery (Dipstick Reading) | | 10 After Delivery (Dipstick Reading) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gals. | In. | Gals. | In. | Gals. | | Gals. | | In. | Gals. | In. | Gals. | +/- Gals. | | In. | Gals. | In. | Gals. | | |

Annexfile 00060

SC281

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS#: _____   Business Name _____   Business Address _____   Retailer's Name _____

Business Phone _____   Quarter (Circle One) 1 2 3 4   Month **7**   Year 19 **2006**   Tank(s) # **3**   Total Capacity (Gals) **6,000**   Contents **Super**

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading (Gals.) | 2 Deliveries (Gals.) | 3 Metered Sales (Gals.) | 4 Total (Column 1+2+3=) (Gals.) | 5 Closing Total Inventory (Dipstick Reading) In. | Gals. | 6 Closing Water Inventory (Dipstick Reading) In. | Gals. | 7 Closing Net Inventory (Column 5 – 6=) Gals. | 8 MTD Actual Variation (Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. | Gals. | 10 After Delivery (Dipstick Reading) In. | Gals. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |

Amaefule 00061

4081

# INVENTORY RECONCILIATION

RETAILER to complete static for each product tank(s). Maintain copies for three years.

SS#: _____  Business Name _____  Business Address _____  Retailer's Name _____

Quarter (Circle One) 1 2 3 4   Month 7   Year 2005   Tank(s) # 2   Total Capacity (Gals.) 8000   Contents Plus

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2-3=) Gals. | 5 Closing Total Inventory (Dipstick Reading) In. / Gals. | 6 Closing Water Inventory (Dipstick Reading) In. / Gals. | 7 Closing Net Inventory (Column 5-6=) Gals. | 8 MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. / Gals. | 10 After Delivery (Dipstick Reading) In. / Gals. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |
| 11 | | | | | | | | | | |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | | | | | | | | | | |
| 16 | | | | | | | | | | |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |
| 19 | | | | | | | | | | |
| 20 | | | | | | | | | | |
| 21 | | | | | | | | | | |
| 22 | | | | | | | | | | |
| 23 | | | | | | | | | | |
| 24 | | | | | | | | | | |
| 25 | | | | | | | | | | |
| 26 | | | | | | | | | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |

# EXHIBIT 15

# (To Amaefule Deposition)

Amaefule 00062

EXHIBIT
15
Amaefule
3/18/05
O.J.

4081

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS# _____ Business Name Easterner Exxon  Retailer's Name Peter Amaefule

Business Phone 202 562 0649  Business Address 4603 South Capitol St SE DC

Quarter (Circle One) 1 2 3 4  Month 10  Year 06  Tank(s) # 1  Total Capacity (Gal) 10,000  Contents Regular

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stock Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2-3) Gals. | 5 Closing Total Inventory (Dipstick Reading) In. / Gals. | 6 Closing Water Inventory (Dipstick Reading) In. / Gals. | 7 Closing Net Inventory (Column 5 − 6) Gals. | 8 MTD Actual Variation (Subtract Column 4 From 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. / Gals. | 10 After Delivery (Dipstick Reading) In. / Gals. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 8800.3 | | 4714.76 | 8285.54 | 124 8207 | 0 | 8207 | +1.46 | | |
| 2 | 8285.54 | | 5563.54 | 6722.74 | 68.5 7242 | 0 | 7242 | +5.26 | | |
| 3 | 6722.74 | | 3576.50 | 7325.0 | 65 7332 | 0 | 7332 | +2.90 | | |
| 4 | 7325.0 | | 4204.39 | 8354.95 | 62 6977 | 0 | 6977 | +10.05 | | |
| 5 | 6954.95 | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | 4275 | | 4830.03 | 4785.5197 | 40.5 4065 | 0 | 4065 | +10.03 | | |
| 10 | 4485.97 | | 4336.88 | 4372.72 | 40.5 4350 | 0 | 4350 | +3.92 | | |
| 11 | 4237.72 | | 4751.58 | 3899.57 | 35.7 3876.58 | 0 | 3876 | −5.21 | | |
| 12 | 2809.57 | | 4809.19 | 4789.57 | 55.66 4721.14 | 0 | 4721.14 | −15.2 | | |
| 13 | 4721.14 | | 4092.82 | 3887.44 | 41.08 3855.58 | 0 | 3855.06 | −32.36 | | |
| 14 | 3877.42 | | 2462.44 | 2838.91 | 52.08 4052.06 | 0 | 4052.06 | −32.33 | | |
| 15 | 2838.91 | | 4601.69 | 4740.47 | 32.78 4785.98 | 0 | 4274 | −20.91 | | |
| 16 | 4740.47 | | 548.69 | 5473.78 | 17.16 1736.58 | 0 | 1736 | −29.14 | | |
| 17 | 1736.78 | | 2518.52 | 4251.32 | 125 1767.64 | 11 | 1767.64 | −57.14 | | |
| 18 | 4251.32 | | 4528.44 | | 10.01 1705.27 | 0 | 1704.47 | −57.28 | | |
| 19 | | | | | | | | | | |
| 20 | 4657.32 | | 344.78 | 509.54 | 2 446 | 0 | 446 | −40.54 | | |
| 21 | 509.54 | | 0 | 509.54 | 4.19 410 | 0 | 410 | −40.54 | | |
| 22 | 509.54 | | 0 | 509.54 | 4.19 410 | 0 | 410 | −40.54 | | |
| 23 | 509.54 | | 0 | 509.54 | 4.19 410 | 0 | 410 | −40.54 | | |
| 24 | 509.54 | | 0 | 509.54 | 4.19 410 | 0 | 410 | −40.54 | | |
| 25 | 509.54 | | 0 | 509.54 | 4.19 410 | 0 | 410 | −40.54 | | |
| 26 | 509.54 | | 0 | 509.54 | 4.19 410 | 0 | 410 | −40.54 | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |

Amaefule 00063

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS#: _____  Business Name: _____  Retailer's Name: _____

Business Phone: _____  Business Address: _____

Quarter (Circle One) 1 2 3 4   Month _____  Year 19 ___  Tank(s) # __3__  Total Capacity (Gals) _6,000_  Contents _Supreme_

4Q81

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st of Month Use Actual Stick Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2+3=) Gals. | 5 Closing Total Inventory (Dipstick Reading) In. Gals. | 6 Closing Water Inventory (Dipstick Readings) In. Gals. | 7 Closing Net Inventory (Column 5-6=) Gals. | MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. Gals. | 10 After Delivery (Dipstick Reading) In. Gals. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | |
| 2 | | | | | | | | | | |
| 3 | | | | | | | | | | |
| 4 | | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | | | | | | | | | | |
| 7 | | | | | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |
| 11 | | | | | | | | | | |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | | | | | | | | | | |
| 16 | | | | | | | | | | |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |
| 19 | | | | | | | | | | |
| 20 | | | | | | | | | | |
| 21 | | | | | | | | | | |
| 22 | | | | | | | | | | |
| 23 | | | | | | | | | | |
| 24 | | | | | | | | | | |
| 25 | | | | | | | | | | |
| 26 | | | | | | | | | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |

# INVENTORY RECONCILIATION

RETAILER to complete **daily** for each product tank(s). Maintain copies for three years.

