**IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

| | |
|---|---|
| **PETER AMAEFULE** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )Civil Action No: 1:06-cv-02087-RWR |
| | ) |
| **EXXONMOBIL OIL CORPORATION** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

**PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S
MOTION FOR SUMMARY JUDGMENT**

Plaintiff, Peter Amaefule, through undersigned counsel, Peter C. Ibe, Esquire, and Victor Mba-Jonas, Esquire, and files this memorandum of law in opposition to Defendant's motion for summary judgment. Plaintiff incorporates by reference the Verified Complaint and exhibits, the motion for preliminary injunction and supporting memorandum, and plaintiff's motion for summary judgment and the attached affidavit.

**INTRODUCTION**

As alleged in the Complaint, the Plaintiff's association with the Exxon began in 1990 when the Plaintiff entered into a Trial Franchise Agreement with Exxon with respect to the gasoline station located at 4650 South Capitol Street, SE, Washington, DC 20032 (hereinafter the "Marketing Premises").   After the trial period, in 1991, Plaintiff entered into a full-fledged Franchise Agreement with the Defendant (the 1991 Franchise Agreement). Pursuant to that agreement, Plaintiff, as a franchisee, operated a gasoline station, selling motor fuel and other products supplied the Defendant (franchisor). The

Plaintiff and the Defendant have been renewing this franchise agreement periodically until the present time.

On December 14, 2005, Plaintiff and Defendant entered into a PMPA Franchise Agreement for the premises located at 4650 South Capitol Street, SE, Washington, DC 20032 (hereinafter the "Marketing Premises"). This new Franchise Agreement renewed the parties' existing franchise relationship whereby Plaintiff agreed to lease the Marketing Premises from Defendant and purchase motor fuels from Defendant for resale to the motoring public. The effective date of the new Franchise Agreement (the 2006 Franchise Agreement) was April 1, 2006 and the expiration date is March 31, 2009. Under the provisions of the PMPA, pursuant to the Franchise Agreement, Plaintiff is the franchisee and Defendant is the Franchisor. The PMPA governs the termination or non-renewal of the 2006 Franchise Agreement.

In its business dealings with the Plaintiff, Exxon utilizes an electronic or computerized system or device to monitor the Plaintiff's gasoline inventory. Exxon also uses the same system in dealing with other franchisees. Under this system, if Exxon notices that Plaintiff gasoline inventory is diminishing or significantly diminishing, Exxon initiates the supply of more gasoline to the Plaintiff. This system virtually eliminates the need for Plaintiff to request more gasoline supply from Exxon. In theory, this system also eliminates the possibility or likelihood that Exxon would attempt to supply gasoline to the Plaintiff when the Plaintiff has full gasoline inventory (or enough gasoline inventory) and no need or room for further supply of gasoline by Exxon.

Plaintiff's Complaint alleges that the Defendant's business practices, pricing practices and marketing practices significantly contributed or caused to Plaintiff's

financial problems, which ultimately resulted in Plaintiff's failure to sell gasoline at his gasoline station for a period of a few days. Thus, Exxon is a direct and/or indirect cause of the Plaintiff's alleged failure to sell motor fuel at his station for a few days.

It is significant to note that even though Plaintiff did not sell motor fuel for a few days at his Exxon Station, Plaintiff ensured that the premises always remained open for business, with respect to other aspects of the business such as the mechanics shop, the snack shop, and the sale of other motor fuel and automobile-related products.

By letter dated November 20, 2006 (the "Termination Notice"), Exxon notified Peter Amaefule that it is terminating the franchise and franchise relationship effective December 8, 2006 "based upon [Peter Amaefule's] failure to operate [his] service station for the sale of motor fuel for at least seven (7) consecutive days, beginning on October 30, 2006 continuing through and possibly beyond November 19, 2006." The Termination Notice also indicates that the termination is based on "[Peter Amaefule's] violation of Articles 2.1 and IX of the Franchise Agreement, which requires [Plaintiff] to use [his] best efforts to maximize the sale of ExxonMobil's motor fuel products at [Plaintiff's] station."  The Termination Notice further provides that "[p]ursuant to Article XIV of the Franchise Agreement and Sections 2802(b)(2)(A), 2802(b)(2)(C) of the PMPA, Exxon hereby terminates its Franchise Agreement, franchise, and franchise relationship with you ..." The Termination Notice states that the termination is "final and irrevocable."

