## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PETER AMAEFULE** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )**Civil Action No: 1:06-cv-02087-RWR** |
| | ) |
| **EXXONMOBIL OIL CORPORATION** | ) |
| | ) |
| **Defendant.** | ) |
| _____ | ) |

## PLAINTIFF'S MEMORANDUM OF LAW IN OPPOSITION TO DEFENDANT'S MOTION TO DISSOLVE THE PRELIMINARY INJUNCTION

**AND NOW COMES** Plaintiff, Peter Amaefule, through undersigned counsel, Peter C. Ibe, Esquire, and files this memorandum of law in opposition to Defendant's motion to dissolve the preliminary injunction.

### I. RESPONSE TO DEFENDANT'S LOCAL RULE 7(m) STATEMENT

In its Local Rule 7(m) statement, the Defendant stated that "after multiple conferences between Mr. Ibe and Ms. Andoh, on February 22, 2008, the dispute relevant to this motion could not be narrowed." The undersigned counsel respectfully disagrees with this characterization. During the conversations between the undersigned counsel and Ms. Andoh, the undersigned counsel proposed a resolution that would eliminate the need for the Defendant to file the motion to dissolve the injunction. Thus, it is inaccurate and implausible for the Defendant to claim that the dispute relevant to the Defendant's motion could not be narrowed.

Specifically, during the conversations, Ms. Andoh informed the undersigned counsel that the basis for the motion was ExxonMobil's belief that Mr. Amaefule has

been running out of gasoline and has not been purchasing the requisite amounts of gasoline. Ms. Andoh claimed that this constituted a violation of the conditions of the preliminary injunction. The undersigned counsel proposed to Ms. Andoh that, without litigating and/or admitting that Mr. Amaefule ran out of gasoline after the entry of the preliminary injunction, Mr. Amaefule would provide ExxonMobil with a written assurance, including the supporting financial documents, that he has the finances to ensure that he would not run out of gasoline. The undersigned counsel even suggested that ExxonMobil draft the document regarding financial assurance so as to address any concerns which ExxonMobil might have. The undersigned proposed that Mr. Amaefule would provide the financial documents that would satisfy ExxonMobil that Mr. Amaefule does indeed have the requisite finances. It is also important to note that at the time that ExxonMobil filed its motion to dissolve the preliminary injunction, Mr. Amaefule had available for sale all brands of gasoline. It is also significant to note that the insurance issues raised by ExxonMobil in its motion were never raised by ExxonMobil's counsel in her conversations with Plaintiff's counsel.

In sum, the undersigned counsel maintains that the dispute that gave rise to the filing of ExxonMobil's motion could have been resolved without the need for court action had ExxonMobil accepted Mr. Amaefule's offer of a verifiable written financial assurance (accompanied by proper documents) that would prove to ExxonMobil that Mr. Amaefule would not run out of gasoline now or in the future.

## II. EXXONMOBIL HAS PROVIDED NO VALID LEGAL BASIS FOR ITS MOTION

ExxonMobil stated that its motion to dissolve the injunction was being filed pursuant to Rule 60(b) of the Federal Rules of Civil Procedure. However, Rule 60(b) is

not a proper basis to seek the dissolution of an injunction. In *SEC v. Vision Communications*, 1995 U.S. Dist. LEXIS 2868, (D.D.C. Mar. 6, 1995), this Court suggested that Rule 60(b) is not proper basis to seek the dissolution of an injunction. The court noted that:

> As a threshold matter, the Court notes that a preliminary injunction does not purport to be a disposition of a matter on its merits; its purpose is not to determine any controverted right, but rather to preserve the status quo, to prevent a threatened wrong, or to avoid any further perpetration of an injury. *See* 11 Wright & Miller, § 2947.

*SEC v. Vision Communications* at *4-5.

Even if Rule 60(b) were the appropriate vehicle to be utilized in seeking to dissolve a preliminary injunction, ExxonMobil has failed to demonstrate that dissolution is warranted under that rule. Significantly, ExxonMobil failed to quote that rule or point to any portion of that rule that permits or supports the motion. Rule 60(b) of the Federal Rules of Civil Procedure states as follows:

> GROUNDS FOR RELIEF FROM A FINAL JUDGMENT, ORDER, OR PROCEEDING.
> On motion and just terms, the court may relieve a party or its legal representative from a final judgment, order, or proceeding for the following reasons:
> (1) mistake, inadvertence, surprise, or excusable neglect;
> (2) newly discovered evidence that, with reasonable diligence, could not have been discovered in time to move for a new trial under Rule 59(b);
> (3) fraud (whether previously called intrinsic or extrinsic), misrepresentation, or misconduct by an opposing party;
> (4) the judgment is void;
> (5) the judgment has been satisfied, released, or discharged; it is based on an earlier judgment that has been reversed or vacated; or applying it prospectively is no longer equitable; or
> (6) any other reason that justifies relief.

F.R.Civ.P. 60(b).

ExxonMobil failed to allege, and failed to establish that the preliminary injunction order was issued by mistake, inadvertence, surprise, or excusable neglect. Exxon also failed to allege, and failed to establish that the preliminary injunction order contained mistakes, inadvertent provisions or resulted in surprise or excusable neglect. *See* F.R.Civ.P. 60(b)(1). ExxonMobil failed to allege, and failed to establish the existence of newly discovered evidence. *See* F.R.Civ.P. 60(b)(2). ExxonMobil failed to allege, and failed to establish that the preliminary injunction order was procured by fraud, misrepresentation, or misconduct by the Plaintiff. *See* F.R.Civ.P. 60(b)(3). ExxonMobil failed to allege, and failed to establish that the preliminary injunction order was void. *See* F.R.Civ.P. 60(b)(4). There was no argument by ExxonMobil that the preliminary injunction order has been satisfied, released, or discharged. *See* F.R.Civ.P. 60(b)(5). Even though Rule 60(b) has a catchall provision regarding "any other reason that justifies relief," Exxon has failed to point to any case law or other authority that applied that provision to circumstances similar to the one being alleged by Exxon in its motion. *See* F.R.Civ.P. 60(b)(6). Indeed, Exxon does not cite any case law for the proposition that 60(b) can be used as a basis to dissolve a preliminary injunction.

Since ExxonMobil's current motion is premised on F.R.Civ.P. 60, it was incumbent on ExxonMobil to establish that it complied with the timing requirements of that rule. Pursuant to F.R.Civ.P. 60(c), "[a] motion under Rule 60(b) must be made within a reasonable time — and for reasons (1), (2), and (3) no more than a year after the entry of the judgment or order or the date of the proceeding." ExxonMobil does not identify the subsection of Rule 60(b) on which it based its motion. Thus, it is difficult to determine the applicable time frame. However, even applying the longer time frame that applies to

subsections (1), (2), and (3) of Rule 60(b) (dealing with mistake, inadvertence, surprise, or excusable neglect; newly discovered evidence; and fraud/misrepresentation), ExxonMobil was still required to file its motion within a year of the entry of the judgment or order or the date of the proceeding. The preliminary injunction order which ExxonMobil seeks to dissolve was entered on entered orally this Court on December 13, 2006, and was signed on December 15, 2006. Therefore, ExxonMobil's current motion to dissolve the preliminary injunction which was filed pursuant to Rule 60(b) on February 28, 2008, is patently untimely (under Rule 60(c)) because it was filed more than a year after the entry of the preliminary injunction order. Accordingly, ExxonMobil's motion to dissolve the preliminary injunction pursuant to F.R.Civ.P. 60(b) must be dismissed.

### III. EXXONMOBIL HAS PROVIDED NO BINDING LEGAL AUTHORITY IS SUPPORT OF ITS "GROUNDS FOR RELIEF."

As the moving party, ExxonMobil bears the burden of providing this Court with the legal authority that would mandate the relief sought and the grounds for that relief. ExxonMobil failed to cite to any binding and/or controlling legal authority that would mandate the dissolution of the preliminary injunction, nor has ExxonMobil cited to any binding and/or controlling legal authority that supports the grounds for relief alleged by ExxonMobil. In discussing its "grounds for relief," ExxonMobil cites *Armada Oil & Gas Co. v. EPPCO, Inc.*, No. 06-CV-10269, 2006 U.S. Dist. LEXIS 59467, at **8-9 (E.D. Mich. Aug. 23, 2006). That decision is a district court case out of Michigan that is certainly not binding on this Court. Moreover, that case involved franchisees, who, after the entry of the injunction engaged in conduct that might constitute fraud with respect to credit card transactions. In that case, the franchisees admitted that they activated 590 $100.00 BP credit cards at one gasoline station, using credits allegedly owed by Armada

(the gasoline company) to the one gas station, and then processed these same BP Cards on the same day at another gasoline station, thereby representing to Armada that the latter station was now owed $59,000.00 for customer credit purchases. The District Court noted that: "Nowhere within the operating rules, terms, and conditions of the BP Card program is a franchisee … authorized to accept a transfer of credits from another franchisee." **Id.** at *4 and *5. The court noted that the improper … BP Card transactions evidence a lack of good faith effort on part of the franchisee. **Id.** at *5. Although not addressed by the district court, it is important to observe that the franchisees in Armada were alleged to have also failed to pay rent, closing the gas station for an unreasonable time, and refusing to grant an access to the station to an official of Armada – all in violation of the injunction. Thus, the facts of the above case are distinguishable from the instant case. In the instant case, there was no fraud or allegations of fraud or bad faith. Mr. Amaefule's alleged inability to purchase gasoline was caused in part by ExxonMobil. Furthermore, ExxonMobil failed to maintain the status quo. Additionally, unlike Armada, Exxon has not set forth or established the elements required for the grant or dissolution of a preliminary injunction.