Amaefule 00064

4091

SS# _____ Business Name _____ Year 19___ Month _____

Business Address _____ Retailer's Name _____

Business Phone _____ Tank(s) # __2__ Total Capacity (Gal.) __8,000__ Contents __Plus__

Quarter (Circle One) 1 2 3 4

| Date | 1. Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading Gals. | 2. Deliveries Gals. | 3. Metered Sales Gals. | 4. Total (Columns 1+2-3=) Gals. | 5. Closing Total Inventory (Dipstick Reading) In. | 5. Gals. | 6. Closing Water Inventory (Dipstick Readings) In. | 6. Gals. | 7. Closing Net Inventory (Column 5-6=) Gals. | 8. MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9. Prior To Delivery (Dipstick Reading) In. | 9. Gals. | 10. After Delivery (Dipstick Reading) In. | 10. Gals. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2906.8 | | 737.54 | 2169.24 | 44 | 2175.4 | 0 | 0 | 2175.4 | +10.11 | | | | |
| 2 | 2490.79 | | 177.99 | 2312.80 | 46 | 2323.3 | 0 | 0 | 2323.3 | +32.22 | | | | |
| 3 | 2377.87 | 1500 | 182.77 | 4711.73 | 92 | 4634.2 | 0 | 0 | 4634.2 | +17.82 | | | | |
| 4 | 4711.89 | | 195.51 | 4580.38 | 91 | 4634.2 | 0 | 0 | 4634.2 | +17.82 | | | | |
| 5 | | | | | | | | | 5=980 | | | | | |
| 6 | | | | | | | | | | | | | | |
| 7 | No MTD Var | | | | Started report - private broken | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | 4010.4 | | 192.30 | 2908.10 | 44 | 2980.25 | 0 | 0 | 2980.25 | -18.42 | | | | |
| 10 | 2413.05 | | 2461.37 | 3945.92 | 443 | 3777.82 | 0 | 0 | 3777.82 | -23.165 | | | | |
| 11 | 3797.91 | | 3,630.35 | 3,620.56 | 3207 | 3530.702 | 0 | 0 | 3530.702 | -17.02 | | | | |
| 12 | 3206.56 | | 3,210.40 | 3235.560 | 401 | 3262.8 | 0 | 0 | 3262.8 | -17.03 | | | | |
| 13 | 3213.40 | | 212.77 | 3412.77 | 3923 | 3097.3 | 0 | 0 | 3097.3 | -12.83 | | | | |
| 14 | 3113.19 | | 239.04 | 2874.15 | 3201 | 3633.9 | 0 | 0 | 3633.9 | +14.95 | | | | |
| 15 | 2874.15 | | 94.25 | 2789.19 | 2173.4 | 2778.4 | 0 | 0 | 2778.4 | -10.52 | | | | |
| 16 | 2759.34 | | 253.58 | 2953.54 | 82 | 2956.10 | 0 | 0 | 2956.10 | +10.81 | | | | |
| 17 | 2533.34 | | 203.92 | 9213.44 | 31.44 | 2824.42 | 0 | 0 | 2824.42 | +11.07 | | | | |
| 18 | 2513.44 | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | |
| 20 | 2913.19 | | 2361.19 | 473.15 | 291.05 | 291.65 | 0 | 0 | 291.65 | -21.12 | | | | |
| 21 | 2975.25 | | 3391.59 | 643.82 | 641.0 | 591.0 | 0 | 0 | 591.0 | -21.82 | | | | |
| 22 | 643.43 | | 310.02 | 431.62 | 8.7 | 375 | 0 | 0 | 375 | -55.160 | | | | |
| 23 | 375.44 | | | 4690.84 | 8.7 | 375 | 0 | 0 | 375 | -55.64 | | | | |
| 24 | 4600.84 | | 0 | 4600.84 | 8.7 | 2325 | 0 | 0 | 2325 | +2.600 | | | | |
| 25 | 4600.84 | | 0 | 4600.84 | 8.7 | 2375 | 0 | 0 | 2375 | +1.64 | | | | |
| 26 | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |

# EXHIBIT 16

# (To Amaefule Deposition)

Amaefule 00065

EXHIBIT
16 · 3/15/05 · O.J.
Amaefule

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

Business Name _EniSoviex Exxon_  Retailer's Name _Peter Amaefule_

Business Address _4500 South Capitol St SE Wash. DC_

Business Phone _____

Quarter (Circle One) 1 2 3 4  Month _11_  Year _2005_  Tank(s) # _1_  Total Capacity (Gals) _10,000_  Contents _Reg_

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2+3=) Gals. | 5 Closing Total Inventory (Dipstick Reading) In. | Gals. | 6 Closing Water Inventory (Dipstick Readings) In. | Gals. | 7 Closing Net Inventory (Column 5 - 6=) Gals. | 8 MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. | Gals. | 10 After Delivery (Dipstick Reading) In. | Gals. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | | | | | | | | | | | | | | |

Annaefule 00066

## INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS# _____  Business Name _____

Business Phone _____  Business Address _____  Retailer's Name _____

Quarter (Circle One) 1 2 3 4  Month 11  Year 19 _____  Tank(s) # 3  Total Capacity (Gals) 25,00  Contents Subremile

4081

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2-3) Gals. | 5 Closing Total Inventory (Dipstick Readings) In. Gals. | 6 Closing Water Inventory (Dipstick Readings) In. Gals. | 7 Closing Net Inventory (Column 5 - 6) Gals. | 8 MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. Gals. | 10 After Delivery (Dipstick Reading) In. Gals. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 265 | 1 | 0 | 262 | 8 | 265 | 1 | 344 | 6 | 257 | 6 |
| 2 | 262 | | 0 | 262 | 8 | 262 | 8 | 344 | 9 | 257 | 9 |
| 3 | | | | | | | | | | | |
| 4 | | | | | | | | | | | |
| 5 | | | | | | | | | | | |
| 6 | | | | | | | | | | | |
| 7 | | | | | | | | | | | |
| 8 | | | | | | | | | | | |
| 9 | | | | | | | | | | | |
| 10 | | | | | | | | | | | |
| 11 | | | | | | | | | | | |
| 12 | | | | | | | | | | | |
| 13 | | | | | | | | | | | |
| 14 | | | | | | | | | | | |
| 15 | | | | | | | | | | | |
| 16 | | | | | | | | | | | |
| 17 | | | | | | | | | | | |
| 18 | | | | | | | | | | | |
| 19 | | | | | | | | | | | |
| 20 | | | | | | | | | | | |
| 21 | ↓ | | | | | | | | | | |
| 22 | | | | | | | | | | | |
| 23 | 226 | 13.51 | | 1567 | | | 144 9 | | | | |
| 24 | | | | | | | | | | | |
| 25 | | | | | | | | | | | |
| 26 | | | | | | | | | | | |
| 27 | | | | | | | | | | | |
| 28 | | | | | | | | | | | |
| 29 | | | | | | | | | | | |
| 30 | | | | | | | | | | | |
| 31 | | | | | | | | | | | |

# INVENTORY RECONCILIATION

Amnaefule 00067

4Q81

RETAILER to complete daily for each product tank(s).  Maintain copies for three years.