## ARGUMENT

## LEGAL STANDARD

## A. SUMMARY JUDGMENT

A party is entitled to summary judgment where "there is no genuine issue as to any material fact and ... the moving party is entitled to a judgment as a matter of law." Fed. R.Civ.P. 56(c). Rule 56 "mandates the entry of summary judgment, after adequate time for discovery and upon motion, against a party who fails to make a showing sufficient to establish the existence of an element essential to the party's case, and on which the party will have the burden of proof at trial." *Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986). Once the movant demonstrates the absence of a material fact, the nonmovant must go beyond the pleadings and produce specific facts showing that there is a genuine issue for trial. *See Celotex*, 477 U.S. at 325.

### B. PMPA

In 1978, Congress enacted Title I of the PMPA to protect petroleum franchisees from arbitrary termination or nonrenewal of their franchises. *See Barnes v. Gulf Oil Corp.*, 795 F.2d 358, 360 (4th Cir. 1986) (*"Barnes I"*). Central to the concern of Congress was the use by franchisors of contract termination as a remedy for contract violations. As the legislative history indicates:

> Commonly the franchisor is able to capitalize on his disparity of bargaining power to obtain great flexibility with respect to his rights to terminate the contractual relationship. As a result, termination of franchise agreements during the term as a remedy for contract violations has been repeatedly utilized.

S. Rep. No. 731, 9th Cong., 2nd Sess. 18, reprinted, 1978 U.S. Code Cong. & Admin. News 873, 875-77. Congress enacted the PMPA to protect franchisees "from arbitrary or discriminatory termination or non-renewal of their franchises." S. REP. No. 95-731, at 15 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873, 874. "Numerous allegations have been made before congressional committees investigating petroleum marketing problems that

4

terminations and non-renewals, or threats of termination or non-renewal, have been used by franchisors to compel franchisees to comply with marketing policies of the franchisor." *Id.* at 17, 1978 U.S.C.C.A.N. at 876. In light of the disparity of bargaining power disadvantaging the franchisee, Congress limited the situations in which a franchisor may terminate or fail to renew an agreement. The PMPA generally prohibits termination of a franchise or nonrenewal of a franchise relationship unless the franchisor both complies with the notification provisions of the statute and bases its decision upon a ground described in the statute. 15 U.S.C. § 2802(a). The PMPA was intended to remedy the disparity of bargaining power between franchisors and franchisees, and to preserve "the competitive influence of independent franchisees in the marketplace." *Roberts v. Amoco Oil Company*, 740 F.2d 602, 612 (8th Cir. 1984). *See also Ellis v. Mobil Oil Corp.*, 969 F.2d 754, 755 (9th Cir. 1993) (finding "overriding purpose of the PMPA is to protect the franchisee's reasonable expectation of continuing the franchise relationship").

As remedial legislation, the PMPA must be construed liberally, consistent with its primary goal of protecting franchisees. *See, Khorenian v. Union Oil Co. of Calif.*, 16 F.2d 533, 535 (9th Cir. 1985), cited with approval in *Barnes II*, 824 F.2d at 305. The PMPA seeks to achieve its goals by "specifically set [ting] forth the permissible grounds for termination or nonrenewal of franchise relationships, and bestow[ing] on federal courts jurisdiction to remedy violations of the [PMPA]." *Doebereiner v. Sohio Oil Co.*, 880 F.2d 329, 332 (11th Cir. 1989), *amended on den. of pet. for reh.*, 893 F.2d 1274 (11th Cir. 1989). Under the PMPA, the termination of a petroleum franchise is barred unless the termination meets specific statutory justifications. *See Darling v. Mobil Oil Corp.*, 864 F.2d 981, 984 (2nd Cir. 1989). As described in *Bridges Enters, v. Exxon Co. U.S.A.*,

820 F.2d 123, 124 (5th Cir. 1987), "[t]he statute is exclusive: a franchisor may terminate or nonrenew a franchise only if its action is based on a permitted ground, and only if the stringent notification requirements of Section 2804 have been met." *See also Barnes I*, 795 F.2d at 361. Where a franchisor bases its termination on a breach of the agreement, it must be shown that the termination was in fact based on the breach. *Reyes v. Atlantic Richfield Co.*, 12 F.3d 1464, 1469 (9th Cir. 1993).