ExxonMobil also cites ***Latimore v. County of Contra Costa***, No. 95-15886, 1996 U.S. App. LEXIS 3524, at *8 (9th Cir. Feb. 15, 1996). That case is an unpublished decision of the 9th Circuit Court of Appeals, which is not binding on this Court. Besides, ExxonMobil makes no reference to the fact that this is an unpublished decision and that citation to unpublished opinions may be limited. The opinion itself stated that: "This disposition is not appropriate for publication and may not be cited to or by the courts of this circuit except as provided by *Ninth Circuit Rule 36-3*."

Ignoring the fact that it lacked binding legal authority in support of its motion, ExxonMobil nevertheless proceeded to file its motion without proper legal basis, perhaps to satisfy its thirst for litigation and flex its financial muscle against the meager resources of Peter Amaefule.

ExxonMobil conveniently ignored cases from this jurisdiction which deal with attempts to dissolve preliminary injunctions and what a movant must establish in order to convince a court to dissolve a preliminary injunction. In *SEC v. Vision Communications*, 1995 U.S. Dist. LEXIS 2868, (D.D.C. Mar. 6, 1995), the United District Court for the District of Columbia dealt with a Motion to Dissolve an Injunction. The Court opined that:

> An injunction may be dissolved where, for instance, changed circumstances eviscerate the justification therefor, *United States v. Swift & Co., 286 U.S. 106, 76 L. Ed. 999, 52 S. Ct. 460 (1932)*, or where failure to dissolve the injunction would occasion severe hardship upon the parties, *American Optical Co. v. Rayex Corp., 291 F. Supp. 502 (S.D. N.Y. 1967)*, aff'd., *394 F.2d 155 (2d Cir. 1968), cert. denied, 393 U.S. 835, 21 L. Ed. 2d 106, 89 S. Ct. 109 (1969)*, although hardship alone will not constitute in and of itself "changed circumstances". *Huk-a-Poo Sportswear, Inc. v. Little Lisa, Ltd., 74 F.R.D. 621 (S.D. N.Y. 1977)*.

*SEC v. Vision Communications*, 1995 U.S. Dist. LEXIS 2868, at *6. The Court went on to set forth the standard to be utilized in considering whether an injunction should be dissolved. The Court opined that:

> In the ordinary case dissolution should depend on the same considerations that guide a judge in deciding whether to grant or deny a preliminary injunction in the first place. The familiar quartet includes likelihood of success, the threat of irreparable injury to the party seeking interim relief, the equities and the public interest.

*SEC v. Vision Communications*, 1995 U.S. Dist. LEXIS 2868, at *7 (*quoting* **Knapp Shoes v. Sylvania Shoe Mfg. Corp.**, 15 F.3d 1222, 1225 (1st Cir. 1994).

Thus, in this jurisdiction, a party seeking to dissolve a preliminary injunction must establish the same elements which must be established in order to obtain a preliminary injunction. ExxonMobil's motion to dissolve the preliminary injunction does not set forth and does not even recognize the need to establish the elements required for a preliminary injunction. Consequently, ExxonMobil failed to establish the elements required for a preliminary injunction. Even without addressing the rest of the elements, it is fairly obvious that ExxonMobil cannot establish one of the elements, namely, that the balance of hardships would favor ExxonMobil. ExxonMobil reported a $40.6 billion profits in 2007, the largest profit in corporate history. ExxonMobil reported that it earned $39.5 billion in profits in 2006. Thus, it would be implausible and ridiculous to argue that the balance of hardships favors ExxonMobil in comparison to Peter Amaefule – a retail franchisee with meager resources who has invested all his money, time, effort, goodwill, blood, sweat, and tears in the operation of his gasoline station and desires nothing more than to keep his gasoline station open and to maintain his business relationship with ExxonMobil. Mr. Amaefule is not seeking charity or favors from ExxonMobil: he only seeks to continue his business whereby he purchases gasoline from ExxonMobil (from which ExxonMobil makes profits) and sells the gasoline to the public.

Apart from the fact that ExxonMobil did not address the elements needed for the grant of a preliminary injunction, ExxonMobil did not address the changes in circumstances that would warrant dissolution of the injunction. Indeed, at the time ExxonMobil filed the motion to dissolve the injunction and at the present time, the

significant change is circumstance strongly requires that the injunction be maintained rather than dissolved: **The significant change in circumstance is that Mr. Amaefule's finances improved so significantly that he was willing to provide ExxonMobil with a written finance assurance (including supporting documents) to assure ExxonMobil that he would not run of gasoline and would continue to purchase gasoline from ExxonMobil now and in the near future.**

Given the fact that ExxonMobil has failed to establish the elements required for the dissolution of a preliminary injunction, and has not established changed circumstances that would warrant the dissolution of the injunction, ExxonMobil's motion must be denied.

### IV. EXXONMOBIL HAS NOT MAINTAINED THE STATUS QUO

As ExxonMobil pointed out, the preliminary injunction order required the parties to maintain the status quo. However, as detailed in Plaintiff's Exhibit 1 (Affidavit of Peter Amaefule), ExxonMobil has not maintained the status since the entry of the preliminary injunction order.

Mr. Amaefule's gasoline station has three underground tanks which store gasoline for sale. One tank stores "regular" grade of gasoline, the other stores the "plus" grade of gasoline and the other stores "supreme" grade of gasoline.  The "regular" tank has a capacity of 10,000 gallons; the "plus" tank has a capacity of 8,000 gallons; and the "supreme" tank has a capacity of 6,000 gallons. The tanks and the pumping mechanisms were designed by ExxonMobil in such a way that Mr. Amaefule cannot pump and/or sell every pint of gasoline contained in every tank. For each tank, there is a level below which gasoline cannot be pumped from the tank even though the tank contains gasoline. This is

known as the "pump stop level" or the "shut off" level. The pump stop levels are arbitrarily established by ExxonMobil without consultation or input for Mr. Amaefule. Before the entry of the preliminary injunction order, ExxonMobil set the pump stop levels as follows: 440 gallons (regular); 330 gallons (plus); and 246 (supreme). See Exhibit 2. This means that pursuant to ExxonMobil's design and decision, when the amount of gasoline in the regular tank is 440 gallons, gasoline can no longer be pumped and sold from that tank; when the amount of gasoline the plus tank is 330 gallons, gasoline can no longer be pumped and sold from that tank; and when the amount of gasoline the supreme tank is 246 gallons, gasoline can no longer be pumped and sold from that tank. As mentioned earlier, ExxonMobil set the pump stop levels at 440 gallons (regular); 330 gallons (plus); and 246 (supreme) prior to entry of the injunction. ExxonMobil maintained these shut off levels until April 2007. See Exhibit's 2, and 3. However, in May 2007, ExxonMobil suddenly changed the pump stop levels for each tank: the pump stop levels were increased to 500 gallons for each tank regardless of the tank capacity. See Exhibit 4.  Prior to the entry of the preliminary injunction order, the pump stop levels were lower than 500 gallon, and the pump stop level for each tank was proportional to the size and capacity of the tank. Mr. Amaefule was not given any notice prior to the increase in the shut off levels, nor was he provided any reason for the sudden and disproportionate increase in the shut off levels. The increase in the shut off levels cost Mr. Amaefule a lot of money and it adversely affected his business operation because it prevented him from selling 500 gallons of each grade of gasoline which he bought and paid for. Thus, by arbitrarily and disproportionately increasing the pump stop levels after the entry of the preliminary injunction order, ExxonMobil did not maintain

the status quo. Therefore, ExxonMobil is guilty of unclean hands in its request for equitable relief and the request should be denied.

It is estimated that the new pump stop levels have cost Mr. Amaefule about $1,260.00 (excluding interests) which he is not permitted to utilize in the operation of his business. ExxonMobil might argue that this is a *de minimis* amount. However, this argument fails because ExxonMobil routinely refuses to deliver the load of gasoline if Mr. Amaefule orders gasoline sends the money to ExxonMobil but is $200 or $300 short of the price set by ExxonMobil. Thus, ExxonMobil's own conduct shows that the monetary loss resulting from the increase in the pump stop levels is not *de minimis*.

Other instances of ExxonMobil's failure to maintain the status quo is its redefinition of what constitutes a full load of gasoline and its refusal to deliver partial loads of gasoline for which Mr. Amaefule has sent payments. Prior to the entry of the preliminary injunction, ExxonMobil permitted Mr. Amaefule to order partial loads of gasoline. However, after the entry of the injunction, ExxonMobil refused to deliver partial loads of gasoline to Mr. Amaefule.

Since ExxonMobil refused to deliver partial loads to Mr. Amaefule, in April 2007 Mr. Amaefule conferred with ExxonMobil officials at the prepay/credit billing department to ascertain what constitutes a full load for purposes of ordering, dispatch, and delivery. The ExxonMobil officials informed Mr. Amaefule that 8,200 gallons of gasoline would constitute a full load (even though the maximum capacity of the delivery truck is 9,000 gallons). Since April 2007, relying on the above information regarding what constitutes a full load, Mr. Amaefule would order full loads of gasoline by phone through the prepay desk and the prepay desk would quote him the price for 8,200 gallons

of gasoline. Mr. Amaefule would then transmit the funds to ExxonMobil for the delivery of the 8,200 gallons.