SS# _____  Business Name _____  Business Address _____  Retailer's Name _____

Quarter (Circle One)  1  2  3  4    Month _11_  Year 19 ___  Tank(s) # _2_    Total Capacity (Gals) _8,000_  Contents _Plus_

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading | | 2 Deliveries | | 3 Metered Sales | | 4 Total (Columns 1+2-3=) | | 5 Closing Total Inventory (Dipstick Readings) | | 6 Closing Water Inventory (Dipstick Readings) | | 7 Closing Net Inventory (Column 5-6=) | | 8 MTD Actual Variation (subtract Column 4 From Column 7) | | 9 Prior To Delivery (Dipstick Reading) | | 10 After Delivery (Dipstick Reading) | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gals. | | Gals. | | Gals. | | Gals. | | In. | Gals. | In. | Gals. | | Gals. | | +/- Gals. | In. | Gals. | In. | Gals. |
| 1 | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | 1801 | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | |

# EXHIBIT 17

# (To Amaefule Deposition)

Supreme

Amasfile 00068

4021

EXHIBIT
Annexture
17    3/5/07
OJ.

# INVENTORY RECONCILIATION

**RETAILER to complete daily for each product tank(s). Maintain copies for three years.**

Business Name _____  Business Address _East Texas Exxon_  Retailer's Name _____

SSN _____  Business Phone _____

Quarter (Circle One) 1 2 3 4   Month _12_  Year _2006_  Tank(s) # _5_   Total Capacity (Gals) _12000_  Contents _Supreme_

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading | | 2 Deliveries | | 3 Metered Sales | | 4 Total (Columns 1+2+3=) | | 5 Closing Total Inventory (Dipstick Readings) | | | 6 Closing Water Inventory (Dipstick Reading) | | | 7 Closing Net Inventory (Column 5-6=) | | 8 MTD Actual Variation (Subtract Column 4 From Column 7) | | 9 Prior To Delivery (Dipstick Reading) | | | 10 After Delivery (Dipstick Reading) | | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | Gals. | | Gals. | | Gals. | | Gals. | | In. | Gals. | | In. | Gals. | | Gals. | | +/- Gals. | | In. | Gals. | | In. | Gals. |
| 1 | | | | | | | | | | | | | | | | | | | | | | | |
| 2 | | | | | | | | | | | | | | | | | | | | | | | |
| 3 | | | | | | | | | | | | | | | | | | | | | | | |
| 4 | | | | | | | | | | | | | | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | | | | | | | | | | |
| 6 | | | | | | | | | | | | | | | | | | | | | | | |
| 7 | | | | | | | | | | | | | | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | | | | | | | | | | |
| 15 | | | | | | | | | | | | | | | | | | | | | | | |
| 16 | | | | | | | | | | | | | | | | | | | | | | | |
| 17 | | | | | | | | | | | | | | | | | | | | | | | |
| 18 | | | | | | | | | | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | | | | | | | | | | |
| 20 | | | | | | | | | | | | | | | | | | | | | | | |
| 21 | | | | | | | | | | | | | | | | | | | | | | | |
| 22 | | | | | | | | | | | | | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | | | | | | | | | | |
| 24 | | | | | | | | | | | | | | | | | | | | | | | |
| 25 | | | | | | | | | | | | | | | | | | | | | | | |
| 26 | | | | | | | | | | | | | | | | | | | | | | | |
| 27 | | | | | | | | | | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | | | | | | | | | | |

Amaceflue 00069

4Q01

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS#' _____  Business Name _Gasoline Sexton_  Retailer's Name _____

Business Address _____

Business Phone _____

Quarter (Circle One) 1 2 3 4   Month _12_   Year _2005_   Tank(s) # _2_   Total Capacity (Gals.) _8000_   Contents _Plus_

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2-3=) Gals. | 5 Closing Total Inventory (Dipstick Readings) In. Gals. | 6 Closing Water Inventory (Dipstick Readings) In. Gals. | 7 Closing Net Inventory (Column 5 - 6=) Gals. | 8 MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. Gals. | 10 After Delivery (Dipstick Reading) In. Gals. |
|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 1703.77 | | 344.05 | 2046.82 | | | | | | |
| 2 | 2046.82 | | 250.47 | 2297.09 | | | | | | |
| 3 | 2297.09 | | 417.56 | 2879.58 | | | | | | |
| 4 | 2879.58 | | | | | | | | | |
| 5 | | | | | | | | | | |
| 6 | 2879.58 | | 13 269.59 | 2610.99 | | | | | | |
| 7 | 2610.99 | | 0 | 2610.99 | | | | | | |
| 8 | | | | | | | | | | |
| 9 | | | | | | | | | | |
| 10 | | | | | | | | | | |
| 11 | | | | | | | | | | |
| 12 | | | | | | | | | | |
| 13 | | | | | | | | | | |
| 14 | | | | | | | | | | |
| 15 | 2610.99 | 1800 | | | 36 1873-0 | 0 | 1878.0 | | | |
| 16 | | | | | 1776.57 0 | 0 | 1776.52 | | | |
| 17 | | | | | | | | | | |
| 18 | | | | | | | | | | |
| 19 | | | 1810.22 | | | | | | | |
| 20 | | | 1444.44 | | | | | | | |
| 21 | 1224.34 | | 189.37 | 1144.97 | 10.98 11442.0 | 0 | 1142.5 | -0.98 | | |
| 22 | | | | | | | | | | |
| 23 | | | | | | | | | | |
| 24 | 648.6 | | 152.85 | 494.25 | 10.74 507.14 | 0 | 507.14 | +12.29 | | |
| 25 | 494.75 | | 85.30 | 409.45 | 9.25 409.44 | 0 | 409.44 | =9.45 | | |
| 26 | 409.45 | | 85.28 | 319.69 | 8 321 | 0 | 321 | -18.87 | | |
| 27 | | | | | | | | | | |
| 28 | | | | | | | | | | |
| 29 | | | | | | | | | | |
| 30 | | | | | | | | | | |
| 31 | | | | | | | | | | |

Annaefule 00070

4091

Regular

# INVENTORY RECONCILIATION

RETAILER to complete daily for each product tank(s). Maintain copies for three years.

SS# _____  Business Name _Gastiver Exxon_  Retailer's Name _Victor for Anaefule_

Business Phone _202-582-0602_  Business Address _4450 South Capital St SE Wash DC_

Quarter (Circle One) 1 2 3 4  Month _12_  Year _199_  Tank(s) # _1_  Total Capacity (Gals) _12,000_  Contents _Regular_