### PMPA's Strict Notice Requirement.

Under the PMPA, 90 days notice is the statutory norm. *See*, 15 U.S.C. § 2804(a). Only in those extreme cases where giving 90 days notice is not reasonable is the franchisor excused from the 90 days requirement and in that instance, notice is to be given "on the earliest date on which furnishing of such notification is reasonably practicable." 15 U.S.C. § 2804(b). Courts have cautioned that "the 90-days notice ordinarily required by the PMPA should not be lightly excused." *Wisser Co. Inc. v. Mobil Oil Co.*, 730 F.2d 54, 60 (2d Cir. 1984). Moreover, the "less than 90 days notice requirement is not an 'all or nothing' requirement that permits no notice at all when 90 days would be unreasonable." *Zipper v. Sun Company, Inc.*, 947 F. Supp. 62, 69 (E.D.N.Y. 1996).

### PMPA CASE LAW IN THE DISTRICT OF COLUMBIA CIRCUIT

Plaintiff's research has revealed only a handful of case in the D.C. Circuit dealing with the PMPA. *See e.g. Sawyer v. BP Oil, Inc*., 619 F.Supp. 1268 (D.C.D.C.,1985); *Anderson v. Chevron Corp.,* 933 F.Supp. 52 (D.C.D.C.,1996); Oparaocha v. Sun Co., Inc., 3 F.Supp.2d 4 (D.C.D.C.,1998); *Rising Micro, L.L.C. v. Exxon Mobil Oil Corp.*, 2006 WL 1193839 (D.D.C.); *Hoai v. Sun Refining & Marketing Co*., 1991 WL 242116

(D.D.C.); *Johnson v. Amoco Oil Co*., 790 F.Supp. 335 (D.C.D.C.,1992); *Razavi v. Amoco Oil Co.*, 41 F.3d 1549 (C.A.D.C.,1994), Razavi v. Amoco Oil Co., 833 F.Supp. 1 (D.D.C.,1993); *Lewis v. Exxon Corp.*, 716 F.2d 1398 (C.A.D.C.,1983). However, none of the above cases addressed the specific issues involved in this case nor do they involve facts identical or analogous to the facts of the present case. In short, Plaintiff's research did not reveal any mandatory legal authority from the D.C. Circuit dealing with the specific facts and issues involved in this case.

### FRANCHISE TERMINATION UNDER THE PMPA

The PMPA governs when an oil company may terminate its franchise relationships. *See* 15 U.S.C. §§ 2801-2806. The PMPA authorizes termination of a petroleum franchise if either of the following occurs: the franchisee fails to "comply with any provision of the franchise, which provision is both reasonable and of material significance to the franchise relationship ...;" or upon the "occurrence of an event which is relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable." 15 U.S.C. §§ 2802(b)(2)(A) & (C).

The PMPA allows a franchisor to terminate a franchise relationship upon the occurrence of certain events. Twelve examples of events "relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the franchise relationship is reasonable" are listed in § 2802(c). In the present case, Exxon sought to terminate Plaintiff's franchise pursuant to PMPA, § 2802(c)(9)(A) ("failure by the franchisee to operate the marketing premises for . . . 7 consecutive days." PMPA, § 2802(c)(9)(A)).

## THERE WAS NO FAILURE BY PLAINTIFF TO OPERATE THE MARKETING PREMISES FOR SEVEN CONSECUTIVE DAYS

In cases of statutory construction, the court is to interpret the words of the statute in light of the purposes Congress sought to serve." ***Chapman v. Houston Welfare Rights Organization***, 441 U.S. 600, 608, 99 S.Ct. 1905, 1911, 60 L.Ed.2d 508 (1979); ***see Veracka v. Shell Oil Co***., 655 F.2d 445, 448 (1st Cir. 1981) (15 U.S.C. s 2802(c)(4)). "In expounding a statute, we must not be guided by a single sentence or member of a sentence, but look to the provision of the whole law, and to its object and policy." United ***States v. Heirs of Boisdore***, 49 U.S. (8 How.) 113, 122, 12 L.Ed. 1009 (1849); ***Philbrook v. Glodgett***, 421 U.S. 707, 713, 95 S.Ct. 1893, 1898, 44 L.Ed.2d 525 (1975).

The relevant section of PMPA, 15 U.S.C § 2802(c)(9)(A), provides that the franchise may be terminated for "[the franchisee's] failure to operate the marketing premises for 7 consecutive days, on any shorter period of time, which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate." By its very language, the above section of the PMPA deals with complete failure to operate the marketing premises, not just failure to sell gasoline. Thus, if the franchisee continues to operate the marketing premises with respect to other aspects of the business (such as the sale of other items, the operation of the mechanics shop, etc), even if the franchisee fails to sell gasoline for a seven-day period, the above section of the PMPA does not mandate or even permit the termination of the franchise. There is nothing in the PMPA that specifically construes the operation of the marketing premises as restricted only to the sale of motor fuel.