However, on some occasions, ExxonMobil has misled Mr. Amaefule regarding what constitutes a full load. Sometimes when Mr. Amaefule transmits the funds for the delivery of 8,200 gallons, ExxonMobil would refuse to deliver the load and insist that Mr. Amaefule did not order a full load or the full tank capacity. Such actions have punitive effects because when ExxonMobil refuses to deliver the 8,200 gallons which Amaefule has bought and paid for, ExxonMobil confiscates Mr. Amaefule's money and refuses to return the money to Mr. Amaefule. Instead, ExxonMobil retains the money and continues to deduct rent from the money which Mr. Amaefule sent for the sole purpose of purchasing gasoline.

As recently as January 18, 2008, ExxonMobil changed its definition of what constitutes a full load. On that date, Mr. Amaefule spoke with an ExxonMobil official, Ms. Trisha Lamond (the spellings might not be correct) and requested to know the cost of a full load of gasoline. The ExxonMobil official quoted Mr. Amaefule the price of 8,200 gallons, being $16,100.00. See Exhibit 5. Following this conversation, Mr. Amaefule transmitted the funds to ExxonMobil expecting the delivery of the gasoline. However, without explanation, ExxonMobil refused to deliver the gasoline. Mr. Amaefule then called the official who previously gave him the price of 8,200 gallons and she suddenly told Mr. Amaefule that he needed to pay the price for 9,000 gallons of gasoline. When Mr. Amaefule inquired about this sudden change, Ms. Lamond indicated that the instructions to withhold came from ExxonMobil's area manager Mr. Ron Alexanderwitz, and the Area Manager, Mr. John Bednash. Mr. Amaefule contacted Mr. Alexanderwitz,

Mr. John Bednash and they did not provide him with any explanations regarding this sudden change. Mr. Amaefule also contacted Mr. Ron McEdugal (the spelling might not be correct) regarding this incident and he never provided any explanation regarding this sudden decision to withhold Mr. Amaefule's funds and insist on the purchase of 9,000 gallons. True to form, ExxonMobil confiscated Mr. Amaefule's funds and continued to deduct the rent from those funds, while claiming that Mr. Amaefule ran out of gasoline in violation of the Franchise Agreement.

On February 11, 2008, Mr. Amaefule sent ExxonMobil the sum of $7,700.00 to complete the payment for 9,000 gallons of gasoline. See Exhibit 6.   Rather than delivering the 9,000 gallons which Mr. Amaefule bought and paid for, ExxonMobil only delivered 8,748 gallons. See Exhibit 7. This failure by ExxonMobil to deliver the full load ordered by Mr. Amaefule contributed to the alleged inability of Mr. Amaefule to have gasoline for sale.

On May 25, 2007, Mr. Amaefule sent Exxon the sum of $16,000.00 which, in addition to his credit card sales which Exxon has in its possession, was sufficient for the purchase of a full load of gasoline. See Exhibit 8. However, Exxon did not deliver the gasoline until four days later (on May 29, 2007), causing Mr. Amaefule to run out of gasoline on those days. See Exhibit 9. Not only that, the May 29, 2007 delivery was only a partial load (5,580 gallons) even though Mr. Amaefule  paid for a full load. See Exhibit 9.

On November 29, 2007, Mr. Amaefule wired to Exxon the sum of $18,200.00, which, when added to the credit cards sales which Exxon has in its possession, was sufficient for the purchase of a full load of gasoline (8,200 gallons). See Exhibit 10.

However, on November 30, 2007, Exxon only delivered a partial load rather than the full load which Mr. Amaefule bought and paid for. Exxon delivered only 7,359 gallons rather than the 8,200 gallons that Mr. Amaefule paid for. See Exhibit 11. Mr. Amaefule had to intervene and call Exxon before they delivered the remaining balance on December 1, 2007. See Exhibit 12.

ExxonMobil also failed to maintain the status quo by sending a letter directly to Mr. Amaefule threatening to terminate his franchise based on insurance issues. See Exhibit 13. It is difficult and implausible to imagine how maintaining the status quo would include threats of termination. Although the insurance issue was resolved and ExxonMobil rescinded its threat of termination (see Exhibit 14), it is important to note that ExxonMobil was well aware of the preliminary injunction order when it sent the threat of termination. Thus, ExxonMobil did not maintain the status quo and is not entitled to the relief it seeks in the motion before this Court.

## V. FURTHER ARGUMENTS IN SUPPORT OF THE MOTION FOR SUMMARY JUDGMENT

### (a) PLAINTIFF'S FINANCIAL PROBLEMS WERE CAUSED BY EXXONMOBIL

Mr. Amaefule was a plaintiff in a lawsuit against ExxonMobil in which about 10,000 Exxon dealers filed a class-action suit against the Exxon Corporation in the United States District Court for the Northern District of Florida. The dealers alleged an intentional and systematic scheme by Exxon (beginning in March 1983) under which they were overcharged for fuel purchased from Exxon. At the conclusion of the trial, in January of 2001, a jury returned a verdict in favor of the plaintiffs. However, through incessant litigation by ExxonMobil which proceeded all the way to the United States

Supreme Court, some members of the class did not receive their judgments until about month ago. Ultimately, ExxonMobil was unsuccessful in its challenges to the jury very verdict and other issues. ***See Exxon Mobil Corp. v. Allapattah Services, Inc.***, 545 U.S. 546 (2005); ***Allapattah Services, Inc. v. Exxon Corp.***, 333 F.3d 1248 (2003). Thus, beginning in March 1, 1983 until about a month ago, ExxonMobil was indebted to the class plaintiffs as a result of the overcharges. As a member of the winning plaintiff's class, ExxonMobil was indebted to Mr. Amaefule during the same period. A jury found that ExxonMobil systematically and intentionally overcharged the plaintiffs, including Mr. Amaefule for the wholesale purchase of motor fuel. This jury's verdict in favor of the class plaintiff's meant that, unless subsequently overturned, ExxonMobil was indebted to the plaintiffs until that judgment is satisfied. With specific reference to Mr. Amaefule, despite the jury verdict, ExxonMobil continued to contest (in the federal district court for the Southern District of Florida) the portion of the judgment awarded to Peter Amaefule. See Exhibit 15. Ultimately, ExxonMobil lost that case. However, the practical effect of ExxonMobil's meritless challenge to the judgment awarded to Mr. Amaefule is that it prevented Mr. Amaefule from receiving his money judgment within a reasonable. As a result of ExxonMobil's endless litigation, Mr. Amaefule only received his judgment about a month ago. Mr. Amaefule he received about $45,000.00 from ExxonMobil as a result of that judgment. This means that ExxonMobil overbilled and overcharged Mr. Amaefule to the tune of about $45,000.00. Thus, at the same time that Exxon is alleging that Mr. Amaefule ran out of gasoline, Exxon was indebted to Mr. Amaefule through improper billing to the tune of about $45,000.00. It is rather unconscionable and perversely ironic that ExxonMobil owed Mr. Amaefule about $45,000.00 and yet at the

same time, ExxonMobil sought to terminate Plaintiff's franchise and take away his livelihood for failing to purchase gasoline which cost about $16,000.00 for a full load.

ExxonMobil's overcharging of Mr. Amaefule to the tune of about $45,000.00 and Exxon incessant and meritless litigation are the causes or the significant causes of Mr. Amaefule's inability to have gasoline available for sale at the relevant periods. Accordingly, there is no "failure" (as defined in the PMPA) by Mr. Amaefule to have gasoline available for sale. Mr. Amaefule has no control over ExxonMobil's improper billing practices, and had no control over ExxonMobil's decision to overcharge him for the purchase of gasoline. Mr. Amaefule had no control over Exxon's decision to engage in incessant litigation which delayed the recovery of the judgment awarded by the jury. If Exxon's attempt to terminate Plaintiff's franchise were permitted, it would reward Exxon for its overcharging of Mr. Amaefule (as well as Exxon's incessant litigation of the jury verdict), which was a significant cause of Mr. Amaefule's inability to have funds available to purchase gasoline from Exxon. It is clear that had Mr. Amaefule had the $45,000.00 which ExxonMobil owed him, he would not run out of gasoline because he would have the funds to continue to purchase and sell gasoline.

### (b) PUMP STOP LEVELS

In its attempt to terminate Plaintiff's franchise, ExxonMobil alleged that Plaintiff ran out of gasoline for at least seven consecutive days. However, this claim is factually inaccurate due to the existence of pump stop levels or shut off levels. At all times when ExxonMobil is alleging that Mr. Amaefule ran out of gasoline Mr. Amaefule did indeed have gasoline in his tanks (which he bought and paid for) but was prevented by ExxonMobil from selling the gasoline. Since Mr. Amaefule always had gasoline in his

tanks, Mr. Amaefule was never completely out of gasoline at his gas station. At all times Mr. Amaefule always had gasoline in his tanks, at least up to the pump stop levels set by ExxonMobil. Also, since it is ExxonMobil that sets the pump stop levels arbitrarily, Mr. Amaefule always had gasoline available for sale but was prevented from doing so by ExxonMobil. It is important to recognize that there is no pump stop level exception to the PMPA. Thus, a franchisor such as ExxonMobil cannot set pump stop levels, prevent the franchisee from selling gasoline and then claim that the franchise should be terminated because the franchisee did not have gasoline available for sale. If this practice were permissible, any ExxonMobil could terminate any franchise by repeated manipulation of the pump stop levels. By manipulating the pump stop levels, ExxonMobil can adversely affect the franchisee's operating capital at will. If the tank capacity is 10,000 gallons, nothing prevents ExxonMobil from setting the pump shut off level at 5,000 or 4,000 gallons, thereby, preventing the retaining franchisee from selling gasoline which he has bought and paid for.