| Date | 1 Open Inventory (Yesterday's Col. #4) 1st Of Month Use Actual Stick Reading Gals. | 2 Deliveries Gals. | 3 Metered Sales Gals. | 4 Total (Columns 1+2-3-4) Gals. | 5 Closing Total Inventory (Dipstick Readings) In. | Gals. | 6 Closing Water Inventory (Dipstick Readings) In. | Gals. | 7 Closing Net Inventory (Column 6-5a) Gals. | 8 MTD Actual Variation (Subtract Column 4 From Column 7) +/- Gals. | 9 Prior To Delivery (Dipstick Reading) In. | Gals. | 10 After Delivery (Dipstick Reading) In. | Gals. |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| 1 | 2627.99 | | 277.70 | 2350.29 | | | | | | | | | | |
| 2 | 2352.14 | | 123.75 | 2228.71 | | | | | | | | | | |
| 3 | 2228.71 | | 369.2 | | | | | | | | | | | |
| 4 | 2008.71 | | | 2008.71 | | | | | | | | | | |
| 5 | | | | | | | | | | | | | | |
| 6 | | | 7448.82 | 555.18 | | | | | | | | | | |
| 7 | 555.18 | | 0 | 555.18 | | | | | | | | | | |
| 8 | | | | | | | | | | | | | | |
| 9 | | | | | | | | | | | | | | |
| 10 | | | | | | | | | | | | | | |
| 11 | | | | | | | | | | | | | | |
| 12 | | | | | | | | | | | | | | |
| 13 | | | | | | | | | | | | | | |
| 14 | | | | | | | | | | | | | | |
| 15 | 555.18 | 5698 | 2428.17 | 5859.97 | 58.9 | 5830.9 | .8 | 12 | 5817.93 | -24 | | | | |
| 16 | | | | | 54.4 | 5444.9 | .8 | 12 | 5433.86 | | | | | |
| 17 | | | | | 48.04 | 5326.4 | .8 | 12 | 5312.4 | | | | | |
| 18 | | | | | | | | | | | | | | |
| 19 | | | | | | | | | | | | | | |
| 20 | | | 4274.90 | | | | | | | | | | | |
| 21 | 3772 | | 44.94 | 3627 | 35.4 | 3524. | .8 | 12 | 3744.90 | +802.96 | | | | |
| 22 | | | 0 | | | | | | | | | | | |
| 23 | | | | | | | | | | | | | | |
| 24 | 2374.97 | | 298.08 | 1075.97 | 14.3 | 1028.9 | .8 | 12 | 1028.17 | +445.75 | | | | |
| 25 | 1075.97 | | 362.23 | 1702.24 | | 1702 | .8 | 12 | 1694 | -45.75 | | | | |
| 26 | 1702.74 | | 4215.58 | 1291.16 | | 978 | .8 | 12 | 980 | 291.16 | | | | |
| 27 | | | | | | | | | | | | | | |
| 28 | | | | | | | | | | | | | | |
| 29 | | | | | | | | | | | | | | |
| 30 | | | | | | | | | | | | | | |
| 31 | | | | | | | | | | | | | | |

# EXHIBIT 18

# (To Amaefule Deposition)

Eastover Exxon
4650 South Capitol St, SE.
Washington DC 20032

PROFIT OR LOSS Statement for YEAR 2006.

Revenue:

|  | Sales | Profit |
|---|---|---|
| Fuel (gallons) 226,933 | $ 602,139.39 | $ 29,790.62 |
| Groceries | 366,845.00 | 102,716.60 |
| Repair Shop (labor) | 42,000.00 | 21,000.00 |
| Repair Shop (Sales) | 18,000.00 | 6,480.00 |
| Rebates | 5,200.00 | 5,200.00 |
|  | $ 1,034,184.39 | $ 165,166.62 |

EXPENSE:

| rent | $ 74,700.00 |
|---|---|
| equipment fees | 7,700.00 |
| accounting & bookkping | 5,800.00 |
| payroll | 34,200.00 |
| credit card processing fees | 13,870.00 |
| insurance | 7,800.00 |
| legal fees | 7,500.00 |
| utilities | 18,000.00 |
| taxes & licenses | 21,540.00 |
| advertising & promotion | 1,200.00 |
| miscellaneous | 6,400.00 |
| repairs | 4,200.00 |
| equipment purchase | 4,950.00 |
| credit financing | 11,400.00 |
| uniforms | 950.00 |
| cleaning & maintenance | 8,246.00 |
| damages & losses | 3,100.00 |
|  | $ 231,556.00 |



Amaefule
EXHIBIT
18    3/5/07
D.J.

Amaefule 00045

Net: -$ 66,439.38
loss

# EXHIBIT B

## (Declaration of Ron Alexandrowicz)

UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA

|  |  |  |
|---|---|---|
| PETER AMAEFULE, | ) | |
| Plaintiff, | ) ) ) | |
| v. | ) ) | Civil Action No. 1:06CV02087 |
| EXXONMOBIL OIL CORPORATION, | ) ) | |
| Defendant. | ) ) ) | |

## DECLARATION OF RON ALEXANDROWICZ

I, **Ron Alexandrowicz**, under penalty of perjury, declare as follows:

1.      I am a Territory Manger with ExxonMobil Oil Corporation ("ExxonMobil"), a subsidiary of Exxon Mobil Corporation. In that capacity, I have responsibility for Exxon-branded dealer franchisees in Washington, D.C. and portions of Maryland. I have held my current position since January 1, 2005, and I have worked for ExxonMobil for over ten years. I have previously submitted declarations in this case on two occasions: on December 11, 2006 in support of ExxonMobil's Opposition to Plaintiff's Motion for a Temporary Restraining Order and Preliminary Injunction, and on February 8, 2007 in support of ExxonMobil's Motion for Summary Judgment. I submit this declaration in support of ExxonMobil's Opposition to Plaintiff's Motion for Summary Judgment. This declaration is based on my personal knowledge.

2.      I have reviewed a handwritten statement submitted by Mr. Amaefule in support of his summary judgment motion. In it, he makes reference to the recent replacement of the "skirts" on the fuel dispensers at his station. This upgrade was unrelated to Mr. Amaefule's termination, or to this lawsuit. In fact, the skirts on Mr. Amaefule's fuel dispensers were replaced as part of an image upgrade program. Many ExxonMobil stations in the Mid-Atlantic Business Unit received the same upgrade during this time period.

3.    Attached as Exhibit 1 to my declaration is a true and correct copy of a summary January 2007 Inventory Management Report for Mr. Amaefule's station, reflecting the daily inventory levels in each of his three underground storage tanks.

4.    Attached as Exhibit 2 to my declaration is a true and correct copy of a summary February 2007 Inventory Management Report for Mr. Amaefule's station, reflecting the daily inventory levels in each of his three underground storage tanks.

5.    Attached as Exhibit 3 to my declaration is a true and correct copy of a summary Inventory Management Report for March 1-15, 2007 for Mr. Amaefule's station, reflecting the daily inventory levels in each of his three underground storage tanks.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 15, 2007.

_____
Ron Alexandrowicz

# EXHIBIT 1

## To Alexandrowicz
## Declaration

# Performance Analysis: Inventory Management

01/01/2007 – 01/31/2007

**Customer:** **ExxonMobil**
3225 Gallows Rd
Fairfax
VA
22037

**Created:** **02/28/2007 07:35 AM**



| Product | Date | Read (Average) |
|---------|------|----------------|
| PLUS | 12/31/2006 | 330 |
| | 01/01/2007 | 330 |
| | 01/02/2007 | 330 |
| | 01/03/2007 | 330 |
| | 01/04/2007 | 330 |
| | 01/05/2007 | 330 |
| | 01/06/2007 | 2086 |
| | 01/07/2007 | 1948 |
| | 01/08/2007 | 1825 |
| | 01/09/2007 | 1722 |
| | 01/10/2007 | 1647 |
| | 01/11/2007 | 1530 |
| | 01/12/2007 | 1243 |
| | 01/13/2007 | 986 |
| | 01/14/2007 | 938 |
| | 01/15/2007 | 876 |
| | 01/16/2007 | 795 |

# Performance Analysis: Inventory Management

01/01/2007 – 01/31/2007     Customer:    **ExxonMobil**
**3225 Gallows Rd**
**Fairfax**
**VA**
**22037**