The United State Congress, in 15 U.S.C § 2802(c)(9)(A), could have specifically provided that a franchise could be terminated based on "the franchisee's failure to sell

motor fuel for 7 consecutive days, or any shorter period of time, which, taking into account facts and circumstances, amounts to an unreasonable period of time not to operate." Yet, Congress did not make such a provision. Congress's decision not to permit termination simply for failure to sell motor fuel is quite consistent with the express purpose behind the enactment of the PMPA – to protect to protect franchisees (who have inferior bargaining power to those of franchisors) from arbitrary termination or nonrenewal of their franchises. In enacting the PMPA, Congress did not equate failure to operate the marketing premises with failure to sell motor fuel.

Defendant glosses over the pivotal issue in this case, namely, what constitutes operation of the marketing premises for purposes of termination under the PMPA. Defendant seems to argue that the term the operation of the marketing premises is restricted to the sale of motor fuel.

One of the biggest flaws in Defendant's argument is the language of the PMPA itself. The section of the PMPA on which Defendant based its termination decision provides that a franchise can be terminated for "failure by the franchisee to operate the marketing premises for . . . 7 consecutive days." PMPA, § 2802(c)(9)(A). There is nothing in the language of section 2802(c)(9)(A) that states or suggests that operation of the marketing premises should be restricted to the sale of motor fuel. Further, there is nothing in the language of section 2802(c)(9)(A) that states or suggests that failure to sell motor fuel is equivalent to failure to operate the marketing premises should be restricted to the sale of motor fuel.

If Congress had intended to equate failure to sell motor fuel with failure to operate the marketing premises, Congress would have so stated. Indeed, in some parts or sections of

the PMPA, Congress used the term motor fuel, and in other parts or sections of the PMPA, Congress used the term marketing premises. These terms were not used interchangeably in the PMPA. Congress's specific use of the term motor fuel in some instances, and its use of the term marketing premises in other instances clearly indicate that Congress is well aware that the operation of the marketing premises is not synonymous with the sale of motor fuel. For instance, in making provisions for pre-1978 franchises, Congress stated as follows in pertinent part:

"In the case of any franchise entered into prior to June 19, 1978, and in the case of any franchise entered into or renewed on or after such date (the term of which is 3 years or longer, or with respect to which the franchisee was offered a term of 3 years or longer), a determination made by the franchisor in good faith and in the normal course of business to withdraw from the **marketing of motor fuel** through retail outlets in the relevant geographic market area in which the **marketing premises** are located, if …"

15 USC section 2802(b)(2)(E) (emphasis added).

The excerpt quoted above shows that Congress can, and did use the term "marketing of motor fuel" when it meant to do so, and Congress can and did use the term "marketing premises" when it mean to do so. Therefore, there is simply no basis to assume or conclude that in section 2802(c)(9)(A), Congress meant to use the term "failure to sell or market motor fuel" – rather than the actual language used in that section, namely, "failure to operate the marketing premises."

In section 2802(b)(3)(B), nonrenewal of a franchise is permitted based on

> The receipt of numerous bona fide customer complaints by the franchisor concerning the franchisee's operation of the marketing premises, if--
> (i) the franchisee was promptly apprised of the existence and

> nature of such complaints following receipt of such complaints by
> the franchisor; and
> (ii) if such complaints related to the condition of such premises or
> to the conduct of any employee of such franchisee, the franchisee
> did not promptly take action to cure or correct the basis of such
> complaints.

It would be absurd to interpret the above subsection to apply only to the sale of motor fuel. Indeed the Defendant's mystery shopper survey (which gauges a franchisees customer service skills and performance) is not restricted to the sale or marketing of motor fuel. Using the Defendant's flawed interpretation of the term "operation of the marketing premises" a franchisee can receive countless customer complaints regarding the premises without running the risk of nonrenewal – as long as the complaints do not involve the sale of motor fuel. This reasoning is an extremely flawed and illogical interpretation of section 2802(b)(3)(B).