The PMPA simply does not permit a franchisor terminate the franchise based on failure to operate the marketing premises for seven consecutive days when the franchisee is actively being prevented (by the franchisor) from selling the gasoline he has available for sale and which he has bought and paid for.

Also, because ExxonMobil actively prevents Mr. Amaefule from selling gasoline below the pump stop levels set by ExxonMobil, any inability by Mr. Amaefule to sell gasoline would not constitute a failure as defined by the PMPA.

### (c) MAKETING PREMISES

17

On the issue of what constitutes the marketing premises, Plaintiff maintains that the term marketing premises encompasses much more than the areas dealing with the purchase and sale of gasoline. Exxon's Lease with Mr. Amaefule (which was entirely drafted by Exxon) covers the "marketing premises." Under the lease, the "marketing premises" include the mechanic's shop and the snack shop. Since the lease encompasses much more than the area associated with the purchase and sale of gasoline, this clearly indicated that ExxonMobil understands the term "marketing premises" to include all aspects and all areas of the gasoline station.

It is significant to note ExxonMobil requires franchisees such as Mr. Amaefule to maintain insurance on the "marketing premises" not just the areas dealing with the purchase and sale of gasoline. Thus, ExxonMobil understands the term "marketing premises" to include all aspects and all areas of the gasoline station.

Exxon's own prior conduct indicates that it views the marketing premises as encompassing much more than the areas dealing with the purchase and sale of gasoline. For instance, a few years ago, ExxonMobil was named as a party in lawsuit arising from a slip and fall accident that occurred on the premises of Mr. Amaefule's gasoline station. The plaintiff in that case fell in an area of the gasoline station that is not related to the gas pumps. Indeed, the area of the fall was closer to the sidewalk than any facilities related to the purchase and sale of gasoline. Yet, ExxonMobil participated in that litigation. If that area of the gas station were not a part of the marketing premises, Exxon would have sought to be dismissed as party in that lawsuit but Exxon did not do so.

**WHEREFORE**, Plaintiff respectfully requests this Court to deny ExxonMobil's Motion to Dissolve the Preliminary Injunction. Additionally, Plaintiff respectfully

requests the Court to consider the facts and arguments set forth in this Memorandum as part of Plaintiff's motion for summary judgment as well as Plaintiff's opposition to Defendant's motion for summary judgment.


    Respectfully submitted,


_____
PETER C. IBE, D.C. BAR # 481265
1629 K Street, NW,
Suite 300
Washington, DC 20006
Phone: (202) 276-7662

Counsel for Plaintiff.

# EXHIBIT 1

## AFFIDAVIT OF PETER AMAEFULE

## IN THE UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| **PETER AMAEFULE** | ) |
| | ) |
| **Plaintiff,** | ) |
| | ) |
| v. | )Civil Action No: 1:06-cv-02087-RWR |
| | ) |
| **EXXONMOBIL OIL CORPORATION** | ) |
| | ) |
| **Defendant.** | ) |
| | ) |

## <u>AFFIDAVIT OF PETER AMAEFULE</u>

1. I, Peter Amaefule, declare as follows under the penalty of perjury:

2. I am the named Plaintiff in the present action.

3. After the entry of the preliminary injunction, at some point in April or May, 2007, Exxon changed the pump shut off levels of all my gasoline tanks (regular, plus, and supreme), from 404 gallons, 330 gallons, and 246 gallons respectively, to 500 gallons across the board for all tanks and all grades of gasoline. This caused me to retain and prevented me from selling 420 gallons of gasoline which I bought and paid for. This amounts to about $1,260.00.

4. Even when I transmit funds to Exxon for the purchase of gasoline and fall $200 or $300 short, Exxon would not supply the gasoline but would confiscate all the money I

sent and continue to deduct rental payments from that money which was specifically mean for the purchase of gasoline.

5. In April 2007, Exxon assured me that 8,200 gallons of gasoline constituted a full load for purposed of purchase and delivery even though the maximum delivery truck capacity is 9,000.

6. Relying on Exxon's representations about what constitutes a full load of gasoline, I continued to purchase full loads from Exxon. However, on some occasions, Exxon failed to deliver the full loads of gasoline that I bought and paid for. For instance on May 25, 2007, I sent Exxon the sum of $16,000.00 which, in addition to my credit card sales which Exxon has in its possession, was sufficient for the purchase of a full load of gasoline. However, Exxon did not deliver the gasoline until four days later (on May 29, 2007), causing me to run of gasoline on those days. Not only that, the May 29, 2007 delivery was only a partial load even though I paid for a full load.

7. On November 29, 2007, I wired to Exxon the sum of $18,200.00, which when added to my credit cards sales which Exxon has in its possession, was sufficient for the purchase of a full load of gasoline.  However, on November 30, 2007, Exxon only delivered a partial load rather than the full load which I bought and paid for. Exxon delivered on 7,359 gallons rather than the 8,200 gallons that I paid for. I had to intervene and call Exxon before they delivered the remaining balance on December 1, 2007.

8. On January 18, 2008, I spoke with an ExxonMobil official, Ms. Trisha Lamond (the spellings might not be correct) and requested to know the cost of a full load of gasoline. She gave me the price of 8,200 gallons, being $16,100.00. Following this conversation, I transmitted the $16,100.00 to ExxonMobil expecting the delivery of the gasoline. However, without explanation, ExxonMobil refused to deliver the gasoline. I then called the official who previously gave me the price of 8,200 gallons and she suddenly told me that I needed to pay the price for 9,000 gallons of gasoline. When I inquired about this sudden change, Ms. Lamond indicated that the instructions to withhold came from ExxonMobil's Territorial Manager, Mr. Ron Alexandrowitz, and the Area Manager, Mr. John Bednash. I then contacted Mr. Alexandrowitz, and Mr. John Bednash and they did not provide me with any explanations regarding this sudden change. I also contacted Mr. Ron McEdugal (the spelling might not be correct) regarding this incident and he never provided any explanation regarding this sudden decision to withhold my money and insist that I purchase 9,000 gallons before the gasoline would be delivered to me. ExxonMobil confiscated my money and continued to deduct the rent from those funds, while claiming that I ran out of gasoline in violation of the Franchise Agreement.

8. On February 11, 2008, I sent ExxonMobil the sum of $7,700.00 to complete the payment for 9,000 gallons of gasoline. Rather than delivering the 9,000 gallons which I bought and paid for, ExxonMobil only delivered 8,748 gallons.

ExxonMobil's repeated failures to deliver the gasoline which I ordered and paid for contributed to my alleged inability to have gasoline for sale.

I declare under penalty of perjury that the foregoing statements above are true and accurate to the best of my knowledge, information and belief.


_____    Executed this 17th day of March, 2008.
Peter Amaefule

# EXHIBIT 2

```
107124
EXXON 25060
4650 S. CAPITOL ST.
E04158639505001

AUG 13, 2006  6:00

INVENTORY REPORT

T 1:REGULAR
T 1:INVALID FUEL LEVEL
VOL INVALID     436 GALS
ULLAGE      -  8974 GALS
90% ULLAGE=  8083 GALS
TC VOLUME *    430 GALS
HGT INVALID   8.42 INCHES
WATER VOL =     11 GALS
WATER       -  0.76 INCHES
TEMP        =  77.5 DEG F

T 2:PLUS
T 2:INVALID FUEL LEVEL
VOL INVALID     330 GALS
ULLAGE      -  7316 GALS
90% ULLAGE=  6553 GALS
TC VOLUME =    325 GALS
HGT INVALID   7.98 INCHES
WATER VOL =     10 GALS
WATER       =  0.78 INCHES
TEMP        =  77.6 DEG F

T 3:SUPREME
T 3:INVALID FUEL LEVEL
VOL INVALID     246 GALS
ULLAGE      =  5735 GALS
90% ULLAGE=  5136 GALS
TC VOLUME <    242 GALS
HGT INVALID   7.98 INCHES
WATER VOL =      8 GALS
WATER       -  0.91 INCHES
TEMP        -  77.5 DEG F

* * * * * * END * * * * * *
```

```
107124
EXXON 25060
4650 S. CAPITOL ST.
E04158639505001

AUG 13, 2006  8:00

CSLD TEST RESULTS

AUG 13, 2006  8:00
```