Created:    **02/28/2007 07:35 AM**

| Product | Date | Read (Average) |
|---------|------|----------------|
| | 01/17/2007 | 580 |
| | 01/18/2007 | 330 |
| | 01/19/2007 | 329 |
| | 01/20/2007 | 330 |
| | 01/21/2007 | 330 |
| | 01/22/2007 | 329 |
| | 01/23/2007 | 329 |
| | 01/24/2007 | 329 |
| | 01/25/2007 | 329 |
| | 01/26/2007 | 329 |
| | 01/27/2007 | 329 |
| | 01/28/2007 | 329 |
| | 01/29/2007 | 329 |
| | 01/30/2007 | 329 |
| | 01/31/2007 | 329 |
| REGULAR | 12/31/2006 | 4113 |
| | 01/01/2007 | 3725 |
| | 01/02/2007 | 3226 |
| | 01/03/2007 | 2712 |
| | 01/04/2007 | 2224 |
| | 01/05/2007 | 1707 |
| | 01/06/2007 | 3759 |
| | 01/07/2007 | 3352 |
| | 01/08/2007 | 3098 |
| | 01/09/2007 | 2763 |
| | 01/10/2007 | 2431 |
| | 01/11/2007 | 2052 |
| | 01/12/2007 | 1702 |
| | 01/13/2007 | 1292 |
| | 01/14/2007 | 1086 |
| | 01/15/2007 | 895 |
| | 01/16/2007 | 602 |
| | 01/17/2007 | 404 |
| | 01/18/2007 | 404 |
| | 01/19/2007 | 403 |
| | 01/20/2007 | 403 |
| | 01/21/2007 | 4461 |
| | 01/22/2007 | 4136 |
| | 01/23/2007 | 3858 |
| | 01/24/2007 | 3555 |
| | 01/25/2007 | 3270 |

# Performance Analysis: Inventory Management

**01/01/2007 – 01/31/2007**          **Customer:**   **ExxonMobil**
                                                     **3225 Gallows Rd**
                                                     **Fairfax**
                                                     **VA**
                                                     **22037**

                                       **Created:**    **02/28/2007 07:35 AM**

| Product | Date | Read (Average) |
|---|---|---|
| | 01/26/2007 | 2933 |
| | 01/27/2007 | 2651 |
| | 01/28/2007 | 2441 |
| | 01/29/2007 | 2155 |
| | 01/30/2007 | 1835 |
| | 01/31/2007 | 1417 |
| SUPREME | 12/31/2006 | 246 |
| | 01/01/2007 | 246 |
| | 01/02/2007 | 247 |
| | 01/03/2007 | 247 |
| | 01/04/2007 | 247 |
| | 01/05/2007 | 247 |
| | 01/06/2007 | 1456 |
| | 01/07/2007 | 1376 |
| | 01/08/2007 | 1252 |
| | 01/09/2007 | 1148 |
| | 01/10/2007 | 1055 |
| | 01/11/2007 | 979 |
| | 01/12/2007 | 842 |
| | 01/13/2007 | 699 |
| | 01/14/2007 | 626 |
| | 01/15/2007 | 571 |
| | 01/16/2007 | 505 |
| | 01/17/2007 | 441 |
| | 01/18/2007 | 302 |
| | 01/19/2007 | 246 |
| | 01/20/2007 | 246 |
| | 01/21/2007 | 1501 |
| | 01/22/2007 | 1267 |
| | 01/23/2007 | 1104 |
| | 01/24/2007 | 856 |
| | 01/25/2007 | 662 |
| | 01/26/2007 | 406 |
| | 01/27/2007 | 267 |
| | 01/28/2007 | 233 |
| | 01/29/2007 | 234 |
| | 01/30/2007 | 235 |
| | 01/31/2007 | 235 |

# EXHIBIT 2

## To Alexandrowicz Declaration

# Performance Analysis: Inventory Management

02/01/2007 – 02/28/2007        **Customer:**  **ExxonMobil**
                                             **3225 Gallows Rd**
                                             **Fairfax**
                                             **VA**
                                             **22037**

                               **Created:**   **02/28/2007 07:32 AM**



Performanance Analysis

Other Id(s): 25050

| Product | Date | Read (Average) |
|---------|------|----------------|
| PLUS | 01/31/2007 | 329 |
| | 02/01/2007 | 329 |
| | 02/02/2007 | 329 |
| | 02/03/2007 | 329 |
| | 02/04/2007 | 329 |
| | 02/05/2007 | 329 |
| | 02/06/2007 | 329 |
| | 02/07/2007 | 329 |
| | 02/08/2007 | 329 |
| | 02/09/2007 | 1643 |
| | 02/10/2007 | 1975 |
| | 02/11/2007 | 1881 |
| | 02/12/2007 | 1738 |
| | 02/13/2007 | 1609 |
| | 02/14/2007 | 1498 |
| | 02/15/2007 | 1405 |
| | 02/16/2007 | 1337 |

# Performance Analysis: Inventory Management

02/01/2007 – 02/28/2007

**Customer:** **ExxonMobil**
**3225 Gallows Rd**
**Fairfax**
**VA**
**22037**

**Created:** **02/28/2007 07:32 AM**

| Product | Date | Read (Average) |
|---|---|---|
| | 02/17/2007 | 1130 |
| | 02/18/2007 | 967 |
| | 02/19/2007 | 826 |
| | 02/20/2007 | 498 |
| | 02/21/2007 | 336 |
| | 02/22/2007 | 1586 |
| | 02/23/2007 | 1389 |
| | 02/24/2007 | 1210 |
| | 02/25/2007 | 961 |
| | 02/26/2007 | 880 |
| | 02/27/2007 | 691 |
| | 02/28/2007 | 499 |
| REGULAR | 01/31/2007 | 1417 |
| | 02/01/2007 | 944 |
| | 02/02/2007 | 459 |
| | 02/03/2007 | 404 |
| | 02/04/2007 | 404 |
| | 02/05/2007 | 404 |
| | 02/06/2007 | 404 |
| | 02/07/2007 | 404 |
| | 02/08/2007 | 404 |
| | 02/09/2007 | 2278 |
| | 02/10/2007 | 2560 |
| | 02/11/2007 | 2238 |
| | 02/12/2007 | 1924 |
| | 02/13/2007 | 1658 |
| | 02/14/2007 | 1454 |
| | 02/15/2007 | 1239 |
| | 02/16/2007 | 912 |
| | 02/17/2007 | 596 |
| | 02/18/2007 | 404 |
| | 02/19/2007 | 404 |
| | 02/20/2007 | 404 |
| | 02/21/2007 | 404 |
| | 02/22/2007 | 2782 |
| | 02/23/2007 | 2398 |
| | 02/24/2007 | 1855 |
| | 02/25/2007 | 1310 |
| | 02/26/2007 | 1114 |
| | 02/27/2007 | 704 |
| | 02/28/2007 | 416 |

# Performance Analysis: Inventory Management

**02/01/2007 – 02/28/2007**    **Customer:**    **ExxonMobil**
**3225 Gallows Rd**
**Fairfax**
**VA**
**22037**

**Created:**    **02/28/2007 07:32 AM**

| Product | Date | Read (Average) |
|---------|------|----------------|
| SUPREME | 01/31/2007 | 235 |
| | 02/01/2007 | 235 |
| | 02/02/2007 | 235 |
| | 02/03/2007 | 235 |
| | 02/04/2007 | 235 |
| | 02/05/2007 | 235 |
| | 02/06/2007 | 235 |
| | 02/07/2007 | 235 |
| | 02/08/2007 | 235 |
| | 02/09/2007 | 1188 |
| | 02/10/2007 | 1395 |
| | 02/11/2007 | 1238 |
| | 02/12/2007 | 1150 |
| | 02/13/2007 | 993 |
| | 02/14/2007 | 926 |
| | 02/15/2007 | 880 |
| | 02/16/2007 | 739 |
| | 02/17/2007 | 569 |
| | 02/18/2007 | 487 |
| | 02/19/2007 | 397 |
| | 02/20/2007 | 246 |
| | 02/21/2007 | 246 |
| | 02/22/2007 | 1968 |
| | 02/23/2007 | 1825 |
| | 02/24/2007 | 1626 |
| | 02/25/2007 | 1458 |
| | 02/26/2007 | 1434 |
| | 02/27/2007 | 1331 |
| | 02/28/2007 | 1140 |