In section 2802(b)(3)(C), nonrenewal of a franchise is permitted for "A failure by the franchisee to operate the marketing premises in a clean, safe, and healthful manner, if the franchisee failed to do so on two or more previous occasions and the franchisor notified the franchisee of such failures." It would be absurd to interpret the term "operate the marketing premises" in the above excerpt to mean only the sale or marketing of gasoline. If one were to accept the Defendant's argument that operation of the marketing premises is restricted to the sale or marketing of motor fuel, the above subsection would permit a franchisee to operate the other aspects of the service station (with the exception of the areas dealing with the sale of motor fuel) in a dirty, unsafe, and unhealthy manner, without incurring the risk of nonrenewal. This would clearly lead to an absurd result.

In section 2802(c), Congress listed events that are relevant to the franchise relationship and as a result of which termination of the franchise or nonrenewal of the

franchise relationship is reasonable. One such event is "fraud or criminal misconduct by the franchisee relevant to the **operation of the marketing premises**." section 2802(c) (emphasis added). It would be absurd to interpret the term "operation of the marketing premises" in the above excerpt as being restricted only to the sale or marketing of motor fuel. If one were to accept the Defendant's argument that operation of the marketing premises is restricted to the sale or marketing of motor fuel, the above subsection would permit a franchisee to commit fraud and criminal misconduct with respect to other aspects of the service station (with the exception of the marketing and sale of motor fuel) without incurring the risk of termination or nonrenewal. This would clearly lead to an absurd result.

In section 2802(c)(11), termination is permitted on the basis of a "knowing failure of the franchisee to comply with Federal, State, or local laws or regulations relevant to the **operation of the marketing premises.**" Emphasis added. It would be absurd to interpret the term "operation of the marketing premises" in the above excerpt as being restricted only to the sale or marketing of motor fuel. If one were to accept the Defendant's argument that operation of the marketing premises is restricted to the sale or marketing of motor fuel, the above subsection would permit a franchisee to violate Federal, State, or local laws or regulations with respect to other aspects of the service station (with the exception of the marketing and sale of motor fuel) without incurring the risk of termination or nonrenewal. This would clearly lead to an absurd result.

The issue of what constitutes the marketing premises under the PMPA was addressed in Singh v. BP Products North America, Inc, 2006 WL 273542 (N.D.Ill.). In that case, the franchisor BP sought to terminate the franchisees gas station franchise

because the Kane County Circuit Court ordered condemnation of a portion of gasoline station (the Leased Premises). In seeking termination BP relied on one of the 12 enumerated grounds for termination or nonrenewal, namely "condemnation or other taking, in whole or in part, of the marketing premises pursuant to the power of eminent domain." 15 U.S .C. § 2802(c)(5). In opposing the termination, the franchisee, Singh, argued that although a portion of the real property has been condemned through eminent domain, the condemnation will not affect the operation of the gas station at that location. Singh further argued that the words "marketing premises" in section 2802(c)(5) to applies only to the portion of the real property where products are marketed, e.g., the mini-mart, the gas pumps, and the car wash. Singh 2006 WL 273542, at *4. The court rejected Singh's argument and opined that: "Such a reading warps the language of the statute **beyond** reason. Singh's contention ignores the legal description of the leased premises, which was attached to the Lease." Singh 2006 WL 273542, at *4.

Plaintiff submits that the case of *Singh v. BP Products North America, Inc*. is highly persuasive and instructive on the issue of what constitutes the marketing premises under the PMPA. Furthermore, that case also, indicated the definition or description of marketing premises in the franchise agreement should be used in determining the scope of the marketing premises for purposes of the termination. In the present case, Plaintiff submits that this Court should follow the dictates of Singh in determining what constitutes the marketing premises. This Court should also reject Exxon's argument or suggestion that the description of the marketing premises in the parties' franchise agreement should be disregarded or should not be controlling.

In sum, Plaintiff maintains that the language of section 2802(c)(9)(A) does not

state or indicate that failure to operate the marketing premises is restricted to, or is equivalent to mere failure to sell or market motor fuel. Given, the overriding purpose of the PMPA (the protecting of retail franchisees), it is unreasonable and unwarranted to restrict the term "operation of the marketing premises" to mere failure to sell motor fuel, thereby, making it easier for franchisors to terminate franchise agreements. Also, other provisions of the PMPA show that the term "operation of the marketing premises" cannot be restricted to the sale or marketing of motor fuel without leading to absurd results and interpretations. Accordingly, Defendant is not entitled to a judgment as a matter of law on its argument that the term "operation of the marketing premise" is restricted to, or synonymous with the "sale or marketing of motor fuel."