# EXHIBIT 3

```
107124
EXXON 26050
4650 S. CAPITOL ST.
E04158639505001

MAR  9, 2007  6:00

INVENTORY REPORT


T 1:REGULAR
T 1:INVALID FUEL LEVEL
VOL INVALID    405 GALS
ULLAGE   =    9005 GALS
90% ULLAGE=   8064 GALS
TC VOLUME =    407 GALS
HGT INVALID   8.01 INCHES
WATER VOL =     11 GALS
WATER    =    0.75 INCHES
TEMP     =    51.3 DEG F


T 2:PLUS
T 2:INVALID FUEL LEVEL
VOL INVALID    330 GALS
ULLAGE   =    7918 GALS
90% ULLAGE=   6553 GALS
TC VOLUME =    332 GALS
HGT INVALID   7.98 INCHES
WATER VOL =      0 GALS
WATER    =    0.00 INCHES
TEMP     =    51.8 DEG F


T 3:SUPREME
T 3:INVALID FUEL LEVEL
VOL INVALID    246 GALS
ULLAGE   =    6735 GALS
90% ULLAGE=   5136 GALS
TC VOLUME =    247 GALS
HGT INVALID   7.99 INCHES
WATER VOL =      7 GALS
WATER    =    0.81 INCHES
TEMP     =    53.3 DEG F


* * * * * END * * * * * *
```

# EXHIBIT 4

```
107124
EXXON 25050
4650 S. CAPITOL ST.
E04158639505001

MAY 20, 2007  6:00

INVENTORY REPORT


T 1:REGULAR
VOLUME      =    498 GALS
ULLAGE      =   8912 GALS
90% ULLAGE=    7971 GALS
TC VOLUME =     496 GALS
HEIGHT      =   9.21 INCHES
WATER VOL =       0 GALS
WATER       =   0.00 INCHES
TEMP        =   63.1 DEG F


T 2:PLUS
VOLUME      =    498 GALS
ULLAGE      =   7150 GALS
90% ULLAGE=    6385 GALS
TC VOLUME =     497 GALS
HEIGHT      =  10.55 INCHES
WATER VOL =       0 GALS
WATER       =   0.00 INCHES
TEMP        =   63.0 DEG F


T 3:SUPREME
VOLUME      =    499 GALS
ULLAGE      =   5482 GALS
90% ULLAGE=    4883 GALS
TC VOLUME =    497 GALS
HEIGHT      =  12.60 INCHES
WATER VOL =      11 GALS
WATER       =   1.13 INCHES
TEMP        =   62.7 DEG F


* * * * * END * * * * *
```

# EXHIBIT 5

**Bank of America**

H

Page 3 of 7
Statement Period
01/01/08 through 01/31/08
E0  P PE  0 E 47                    0024146
Enclosures 1
Account Number  0020 8663 9945

PETER & H ENTERPRISES INC
T/A EASTOVER EXXON

## Withdrawals and Debits - Continued

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 01/18 | 16,100.00 | Wire Type:Wire Out Date:080118 Time:1535 Et Trn:2008011300240018 Service Ref:364014 Bnf:Exxon Mobil ID:40640854 Bnf Bk:Citibank N A ID:0008 Pmt Det:01080118008541Nn/Acc/Credit Dealer A/C 1024481 | 903701180240018 |
| 01/18 | 25.00 | Wire Transfer Fee | 903701130102005 |
| 01/23 | 35.00 | Overdraft Item Fee For Activity Of 01-22 Check #0000007272 | 934001220001164 |
| 01/23 | 35.00 | Overdraft Item Fee For Activity Of 01-22 Check #0000007273 | 934001220001165 |
| 01/23 | 35.00 | NSF: Returned Item Fee For Activity Of 01-22 Check #0000007274 | 934001220007420 |
| 01/28 | 1,560.32 | Exxonmobil Corp  Des:Adds Draft ID:0001024481 Indn:Peter Amaefule          Co ID:1135401570 Ccd | 902328006633385 |
| 01/29 | 35.00 | NSF: Returned Item Fee For Activity Of 01-28 Electronic Transa | 934001280005240 |
| 01/30 | 35.00 | Overdraft Item Fee For Activity Of 01-29 Check #0000007275 | 934001290000924 |
| 01/30 | 35.00 | Overdraft Item Fee For Activity Of 01-29 Check #0000007276 | 934001290000925 |
| 01/31 | 1.98 | Overdraft Interest Charge | |
| 01/31 | 3.00 | Check Enclosure Fee | |
| 01/31 | 13.00 | Monthly Maintenance Fee | |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 01/01 | 2,406.08 | 01/11 | 443.40 | 01/25 | 89.78 |
| 01/02 | 2,024.43 | 01/14 | 164.44 | 01/28 | 1,470.54 - |
| 01/04 | 1,928.35 | 01/17 | 45.44 | 01/29 | 702.10 - |
| 01/07 | 1,627.15 | 01/18 | 22.71 - | 01/30 | 772.10 - |
| 01/08 | 1,445.59 | 01/22 | 1,618.43 - | 01/31 | 790.08 - |
| 01/09 | 1,089.40 | 01/23 | 845.22 - | | |

Recycled Paper

# EXHIBIT 6

# Bank of America

PETER & R ENTERPRISES INC
T/A EASTOVER EXXON

Page 3 of 5
Statement Period
02/01/08 through 02/29/08
EO  P PE  0E 47          0022287
Enclosures 1
Account Number  0020 8663 9945

## Withdrawals and Debits - Continued

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 02/05 | 35.00 | NSF: Returned Item Fee For Activity Of 02-04 Check #0000007278 | 934002040005368 |
| 02/07 | 35.00 | NSF: Returned Item Fee For Activity Of 02-06 Check #0000007280 | 934002060002790 |
| 02/08 | 35.00 | NSF: Returned Item Fee For Activity Of 02-07 Check #0000007270 | 934002070002992 |
| 02/11 | 7,700.00 | Wire Type:Wire Out Date:080211 Time:1054 Et Trn:2008021100114550 Service Ref:240522 Bnf:Exxon Mobile ID:40640854 Bnf Bk:Citibank N A ID:0008 Pmt Det:01080211002866Nn/Acc/Credit Dealer Account // 1024481 | 903702110114550 |
| 02/11 | 700.00 | DC Tlr cash withdrawal from Chk 9945 Banking Ctr South Capitol    #3018015 DC Confirmation# 2746056341 | 957502119986059 |
| 02/11 | 700.00 | DC Tlr cash withdrawal from Chk 9945 Banking Ctr South Capitol    #3018015 DC Confirmation# 2766633324 | 957502119926079 |
| 02/11 | 25.00 | Wire Transfer Fee | 903702110089552 |
| 02/11 | 35.00 | NSF: Returned Item Fee For Activity Of 02-08 Check #0000007279 | 934002080002217 |
| 02/13 | 2,000.00 | DC Tlr transfer to Chk 4691 Banking Ctr South Capitol    #3018015 DC Confirmation# 2938525080 | 957502137546251 |
| 02/14 | 35.00 | Overdraft Item Fee For Activity Of 02-13 Check #0000007284 | 934002130000531 |
| 02/20 | 35.00 | NSF: Returned Item Fee For Activity Of 02-19 Check #0000007286 | 934002190007195 |
| 02/22 | 35.00 | NSF: Returned Item Fee For Activity Of 02-21 Check #0000007286 | 934002210003037 |
| 02/26 | 656.00 | Utica National  Des:Ins Prem  ID:xxxxx4477 Indn:<eastover Exxon      Co ID:9150476880 Ppd | 902357005179595 |
| 02/26 | 320.12 | Exxonmobil Corp  Des:Adds Draft ID:0001024481 Indn:Peter Amaefule      Co ID:1135401570 Ccd | 902357004764679 |
| 02/29 | 1.19 | Interest on Uncollected Balances | |
| 02/29 | 5.00 | Check Enclosure Fee | |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 02/01 | 790.08 - | 02/08 | 2,055.08 - | 02/20 | 332.13 - |
| 02/04 | 1,426.89 - | 02/11 | 2,169.57 | 02/21 | 2,182.13 - |
| 02/05 | 825.08 - | 02/13 | 262.13 - | 02/22 | 47,067.99 |
| 02/06 | 411.05 - | 02/14 | 297.13 - | 02/26 | 46,091.87 |
| 02/07 | 248.83 - | 02/19 | 4,197.13 - | 02/29 | 46,085.68 |

# EXHIBIT 7

# NON-NEGOTIABLE / BILL OF LADING

THIS IS TO CERTIFY THAT THE HEREIN NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED, AND LABELED, AND ARE IN PROPER CONDITION FOR TRANSPORTATION, ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION.

THE CARRIER CERTIFIES THAT THE CARGO TANK SUPPLIED FOR THIS SHIPMENT IS A PROPER CONTAINER FOR THE TRANSPORTATION OF THIS COMMODITY AS DESCRIBED BY THE SHIPPER.

THE SUPPLIER WHOSE NAME IS INDICATED ON THIS BOL IS RESPONSIBLE FOR COLLECTING AND REMITTING THE STATE MOTOR FUEL TAXES.

GASOLINE ADDITIZED TO MEET EPA DETERGENT ADDITIVE REQUIREMENTS.

THE DRIVER BY SIGNING THIS TICKET HEREBY CERTIFIES THAT TRANSPORT WAS LOADED AS DESCRIBED.