# EXHIBIT 3

## To Alexandrowicz Declaration

## Performance Analysis: Inventory Management

03/01/2007 – 03/15/2007      **Customer:**   **ExxonMobil**
                                              **3225 Gallows Rd**
                                              **Fairfax**
                                              **VA**
                                              **22037**

                              **Created:**   **03/15/2007 09:57 AM**



### Performanance Analysis
#### Other Id(s): 25050

Product(s)
● PLUS
■ REGULAR
★ SUPREME

| Product | Date | Read (Average) |
|---------|------|----------------|
| PLUS | 02/28/2007 | 441 |
| | 03/01/2007 | 331 |
| | 03/02/2007 | 330 |
| | 03/03/2007 | 331 |
| | 03/04/2007 | 331 |
| | 03/05/2007 | 331 |
| | 03/06/2007 | 330 |
| | 03/07/2007 | 330 |
| | 03/08/2007 | 330 |
| | 03/09/2007 | 330 |
| | 03/10/2007 | 330 |
| | 03/11/2007 | 330 |
| | 03/12/2007 | 330 |
| | 03/13/2007 | 330 |
| | 03/14/2007 | 330 |
| | 03/15/2007 | 330 |
| REGULAR | 02/28/2007 | 408 |

# Performance Analysis: Inventory Management

**03/01/2007 – 03/15/2007**          **Customer:**  **ExxonMobil**
**3225 Gallows Rd**
**Fairfax**
**VA**
**22037**

**Created:**     **03/15/2007 09:57 AM**

| Product | Date | Read (Average) |
|---------|------|----------------|
|  | 03/01/2007 | 404 |
|  | 03/02/2007 | 404 |
|  | 03/03/2007 | 1561 |
|  | 03/04/2007 | 1654 |
|  | 03/05/2007 | 1340 |
|  | 03/06/2007 | 937 |
|  | 03/07/2007 | 549 |
|  | 03/08/2007 | 405 |
|  | 03/09/2007 | 405 |
|  | 03/10/2007 | 404 |
|  | 03/11/2007 | 404 |
|  | 03/12/2007 | 404 |
|  | 03/13/2007 | 404 |
|  | 03/14/2007 | 404 |
|  | 03/15/2007 | 404 |
| SUPREME | 02/28/2007 | 1094 |
|  | 03/01/2007 | 626 |
|  | 03/02/2007 | 243 |
|  | 03/03/2007 | 1079 |
|  | 03/04/2007 | 1343 |
|  | 03/05/2007 | 1157 |
|  | 03/06/2007 | 885 |
|  | 03/07/2007 | 581 |
|  | 03/08/2007 | 322 |
|  | 03/09/2007 | 246 |
|  | 03/10/2007 | 246 |
|  | 03/11/2007 | 247 |
|  | 03/12/2007 | 247 |
|  | 03/13/2007 | 247 |
|  | 03/14/2007 | 247 |
|  | 03/15/2007 | 247 |

# EXHIBIT C

# (Declaration of Brian Howie)

# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| PETER AMAEFULE, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | Civil Action No. 1:06CV02087 |
| | ) | |
| EXXONMOBIL OIL CORPORATION, | ) | |
| | ) | |
| Defendant. | ) | |
| | ) | |

## DECLARATION OF BRIAN A. HOWIE

I, **Brian A. Howie**, under penalty of perjury, declare as follows:

1.      I am a partner in the law firm of Howrey LLP, which is counsel for defendant ExxonMobil Oil Corporation ("ExxonMobil") in this litigation. I submit this declaration in support of ExxonMobil's Opposition to Plaintiff's Motion For Summary Judgment. I have personal knowledge of the matters set forth in this declaration, and I have reviewed all documents attached as exhibits.

2.      Attached as Exhibit 1 to this declaration is a true and correct copy of a letter I sent to Peter C. Ibe, Esq., counsel for plaintiff, on February 2, 2007.

3.      Attached as Exhibit 2 to this declaration is a true and correct copy of a letter I sent to Peter C. Ibe, Esq., counsel for plaintiff, on February 14, 2007.

4.      Attached as Exhibit 3 to this declaration is a true and correct copy of a second letter I sent to Peter C. Ibe, Esq., counsel for plaintiff, on February 14, 2007.

5.      Attached as Exhibit 4 to this declaration is a true and correct copy of a letter I sent to Peter C. Ibe, Esq., counsel for plaintiff, on February 20, 2007.

6.      Attached as Exhibit 5 to this declaration is a true and correct copy of a letter I sent to Peter C. Ibe, Esq., counsel for plaintiff, on March 7, 2007.

7.     Attached as Exhibit 6 to this declaration is a true and correct copy of a letter I sent to Peter C. Ibe, Esq., counsel for plaintiff, on March 14, 2007.

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.  Executed on March 15, 2007.

_____
Brian A. Howie

# EXHIBIT 1

# To Howie Declaration

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Brian A. Howie**
Partner
T 202.383.6876
F 202.383.6610
howieb@howrey.com

February 2, 2007

<u>BY EMAIL AND REGULAR MAIL</u>

Peter C. Ibe
1717 K. Street, N.W.
Suite 600
Washington, D.C. 20036

Re:    *Amaefule v. ExxonMobil Oil Corporation*
<u>No. 1:06-02087-RWR (D.D.C.)</u>

Dear Peter:

I am writing in response to your January 29, 2007 e-mail regarding the categories of documents that you have requested in this case.

As an initial matter, I would like to reiterate what I told you on Monday – namely, that your list was significantly longer than what I expected to see, given our agreement to proceed (at the Court's suggestion) under Fed. R. Civ. P. 65(a)(2) with an expedited schedule for resolution of the merits, in the form of early summary judgment motions. Given the short deadlines and the narrow issue presented here (whether or not ExxonMobil's termination of plaintiff's franchise complied with the PMPA), thirty-four categories of documents – many of which have no relevance to plaintiff's claim – is excessive.

Nevertheless, I am prepared to provide documents that relate to plaintiff's claim. Thus, ExxonMobil will produce whatever non-privileged, responsive documents it possesses that are responsive to Nos. 11-16 and 26-30.

With respect to Nos. 8-10, the crux of plaintiff's allegations is that ExxonMobil manipulates its fuel deliveries to franchise dealers (in disregard of its automated system that monitors dealer fuel inventory and schedules fuel deliveries) in tandem with increases (or decreases) in the dealer tankwagon (DTW) price.[1]  I do not believe that the "method, practice and procedure" by which ExxonMobil sets its DTW prices is relevant to those allegations.

---

[1]    The DTW price is the price paid by the dealer to ExxonMobil for gasoline. That price is set by ExxonMobil.