In the present case, even during the seven-day period of time which Exxon claims that Plaintiff did not sell motor fuel, Plaintiff continued to operate the marketing premises, marketing and selling other items which form part of the business. Plaintiff operate the marketing premises, including the provision of auto repair services which was and is a part of the Plaintiff's business at the marketing premises located at 4650 South Capitol Street, SE, Washington, DC 20032. Plaintiff hereby incorporates by reference the pertinent facts (relating to his operation of the marketing premises) as set forth in the Verified Complaint. Thus, there is no legal or factual basis for Exxon's claim that Plaintiff failed to operate the marketing premises for seven consecutive days. Since the termination of Plaintiff's franchise was based on an alleged failure to operate the marketing premises for seven consecutive days, Plaintiff is entitled to summary judgment because Plaintiff never ceased to operate the marketing premises even when he did not have gasoline for sale.

14

**Marketing Premises as used in the Franchise Agreement:**

At the outset, it must be pointed that the parties' Franchise Agreement is a Contract of adhesion which was solely and completely drafted by Exxon without input from Plaintiff. As such, the terms of the contract and any ambiguities contained therein must be construed strictly against the drafter and the risks of ambiguity fall on the drafter. See Williston on Contracts 4th—Forms §§ 32F:3, 32F:4. *See also, Dureiko v. U.S.,* 209 F.3d 1345 (Fed. Cir. 2000); *Metric Constructors, Inc. v. National Aeronautics and Space Admin.*, 169 F.3d 747 (Fed. Cir. 1999).

Various provisions of the parties' Franchise Agreement clearly indicate that the term "marketing premises" encompasses much more than the areas and/or equipment connected with the purchase and sale of motor fuel. Portions of the Franchise Agreement indicate that the operation of the marketing encompasses much more than the purchase and sale of motor fuel.

For instance, the rent for the service station may be increased if Exxon rebuilds or certain items to the station such as "additional service station bay lifts" *See* Agreement, ExxonMobil's Guidelines (Attachment I), page 5. The Franchise Agreement distinguishes between marketing premises and the motor fuels business. *See* Article 9.4. The agreement also indicates that the operation of the related businesses are part and parcel of the Agreement. Thus, Exxon could seek termination based on a franchisee's conduct on the premises that does not involve the sale of motor fuel. *See* Article 9.1.

In article 9.14 (b), the agreement prohibits certain conduct on the marketing premises. It would be absurd to reason that such prohibition only applies to the parts of the service station connected with the sale of motor fuel.

The meaning of the term "franchise" under the PMPA might be helpful determining what constitutes marketing premises. Within the meaning of the PMPA, a "franchise" consists of three core components: a contract to use the refiner's trademark, a contract for the supply of motor fuel to be sold under the trademark, and a lease of the premises at which the motor fuel is sold. *Barnes v. Gulf Oil Corp.,* 795 F.2d 358, 360 (4th Cir.1986) (citing S.REP. NO. 731, 95th Cong., 2d Sess. 17, 29 (1978), *reprinted in* 1978 U.S.C.C.A.N. 873) (additional citations omitted).

The Senate Report on the PMPA reads in part:

"The term "franchise" is defined in terms of a motor fuel trademark license.... Secondary agreements, such as leases of real property or motor fuel supply agreements are incorporated in the definition of a franchise. Therefore the substantive provisions of this title, relating to the termination of a franchise or nonrenewal of the real estate lease or motor fuel supply agreement may not be circumvented by a termination or non-renewal of the real estate lease or motor fuel supply agreement which thereby renders the trademark license valueless."

1978 US Cong & Ad News, p. 888.

In *Atlantic Richfield Co. v. Brown*, No. 85-C-5131 (N.D.Ill. Oct. 21, 1985) [WESTLAW, 1985 WL 3316] the court held that Arco leases for the premises, gasoline, and mini-markets were so inextricably linked that coverage under the PMPA extended to the mini-market lease. Central to the court's finding of linkage was the fact that "termination of the premises lease automatically triggers termination of the mini-market agreement." *Id.*

**II. PLAINTIFF'S ALLEGED "FAILURE" TO SELL GASOLINE IS NOT A "FAILURE" UNDER THE PMPA BECAUSE THE FAILURE WAS CAUSED BY**

**FINANCIAL HARDSHIP WHICH WAS CAUSED, AT LEAST PARTIALLY BY EXXONMOBIL**

Plaintiff alleges that sometime in October 2006, Exxon's practice of supplying old inventory of gasoline (at higher prices) to the Plaintiff when the competitors' prices are lower or much lower, caused Plaintiff to lose a lot of money from the sale of the gasoline. As a result, for a few days, Plaintiff did not have enough funds to immediately order new gasoline supplies from the Exxon to replenish Plaintiff's inventory and Exxon refused to supply the gasoline to the Plaintiff on credit. Thus, Exxon is a direct and/or indirect cause of the Plaintiff's alleged failure to sell motor fuel at his station for a few days.