SIGN HERE → 2-11-08 Sidney W. Ballard
DATE

RECEIVED QUANTITIES IN GOOD ORDER

SIGN HERE →
DATE



**KINDER MORGAN**
SOUTHEAST TERMINALS LLC

## "FOR CHEMICAL EMERGENCY - SPILL, LEAK, FIRE, EXPOSURE OR ACCIDENT CALL CHEMTREC 800-424-9300 DAY OR NIGHT."

### SHIPPING DESCRIPTIONS

Gallons     8748   Gasoline, 3, UN1203, P.G. II

Product Loaded At: 8200 Terminal Rd. , VA  Phone: (703) 550-3513

| SOLD TO | SHIP TO |
|---|---|
| PETER AMAEFULE<br>DBA EASTOVER EXXON<br>4650 S CAPITOL STREET SE<br>WASHINGTON, DC 20032-0000<br>CUST #:  1024481 | PETER AMAEFULE<br>DBA EASTOVER EXXON<br>4650 S CAPITOL STREET SE<br>WASHINGTON, DC 20032-0000<br>ORDER #: 0202504 |

| SUPPLIER | PETRO EX / TAXS | MANIFEST NO. | MANIFEST DATE |
|---|---|---|---|
| EXXON<br>Fairfax, VA 22037-0001<br>1 TANK TRUCK | | 0529993 | 02/11/08 |

| | SPECIAL HANDLING | CUSTOMER ORDER NO. |
|---|---|---|
| | | |

| CARRIER | DRIVER NAME | | DRIVER NO. |
|---|---|---|---|
| EXXON<br>HOUSTON, TX | BALLARD, SIDNEY | | 51124 |

| TRAILER NUMBER | END LOAD TIME | LOAD SPOT |
|---|---|---|
| 4060 | 16:18 | 01 |

```
-------------- PRODUCT INFORMATION -------------      ******* Additive Information *******
        PRODUCT      OCT GROSS   TEMP GRAV NET         Adtv name      Rate  Target Gross  Adtv%
30956  89 Mid Eth      89 1288   45.6 60.3 1301
30871  93 PremEth      93 1782   42.8 60.3 1803                                              %
30733  87 Reg Eth      87 5678   47.1 60.3 5728                                             %
                                                                                            %
```

EXXONMOBIL OIL CORPORATION IS RESPONSIBLE FOR COLLECTING AND REMITTING THE STATE MOTOR FUEL TAXES.

THIS PRODUCT IS REFORMULATED GASOLINE, CONTAINING DETERGENT ADDITIVE.
NON-VOC CONTROLLED, BENZENE 1.3 VOL.%MAX. CONTAINS 10 VOL % ETHANOL.
Gasoline: Danger. Extremely flammable.
Causes skin and respiratory tractirritation. May cause seriojhs or fatal
lung damage. Contains benzene andethylbenzene. May cause cancer, blood
related disorder, and nervous systemdamage.

"SEE BACK FOR HAZARD WARNINGS AND PRODUCT NOTES"

# EXHIBIT 8



 **Bank of America**

PETER & H ENTERPRISES INC
T/A EASTOVER EXXON

Page 3 of 5
Statement Period
05/01/07 through 05/31/07
E0  P PE  0E 47                    0000
Enclosures 1
Account Number  0020 8663 9945

## Withdrawals and Debits - Continued

### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 05/02 | 12,200.00 | Wire Type:Wire Out Date:070502 Time:1445 Et Trn:2007050200191772 Service Ref:309745 Bnf:Exxon Mobil ID:40640854 Bnf Bk:Citibank N A ID:0008 Pmt Det:01070502006744Nn/Acc/Credit Dealer A/C 1024481 | 903705020191772 |
| 05/02 | 25.00 | Wire Transfer Fee | |
| 05/07 | 4,000.00 | Counter Debit | 903705020096331 |
| 05/08 | 35.00 | Overdraft Item Fee For Activity Of 05-07 Check #0000007205 | 813003710639723 934005070000932 |
| 05/11 | 35.00 | Overdraft Item Fee For Activity Of 05-10 Check #0000007206 | 934005100000645 |
| 05/15 | 500.00 | Wf Bus Credit   ;Des = auto Pay  ;ID = 90382130273104 Eff Date: 070515;Indn:Amaefule,Peter N | 902371350655401 |
| 05/16 | 35.00 | NSF: Returned Item Fee For Activity Of 05-15 Electronic Transa | 934005150003075 |
| 05/23 | 500.00 | Wf Bus Credit   ;Des = auto Pay  ;ID = 90382130273104 Eff Date: 070523;Indn:Amaefule,Peter N | 902371421231531 |
| 05/23 | 35.00 | NSF: Returned Item Fee For Activity Of 05-22 Check #0000009000 | 934005220003028 |
| 05/23 | 35.00 | NSF: Returned Item Fee For Activity Of 05-22 Check #0000009001 | 934005220003027 |
| 05/24 | 35.00 | NSF: Returned Item Fee For Activity Of 05-23 Electronic Transa | 934005230002647 |
| 05/25 | 16,000.00 | Wire Type:Wire Out Date:070525 Time:1039 Et Trn:2007052500133085 Service Ref:278108 Bnf:Exxon Mobil ID:40640854 Bnf Bk:Citibank N A ID:0008 Pmt Det:01070525001225Nn/Acc/Credit Dealer A/C 1024481 | 903705250133085 |
| 05/25 | 25.00 | Wire Transfer Fee | 903705250111057 |
| 05/29 | 309.49 | Exxonmobil Corp ;Des = adds Draft;ID = 0001024481 Eff Date: 070529;Indn;Peter Amaefule | 902371490440940 |
| 05/30 | 35.00 | NSF: Returned Item Fee For Activity Of 05-29 Check #0000007207 | 934005290006937 |
| 05/31 | 35.00 | NSF: Returned Item Fee For Activity Of 05-30 Check #0000007207 | 934005300003488 |
| 05/31 | 3.59 | Overdraft Interest Charge | |
| 05/31 | 34.80 | Cash Deposit Processing | |
| 05/31 | 3.00 | Check Enclosure Fee | |
| 05/31 | 13.00 | Monthly Maintenance Fee | |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 05/01 | 8,955.30 | 05/11 | 142.62 - | 05/24 | 282.62 - |
| 05/02 | 28.30 | 05/15 | 642.62 - | 05/25 | 502.38 |
| 05/07 | 40.44 - | 05/16 | 177.62 - | 05/29 | 677.11 - |
| 05/08 | 75.44 - | 05/22 | 454.28 - | 05/30 | 712.11 - |
| 05/10 | 107.62 - | 05/23 | 747.62 - | 05/31 | 7,431.50 - |

Recycled Paper

# EXHIBIT 9

**NON-NEGOTIABLE / BILL OF LADING**

THIS IS TO CERTIFY THAT THE HEREIN NAMED
MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED,
PACKAGED, MARKED, AND LABELED, AND ARE IN
PROPER CONDITION FOR TRANSPORTATION,
ACCORDING TO THE APPLICABLE REGULATIONS OF
THE DEPARTMENT OF TRANSPORTATION.

THE CARRIER CERTIFIES THAT THE CARGO TANK
SUPPLIED FOR THIS SHIPMENT IS A PROPER
CONTAINER FOR THE TRANSPORTATION OF THIS
COMMODITY AS DESCRIBED BY THE SHIPPER.

THE SUPPLIER WHOSE NAME IS INDICATED ON THIS
BOL IS RESPONSIBLE FOR COLLECTING AND
REMITTING THE STATE MOTOR FUEL TAXES.

GASOLINE ADDITIZED TO MEET EPA DETERGENT
ADDITIVE REQUIREMENTS.





| THE DRIVER BY SIGNING THIS TICKET HEREBY CERTIFIES THAT TRANSPORT WAS LOADED AS SPECIFIED. |
| --- |
| SIGN HERE → _____ DATE |
| RECEIVED QUANTITIES IN GOOD ORDER |
| SIGN HERE → 5/29/07 DATE |

**"FOR CHEMICAL EMERGENCY -
SPILL, LEAK, FIRE, EXPOSURE
OR ACCIDENT CALL CHEMTREC
800-424-9300 DAY OR NIGHT."**

---

SHIPPING DESCRIPTIONS

    Gallons      5580   Gasoline, 3, UN1203, P.G. II

Product Loaded At: 8200 Terminal Rd. Newington, VA 22122 Phone: (703)550-3513

| SOLD TO | SHIP TO |
| --- | --- |
| PETER AMAEFULE<br>DBA EASTOVER EXXON<br>4650 S CAPITOL STREET SE<br>WASHINGTON, DC 20032-0000<br>CUST #:  1024481 | PETER AMAEFULE<br>DBA EASTOVER EXXON<br>4650 S CAPITOL STREET SE<br>WASHINGTON, DC 20032-0000<br>ORDER #:  0444550 |

| SUPPLIER | PETROEX / TABS | MANIFEST NO. | MANIFEST DATE |
| --- | --- | --- | --- |
| EXXON<br>Fairfax, VA 22037-0001 | | 0468403 | 05/29/07 |
| | SPECIAL HANDLING | CUSTOMER ORDER NO. | |

| CARRIER | DRIVER NAME | | DRIVER NO. |
| --- | --- | --- | --- |
| EXXON<br>HOUSTON, TX | TURNER, JULIUS C. | | 45300 |
| | TRAILER NUMBER | END LOAD TIME | LOAD SPOT |
| | 4061 | 15:54 | 01 |

--------------- PRODUCT INFORMATION ---------------    ******* Additive Information *******
      PRODUCT        OCT GROSS  TEMP GRAV NET     Adtv name    Rate  Target Gross  Adtv%
30943 89 Mid Eth     89  1287   88.0 58.7 1264                                          %
30856 93 PremEth     93  1782   76.6 58.7 1762                                          %
30720 87 Reg Eth     87  2511   72.4 58.7 2490                                          %

EXXONMOBIL OIL CORPORATION IS RESPONSIBLE FOR COLLECTING AND
REMITTING THE STATE MOTOR FUEL TAXES.