AMSTERDAM  BRUSSELS  CHICAGO  EAST PALO ALTO  HOUSTON  IRVINE  LONDON
LOS ANGELES  NEW YORK  NORTHERN VIRGINIA  PARIS  SALT LAKE CITY  SAN FRANCISCO  TAIPEI  WASHINGTON, DC

# HOWREY LLP

Peter C. Ibe
February 2, 2007
Page 2

Nevertheless, I do agree that plaintiff is entitled to some limited discovery on its allegations. Thus, ExxonMobil will produce, for the time period January 1, 2006 through December 31, 2006: (a) the DTW prices for plaintiff's price zone; (b) a summary document reflecting the daily inventory readings in each of plaintiff's three underground storage tanks; and (c) a summary document reflecting all fuel deliveries to plaintiff's station. Additionally, ExxonMobil will make available for deposition a witness (or witnesses) to testify generally about (a) ExxonMobil's automated inventory and ordering system; and (b) the method by which DTW prices are set.

With respect to the remaining categories, ExxonMobil will not produce any documents. For many of these categories (as explained *infra*), ExxonMobil would not have any documents to produce in any event:

Nos. 1, 3-4 and 7: The price of crude oil is not relevant to any of the claims or defenses in this case. Moreover, ExxonMobil does not have any "role" in determining the price of crude oil.

Nos. 2 and 5-6: ExxonMobil does not set the retail price of gasoline, except at its company-operated stations.[2] Plaintiff is a dealer-operated station, and in such cases, "Franchise Dealer shall determine its own retail prices, pricing policies and discounting policies." (PMPA Franchise Agreement, § 9.20).

Nos. 17-21, 24: The sole issue in this case is whether ExxonMobil's termination of plaintiff complies with the PMPA. Terminations of other franchise dealers – whether or not upheld by a court – are not relevant to that issue.[3] Likewise, whether or not ExxonMobil's decision to provide plaintiff with less than 90 days' notice was reasonable depends on the circumstances of this case only.

No. 22: This case has nothing to do with price gouging or collusion with other oil companies.

No. 23: The testimony of an ExxonMobil official before a judicial or legislative body has nothing to do with this case.

Nos. 25, 34: Plaintiff was not terminated for "failing to have available for sale all grades of gasoline." Thus, these requests are not relevant.

Nos. 32-33: There is no allegation in this case that ExxonMobil's termination of plaintiff was retaliation for plaintiff's participation in a lawsuit against (or cooperation in an investigation of) ExxonMobil. Nor can any "punitive or adverse action(s)" taken by ExxonMobil against one of its own officers or employees (for any reason) have any relevance to plaintiff's claim here.

---

[2]    There are no allegations in this case that relate to company-operated stations.

[3]    Some of these requests (Nos. 19-21) are not even limited to provisions of the PMPA that are at issue here.

**HOWREY** LLP

I look forward to speaking with you regarding these issues.

Sincerely,

Brian A. Howie

# EXHIBIT 2

## To Howie Declaration

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Brian A. Howie**
Partner
T 202.383.6876
F 202.383.6610
howieb@howrey.com

February 14, 2007

BY EMAIL AND REGULAR MAIL

Peter C. Ibe
1717 K. Street, N.W.
Suite 600
Washington, D.C. 20036

> Re:  *Amaefule v. ExxonMobil Oil Corporation*
>      **No. 1:06-02087-RWR (D.D.C.)**

Dear Peter:

I write in response to your February 3 e-mail concerning my letter of February 2. I want to make clear that I did not treat your initial list of categories as "formal" document requests to which a whole panoply of objections had to be served. In the spirit of our agreement (at the Court's suggestion) to expedite the resolution of this case, I decided that it made more sense simply to identify those categories in response to which ExxonMobil would produce documents and, separately, explain why ExxonMobil believed the remaining categories were neither relevant nor reasonably calculated to lead to the discovery of admissible evidence.

Because your e-mail mentions potentially litigating these issues, however, I want to make clear that ExxonMobil's objections were not limited to the grounds set forth in my letter and that ExxonMobil is not waiving any other objections. Thus, ExxonMobil makes the following additional objections to plaintiff's 34 categories:[1]

Nos. 1, 3-4, 7:  These requests are unintelligible because they suggest that ExxonMobil has a "role" in the determination of (and/or receives advance notice of increases or decreases in) the market price of crude oil. The requests are also overbroad and unduly burdensome.

Nos. 2, 5-6:  These requests are unintelligible to the extent they suggests that ExxonMobil has a "role" in the determination of (and/or receives advance notice of increases or decreases in) the retail price of gasoline at dealer-operated stations. As I explained in my previous letter, ExxonMobil sets the retail price of gasoline only at its company-operated

---

[1] You did not specify a time period in your initial e-mail conveying the 34 categories. ExxonMobil objects on overbreadth and undue burden grounds to all requests to the extent they are not limited to the time period January 1, 2006 to December 31, 2006.

# HOWREY LLP

stations.  To the extent plaintiff seeks documents about that practice, the request is also overbroad and unduly burdensome.

Nos. 8-9:  These requests are overbroad and unduly burdensome to the extent they seek information on ExxonMobil's setting of DTW prices for any price zone other than the price zone in which plaintiff operated.  As I stated on Friday, ExxonMobil will make available for deposition a witness (or witnesses) to testify about (a) ExxonMobil's automated inventory and ordering system; and (b) the general method by which DTW prices are set.

No. 10:  This request is overbroad and unduly burdensome to the extent it seeks information on the inventory levels at any service station other than plaintiff's station.

Nos. 17-21, 24-25:  These requests are overbroad and unduly burdensome because they seek documents pertaining to all ExxonMobil terminations of its franchisees; they are not limited to ExxonMobil's termination of plaintiff's franchise.  Moreover, Request Nos. 19-20 are not even limited to terminations.

No. 22:  This request is overbroad and unduly burdensome because it is not limited to DTW prices (which is the only price that plaintiff paid).

No. 23:  This request is overbroad and unduly burdensome because it contains no limitation on subject matter.

No. 31-32:  These requests are overbroad and unduly burdensome because they are not limited to any prior disputes between ExxonMobil and plaintiff or any alleged participation by plaintiff in an investigation of or lawsuit against ExxonMobil.

No. 33:  This request is overbroad and unduly burdensome because it involves all current and former employees of ExxonMobil and is not tied in any way to ExxonMobil's dealings with its dealer franchisees.

No. 34:  This request is unintelligible because ExxonMobil did not terminate plaintiff for failing to sell specific grades of gasoline.

I look forward to speaking with you regarding these issues.

Sincerely,

Brian A. Howie

# EXHIBIT 3

## To Howie Declaration

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Brian A. Howie**
Partner
T 202.383.6876
F 202.383.6610
howieb@howrey.com

February 14, 2007

BY EMAIL AND REGULAR MAIL

Peter C. Ibe
1717 K. Street, N.W.
Suite 600
Washington, D.C. 20036

   Re: *Amaefule v. ExxonMobil Oil Corporation*
      No. 1:06-02087-RWR (D.D.C.)

Dear Peter:

   I am writing in response to your February 3, 2007 e-mail regarding additional categories of documents you have requested in this case. In response, ExxonMobil states that it will produce non-privileged, responsive documents it possesses responsive to Request Nos. 1, 2, 6, and 7. I am treating Nos. 1 and 2 as identical and will produce a complete printout of plaintiff's account with ExxonMobil Oil Corporation for calendar year 2006. Plaintiff has no separate account with Exxon Mobil Corporation.

   ExxonMobil will not produce any documents in response to the remaining categories. For some of these categories (as explained *infra*), ExxonMobil would not have any documents to produce in any event:

   Nos. 3-4: These requests seek documents that are not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence. The requests are also overbroad, unintelligible, vague and ambiguous and unduly burdensome. Finally, some of the information sought is available from public sources.