As such, Exxon caused a portion of Plaintiff's financial hardship. Thus, there was no failure (as defined in the PMPA). Because there was no failure under the PMPA, there was no basis for Exxon to seek to terminate the franchise. It is important to note that to sustain his argument on the issue of failure, Plaintiff is not required to establish that all of his financial problems were caused by Exxon, nor is he required to establish that all of the circumstances were beyond his reasonable control. Under the PMPA the term "failure" does not include "any failure for **a cause** beyond the reasonable control of the franchisee." 15 U.S.C. § 2801(13)(B). (emphasis added). A plain reading of the above excerpt shows that an event or failure cannot be deemed a failure under the PMPA if **a cause** of that event or failure is beyond the reasonable control of the franchisee. Thus, in the present case, Plaintiff only needs to establish that Exxon was **a cause** of his alleged failure to operate the marketing premises for more than seven consecutive days. In support of his argument that Exxon was **a cause** of his alleged failure to operate the marketing premises for more than seven consecutive days, Plaintiff hereby incorporates

by reference his verified complaint, his motion for summary judgment and the affidavit in support of the motion for summary judgment.

Another aspect of Exxon's cause of Plaintiff's alleged failure is the fact at least on one occasion, Exxon overbilled Plaintiff for the gasoline supplied to Plaintiff. Subsequently, through a self-audit, Exxon credited Plaintiff for the amount he was overbilled. **See Exhibit 1.** Thus, Exxon essentially admitted that it improperly billed Plaintiff on at least one occasion. This raises the important question regarding whether an independent audit would reveal more instances of improper billing. Another significance of this instance of overbilling admitted by Exxon is that at the time when Exxon is seeking to terminate Plaintiff's franchise because Plaintiff did not order gasoline from Exxon (and did not have gasoline for sale due to lack of funds), Exxon was in possession of funds belonging to Plaintiff – funds which Exxon acquired through improper billing. The fact that Exxon subsequently credited Plaintiff's account for this improper billing does not negate the fact that a cause of Plaintiff's failure to order gasoline from Exxon is Exxon's admitted improper retention of funds belonging to Plaintiff.

**III. ExxonMobil is not Entitled to Judgment as a Matter of Law on the issue of Notice. failed to Comply With The Notice Provisions Of Section 2804(A)(2) And 2804(B)(1) Of The PMPA.**

Pursuant to section 2804(A)(2) and section 2804 (B)(1) of the PMPA, a franchisor is required to furnish a franchisee with (90) days notice of termination except in circumstances where it would prove unreasonable for the franchisor to provide ninety (90) days notice. No such circumstance exists here. The alleged failure to sell gasoline for seven consecutive days no longer exists. The violation, if there was one, has been cured.

There was and is no current emergency mandating a notice period of less than ninety (90) days. Thus, the notice given by the Defendant is deficient under the terms of the PMPA.

Plaintiff has been a solid Exxon dealer for over fifteen (15) years. Plaintiff has persevered as a gas station franchisee through difficult times while remaining loyal to the Exxon brand and using his best efforts to market Exxon products. His business operations at the marketing premises during this time have been conducted without much incident or customer complaints. Yet, the Defendant gave Plaintiff less than 30 days notice for the termination of a franchise he has operated for over fifteen years. Defendant's course of action in this instance has been taken in wanton disregard of Plaintiff's tenure of more than fifteen years of loyal service, and in wanton disregard of the notice provisions of the PMPA.

There is no dispute that Exxon did not provide the Plaintiff with the 90-day notice. Exxon is therefore not entitled to summary judgment on this issue of notice.

**IV. Exxon's Failure to Give 90 Days Notice was not Reasonable: the issue of reasonableness presents a genuine issue of material fact**

Where a franchisor elects to proceed under § 2804(b) to provide less than 90 days notice upon the occurrence of an "event", the franchisor must establish the reasonableness of its decision to dispense with the 90 days notice requirement. In determining the reasonableness of less than 90 days' notice, the issue of "reasonableness" is necessarily an issue of fact. *See Roberts v. Amoco Oil Co.,* 740 F.2d 602, 606 (8th Gir. 1984) (In discussing another section of the PMPA, court found that the legislative history of PMPA suggests that Congress intended to favor franchisees by treating "reasonableness" determination as an issue of fact). The term "reasonable" in the PMPA has been

interpreted to mean that which is "just, fair or proper." ***Doebereiner v. Sohio Oil Co.***, 880 F.2d 329, as amended on denial of rehearing, 893 F.2d 1275 (11th Cir. 1990).