THIS PRODUCT IS REFORMULATED GASOLINE,CONTAINING DETERGENT ADDITIVE.
VOC-CONTROLLED, REGION 1, VOC EMISSIONSPERFORMANCE REDUCTION: 25.0% MIN.
BENZENE 1.3 VOL % MAX.CONTAINS 10.0 VOL % ETHANOL.
Gasoline: Danger. Extremely flammable.
Causes skin and reskpiratory tractirritation. May cause serious or fatal
related disorder, and nervous systemdamage.

**"SEE BACK FOR HAZARD WARNINGS AND PRODUCT NOTES"**

# EXHIBIT 10

## Bank of America

**H**

PETER & H ENTERPRISES INC
T/A EASTOVER EXXON

Page 3 of 5
Statement Period
11/01/07 through 11/30/07
E0 P PE 0E 47                    0024277
Enclosures 1
Account Number   0020 8663 9945

### Withdrawals and Debits - Continued
### Other Debits

| Date Posted | Amount ($) | Description | Bank Reference |
|---|---|---|---|
| 11/20 | 800.00 | DC Tlr cash withdrawal from Chk 9945<br>Banking Ctr South Capitol           #3018015 DC<br>Confirmation# 5570104280 | 957511209943166 |
| 11/26 | 321.35 | Exxonmobil Corp  Des:Adds Draft ID:0001024481<br>Indn:Peter Amaefule          Co ID:1135401570 Ccd | 902330009142748 |
| 11/29 | 18,200.00 | Wire Type:Wire Out Date:071129 Time:1358 Et<br>Trn:2007112900201752 Service Ref:333203<br>Bnf:Exxon Mobil ID:40640854 Bnf Bk:Citibank N A<br>ID:0008 Pmt Det:01071129005538Nn/Acc/Credit Dealer<br>A/C 1024481 | 903711290201752 |
| 11/29 | 25.00 | Wire Transfer Fee | 903711290103541 |
| 11/30 | 1.93 | Overdraft Interest Charge | |
| 11/30 | 1.60 | Cash Deposit Processing | |
| 11/30 | 3.00 | Check Enclosure Fee | |
| 11/30 | 13.00 | Monthly Maintenance Fee | |

### Daily Ledger Balances

| Date | Balance ($) | Date | Balance ($) | Date | Balance ($) |
|---|---|---|---|---|---|
| 11/01 | 354.10 - | 11/19 | 11,570.35 | 11/28 | 10,450.50 |
| 11/08 | 439.03 - | 11/20 | 10,676.04 | 11/29 | 126.50 |
| 11/09 | 389.10 - | 11/26 | 9,850.50 | 11/30 | 105.97 |

Recycled Paper

# EXHIBIT 11

THIS IS TO CERTIFY THAT THE HEREIN NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED, AND LABELED, AND ARE IN PROPER CONDITION FOR TRANSPORTATION, ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION.

THE CARRIER CERTIFIES THAT THE CARGO TANK SUPPLIED FOR THIS SHIPMENT IS A PROPER CONTAINER FOR THE TRANSPORTATION OF THIS COMMODITY AS DESCRIBED BY THE SHIPPER.

THE SUPPLIER WHOSE NAME IS INDICATED ON THIS BOL IS RESPONSIBLE FOR COLLECTING AND REMITTING THE STATE MOTOR FUEL TAXES.

GASOLINE ADDITIZED TO MEET EPA DETERGENT ADDITIVE REQUIREMENTS.

THE DRIVER BY SIGNING THIS TICKET HEREBY CERTIFIES THAT TRANSPORT WAS LOADED AS SPECIFIED.

SIGN HERE →
DATE

RECEIVED QUANTITIES IN GOOD ORDER

SIGN HERE →
DATE

# NON-NEGOTIABLE / BILL OF LADING



## "FOR CHEMICAL EMERGENCY - SPILL, LEAK, FIRE, EXPOSURE OR ACCIDENT CALL CHEMTREC 800-424-9300 DAY OR NIGHT."

SHIPPING DESCRIPTIONS

Gallons    8628   Gasoline, 3, UN1203, P.G. II

Product Loaded At: 8200 Terminal Rd. , VA  Phone: (703)550-3513

**SOLD TO**

PETER AMAEFULE
DBA EASTOVER EXXON
4650 S CAPITOL STREET SE
WASHINGTON, DC 20032-0000
CUST #:  1624481

PETER AMAEFULE
DBA EASTOVER EXXON
4650 S CAPITOL STREET SE
WASHINGTON, DC 20032-0000
ORDER #: 0678091

**SUPPLIER**

EXXON
Fairfax, VA 22037-0001
1 TANK TRUCK

| | MANIFEST NO. | MANIFEST DATE |
|---|---|---|
| | 0511600 | 11/30/07 |

SPECIAL HANDLING        CUSTOMER ORDER NO.

**CARRIER**

EXXON
HOUSTON, TX

| DRIVER NAME | | DRIVER NO. |
|---|---|---|
| QUINONES,  RAMON | | 47158 |

| TRAILER NUMBER | END LOAD TIME | LOAD SPOT |
|---|---|---|
| 1066 | 15:55 | 01 |

---------------- PRODUCT INFORMATION ----------------    ****** Additive Information ******

| PRODUCT | OCT | GROSS | TEMP | GRAV | | Adtv name | Rate | Target Gross | Adtv% |
|---|---|---|---|---|---|---|---|---|---|
| 30956  89 Mid Eth | 89 | 1756 | 54.6 | 62.5 | | | | | % |
| 50471  93 PremEth | 93 | 1269 | 52.2 | 61.1 | | | | | % |
| 30783  87 Reg Eth | 87 | 5602 | 53.0 | 63.3 | | | | | % |

EXXONMOBIL OIL CORPORATION IS RESPONSIBLE FOR COLLECTING AND REMITTING THE STATE MOTOR FUEL TAXES.

THIS PRODUCT IS REFORMULATED GASOLINE, CONTAINING DETERGENT ADDITIVE.
NON-VOC CONTROLLED, BENZENE 1.3 VOL.%MAX.CONTAINS 10 VOL % ETHANOL.
Gasoline: Danger. Extremely flammable.
Causes skin and respiratory tractirritation. May cause serious or fatal
lung damage. Contains benzene and ethylbenzene. Can cause cancer, blood
related disorder, and nervous system damage.

Sys not Deliver

# EXHIBIT 12

**NON-NEGOTIABLE / BILL OF LADING**

THIS IS TO CERTIFY THAT THE HEREIN NAMED MATERIALS ARE PROPERLY CLASSIFIED, DESCRIBED, PACKAGED, MARKED, AND LABELED, AND ARE IN PROPER CONDITION FOR TRANSPORTATION, ACCORDING TO THE APPLICABLE REGULATIONS OF THE DEPARTMENT OF TRANSPORTATION.

THE CARRIER CERTIFIES THAT THE CARGO TANK SUPPLIED FOR THIS SHIPMENT IS A PROPER CONTAINER FOR THE TRANSPORTATION OF THIS COMMODITY AS DESCRIBED BY THE SHIPPER.

THE SUPPLIER WHOSE NAME IS INDICATED ON THIS BOL IS RESPONSIBLE FOR COLLECTING AND REMITTING THE STATE MOTOR FUEL TAXES.

GASOLINE ADDITIZED TO MEET EPA DETERGENT ADDITIVE REQUIREMENTS.



**KINDER MORGAN**
SOUTHEAST TERMINALS LLC

THE DRIVER BY SIGNING THIS TICKET HEREBY CERTIFIES THAT TRANSPORT WAS LOADED AS SPECIFIED.

SIGN HERE ➡ _____ DATE

RECEIVED QUANTITIES IN GOOD ORDER

SIGN HERE ➡ _____ DATE

**"FOR CHEMICAL EMERGENCY - SPILL, LEAK, FIRE, EXPOSURE OR ACCIDENT CALL CHEMTREC 800-424-9300 DAY OR NIGHT."**

SHIPPING DESCRIPTIONS

Gallons    1267   Gasoline, 3, UN1203, P.G. II

Product Loaded At: 8200 Terminal Rd. , VA  Phone: (703)550-3513

| SOLD TO | SHIP TO |
|---|---|
| PETER AMAEFULE<br>DBA EASTOVER EXXON<br>4650 S CAPITOL STREET SE<br>WASHINGTON, DC 20032-0000<br>CUST #:  1024481 | PETER AMAEFULE<br>DBA EASTOVER EXXON<br>4650 S CAPITOL STREET SE<br>WASHINGTON, DC 20032-0000<br>ORDER #:  0678091 |

| SUPPLIER | PETROEX / TABS | MANIFEST NO. | MANIFEST DATE |
|---|---|---|---|
| EXXON<br>Fairfax, VA 22037-0001<br>1 TANK TRUCK | | 0511787 | 12/01/07 |

| | SPECIAL HANDLING | CUSTOMER ORDER NO. |
|---|---|---|
| | | |

| CARRIER | DRIVER NAME | | DRIVER NO. |
|---|---|---|---|
| EXXON<br>HOUSTON, TX | ARBOGAST,   KEVIN | | 47624 |
| | TRAILER NUMBER | END LOAD TIME | LOAD SPOT |
| | 4308 | 10:07 | 01 |

-------------- PRODUCT INFORMATION --------------  ******* Additive Information *******
| PRODUCT | | OCT | GROSS | TEMP | GRAV | NET | Adtv name | Rate | Target | Gross | Adtv% |
|---|---|---|---|---|---|---|---|---|---|---|
| 30871 | 93 PremEth | 93 | 1267 | 48.9 | 61.1 | 1277 | | | | % |

EXXONMOBIL OIL CORPORATION IS RESPONSIBLE FOR COLLECTING AND REMITTING THE STATE MOTOR FUEL TAXES.