   No. 5: This request is unintelligible because ExxonMobil does not have the DTW prices of its competitors. The request is also not relevant to the subject matter of this case and not reasonably calculated to lead to the discovery of admissible evidence, because plaintiff paid ExxonMobil's DTW price, not the DTW price of any ExxonMobil competitor. Finally, the request is overbroad and unduly burdensome.

# HOWREY LLP

Peter C. Ibe
February 14, 2007
Page 2

No. 8:  This request is unintelligible.  ExxonMobil has not asserted any bases for its termination of plaintiff's PMPA franchise other than those set forth in the November 20, 2006 Notice of Termination.

I look forward to speaking with you regarding these issues.

Sincerely,

*Brian A Howie*

Brian A. Howie

# EXHIBIT 4

## To Howie Declaration

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Brian A. Howie**
Partner
T 202.383.6876
F 202.383.6610
howieb@howrey.com

February 20, 2007

BY EMAIL AND FEDERAL EXPRESS

Peter C. Ibe
1717 K. Street, N.W.
Suite 600
Washington, D.C. 20036

> Re: *Amaefule v. ExxonMobil Oil Corporation*
> No. 1:06-02087-RWR (D.D.C.)

Dear Peter:

Enclosed please find non-privileged documents that ExxonMobil is producing, as set forth in my letters of February 2 and February 14, 2007. The documents are Bates-stamped EM000001 to 000256. Although ExxonMobil may produce a few additional documents later this week, the enclosed material represents the bulk of our production.

Consistent with my February 2 and February 14 letters, I reiterate that ExxonMobil will make available for deposition a witness (or witnesses) to testify about (a) ExxonMobil's automated inventory and ordering system; and (b) the general method by which DTW prices are set. Please let me know what your availability is over the next two weeks, so that we may schedule the deposition.

In addition, I still have not received any documents from plaintiff in response to ExxonMobil's informal document requests. You had told me several weeks ago that the documents would be forthcoming. Please let me know when we will receive the documents.

Finally, we need to schedule a date for plaintiff's deposition. I am available on the following days:

> Friday, Feb. 23
> Monday, Feb. 26 (afternoon only)
> Tuesday, Feb. 27 (anytime after 10:30 a.m.)
> Wednesday, Feb. 28

# HOWREY

Peter C. Ibe
February 20, 2007
Page 2

Given the March 1 deadline for filing summary judgment motions, I would prefer to take the deposition *before* Feb. 28, but if necessary I will take the deposition that day.  Of course, I will need plaintiff's documents prior to taking his deposition.

I look forward to speaking with you regarding these issues.

Sincerely,

Brian A. Howie

# EXHIBIT 5

# To Howie Declaration

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Brian A. Howie**
Partner
T 202.383.6876
F 202.383.6610
howieb@howrey.com

March 7, 2007

BY EMAIL AND REGULAR MAIL

Peter C. Ibe
1717 K. Street, N.W.
Suite 600
Washington, D.C. 20036

**Re:**    ***Amaefule v. ExxonMobil Oil Corporation***
           ***No. 1:06-02087-RWR (D.D.C.)***

Dear Peter:

        I write to remind you that, during his March 5, 2007 deposition, Mr. Amaefule agreed to search for and produce, to the extent they exist, the following categories of documents:

1.    Tax returns for 2006, when they become available;

2.    Documents regarding an alleged 1998 "inspection" of Eastover Exxon by ExxonMobil (allegedly indicating that the station should be renovated);

3.    Bills of lading from fuel deliveries for 2006 reflecting those fuel loads for which there was "no room" in plaintiff's underground storage tanks and which therefore were taken away by the tanker truck; and

4.    Inventory reconciliation sheets for the months of January, February, March, April, May, June, August and September 2006.

These categories are based on my notes and recollection of the deposition; thus, I reserve the right to modify this list when I review the transcript later this week. I look forward to receiving the above-listed documents from Mr. Amaefule at his earliest possible convenience.

        I also would like to renew my offer to make available for deposition a witness or witnesses to testify about (1) ExxonMobil's automated fuel inventory system; and (2) the method by which DTW prices are set for plaintiff's price zone.[1] As I have mentioned before, your taking

---

[1]    ExxonMobil already has produced documents sufficient to show plaintiff's daily inventory level (in each of his three underground storage tanks), as well as the daily DTW price in plaintiff's price zone, for all of 2006.

# HOWREY LLP

these depositions would be without prejudice to your seeking the production of those documents identified during the deposition(s) that are relevant to plaintiff's claims. I would urge you to reconsider your apparent decision to decline my offer. In light of the streamlined and accelerated procedure under which we are operating, depositions are more productive and far more likely to provide you with the information you seek regarding these subjects than overbroad and unduly burdensome document requests.

Sincerely,

Brian A. Howie

cc: Victor Mba-Jonas, Esq. (by mail)

# EXHIBIT 6

# To Howie Declaration

# HOWREY LLP

1299 Pennsylvania Avenue, NW
Washington, DC 20004-2402
www.howrey.com

**Brian A. Howie**
Partner
T 202.383.6876
F 202.383.6610
howieb@howrey.com

March 14, 2007

BY EMAIL AND REGULAR MAIL

Peter C. Ibe
1717 K. Street, N.W.
Suite 600
Washington, D.C. 20036

Re:    *Amaefule v. ExxonMobil Oil Corporation*
            **No. 1:06-02087-RWR (D.D.C.)**

Dear Peter:

I write in response to that portion of your e-mail of March 14, 2007 that relates to plaintiff's request for documents and ExxonMobil's response.

Your e-mail asks for the "documents which you have not produced." ExxonMobil disputes your contention that it has been remiss in its production of documents. As you may recall, you served us with (an unreasonable) *42* separate requests on January 29 and February 3, 2007. As I explained in detail in my letters of February 2 and February 14, many of these requests were overbroad, unduly burdensome and not relevant. We readily concede that ExxonMobil did not produce documents in response to all 42 of those requests. Such a production would take months.

ExxonMobil did, however, produce documents in response to many of plaintiff's requests, on February 20, 2007. Further, ExxonMobil has repeatedly offered in writing to make available witnesses for deposition on the issues of (1) the general method of setting of DTW prices; and (2) ExxonMobil's automated fuel inventory system. (*See, e.g.,* Feb. 2, Feb. 14, Feb. 20, and Mar. 7 letters). As I explained, those depositions would be taken by you without prejudice to requesting documents identified during the depositions. Given the accelerated schedule under which we are operating, I continue to believe that this is the quickest and most efficient way for you to obtain information on these two subjects.

I am not sure whether your e-mail is a request that ExxonMobil produce in response to all of the requests to which ExxonMobil did not previously produce documents or whether you intended to follow-up on just one or two of the requests. In either case, I believe you have an affirmative obligation (as would I) to meet and confer with me in a good-faith attempt to reach some accommodation on the scope of the requests. *See* LCvR 7(m). It may be that there is some subset of documents in response

# HOWREY LLP

Peter C. Ibe
March 14, 2007
Page 2

to some of your requests that ExxonMobil would be willing to produce.  I have stated in all of my letters that I remain ready and willing to discuss these issues with you, but you have never asked to schedule a meet and confer on these requests.  If those discussions are not fruitful, then at that time you may take whatever other steps you feel are appropriate to compel the production of the documents (*e.g.*, a motion to compel).

Sincerely,

Brian A. Howie

BAH:ra

cc:  Victor Mba-Jonas, Esq. (by mail)

DM_US:20290826_2