Because the issue of the reasonableness of Exxon's decision not to furnish a 90 day notice is an issue of material fact, Exxon is not entitled to summary judgment on this issue.

It is also significant that Exxon has failed to establish that providing Plaintiff with 90 days notice would have unreasonably harmed Exxon. In order to prevail in its claim that furnishing less 90 days notice was appropriate, Exxon was required to establish that providing the ninety days' notice would have unreasonably harmed Exxon. This view was eloquently explained in ***Pruitt v. New England Petroleum Ltd. Partnership***, 2006 WL 3332773 (D.Conn.). In ***Pruitt***, the Court examined the following cases which upheld less than ninety days' notice of termination to the franchisee: ***Marathon Petroleum Co. v. Pendleton***, 889 F.2d 1509, 1513 (6th Cir.1989) ; ***Abujudeh v. Mobil Oil Corp.***, 841 F .2d 310, 311-12 (9th Cir.1988); ***Shell Oil Co. v. Wentworth***, 822 F.Supp. 878, 883 (D.Conn.1993); ***Charter Mktg. Co. v. Bergen***, No. H-89-405, 1989 U.S. Dist. LEXIS 18393, at *10 (D.Conn., October 20, 1989); ***Texaco Ref. and Mktg., Inc. v. Davis***, 835 F.Supp. 1223, 1232 (D. Oregon 1993); ***Smoot v. Mobil Oil Corp.***, 722 F.Supp. 849, 855 (D.Mass.1989)); ***Brummett v. Amoco Oil Corp.***, No. G88-26, 1988 U.S. Dist. LEXIS 3561, at * 15 (W.D. Mich. April 19, 1988); ***Loomis v. Gulf Oil***, 567 F.Supp. 591, 597 (M.D.Fla.1983)

After reviewing the above cases, the ***Pruitt*** court concluded that "in all of these cases the franchisor proved that ninety days' notice would unreasonably harm the franchisor." ***See Pruitt***, 2006 WL 3332773, at *3. Ultimately, the Pruitt court Based on the parties'

factual stipulations and the arguments presented at trial, the Court concludes that the franchisor's eighty-nine day notice of termination to Pruitt was insufficient under the PMPA and hence it was invalid because the franchisor failed to establish that providing the 90 days notice would have unreasonably harmed the franchisor.

In the present case, since Exxon has Exxon has failed to establish that providing Plaintiff with 90 days notice would have unreasonably harmed Exxon, Exxon is not entitled to summary judgment on the issue of notice.

**RELIANCE ON STALE EVENTS**

To support and justify its termination decision as well as its decision to provide less than 90 days notice Defendant appears to cite and rely on events and that occurred more than 120 days prior to the date of the notice of termination. Pursuant to the PMPA, when the franchisor complies with the 90 days notice requirement, the termination can only be justified on the basis of events which occurred not later than 120 days from the date of the termination notice. When the franchisor fails to comply with the 90 days notice requirement, the termination can only be justified on the basis of events which occurred not later than 60 days from the date of the termination notice. In the present case, since the Defendant did not furnish the 90 days notice, any references by the Defendant to events beyond 60 days of the date of the termination notice must be disregarded.

**ADVERSE INFERENCE RULE:**

Plaintiff requested documents from Exxon relating to its pricing policies and practices but Exxon failed to provide such documents. Thus, this Court should apply the adverse inference rule because the documents are in Exxon's exclusive control. Thus, the issue of Exxon's predatory pricing should be resolved in Plaintiff's favor.

21

**WHEREFORE**, Plaintiff respectfully requests the Court deny ExxonMobil's Motion

for Summary Judgment.

Respectfully submitted,


_____
PETER C. IBE, D.C. BAR # 481265
1717 K Street, NW,
Suite 600
Washington, DC 20036
Phone: (202) 276-7662


_____
Victor Mba-Jonas, Esq., D.C. BAR # 452042
8020 New Hampshire Avenue,
Suite 130, Adelphi, MD 20783
Phone: (301) 431-0333

Counsel for Plaintiff.