THIS PRODUCT IS REFORMULATED GASOLINE, CONTAINING DETERGENT ADDITIVE. NON-VOC CONTROLLED, BENZENE 1.3 VOL.% MAX. CONTAINS 10 VOL % ETHANOL. Gasoline: Danger. Extremely flammable. Causes skin and respiratory tractirritation. May cause seriojhs or fatal lung damage. Contains benzene andethylbenzene. May cause cancer, blood related disorder, and nervous systemdamage.

**"SEE BACK FOR HAZARD WARNINGS AND PRODUCT NOTES"**

# EXHIBIT 13

**ExxonMobil**
*Fuels Marketing*

3225 Gallows Rd.
Fairfax, VA 22037

October 11, 2007

**CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

PETER AMAEFULE
EXXON SERVICE STATION
4650 S CAPITOL STREET SE
WASHINGTON, DC   20032

Notice of Termination
Certificate of Insurance
Station #: 25050

Dear Dealer:

We are writing on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). Under the terms of Article XI in your franchise agreement(s) with ExxonMobil, you are required to procure and maintain certain levels of insurance, and to provide a Certificate of Insurance to ExxonMobil or its agent.

In a letter dated August 1, 2007, you were reminded of your obligation to provide proof of insurance as required in your franchise agreement(s). As of today, AMCS, an independent contractor, is acting as ExxonMobil's agent for the purpose of monitoring your compliance with insurance requirements and has not received your Certificate of Insurance that meets the requirements of your Franchise Agreement. This represents a breach of a material provision of your Franchise Agreement.

For this reason, pursuant to the terms of Article XIV of your Franchise Agreement, ExxonMobil hereby cancels, terminates, and non-renews your franchise agreement and all other agreements between ExxonMobil and yourself effective January 31, 2008.

This notice is a separate and independent notice, and is issued for the reason stated herein. This notice does not supersede, modify, affect or change the effective date of any prior Notice of Termination or Non-renewal that you may have received.

This notice is given to you, in part, pursuant to the requirements of the Petroleum Marketing Practices Act. A copy of the statement prepared by the Federal Department of Energy containing a summary of the provisions of the act is enclosed herewith.

ExxonMobil will consider rescinding this notice provided AMCS has received a bona fide Certificate of Insurance prior to the effective termination date of January 31, 2008.

Absent a written Notice of Rescission from ExxonMobil, this Notice of Termination shall remain final.

Sincerely,

John Bednash
Area Manager
Mid Atlantic

cc:    R. Alexandrowicz
       B. Frederick

# EXHIBIT 14

**ExxonMobil**
*Fuels Marketing*

3225 Gallows Rd.
Fairfax, VA 22037

January 21, 2008

**VIA CERTIFIED MAIL**
**RETURN RECEIPT REQUESTED**

Peter Amaefule
Exxon Service Station
4650 S. Capitol Street SE
Washington, DC   20032

RESCISSION OF NOTICE OF TERMINATION
RE: CERTIFICATE OF INSURANCE

Station Location #: 25050

Dear Peter Amaefule:

We are writing on behalf of ExxonMobil Oil Corporation ("ExxonMobil"). In a letter dated October 11, 2007, ExxonMobil advised you that it was canceling, terminating and non-renewing your franchise agreement(s) effective January 31, 2008, because of your failure to provide proof of insurance as required by your franchise agreement(s).

Since that time, you provided AMCS with adequate proof of insurance. Accordingly, ExxonMobil hereby withdraws and rescinds the October 11, 2007 Notice of Termination and Non-renewal. This rescission letter DOES NOT affect, modify, or change any previous notice of termination or non-renewal, which may have been issued to you for a separate and independent reason.

Your cooperation in providing the required information is appreciated. If you have any questions, please contact your Territory Manager.

Sincerely,

John Bednash
Area Manager
Mid Atlantic

cc:   R. Alexandrowicz
      B. Frederick

# EXHIBIT 15

IN THE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF FLORIDA
Miami Division

Case No. 91-0986-CIV-Gold/Simonton
Special Master Thomas E. Scott, Jr.

| | |
|---|---|
| ALLAPATTAH SERVICES, INC., et al.,  )<br><br>Plaintiffs,  )<br><br>v.  )<br><br>EXXON CORPORATION,  )<br><br>Defendant.  ) | Claim #  1002583<br>Station # 25050 |

### Exxon's Answer and Defenses to Claim # 1002583

For its answer and defenses to Claim Number 1002583, Defendant Exxon Corporation ("Exxon") states as follows:

#### Exxon's Preliminary Statement

This is a claim that appears to pertain to Exxon direct served Station Number 25050. Exxon's records reflect that the following dealer(s) entered into one or more dealer sales agreements with Exxon regarding that station during the Allapattah period. By providing this information, Exxon does not concede that a proper claim has been filed for any of these dealer(s):

| | Dealer Name | Start Date | End Date |
|---|---|---|---|
| a. | Koo L Yuen | 03/01/1983 | 12/01/1984 |
| b. | Kingston E. Price | 12/01/1984 | 05/22/1989 |
| c. | Mahboob Ahmad | 05/22/1989 | 11/19/1990 |
| d. | Peter Amaefule | 11/19/1990 | 08/28/1994 |

Exxon denies all allegations of the claim that are contrary to the information shown in its records either because Exxon knows the allegations to be untrue or because it is without knowledge of the truth of the allegations.

### Answer

1. Exxon admits that Peter Amaefule owned or operated an Exxon direct served station as an individual at some time between March 1, 1983 and August 28, 1994. Exxon denies all other allegations of part 1.

2. Exxon admits that Peter Amaefule operated station number 25050 as an Exxon direct served station at the address alleged in part 2.B of the proof of claim between November 19, 1990 and August 28, 1994. Exxon denies all other allegations of part 2.

3. Exxon is without knowledge of the allegations of part 3, and therefore they are denied.

4. Exxon is without knowledge of the allegations of part 4, and therefore they are denied. Claimant has failed to attach documents that establish claimant's ownership of the claim.

5. Exxon is without knowledge of the allegations of part 5 and therefore they are denied.

6. Part 6 requires no answer.

7. Exxon is without knowledge of the allegations of part 7 and therefore they are denied.

All allegations not specifically admitted by Exxon above are here denied.

### Defenses and Affirmative Defenses

Without conceding that it has the burden of proof on any of the following defenses and affirmative defenses, Exxon asserts the following defenses and affirmative defenses:

1. Exxon has filed a petition for a writ of certiorari in the United States Supreme Court to obtain review of the decision of the U.S. Court of Appeals for the Eleventh Circuit in Allapattah Services, Inc. v. Exxon Corp., 333 F.3d 1248, 1257 (11th Cir. 2003). The Supreme Court granted the petition at 125 S.Ct. 317 (2004), to review the following issue: "Whether the supplemental jurisdiction statute, 28 U.S.C. § 1367, authorizes federal courts with diversity jurisdiction over the individual claims of named plaintiffs to exercise supplemental jurisdiction over the claims of absent class members that do not satisfy the minimum amount-in-controversy

requirement of 28 U.S.C. § 1332?" Exxon preserves its position in the claims administration process pending a final ruling from the United States Supreme Court. The Supreme Court is expected to render its decision by June 30, 2005. After the Supreme Court renders its decision, this defense will be reassessed.

## Conflicting Claims

Claim Numbers 1002699 and 2172 appear to conflict with the instant claim because they assert claims based on the same sales of motor fuel.

Respectfully submitted,

Hunton & Williams LLP

By

Marty Steinberg, Thomas R. Julin, Allie Hernandez Pennie & Jamie L. Zysk
Florida Bar Nos. 187293, 325376, 125989 & 0728861
1111 Brickell Avenue, Suite 2500
Miami, Florida 33131
305.810.2500 Fax 2460
msteinberg, tjulin, apennie or jzysk@hunton.com

Burlington, Weil, Schwiep, Kaplan & Blonsky, P.A.

By

Robert K. Burlington & Paul J. Schwiep
Florida Bar Nos. 261882 & 823244
Office in the Grove - Penthouse
2699 South Bayshore Drive
Miami, Florida 33133
(305) 858-2900 Fax 5261
rburlington or pschwiep@bwskb.com

Robert B. Wallis
Admitted *Pro Hac Vice*
Counsel, Exxon Mobil Corporation
800 Bell Street – Suite 1859N
Houston, Texas 77002
713.656.5961 Fax 713.656.7790
robert.b.wallis@exxonmobil.com

Attorneys for Exxon Corporation

3